SEALED
## Attachment A:

# Written Materials on the Misconduct Allegations Related to Stanley Woodward

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IN RE GRAND JURY SUBPOENA GJ42-17 and GJ42-69 | **Case No. 23-gj-10** |
|  | **Chief Judge James E. Boasberg** |
|  | **UNDER SEAL** |

## MOTION FOR DISCLOSURE OF GRAND JURY MATERIALS

Pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(i), President Donald J. Trump, by and through his undersigned counsel, respectfully moves this Court to order the Office of Special Counsel ("OSC") to disclose the transcripts of Grand Jury testimony of Waltine Nauta, Carlos de Oliveira, Margo Martin, and Chamberlain Harris, as well as the "minutes" component of the Grand Jury proceedings, for review and possible inclusion in motions for additional relief.

## INTRODUCTION

It is widely recognized that the "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co v. Petrol Stops Northwest*, 441 U.S. 211, 220 (1979). The tradition of secrecy surrounding Grand Jury proceedings "evolved, at least partially, as a means of . . . . ensuring the impartiality of that body." *Butterworth v. Smith*, 494 U.S. 624, 629 (1990). Thus, it follows that when the Grand Jury ceases to function as an impartial body, and instead serves as the overreaching arm of a biased and overzealous prosecutor, the need for secrecy must yield to the need to preserve the constitutional sanctity of the institution. Indeed, the Supreme Court has explicitly recognized that the invocation of the Grand Jury's secrecy is not "some talisman that dissolves all constitutional protections." *Id.* (internal quotation marks omitted)

1

(quoting *United States v. Dionisio*, 410 U.S. U.S. 1, 11 (1973)); *Senate of Commonwealth of Puerto Rico v. Dep't of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987) (recognizing that there is no "*per se* rule against disclosure of any and all information which has reached the grand jury chambers."). Rather, the Grand Jury must operate within the limits of the Constitution. *Butterworth*, 494 U.S. at 629.

President Trump, like all other citizens, is constitutionally entitled to an unbiased Grand Jury. *Costello v. United States*, 350 U.S. 359, 363 (1956). This fundamental protection stems from the recognition that "the potential for abuse" is "inherent in grand jury proceedings" given that those proceedings "are secret, Ex parte, and largely under the control of the federal prosecutor." *U.S. v. Serubo*, 604 F.2d 807, 815 (3d Cir. 1979). Thus, even though the Grand Jury "belongs to no branch of the institutional government," the prosecutor exerts significant influence over its investigative process. *United States v. Williams*, 504 U.S. 36, 47 (1992). Yet, in exerting this influence, the prosecutor "may not circumvent" the Grand Jury's independence "by overreaching conduct that deprives it of autonomous and unbiased judgment." *United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir. 1983). "If the grand jury is to accomplish either of its functions, independent determination of probable cause that a crime has been committed and protection of citizens against unfounded prosecutions, limits must be set on the manipulation of grand juries by over-zealous prosecutors." *United States v. Samango*, 607 F.2d 877, 882 (9th Cir. 1979).

The Grand Jury investigation of classified documents and other alleged presidential records stored at President Trump's residence at Mar-a-Lago has been infected by prosecutorial misconduct and bias. From the inception of its investigation, the Department of Justice and, subsequently the OSC, have abandoned the professional cooperation and courtesies typically employed by prosecutors and defense counsel and instead have exacerbated the adversarial nature

of the proceedings to deprive President Trump of due process. By way of example, President Trump has reason to believe that OSC attorneys have made inappropriate and unethical comments in the presence of the Grand Jury; pressured witnesses to waive their rights; implied culpability upon the rightful invocation of testimonial privileges; insinuated to an attorney that he would increase his odds of judicial appointment if he pressured his client to cooperate with the OSC; refused to accommodate well-founded requests for brief delays in Grand Jury proceedings; and regularly employed tactics designed to minimize the ability of clients to meaningfully prepare for their testimony with their counsel of choice. President Trump anticipates that he will pursue relief from this Court regarding the OSC's abuse of the Grand Jury process.[1] To enable him to do so with a fuller record, and prevent injustice, we request that the Court order the disclosure of the requested Grand Jury materials. The undersigned counsel have no objection to any restrictions the Court may wish to place on maintaining the secrecy of the transcripts.

## FACTUAL BACKGROUND

In or about May of 2022, the Department of Justice empaneled a Grand Jury to investigate matters related to the storage of classified documents and other alleged presidential records at President Trump's home at Mar-a-Lago in Palm Beach, Florida. Since then, and following Attorney General Garland's appointment of Special Counsel Jack Smith, numerous witnesses have been subpoenaed to testify before the Grand Jury, including employees of the Trump organization, the former Vice President of the United States, former White House staffers, U.S. Secret Service Special Agents, employees of Mar-a-Lago, groundskeepers, maids, and at least four of President Trump's attorneys.

---

[1] Most recently, the OSC has apparently begun using a Grand Jury in the Southern District of Florida ("SDFL"). It is unclear whether this reflects a tactical maneuver relating to venue issues, an effort to "sanitize" the Grand Jury from some of the abusive conduct that occurred in Washington, DC, or something else. President Trump reserves all rights to challenge any misuse of the SDFL Grand Jury.

From its inception, this investigation has been tainted by prosecutorial misconduct. On August 24, 2022, attorney Stanley Woodward, who represents Waltine "Walt" Nauta, met with Jay Bratt, one of the lead prosecutors in this matter, at the Department of Justice. This was the first time that Mr. Woodward had ever met Mr. Bratt. Upon Mr. Woodward's arrival at Main Justice, he was led to a conference room where Mr. Bratt awaited with what appeared to be a folder containing information about Mr. Woodward. Mr. Bratt thereupon told Mr. Woodward he didn't consider him to be a "Trump lawyer," and he further advised that he was aware that Mr. Woodward had been recommended to President Biden for an appointment to the Superior Court of the District of Columbia. Mr. Bratt followed up with words to the effect of "I wouldn't want you to do anything to mess that up." Thereafter, Mr. Bratt advised Mr. Woodward that "one way or the other" his client, Walt Nauta, would be giving up his lavish lifestyle of "private planes and golf clubs" and he encouraged Mr. Woodward to persuade Mr. Nuata to cooperate with the government's investigation (this was prior to the appointment of the Special Counsel).

Mr. Woodward has long been an extremely professional and upstanding officer of the Court. Mr. Bratt's statement suggested a *quid pro quo* or even a threat intended to cause Mr. Woodward to persuade his client to cooperate with Mr. Bratt. In other words, "play ball or you have no chance of becoming a judge." Under such circumstances, it is appropriate for the Court to ease the secrecy protections typically afforded by Rule 6(e) so that it may determine if similar egregious behavior has made its way into this unprecedented investigation, particularly regarding the testimony of Mr. Nauta.

Further troubling gamesmanship continued behind the closed doors of the Grand Jury room after the appointment of the OSC, created with Attorney General Garland's appointment of Special Counsel Jack Smith in November 2022. For example, during the Grand Jury testimony of Tim

Parlatore, one of President Trump's attorneys, an OSC prosecutor repeatedly attempted to force Mr. Parlatore into disclosing information protected from disclosure by attorney-client privilege. No fewer than *forty-five* times, the OSC prosecutor promulgated questions to Mr. Parlatore regarding his communications with his client, those with other members of the legal team, and the team's legal strategy and work product. Each time Mr. Parlatore invoked privilege on behalf of President Trump, the OSC counsel followed up by implying that he was *refusing* to tell the Grand Jury what it had a right to know. *See, e.g.*, Grand Jury Testimony Tr. Timothy Parlatore ("Tr.") 104:2-5 ("So you're not going to provide any testimony to the Grand Jury about why other locations, such as the storage units, and Trump Tower, and the Flagler office were not searched prior to November 9th?"). During one exchange in which Mr. Parlatore refused to answer a question on privilege grounds, the OSC prosecutor asked, "[I]f the former President's so cooperative, why hasn't he allowed you, [Mr. Parlatore], to share his conversations with the Grand Jury today?" This implied that if President Trump had nothing to hide, Mr. Parlatore should willingly waive his client's constitutional rights. Tr. 41:21-22.

On a number of occasions, OSC lawyers have been abusive in their treatment of witnesses appearing before the Grand Jury – particularly those who are current or former employees of President Trump or the Trump organization. The Department and the OSC have continuously manufactured a false sense of urgency, compelling witnesses to appear and testify on an unreasonably expedited basis (often only one or two days of notice). The OSC attorneys have rebuffed defense counsel's requests to delay the witness' appearance, regardless of the circumstances. For example:

* OSC prosecutor Brett Reynolds balked at delaying the Grand Jury appearances of several witnesses represented by attorney Stanley Woodward after Mr. Woodward suffered a compound

fracture in a motor vehicle accident days prior to the witnesses' scheduled appearances. Rather than accommodate Mr. Woodward's request for a brief extension of time, Mr. Reynolds callously asked, "What will you come up with next week?"[2] As this Court is aware, Mr. Woodward has had to seek relief from the Court with scheduling witness appearances.

* Represented witness Chamberlain Harris, a young assistant administrator at Mar-a-Largo, turned over a laptop computer to OSC but declined, upon advice of counsel, to immediately provide her computer password since the laptop belonged to her employer. Rather than engage in communications with counsel or obtain a search warrant, an OSC attorney told Ms. Harris, who lives in Florida, that if she would not turn over the password "voluntarily," she would be compelled to provide it to the Grand Jury in Washington, D.C., in person and within 48 hours' notice. Ms. Chamberlain, recognizing the futility of her situation, acquiesced to the ultimatum, and turned over the password.

* The OSC also forced President Trump's aide, Margo Martin, also a Florida resident, to appear in Washington, DC and testify before the Grand Jury with only 72 hours' notice. The OSC refused to delay Ms. Martin's appearance to allow her newly retained counsel to have sufficient time to consult with her before the appearance.

* Carlos de Oliveira, a Mar-a-Lago employee, is represented by attorney John Irving. Mr. Irving agreed to image de Oliveira's cell phone and to turn over non-privileged material to the OSC. Despite that agreement, the OSC showed up at de Oliveira's home with a seizure warrant and took the telephone. Even after the seizure, OSC attorneys demanded that Mr. Irving provide them with the results of his privately conducted forensic analysis.

---

[2] At the time of this occurrence, the Special Counsel had yet to be appointed, but Mr. Reynolds joined the OSC after his appointment.

The Grand Jury's investigation has, as of the time of this filing, lasted at least a year and numerous witnesses have been compelled to testify. It is unclear how much longer the investigation will continue and how many more witnesses will be compelled to appear. It is against this troubling backdrop that President Trump requests disclosure of the requested Grand Jury materials.

## LEGAL STANDARD

Rule 6(e) of the Federal Rules of Criminal Procedure codifies the traditional rule of Grand Jury secrecy. *U.S. v. Sells Eng'g, Inc.,* 463 U.S. 418, 425 (1983). However, Rule 6(e) does not necessarily "draw[] a veil of secrecy . . . over all matters occurring in the world that happen to be investigated by a grand jury." *Judicial Watch, Inc. v. Tillerson*, 270 F.Supp.3d 1, 5 (D.D.C. 2017) (alteration in original) (quoting *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 (D.C. Cir. 1980)). The Rule lays out several exceptions to the general requirement of secrecy. Relevant here, pursuant to Rule 6(e)(3)(E)(i), a court may authorize disclosure of Grand Jury matters when requested "preliminary to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E)(i). The phrase "in connection with" refers to a pending proceeding, while "preliminarily to" contemplates disclosure of materials in connection with "pending or anticipated" litigation. *U.S. v. Baggot*, 463 U.S. 476, 480 (1983).

Generally, to obtain disclosure under this provision the movant must make a "strong showing of particularized need," *Sells Eng'g, Inc.*, 463 U.S. at 443, that "the materials sought [are] 'needed to avoid a possible injustice in another judicial proceeding[.]'" *Baggot*, 463 U.S. at 480 n.4 (*quoting Douglas Oil Co.*, 441 U.S. at 222). Under this "particularized need" standard, the movant must show that:

(1) the information sought is needed to avoid a possible injustice in another judicial proceeding;

(2) the need for disclosure is greater than the need for continued secrecy; and

(3) the request is structured to cover only material so needed.'"

*Judicial Watch*, 270 F. Supp.3d at 5 (quoting *Douglas Oil Co.*, 441 U.S. at 222).

This standard is a "highly flexible one," that is "sensitive to the fact that the requirements of secrecy are greater in some situations than in others." *Sells Eng'g Inc.*, 463 U.S. at 445. Courts in this circuit recognize that "secrecy is no longer 'necessary' when the contents of grand jury matters have become public." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1138, 1140 (D.C. Cir. 2006); *see also In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994) (recognizing that when information is "widely known" it loses "its character as Rule 6(e) material."). "[A]s the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing justification." *Douglas Oil Co.*, 441 U.S. at 1674.

## ARGUMENT

### I.     The Information Sought is Needed to Avoid a Possible Injustice in Another Judicial Proceeding

Given the numerous instances of prosecutorial misconduct, some of which are described above, President Trump anticipates litigation regarding the abuse of the Grand Jury process and possibly a motion for disqualification of certain OSC attorneys. President Trump acknowledges that, as the party bringing the motion, he will be required to satisfy a high standard of proof to establish that disqualification is warranted. *See U.S. v. Bolden*, 353 F.3d 870, 878 (10th Cir. 2003); *Felix v. Balkin*, 49 F.Supp.2d 260 267 (S.D.N.Y. 1999). Given these circumstances, disclosure of the requested Grand Jury materials is required to perfect the record for President Trump's anticipated motion. *See Anilao v. Spota,* 918 F.Supp.2d 157, 175 (E.D.N.Y. 2013) (movants satisfied the "substantial need" showing when the Grand Jury materials were required to substantiate their claims of malicious prosecution).

8

Courts have held that the inspection of Grand Jury materials may be warranted when a defendant offers "specific factual allegations of government misconduct." *United States v. Hunt*, 534 F.Supp.3d 233, 259 (E.D.N.Y. 2021); *United States v. Schlegel*, 687 Fed. Appx. 26, 30 (2d Cir. 2017) (a review of Grand Jury minutes is appropriate when the defendant can provide "concrete allegations of Government misconduct."). For example, in *Anilao v. Spota*, the court permitted disclosure of Grand Jury materials when the movants "point[ed] to specific alleged misconduct by the prosecution in the Grand Jury," including instances in which the prosecutors made misleading statements and omitted pertinent exculpatory information in their presentation to the Grand Jury. 918 F. Supp.2d at 163-64. Here, President Trump offers numerous concrete allegations of prosecutorial misconduct, including the following:

- Pressuring Mr. Parlatore to disclose privileged information during his testimony before the Grand Jury;

- Raising an inference of culpability when Mr. Parlatore refused to testify regarding privileged attorney-client communications;

- Demanding that Florida resident Chamberlin Harris "voluntarily" turn over her computer password to the OSC. When Ms. Chamberlin, per the advice of counsel, refused to do so, the OSC attorney resorted to threats. Rather than obtain a warrant, the OSC told Ms. Harris that she would be forced to provide the password to the Grand Jury in person in Washington, D.C. with only 1-2 days of notice;

- Refusing to delay the Grand Jury appearance of a represented witness, after the witness' attorney suffered a compound fracture in a motor vehicle accident the day before her appearance. Rather than accommodate the attorney's request for a brief extension of time, the Mr. Reynolds callously stated, "What will you come up with next week?" and required the witness' appearance;

- Continuously making claims that attorneys are "conflicted," but never providing a factual basis for such claims or following up with the Court;

- Requiring President Trump's aide, Margo Martin, to appear and testify before the Grand Jury with only 72 hours of notice. The OSC refused to delay the appearance, even after Ms. Martin's newly retained counsel requested that he be given sufficient time to consult with his client before her appearance;

- Executing a seizure warrant to take the phone of a Mar-a-Lago employee, despite the fact that the Property Manager's counsel was in the process of providing data from the phone to OSC in response to a Grand Jury subpoena. Even after executing the seizure warrant, the OSC demanded that the valet's counsel turn over the results of his own privately conducted forensic analysis; and

- Pressuring Mr. Woodward to force his client to cooperate with the Government by insinuating that Mr. Woodward's pending consideration for a judgeship would be jeopardized if he "failed" to convince his client to cooperate.

These snapshots demonstrate an alarming pattern of behavior by the Department and OSC – a blatant disregard for the professional and ethical rules that govern proceedings such as this. Of particular concern is the risk that these vignettes form merely the tip of the iceberg of the OSC's misconduct. As of now, undersigned counsel have only been provided with one Grand Jury transcript – memorializing the troubling questioning of Tim Parlatore regarding all assertions of attorney-client privilege. Even in the absence of additional transcripts, a disturbing pattern has become clear: perhaps because of the "high value" of the target of this investigation, the OSC consistently tries to drive a wedge between witnesses and their attorneys.

Refusing to accommodate brief delays in a year-old investigation, seizing a witness's cell phone while his attorney had already negotiated a process by which he would turn over responsive records, and corruptly suggesting that an attorney's judicial ambitions would be affected by his client's decision on cooperation all constitute various means to divide client from counsel. Each power play suggests to the client that their counsel has no ability to protect them from OSC's overly aggressive conduct. Given its pattern of abuse, it seems increasingly likely that the OSC's tactics have permeated the entirety of the Grand Jury's investigation, possibly including the "minutes" during which prosecutors often share thoughts about the direction of the investigation and their impressions of witnesses who have been questioned.

Failure to disclose the Grand Jury materials will necessarily result in injustice by depriving President Trump of the ability to adequately challenge the prosecutorial misconduct of the OSC's

attorneys. Were the OSC to engage in the aforementioned misconduct in a public court proceeding, there would be no reason to prevent President Trump from accessing the records required to make a motion for disqualification. Precluding him from asserting the same argument merely because the misconduct occurred behind the closed doors of the Grand Jury room is undeniably unjust. *Dennis v. U.S.*, 384 U.S. 855, 871 (1966) (recognizing "that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice."). This is particularly true in a case where the identity of many of the witnesses who have appeared before the Grand Jury is widely known.

## II.     The Need for Disclosure is Greater than the Need for Continued Secrecy

Because the Grand Jury's investigation has been widely publicized in the media (due, we suspect, in large part to a deluge of leaks emanating from the Department and/or OSC) the policy concerns underlying the need for the preservation of secrecy is substantially reduced. *See, e.g., Anilao,* 918 F.Supp.2d at 164 (holding that the "policy considerations underlying Grand Jury secrecy [were] extremely weak," when the subjects of the investigation were publicly named). The public has been made aware of the Grand Jury's investigation,[3] the individuals subpoenaed to testify before it,[4] and many of the rulings issued by this Court in the exercise of its supervisory authority,[5] and the need for continued secrecy has been diminished. The DC Circuit has embraced

---

[3] *See, e.g.,* Matt Zapotosky et al., *Grand jury used in probe of classified documents taken to Mar-a-Lago,* WASH. POST (May 12, 2022), https://www.washingtonpost.com/national-security/2022/05/12/mar-a-lago-documents-grand-jury/.

[4] *See, e.g.,* Katelyn Polantz et al., *EXCLUSIVE: Dozens of Mar-a-Lago staff, from servers to aides are subpoenaed in classified documents probe,* CNN (Mar. 17, 2023), https://www.cnn.com/2023/03/16/politics/mar-a-lago-trump-subpoenas/index.html.

[5] *See, e.g.,* Sara Murray et al., *Justice Department convinces federal judge Trump used his attorney in furtherance of a crime in classified docs probe,* CNN (Mar. 22, 2023), https://www.cnn.com/2023/03/21/politics/corcoran-trump-testimony/index.html; Katherine Faulders et al., *Sources: Special counsel claims Trump deliberately misled his attorneys about classified documents,*

11

the "common-sense proposition that secrecy is no longer 'necessary' when the contents of Grand Jury matters have become public." *In re Grand Jury Subpoena, Judith Miller*, 438 F.2d at 1140; *see also In re North*, 16 F.3d 1234 (D.C. Cir. 1994) (recognizing that when information is "sufficiently widely known" it loses "its character as Rule 6(e) material.").

The diminished need for secrecy in the context of highly publicized Grand Jury investigations was addressed by the Court's decision in *In re Sealed Case No. 99-3091*, 192 F.3d 995 (D.D.C. 1999), which centered around the special counsel's investigation of President Clinton. At issue were statements made by members of the Special Counsel staff to the New York Times regarding their opinion that President Clinton should be indicted on charges of perjury and obstruction of justice. *Id.* at 997. The Court held that these statements did not constitute a *prima facie* violation of Rule 6(e) because the staffers' comments did not reveal any secret Grand Jury material. *Id.* at 1004. Rather, the Court reasoned, it "was already a matter of widespread public knowledge" both that President Clinton had testified and that the Grand Jury was investigating possible perjury and obstruction charges against him. *Id.* at 1005. Here, too, the Grand Jury's investigation of President Trump's handling of various documents, along with the identities of witnesses who have been called to testify before it, are matters of widespread public knowledge. Simply put, the cat is already out of the bag – the information is no longer secret. *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994) ("The purpose of Rule 6(e) is to preserve secrecy. Information widely known is not secret."). Accordingly, the circumstances weigh in favor of disclosure.

**III.    The Request is Structured to Cover Only Material So Needed**

President Trump has a good-faith basis to believe that OSC attorneys have engaged in prosecutorial misconduct throughout their investigation of documents stored at Mar-a-Lago.

---

*judge wrote*, ABC NEWS (Mar. 21, 2023), https://abcnews.go.com/US/sources-special-counsel-claims-trump-deliberately-misled-attorneys/story?id=98024191.

President Trump requests disclosure only of the Grand Jury transcripts needed to support the allegations of prosecutorial misconduct he intends to raise in a motion for disqualification. Counsel for President Trump will maintain the materials subject to an appropriate protective order. Specifically, disclosure of the materials may be limited to only specific individuals and the Court may issue a corresponding order prohibiting the disclosure or discussion of the materials' content to anyone outside our legal team. Such limitations will protect any secrecy interest that remains.

## CONCLUSION

President Trump has demonstrated that (1) failure to disclose the Grand Jury materials will necessarily result in injustice by depriving President Trump of the ability to adequately challenge ongoing prosecutorial misconduct by the OSC; (2) the need for Grand Jury secrecy is diminished because the Grand Jury's investigation has been widely publicized and is generally known to the public; and (3) the request for Grand Jury materials is no broader than necessary to prevent injustice. Consideration of these factors weighs in favor of disclosure. Further, these arguments are bolstered by the numerous concrete examples of prosecutorial misconduct provided by President Trump.

Accordingly, President Trump respectfully requests that this Court issue an order requiring that the OSC / Department of Justice disclose the transcripts corresponding with the Grand Jury testimony of Waltine Nauta, Carlos de Oliveira, Margo Martin, and Chamberlain Harris, as well as the accompanying "minutes" of their presentation to the Grand Jury.

Dated: June 4, 2023                                 Respectfully submitted,

                                                    /s/ James M. Trusty
                                                    James M. Trusty (D.C. Bar No. 198359)
                                                    Ifrah Law PLLC
                                                    1717 Pennsylvania Avenue NW, Suite 650

Washington, DC 20006
Telephone: (202) 524-4176
Email: jtrusty@ifrahlaw.com

*/s/ John P. Rowley III*
John P. Rowley III (D.C. Bar No. 392629)
SECIL Law PLLC
1701 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20006
Telephone: (202) 417-8652
Email: jrowley@secillaw.com

*/s/ Lindsey Halligan*
Lindsey Halligan (FL Bar No. 109481)
511 S.E. 5th Avenue
Fort Lauderdale, FL 33301
Telephone: (720) 435-2870
Email: lindseyhalligan@outlook.com
(*admitted pro hac vice*)

*Counsel for President Donald J. Trump*

14

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN RE GRAND JURY SUBPOENA GJ42-17 and GJ42-69 | ) ) ) ) ) ) ) ) ) | **Case No. 23-gj-10** <br><br> **Chief Judge James E. Boasberg** <br><br> **UNDER SEAL** |

## AMENDED MOTION FOR DISCLOSURE OF GRAND JURY MATERIALS

Pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(i), President Donald J. Trump, by and through his undersigned counsel, files this Amended Motion and respectfully moves this Court to order the Office of Special Counsel ("OSC") to disclose the transcripts of Grand Jury testimony of Waltine Nauta, Carlos de Oliveira, Margo Martin, and Chamberlain Harris, as well as the "minutes" component of the Grand Jury proceedings, for review and possible inclusion in motions for additional relief.

## INTRODUCTION

It is widely recognized that the "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 220 (1979). The tradition of secrecy surrounding Grand Jury proceedings "evolved, at least partially, as a means of . . . . ensuring the impartiality of that body." *Butterworth v. Smith*, 494 U.S. 624, 629 (1990). Thus, it follows that when the Grand Jury ceases to function as an impartial body, and instead serves as the overreaching arm of a biased and overzealous prosecutor, the need for secrecy must yield to the need to preserve the constitutional sanctity of the institution. Indeed, the Supreme Court has explicitly recognized that the invocation of the Grand Jury's secrecy is not

1

"some talisman that dissolves all constitutional protections." *Id.* (internal quotation marks omitted) (quoting *United States v. Dionisio*, 410 U.S. U.S. 1, 11 (1973)); *Senate of Commonwealth of Puerto Rico v. Dep't of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987) (recognizing that there is no "*per se* rule against disclosure of any and all information which has reached the grand jury chambers."). Rather, the Grand Jury must operate within the limits of the Constitution. *Butterworth*, 494 U.S. at 629.

President Trump, like all other citizens, is constitutionally entitled to an unbiased Grand Jury. *Costello v. United States*, 350 U.S. 359, 363 (1956). This fundamental protection stems from the recognition that "the potential for abuse" is "inherent in grand jury proceedings" given that those proceedings "are secret, ex parte, and largely under the control of the federal prosecutor." *U.S. v. Serubo*, 604 F.2d 807, 815 (3d Cir. 1979). Thus, even though the Grand Jury "belongs to no branch of the institutional government," the prosecutor exerts significant influence over its investigative process. *United States v. Williams*, 504 U.S. 36, 47 (1992). Yet, in exerting this influence, the prosecutor "may not circumvent" the Grand Jury's independence "by overreaching conduct that deprives it of autonomous and unbiased judgment." *United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir. 1983). "If the grand jury is to accomplish either of its functions, independent determination of probable cause that a crime has been committed and protection of citizens against unfounded prosecutions, limits must be set on the manipulation of grand juries by over-zealous prosecutors." *United States v. Samango*, 607 F.2d 877, 882 (9th Cir. 1979).

The Grand Jury investigation of allegedly classified documents and other alleged presidential records stored at President Trump's residence at Mar-a-Lago has been infected by prosecutorial misconduct and bias. From the inception of its investigation, the Department of Justice and the OSC, have abandoned the professional cooperation and courtesies typically

employed by prosecutors and defense counsel and instead have exacerbated the adversarial nature of the proceedings to deprive President Trump of due process. By way of example, President Trump has reason to believe that OSC attorneys have made inappropriate and unethical comments in the presence of the Grand Jury; pressured witnesses to waive their rights; implied culpability upon the rightful invocation of testimonial privileges; threatened an attorney that he would lessen his odds of judicial appointment if he failed to pressure his client to cooperate with the OSC; refused to accommodate well-founded requests for brief delays in Grand Jury proceedings; and regularly employed tactics designed to minimize the ability of clients to meaningfully prepare for their testimony with their counsel of choice. President Trump anticipates that he will pursue relief from this Court regarding the OSC's abuse of the Grand Jury process.[1] To enable him to do so with a fuller record, and to prevent injustice, we request that the Court order the disclosure of the requested Grand Jury materials. The undersigned counsel have no objection to any restrictions the Court may wish to place on maintaining the secrecy of the transcripts.

## **FACTUAL BACKGROUND**

In or about May of 2022, the Department of Justice empaneled a Grand Jury to investigate matters related to the storage of allegedly classified documents and other alleged presidential records at President Trump's home at Mar-a-Lago in Palm Beach, Florida. Since then, and following Attorney General Garland's appointment of Special Counsel Jack Smith, numerous witnesses have been subpoenaed to testify before the Grand Jury, including employees of the Trump organization, the former Vice President of the United States, former White House staffers,

---

[1] Most recently, the OSC has apparently begun using a Grand Jury in the Southern District of Florida ("SDFL"). It is unclear whether this reflects a tactical maneuver relating to venue issues, an effort to "sanitize" the Grand Jury from some of the abusive conduct that occurred in Washington, DC, or something else. President Trump reserves all rights to challenge any misuse of the SDFL Grand Jury.

3

U.S. Secret Service Special Agents, employees of Mar-a-Lago, groundskeepers, maids, and at least four of President Trump's attorneys.

From its inception, this investigation has been tainted by prosecutorial misconduct. On August 24, 2022, attorney Stanley Woodward, who represents Waltine "Walt" Nauta, met with Jay Bratt, one of the lead prosecutors in this matter, at the Department of Justice. This was the first time that Mr. Woodward had ever met Mr. Bratt. Upon Mr. Woodward's arrival at Main Justice, he was led to a conference room where Mr. Bratt awaited with what appeared to be a folder containing information about Mr. Woodward. Mr. Bratt thereupon told Mr. Woodward he didn't consider him to be a "Trump lawyer," and he further said that he was aware that Mr. Woodward had been recommended to President Biden for an appointment to the Superior Court of the District of Columbia. Mr. Bratt followed up with words to the effect of "I wouldn't want you to do anything to mess that up." Thereafter, Mr. Bratt advised Mr. Woodward that "one way or the other" his client, Walt Nauta, would be giving up his lavish lifestyle of "private planes and golf clubs" and he encouraged Mr. Woodward to persuade Mr. Nauta to cooperate with the government's investigation (this was prior to the appointment of the Special Counsel).

Mr. Woodward has long been an extremely professional and upstanding officer of the Court. Mr. Bratt's statement suggested a *quid pro quo* or even a threat intended to cause Mr. Woodward to persuade his client to cooperate with Mr. Bratt. In other words, "play ball or you have no chance of becoming a judge." Under such circumstances, it is appropriate for the Court to ease the secrecy protections typically afforded by Rule 6(e) so that it may determine if similar egregious behavior has made its way into this unprecedented investigation, particularly regarding the testimony of Mr. Nauta.

Further troubling gamesmanship continued behind the closed doors of the Grand Jury room after the appointment of the OSC, created with Attorney General Garland's appointment of Special Counsel Jack Smith in November 2022. For example, during the Grand Jury testimony of Tim Parlatore, one of President Trump's attorneys, an OSC prosecutor repeatedly attempted to force Mr. Parlatore into disclosing information protected from disclosure by attorney-client privilege. No fewer than *forty-five* times, the OSC prosecutor promulgated questions to Mr. Parlatore regarding his communications with his client, those with other members of the legal team, and the team's legal strategy and work product. Each time Mr. Parlatore invoked privilege on behalf of President Trump, the OSC counsel followed up by implying that he was *refusing* to tell the Grand Jury what it had a right to know. *See, e.g.*, Grand Jury Testimony Tr. Timothy Parlatore ("Tr.") 104:2-5 ("So you're not going to provide any testimony to the Grand Jury about why other locations, such as the storage units, and Trump Tower, and the Flagler office were not searched prior to November 9th?"). During one exchange in which Mr. Parlatore refused to answer a question on privilege grounds, the OSC prosecutor asked, "[I]f the former President's so cooperative, why hasn't he allowed you, [Mr. Parlatore], to share his conversations with the Grand Jury today?" This implied that if President Trump had nothing to hide, Mr. Parlatore should willingly waive his client's constitutional rights. Tr. 41:21-22.

On a number of occasions, OSC lawyers have been abusive in their treatment of witnesses appearing before the Grand Jury – particularly those who are current or former employees of President Trump or the Trump organization. The Department and the OSC have continuously manufactured a false sense of urgency, compelling witnesses to appear and testify on an unreasonably expedited basis (often only one or two days of notice). The OSC attorneys have

rebuffed counsel's requests to delay witness' appearances, regardless of the circumstances. For example:

    * OSC prosecutor Brett Reynolds balked at delaying the Grand Jury appearances of several witnesses represented by attorney Stanley Woodward after Mr. Woodward suffered a compound fracture in a motor vehicle accident days prior to the witnesses' scheduled appearances. Rather than accommodate Mr. Woodward's request for a brief extension of time, Mr. Reynolds callously asked, "What will you come up with next week?"[2] As this Court is aware, Mr. Woodward has had to seek relief from the Court with scheduling witness appearances.

    * Represented witness Chamberlain Harris, a young assistant administrator at Mar-a-Largo, turned over a laptop computer to the OSC but declined, upon advice of counsel, to immediately provide her computer password since the laptop belonged to her employer. Rather than engage in communications with counsel or obtain a search warrant, an OSC attorney told Ms. Harris, who lives in Florida, that if she would not turn over the password "voluntarily," she would be compelled to provide it to the Grand Jury in Washington, D.C., in person and within 48 hours' notice. Ms. Harris, recognizing the futility of her situation, acquiesced to the ultimatum, and turned over the password.

    * The OSC also forced President Trump's aide, Margo Martin, also a Florida resident, to appear in Washington, D.C. and testify before the Grand Jury with only 72 hours' notice. The OSC refused to delay Ms. Martin's appearance to allow her newly retained counsel to have sufficient time to consult with her before the appearance.

    * Carlos de Oliveira, a Mar-a-Lago employee, is represented by attorney John Irving. Mr. Irving agreed to image de Oliveira's cell phone and to turn over non-privileged material to the

---

[2] At the time of this occurrence, the Special Counsel had yet to be appointed, but Mr. Reynolds joined the OSC after his appointment.

OSC. Despite that agreement, the OSC showed up at de Oliveira's home with a seizure warrant and took the telephone. Even after the seizure, OSC attorneys demanded that Mr. Irving provide them with the results of his privately conducted forensic analysis.

The Grand Jury's investigation has, as of the time of this filing, lasted at least a year and numerous witnesses have been compelled to testify. It is unclear how much longer the investigation will continue and how many more witnesses will be compelled to appear. It is against this troubling backdrop that President Trump requests disclosure of the requested Grand Jury materials.

## LEGAL STANDARD

Rule 6(e) of the Federal Rules of Criminal Procedure codifies the traditional rule of Grand Jury secrecy. *U.S. v. Sells Eng'g, Inc.,* 463 U.S. 418, 425 (1983). However, Rule 6(e) does not necessarily "draw[] a veil of secrecy . . . over all matters occurring in the world that happen to be investigated by a grand jury." *Judicial Watch, Inc. v. Tillerson*, 270 F.Supp.3d 1, 5 (D.D.C. 2017) (alteration in original) (quoting *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 (D.C. Cir. 1980)). The Rule lays out several exceptions to the general requirement of secrecy. Relevant here, pursuant to Rule 6(e)(3)(E)(i), a court may authorize disclosure of Grand Jury matters when requested "preliminary to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E)(i). The phrase "in connection with" refers to a pending proceeding, while "preliminarily to" contemplates disclosure of materials in connection with "pending or anticipated" litigation. *U.S. v. Baggot*, 463 U.S. 476, 480 (1983).

Generally, to obtain disclosure under this provision the movant must make a "strong showing of particularized need," *Sells Eng'g, Inc.*, 463 U.S. at 443, that "the materials sought [are] 'needed to avoid a possible injustice in another judicial proceeding[.]'" *Baggot*, 463 U.S. at 480 n.4 (*quoting Douglas Oil Co.*, 441 U.S. at 222). Under this "particularized need" standard, the movant must show that:

7

(1) the information sought is needed to avoid a possible injustice in another judicial
proceeding;

(2) the need for disclosure is greater than the need for continued secrecy; and

(3) the request is structured to cover only material so needed.

*Judicial Watch*, 270 F. Supp.3d at 5 (quoting *Douglas Oil Co.*, 441 U.S. at 222).

This standard is a "highly flexible one," that is "sensitive to the fact that the requirements
of secrecy are greater in some situations than in others." *Sells Eng'g Inc.*, 463 U.S. at 445. Courts
in this circuit recognize that "secrecy is no longer 'necessary' when the contents of grand jury
matters have become public." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1138, 1140
(D.C. Cir. 2006); *see also In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994) (recognizing that when
information is "widely known" it loses "its character as Rule 6(e) material."). "[A]s the
considerations justifying secrecy become less relevant, a party asserting a need for grand jury
transcripts will have a lesser burden in showing justification." *Douglas Oil Co.*, 441 U.S. at 1674.

## ARGUMENT

**I.      The Information Sought is Needed to Avoid a Possible Injustice in Another
Judicial Proceeding**

Given the numerous instances of prosecutorial misconduct, some of which are described
above, President Trump anticipates potential litigation regarding the abuse of the Grand Jury
process and possibly a motion for disqualification of certain OSC attorneys. President Trump
acknowledges that, as the party bringing the motion, he will be required to satisfy a high standard
of proof to establish that disqualification is warranted. *See U.S. v. Bolden*, 353 F.3d 870, 878 (10th
Cir. 2003); *Felix v. Balkin*, 49 F.Supp.2d 260 267 (S.D.N.Y. 1999). Given these circumstances,
disclosure of the requested Grand Jury materials is required to perfect the record for President
Trump's anticipated motion. *See Anilao v. Spota*, 918 F.Supp.2d 157, 175 (E.D.N.Y. 2013)

8

(movants satisfied the "substantial need" showing when the Grand Jury materials were required to substantiate their claims of malicious prosecution).

Courts have held that the inspection of Grand Jury materials may be warranted when a defendant offers "specific factual allegations of government misconduct." *United States v. Hunt*, 534 F.Supp.3d 233, 259 (E.D.N.Y. 2021); *United States v. Schlegel*, 687 Fed. Appx. 26, 30 (2d Cir. 2017) (a review of Grand Jury minutes is appropriate when the defendant can provide "concrete allegations of Government misconduct."). For example, in *Anilao v. Spota*, the court permitted disclosure of Grand Jury materials when the movants "point[ed] to specific alleged misconduct by the prosecution in the Grand Jury," including instances in which the prosecutors made misleading statements and omitted pertinent exculpatory information in their presentation to the Grand Jury. 918 F. Supp.2d at 163-64. Here, President Trump offers numerous concrete allegations of prosecutorial misconduct, including the following:

- Pressuring Mr. Parlatore to disclose privileged information during his testimony before the Grand Jury;
- Raising an inference of culpability when Mr. Parlatore refused to testify regarding privileged attorney-client communications;
- Demanding that Florida resident Chamberlain Harris "voluntarily" turn over her computer password to the OSC. When Ms. Harris, per the advice of counsel, refused to do so, the OSC attorney resorted to threats. Rather than obtain a warrant, the OSC told Ms. Harris that she would be forced to provide the password to the Grand Jury in person in Washington, D.C. with only 1-2 days of notice;
- Refusing to delay the Grand Jury appearance of a represented witness, after the witness' attorney suffered a compound fracture in a motor vehicle accident the day before her appearance. Rather than accommodate the attorney's request for a brief extension of time, the Mr. Reynolds callously stated, "What will you come up with next week?" and required the witness's appearance;
- Continuously making claims that attorneys are "conflicted," but never providing a factual basis for such claims or following up with the Court;
- Requiring President Trump's aide, Margo Martin, to appear and testify before the Grand Jury with only 72 hours of notice. The OSC refused to delay the appearance, even after Ms. Martin's newly retained counsel requested that he be given sufficient time to consult with his client before her appearance;
- Executing a seizure warrant to take the phone of a Mar-a-Lago employee, despite the fact that the employee's counsel was in the process of providing data from the

9

phone to the OSC in response to a Grand Jury subpoena. Even after executing the seizure warrant, the OSC demanded that the employee's counsel turn over the results of his own privately conducted forensic analysis; and

- Pressuring Mr. Woodward to force his client to cooperate with the Government by insinuating that Mr. Woodward's pending consideration for a judgeship would be jeopardized if he "failed" to convince his client to cooperate.

These snapshots demonstrate an alarming pattern of behavior by the Department and the OSC – a blatant disregard for the professional and ethical rules that govern proceedings such as this. Of particular concern is the risk that this information forms merely the tip of the iceberg of the OSC's misconduct. As of now, undersigned counsel have only been provided with one Grand Jury transcript – memorializing the troubling questioning of Tim Parlatore regarding all assertions of attorney-client privilege. Even in the absence of additional transcripts, a disturbing pattern has become clear: perhaps because of the "high value" of the target of this investigation, the OSC consistently tries to drive a wedge between witnesses and their attorneys.

Refusing to accommodate brief delays in a year-old investigation, seizing a witness's cell phone while his attorney had already negotiated a process by which he would turn over responsive records, and corruptly suggesting that an attorney's judicial ambitions would be affected by his client's decision on cooperation all constitute various means to divide client from counsel. Each "power play" suggests to the client that their counsel has no ability to protect them from the OSC's overly aggressive conduct. Given its pattern of abuse, it seems increasingly likely that the OSC's tactics have permeated the entirety of the Grand Jury's investigation, possibly including the "minutes" during which prosecutors often share thoughts about the direction of the investigation and their impressions of witnesses who have been questioned.

Failure to disclose the Grand Jury materials will necessarily result in injustice by depriving President Trump of the ability to adequately challenge the prosecutorial misconduct of the OSC's attorneys. Were the OSC to engage in the aforementioned misconduct in a public court proceeding,

there would be no reason to prevent President Trump from accessing the records required to make a motion for disqualification. Precluding him from asserting the same argument merely because the misconduct occurred behind the closed doors of the Grand Jury room is undeniably unjust. *Dennis v. U.S.*, 384 U.S. 855, 871 (1966) (recognizing "that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice."). This is particularly true in a case where the identity of many of the witnesses who have appeared before the Grand Jury is widely known.

## II.     The Need for Disclosure is Greater than the Need for Continued Secrecy

Because the Grand Jury's investigation has been widely publicized in the media (due, we suspect, in large part to a deluge of leaks emanating from the Department and/or the OSC) the policy concerns underlying the need for the preservation of secrecy are substantially reduced. *See, e.g.*, *Anilao*, 918 F.Supp.2d at 164 (holding that the "policy considerations underlying Grand Jury secrecy [were] extremely weak," when the subjects of the investigation were publicly named). The public has been made aware of the Grand Jury's investigation,[3] the individuals subpoenaed to testify before it,[4] and many of the rulings issued by this Court in the exercise of its supervisory authority,[5] and the need for continued secrecy has been diminished. The D.C. Circuit has embraced

---

[3] *See, e.g.*, Matt Zapotosky et al., *Grand jury used in probe of classified documents taken to Mar-a-Lago*, WASH. POST (May 12, 2022), https://www.washingtonpost.com/national-security/2022/05/12/mar-a-lago-documents-grand-jury/.

[4] *See, e.g.*, Katelyn Polantz et al., *EXCLUSIVE: Dozens of Mar-a-Lago staff, from servers to aides are subpoenaed in classified documents probe*, CNN (Mar. 17, 2023), https://www.cnn.com/2023/03/16/politics/mar-a-lago-trump-subpoenas/index.html.

[5] *See, e.g.*, Sara Murray et al., *Justice Department convinces federal judge Trump used his attorney in furtherance of a crime in classified docs probe*, CNN (Mar. 22, 2023), https://www.cnn.com/2023/03/21/politics/corcoran-trump-testimony/index.html; Katherine Faulders et al., *Sources: Special counsel claims Trump deliberately misled his attorneys about classified documents, judge wrote*, ABC NEWS (Mar. 21, 2023), https://abcnews.go.com/US/sources-special-counsel-claims-trump-deliberately-misled-attorneys/story?id=98024191.

the "common-sense proposition that secrecy is no longer 'necessary' when the contents of Grand Jury matters have become public." *In re Grand Jury Subpoena, Judith Miller*, 438 F.2d at 1140; *see also In re North*, 16 F.3d 1234 (D.C. Cir. 1994) (recognizing that when information is "sufficiently widely known" it loses "its character as Rule 6(e) material.").

The diminished need for secrecy in the context of highly publicized Grand Jury investigations was addressed by the Court's decision in *In re Sealed Case No. 99-3091*, 192 F.3d 995 (D.D.C. 1999), which centered around the special counsel's investigation of President Clinton. At issue were statements made by members of the Special Counsel staff to the New York Times regarding their opinion that President Clinton should be indicted on charges of perjury and obstruction of justice. *Id.* at 997. The Court held that these statements did not constitute a *prima facie* violation of Rule 6(e) because the staffers' comments did not reveal any secret Grand Jury material. *Id.* at 1004. Rather, the Court reasoned, it "was already a matter of widespread public knowledge" both that President Clinton had testified and that the Grand Jury was investigating possible perjury and obstruction charges against him. *Id.* at 1005. Here, too, the Grand Jury's investigation of President Trump's handling of various documents, along with the identities of witnesses who have been called to testify before it, are matters of widespread public knowledge. Simply put, the cat is already out of the bag – the information is no longer secret. *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994) ("The purpose of Rule 6(e) is to preserve secrecy. Information widely known is not secret."). Accordingly, the circumstances weigh in favor of disclosure.

**III.    The Request is Structured to Cover Only Material So Needed**

President Trump has a good-faith basis to believe that OSC attorneys have engaged in prosecutorial misconduct throughout their investigation of documents stored at Mar-a-Lago. President Trump requests disclosure only of the Grand Jury transcripts needed to support the

allegations of prosecutorial misconduct he intends to raise in a potential motion for disqualification. Counsel for President Trump is amenable to maintaining the materials subject to an appropriate protective order. Specifically, disclosure of the materials may be limited to only specific individuals and the Court may issue a corresponding order prohibiting the disclosure or discussion of the materials' content to anyone outside our legal team. Such limitations will protect any secrecy interest that remains.

**CONCLUSION**

President Trump has demonstrated that (1) failure to disclose the Grand Jury materials will necessarily result in injustice by depriving President Trump of the ability to adequately challenge ongoing prosecutorial misconduct by the OSC; (2) the need for Grand Jury secrecy is diminished because the Grand Jury's investigation has been widely publicized and is generally known to the public; and (3) the request for Grand Jury materials is no broader than necessary to prevent injustice. Consideration of these factors weighs in favor of disclosure. Further, these arguments are bolstered by the numerous concrete examples of prosecutorial misconduct provided by President Trump.

Accordingly, President Trump respectfully requests that this Court issue an order requiring that the OSC / Department of Justice disclose the transcripts corresponding with the Grand Jury testimony of Waltine Nauta, Carlos de Oliveira, Margo Martin, and Chamberlain Harris, as well as the accompanying "minutes" of their presentation to the Grand Jury.

Dated: June 5, 2023                           Respectfully submitted,

                                              */s/ James M. Trusty*
                                              James M. Trusty (D.C. Bar No. 198359)
                                              Ifrah Law PLLC
                                              1717 Pennsylvania Avenue NW, Suite 650

13

Washington, DC 20006
Telephone: (202) 524-4176
Email: jtrusty@ifrahlaw.com

/s/ John P. Rowley III
John P. Rowley III (D.C. Bar No. 392629)
SECIL Law PLLC
1701 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20006
Telephone: (202) 417-8652
Email: jrowley@secillaw.com

/s/ Lindsey Halligan
Lindsey Halligan (FL Bar No. 109481)
511 S.E. 5th Avenue
Fort Lauderdale, FL 33301
Telephone: (720) 435-2870
Email: lindseyhalligan@outlook.com
(*admitted pro hac vice*)

*Counsel for President Donald J. Trump*

14

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 5th day of June 2023, a copy of the foregoing Amended

Motion was served by electronic mail in accordance with the procedures for filing in sealed cases.

<u>*/s/ James M. Trusty*</u>
James M. Trusty (D.C. Bar No. 198359)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE GRAND JURY SUBPOENA<br>GJ42-17 and GJ42-69 | ) ) ) ) ) ) ) ) ) ) | **Case No. 23-gj-38**<br><br>**Chief Judge James E. Boasberg**<br><br>**UNDER SEAL** |

## <u>AMENDED MOTION FOR DISCLOSURE OF GRAND JURY MATERIALS</u>

Pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(i), President Donald J. Trump, by and through his undersigned counsel, files this Amended Motion and respectfully moves this Court to order the Office of Special Counsel ("OSC") to disclose the transcripts of Grand Jury testimony of Waltine Nauta, Carlos de Oliveira, Margo Martin, and Chamberlain Harris, as well as the "minutes" component of the Grand Jury proceedings, for review and possible inclusion in motions for additional relief.

## <u>INTRODUCTION</u>

It is widely recognized that the "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 220 (1979). The tradition of secrecy surrounding Grand Jury proceedings "evolved, at least partially, as a means of . . . . ensuring the impartiality of that body." *Butterworth v. Smith*, 494 U.S. 624, 629 (1990). Thus, it follows that when the Grand Jury ceases to function as an impartial body, and instead serves as the overreaching arm of a biased and overzealous prosecutor, the need for secrecy must yield to the need to preserve the constitutional sanctity of the institution. Indeed, the Supreme Court has explicitly recognized that the invocation of the Grand Jury's secrecy is not

1

"some talisman that dissolves all constitutional protections." *Id.* (internal quotation marks omitted) (quoting *United States v. Dionisio*, 410 U.S. U.S. 1, 11 (1973)); *Senate of Commonwealth of Puerto Rico v. Dep't of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987) (recognizing that there is no "*per se* rule against disclosure of any and all information which has reached the grand jury chambers."). Rather, the Grand Jury must operate within the limits of the Constitution. *Butterworth*, 494 U.S. at 629.

President Trump, like all other citizens, is constitutionally entitled to an unbiased Grand Jury. *Costello v. United States*, 350 U.S. 359, 363 (1956). This fundamental protection stems from the recognition that "the potential for abuse" is "inherent in grand jury proceedings" given that those proceedings "are secret, ex parte, and largely under the control of the federal prosecutor." *U.S. v. Serubo*, 604 F.2d 807, 815 (3d Cir. 1979). Thus, even though the Grand Jury "belongs to no branch of the institutional government," the prosecutor exerts significant influence over its investigative process. *United States v. Williams*, 504 U.S. 36, 47 (1992). Yet, in exerting this influence, the prosecutor "may not circumvent" the Grand Jury's independence "by overreaching conduct that deprives it of autonomous and unbiased judgment." *United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir. 1983). "If the grand jury is to accomplish either of its functions, independent determination of probable cause that a crime has been committed and protection of citizens against unfounded prosecutions, limits must be set on the manipulation of grand juries by over-zealous prosecutors." *United States v. Samango*, 607 F.2d 877, 882 (9th Cir. 1979).

The Grand Jury investigation of allegedly classified documents and other alleged presidential records stored at President Trump's residence at Mar-a-Lago has been infected by prosecutorial misconduct and bias. From the inception of its investigation, the Department of Justice and the OSC, have abandoned the professional cooperation and courtesies typically

employed by prosecutors and defense counsel and instead have exacerbated the adversarial nature of the proceedings to deprive President Trump of due process. By way of example, President Trump has reason to believe that OSC attorneys have made inappropriate and unethical comments in the presence of the Grand Jury; pressured witnesses to waive their rights; implied culpability upon the rightful invocation of testimonial privileges; threatened an attorney that he would lessen his odds of judicial appointment if he failed to pressure his client to cooperate with the OSC; refused to accommodate well-founded requests for brief delays in Grand Jury proceedings; and regularly employed tactics designed to minimize the ability of clients to meaningfully prepare for their testimony with their counsel of choice. President Trump anticipates that he will pursue relief from this Court regarding the OSC's abuse of the Grand Jury process.[1] To enable him to do so with a fuller record, and to prevent injustice, we request that the Court order the disclosure of the requested Grand Jury materials. The undersigned counsel have no objection to any restrictions the Court may wish to place on maintaining the secrecy of the transcripts.

## **FACTUAL BACKGROUND**

In or about May of 2022, the Department of Justice empaneled a Grand Jury to investigate matters related to the storage of allegedly classified documents and other alleged presidential records at President Trump's home at Mar-a-Lago in Palm Beach, Florida. Since then, and following Attorney General Garland's appointment of Special Counsel Jack Smith, numerous witnesses have been subpoenaed to testify before the Grand Jury, including employees of the Trump organization, the former Vice President of the United States, former White House staffers,

---

[1] Most recently, the OSC has apparently begun using a Grand Jury in the Southern District of Florida ("SDFL"). It is unclear whether this reflects a tactical maneuver relating to venue issues, an effort to "sanitize" the Grand Jury from some of the abusive conduct that occurred in Washington, DC, or something else. President Trump reserves all rights to challenge any misuse of the SDFL Grand Jury.

U.S. Secret Service Special Agents, employees of Mar-a-Lago, groundskeepers, maids, and at least four of President Trump's attorneys.

From its inception, this investigation has been tainted by prosecutorial misconduct. On August 24, 2022, attorney Stanley Woodward, who represents Waltine "Walt" Nauta, met with Jay Bratt, one of the lead prosecutors in this matter, at the Department of Justice. This was the first time that Mr. Woodward had ever met Mr. Bratt. Upon Mr. Woodward's arrival at Main Justice, he was led to a conference room where Mr. Bratt awaited with what appeared to be a folder containing information about Mr. Woodward. Mr. Bratt thereupon told Mr. Woodward he didn't consider him to be a "Trump lawyer," and he further said that he was aware that Mr. Woodward had been recommended to President Biden for an appointment to the Superior Court of the District of Columbia. Mr. Bratt followed up with words to the effect of "I wouldn't want you to do anything to mess that up." Thereafter, Mr. Bratt advised Mr. Woodward that "one way or the other" his client, Walt Nauta, would be giving up his lavish lifestyle of "private planes and golf clubs" and he encouraged Mr. Woodward to persuade Mr. Nauta to cooperate with the government's investigation (this was prior to the appointment of the Special Counsel).

Mr. Woodward has long been an extremely professional and upstanding officer of the Court. Mr. Bratt's statement suggested a *quid pro quo* or even a threat intended to cause Mr. Woodward to persuade his client to cooperate with Mr. Bratt. In other words, "play ball or you have no chance of becoming a judge." Under such circumstances, it is appropriate for the Court to ease the secrecy protections typically afforded by Rule 6(e) so that it may determine if similar egregious behavior has made its way into this unprecedented investigation, particularly regarding the testimony of Mr. Nauta.

Further troubling gamesmanship continued behind the closed doors of the Grand Jury room after the appointment of the OSC, created with Attorney General Garland's appointment of Special Counsel Jack Smith in November 2022. For example, during the Grand Jury testimony of Tim Parlatore, one of President Trump's attorneys, an OSC prosecutor repeatedly attempted to force Mr. Parlatore into disclosing information protected from disclosure by attorney-client privilege. No fewer than *forty-five* times, the OSC prosecutor promulgated questions to Mr. Parlatore regarding his communications with his client, those with other members of the legal team, and the team's legal strategy and work product. Each time Mr. Parlatore invoked privilege on behalf of President Trump, the OSC counsel followed up by implying that he was *refusing* to tell the Grand Jury what it had a right to know. *See, e.g.*, Grand Jury Testimony Tr. Timothy Parlatore ("Tr.") 104:2-5 ("So you're not going to provide any testimony to the Grand Jury about why other locations, such as the storage units, and Trump Tower, and the Flagler office were not searched prior to November 9th?"). During one exchange in which Mr. Parlatore refused to answer a question on privilege grounds, the OSC prosecutor asked, "[I]f the former President's so cooperative, why hasn't he allowed you, [Mr. Parlatore], to share his conversations with the Grand Jury today?" This implied that if President Trump had nothing to hide, Mr. Parlatore should willingly waive his client's constitutional rights. Tr. 41:21-22.

On a number of occasions, OSC lawyers have been abusive in their treatment of witnesses appearing before the Grand Jury – particularly those who are current or former employees of President Trump or the Trump organization. The Department and the OSC have continuously manufactured a false sense of urgency, compelling witnesses to appear and testify on an unreasonably expedited basis (often only one or two days of notice). The OSC attorneys have

rebuffed counsel's requests to delay witness' appearances, regardless of the circumstances. For example:

      * OSC prosecutor Brett Reynolds balked at delaying the Grand Jury appearances of several witnesses represented by attorney Stanley Woodward after Mr. Woodward suffered a compound fracture in a motor vehicle accident days prior to the witnesses' scheduled appearances. Rather than accommodate Mr. Woodward's request for a brief extension of time, Mr. Reynolds callously asked, "What will you come up with next week?"[2] As this Court is aware, Mr. Woodward has had to seek relief from the Court with scheduling witness appearances.

      * Represented witness Chamberlain Harris, a young assistant administrator at Mar-a-Largo, turned over a laptop computer to the OSC but declined, upon advice of counsel, to immediately provide her computer password since the laptop belonged to her employer. Rather than engage in communications with counsel or obtain a search warrant, an OSC attorney told Ms. Harris, who lives in Florida, that if she would not turn over the password "voluntarily," she would be compelled to provide it to the Grand Jury in Washington, D.C., in person and within 48 hours' notice. Ms. Harris, recognizing the futility of her situation, acquiesced to the ultimatum, and turned over the password.

      * The OSC also forced President Trump's aide, Margo Martin, also a Florida resident, to appear in Washington, D.C. and testify before the Grand Jury with only 72 hours' notice. The OSC refused to delay Ms. Martin's appearance to allow her newly retained counsel to have sufficient time to consult with her before the appearance.

      * Carlos de Oliveira, a Mar-a-Lago employee, is represented by attorney John Irving. Mr. Irving agreed to image de Oliveira's cell phone and to turn over non-privileged material to the

---

[2] At the time of this occurrence, the Special Counsel had yet to be appointed, but Mr. Reynolds joined the OSC after his appointment.

OSC. Despite that agreement, the OSC showed up at de Oliveira's home with a seizure warrant and took the telephone. Even after the seizure, OSC attorneys demanded that Mr. Irving provide them with the results of his privately conducted forensic analysis.

The Grand Jury's investigation has, as of the time of this filing, lasted at least a year and numerous witnesses have been compelled to testify. It is unclear how much longer the investigation will continue and how many more witnesses will be compelled to appear. It is against this troubling backdrop that President Trump requests disclosure of the requested Grand Jury materials.

## **LEGAL STANDARD**

Rule 6(e) of the Federal Rules of Criminal Procedure codifies the traditional rule of Grand Jury secrecy. *U.S. v. Sells Eng'g, Inc.,* 463 U.S. 418, 425 (1983). However, Rule 6(e) does not necessarily "draw[] a veil of secrecy . . . over all matters occurring in the world that happen to be investigated by a grand jury." *Judicial Watch, Inc. v. Tillerson*, 270 F.Supp.3d 1, 5 (D.D.C. 2017) (alteration in original) (quoting *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 (D.C. Cir. 1980)). The Rule lays out several exceptions to the general requirement of secrecy. Relevant here, pursuant to Rule 6(e)(3)(E)(i), a court may authorize disclosure of Grand Jury matters when requested "preliminary to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E)(i). The phrase "in connection with" refers to a pending proceeding, while "preliminarily to" contemplates disclosure of materials in connection with "pending or anticipated" litigation. *U.S. v. Baggot*, 463 U.S. 476, 480 (1983).

Generally, to obtain disclosure under this provision the movant must make a "strong showing of particularized need," *Sells Eng'g, Inc.*, 463 U.S. at 443, that "the materials sought [are] 'needed to avoid a possible injustice in another judicial proceeding[.]'" *Baggot*, 463 U.S. at 480 n.4 (*quoting Douglas Oil Co.*, 441 U.S. at 222). Under this "particularized need" standard, the movant must show that:

> (1) the information sought is needed to avoid a possible injustice in another judicial proceeding;
>
> (2) the need for disclosure is greater than the need for continued secrecy; and
>
> (3) the request is structured to cover only material so needed.

*Judicial Watch*, 270 F. Supp.3d at 5 (quoting *Douglas Oil Co.*, 441 U.S. at 222).

This standard is a "highly flexible one," that is "sensitive to the fact that the requirements of secrecy are greater in some situations than in others." *Sells Eng'g Inc.*, 463 U.S. at 445. Courts in this circuit recognize that "secrecy is no longer 'necessary' when the contents of grand jury matters have become public." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1138, 1140 (D.C. Cir. 2006); *see also In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994) (recognizing that when information is "widely known" it loses "its character as Rule 6(e) material."). "[A]s the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing justification." *Douglas Oil Co.*, 441 U.S. at 1674.

## **ARGUMENT**

### I.     The Information Sought is Needed to Avoid a Possible Injustice in Another Judicial Proceeding

Given the numerous instances of prosecutorial misconduct, some of which are described above, President Trump anticipates potential litigation regarding the abuse of the Grand Jury process and possibly a motion for disqualification of certain OSC attorneys. President Trump acknowledges that, as the party bringing the motion, he will be required to satisfy a high standard of proof to establish that disqualification is warranted. *See U.S. v. Bolden*, 353 F.3d 870, 878 (10th Cir. 2003); *Felix v. Balkin*, 49 F.Supp.2d 260 267 (S.D.N.Y. 1999). Given these circumstances, disclosure of the requested Grand Jury materials is required to perfect the record for President Trump's anticipated motion. *See Anilao v. Spota*, 918 F.Supp.2d 157, 175 (E.D.N.Y. 2013)

(movants satisfied the "substantial need" showing when the Grand Jury materials were required to substantiate their claims of malicious prosecution).

Courts have held that the inspection of Grand Jury materials may be warranted when a defendant offers "specific factual allegations of government misconduct." *United States v. Hunt*, 534 F.Supp.3d 233, 259 (E.D.N.Y. 2021); *United States v. Schlegel*, 687 Fed. Appx. 26, 30 (2d Cir. 2017) (a review of Grand Jury minutes is appropriate when the defendant can provide "concrete allegations of Government misconduct."). For example, in *Anilao v. Spota*, the court permitted disclosure of Grand Jury materials when the movants "point[ed] to specific alleged misconduct by the prosecution in the Grand Jury," including instances in which the prosecutors made misleading statements and omitted pertinent exculpatory information in their presentation to the Grand Jury. 918 F. Supp.2d at 163-64. Here, President Trump offers numerous concrete allegations of prosecutorial misconduct, including the following:

- Pressuring Mr. Parlatore to disclose privileged information during his testimony before the Grand Jury;
- Raising an inference of culpability when Mr. Parlatore refused to testify regarding privileged attorney-client communications;
- Demanding that Florida resident Chamberlain Harris "voluntarily" turn over her computer password to the OSC. When Ms. Harris, per the advice of counsel, refused to do so, the OSC attorney resorted to threats. Rather than obtain a warrant, the OSC told Ms. Harris that she would be forced to provide the password to the Grand Jury in person in Washington, D.C. with only 1-2 days of notice;
- Refusing to delay the Grand Jury appearance of a represented witness, after the witness' attorney suffered a compound fracture in a motor vehicle accident the day before her appearance. Rather than accommodate the attorney's request for a brief extension of time, the Mr. Reynolds callously stated, "What will you come up with next week?" and required the witness's appearance;
- Continuously making claims that attorneys are "conflicted," but never providing a factual basis for such claims or following up with the Court;
- Requiring President Trump's aide, Margo Martin, to appear and testify before the Grand Jury with only 72 hours of notice. The OSC refused to delay the appearance, even after Ms. Martin's newly retained counsel requested that he be given sufficient time to consult with his client before her appearance;
- Executing a seizure warrant to take the phone of a Mar-a-Lago employee, despite the fact that the employee's counsel was in the process of providing data from the

phone to the OSC in response to a Grand Jury subpoena. Even after executing the seizure warrant, the OSC demanded that the employee's counsel turn over the results of his own privately conducted forensic analysis; and

- Pressuring Mr. Woodward to force his client to cooperate with the Government by insinuating that Mr. Woodward's pending consideration for a judgeship would be jeopardized if he "failed" to convince his client to cooperate.

These snapshots demonstrate an alarming pattern of behavior by the Department and the OSC – a blatant disregard for the professional and ethical rules that govern proceedings such as this. Of particular concern is the risk that this information forms merely the tip of the iceberg of the OSC's misconduct. As of now, undersigned counsel have only been provided with one Grand Jury transcript – memorializing the troubling questioning of Tim Parlatore regarding all assertions of attorney-client privilege. Even in the absence of additional transcripts, a disturbing pattern has become clear: perhaps because of the "high value" of the target of this investigation, the OSC consistently tries to drive a wedge between witnesses and their attorneys.

Refusing to accommodate brief delays in a year-old investigation, seizing a witness's cell phone while his attorney had already negotiated a process by which he would turn over responsive records, and corruptly suggesting that an attorney's judicial ambitions would be affected by his client's decision on cooperation all constitute various means to divide client from counsel. Each "power play" suggests to the client that their counsel has no ability to protect them from the OSC's overly aggressive conduct. Given its pattern of abuse, it seems increasingly likely that the OSC's tactics have permeated the entirety of the Grand Jury's investigation, possibly including the "minutes" during which prosecutors often share thoughts about the direction of the investigation and their impressions of witnesses who have been questioned.

Failure to disclose the Grand Jury materials will necessarily result in injustice by depriving President Trump of the ability to adequately challenge the prosecutorial misconduct of the OSC's attorneys. Were the OSC to engage in the aforementioned misconduct in a public court proceeding,

there would be no reason to prevent President Trump from accessing the records required to make a motion for disqualification. Precluding him from asserting the same argument merely because the misconduct occurred behind the closed doors of the Grand Jury room is undeniably unjust. *Dennis v. U.S.*, 384 U.S. 855, 871 (1966) (recognizing "that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice."). This is particularly true in a case where the identity of many of the witnesses who have appeared before the Grand Jury is widely known.

## II.    The Need for Disclosure is Greater than the Need for Continued Secrecy

Because the Grand Jury's investigation has been widely publicized in the media (due, we suspect, in large part to a deluge of leaks emanating from the Department and/or the OSC) the policy concerns underlying the need for the preservation of secrecy are substantially reduced. *See, e.g., Anilao*, 918 F.Supp.2d at 164 (holding that the "policy considerations underlying Grand Jury secrecy [were] extremely weak," when the subjects of the investigation were publicly named). The public has been made aware of the Grand Jury's investigation,[3] the individuals subpoenaed to testify before it,[4] and many of the rulings issued by this Court in the exercise of its supervisory authority,[5] and the need for continued secrecy has been diminished. The D.C. Circuit has embraced

---

[3] *See, e.g.*, Matt Zapotosky et al., *Grand jury used in probe of classified documents taken to Mar-a-Lago*, WASH. POST (May 12, 2022), https://www.washingtonpost.com/national-security/2022/05/12/mar-a-lago-documents-grand-jury/.

[4] *See, e.g.*, Katelyn Polantz et al., *EXCLUSIVE: Dozens of Mar-a-Lago staff, from servers to aides are subpoenaed in classified documents probe*, CNN (Mar. 17, 2023), https://www.cnn.com/2023/03/16/politics/mar-a-lago-trump-subpoenas/index.html.

[5] *See, e.g.*, Sara Murray et al., *Justice Department convinces federal judge Trump used his attorney in furtherance of a crime in classified docs probe*, CNN (Mar. 22, 2023), https://www.cnn.com/2023/03/21/politics/corcoran-trump-testimony/index.html; Katherine Faulders et al., *Sources: Special counsel claims Trump deliberately misled his attorneys about classified documents, judge wrote*, ABC NEWS (Mar. 21, 2023), https://abcnews.go.com/US/sources-special-counsel-claims-trump-deliberately-misled-attorneys/story?id=98024191.

the "common-sense proposition that secrecy is no longer 'necessary' when the contents of Grand Jury matters have become public." *In re Grand Jury Subpoena, Judith Miller*, 438 F.2d at 1140; *see also In re North*, 16 F.3d 1234 (D.C. Cir. 1994) (recognizing that when information is "sufficiently widely known" it loses "its character as Rule 6(e) material.").

The diminished need for secrecy in the context of highly publicized Grand Jury investigations was addressed by the Court's decision in *In re Sealed Case No. 99-3091*, 192 F.3d 995 (D.D.C. 1999), which centered around the special counsel's investigation of President Clinton. At issue were statements made by members of the Special Counsel staff to the New York Times regarding their opinion that President Clinton should be indicted on charges of perjury and obstruction of justice. *Id.* at 997. The Court held that these statements did not constitute a *prima facie* violation of Rule 6(e) because the staffers' comments did not reveal any secret Grand Jury material. *Id.* at 1004. Rather, the Court reasoned, it "was already a matter of widespread public knowledge" both that President Clinton had testified and that the Grand Jury was investigating possible perjury and obstruction charges against him. *Id.* at 1005. Here, too, the Grand Jury's investigation of President Trump's handling of various documents, along with the identities of witnesses who have been called to testify before it, are matters of widespread public knowledge. Simply put, the cat is already out of the bag – the information is no longer secret. *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994) ("The purpose of Rule 6(e) is to preserve secrecy. Information widely known is not secret."). Accordingly, the circumstances weigh in favor of disclosure.

## III.    The Request is Structured to Cover Only Material So Needed

President Trump has a good-faith basis to believe that OSC attorneys have engaged in prosecutorial misconduct throughout their investigation of documents stored at Mar-a-Lago. President Trump requests disclosure only of the Grand Jury transcripts needed to support the

allegations of prosecutorial misconduct he intends to raise in a potential motion for disqualification. Counsel for President Trump is amenable to maintaining the materials subject to an appropriate protective order. Specifically, disclosure of the materials may be limited to only specific individuals and the Court may issue a corresponding order prohibiting the disclosure or discussion of the materials' content to anyone outside our legal team. Such limitations will protect any secrecy interest that remains.

## CONCLUSION

President Trump has demonstrated that (1) failure to disclose the Grand Jury materials will necessarily result in injustice by depriving President Trump of the ability to adequately challenge ongoing prosecutorial misconduct by the OSC; (2) the need for Grand Jury secrecy is diminished because the Grand Jury's investigation has been widely publicized and is generally known to the public; and (3) the request for Grand Jury materials is no broader than necessary to prevent injustice. Consideration of these factors weighs in favor of disclosure. Further, these arguments are bolstered by the numerous concrete examples of prosecutorial misconduct provided by President Trump.

Accordingly, President Trump respectfully requests that this Court issue an order requiring that the OSC / Department of Justice disclose the transcripts corresponding with the Grand Jury testimony of Waltine Nauta, Carlos de Oliveira, Margo Martin, and Chamberlain Harris, as well as the accompanying "minutes" of their presentation to the Grand Jury.

Dated: June 21, 2023
(Originally filed June 5, 2023)                    Respectfully submitted,

                                                   */s/ Todd Blanche*
                                                   Todd Blanche
                                                   Blanche Law
                                                   99 Wall Street, Suite 4460

New York NY 10005
212-716-1250
toddblanche@blanchelaw.com

*Counsel for President Donald J. Trump*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of June 2023, a copy of the foregoing Amended

Motion was served by electronic mail in accordance with the procedures for filing in sealed cases.

*/s/ Todd Blanche*
Todd Blanche

Case 9:23-cr-80101-AMC   Document 115-1   Entered on FLSD Docket 08/11/2023   Page 46 of
196
Case 1:23-gj-00010-BAH *SEALED*   Document 41   Filed 06/07/23   Page 1 of 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS<br>GJ42-17 and GJ42-69 | )   CASE NO. 23-gj-10<br>)<br>)   UNDER SEAL AND EX PARTE<br>)<br>) |

## ORDER AUTHORIZING LIMITED UNSEALING AND IMPOSING PROTECTION

The United States has moved for a limited unsealing of certain portions of a motion filed

by former President Donald J. Trump, *see* Amended Motion for Disclosure of Grand Jury

Materials, 23-gj-10 (D.D.C.) (filed June 5, 2023) ("Disclosure Motion"), in order to share those

portions with attorney Stanley Woodward.

By Local Rule of this Court, because the proceeding on the Disclosure Motion is "in

connection with a grand jury subpoena or other matter occurring before a grand jury, all other

papers filed in support of or in opposition to [the] motion . . . shall be filed under seal," and all

hearings "shall be closed." D.D.C. LCrR 6.1. Accordingly, the proceeding on the Disclosure

Motion must not be made public except by order of the Court. *See id.* ("Papers, orders and

transcripts of hearings subject to this Rule, or portions thereof, may be made public by the Court

on its own motion or on motion of any person upon a finding that continued secrecy is not

necessary to prevent disclosure of matters occurring before the grand jury."). These requirements

advance the important public and private interests served by the grand jury secrecy requirement

contained in Federal Rule of Criminal Procedure 6(e). *See, e.g., United States v. Sells Eng'g, Inc.,*

463 U.S. 418, 424 (1983) ("[I]f preindictment proceedings were made public, many prospective

witnesses would be hesitant to come forward voluntarily, knowing that those against whom they

testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury

would be less likely to testify fully and frankly, as they would be open to retribution as well as to

inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule." (quoting *Douglas Oil v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979)). *See also McKeever v. Barr*, 920 F.3d 842, 844-45 (D.C. Cir. 2019) (articulating the "vital interests" safeguarded by Federal Rule of Criminal Procedure 6(e)).

To ensure adherence to Local Criminal Rule 6.1, Federal Rule of Criminal Procedure 6(e), and the interests underlying those rules, it is:

**ORDERED** that the government is authorized to disclose to Stanley Woodward, either orally or in an appropriately redacted form, discussion on pages 4 and 10 of the Disclosure Motion concerning Woodward's meeting at the Department of Justice on August 24, 2022.

DATE: JUNE __7__, 2023.

JAMES E. BOASBERG
CHIEF JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

IN RE GRAND JURY SUBPOENAS     )    CASE NO. 23-gj-10
GJ42-17 and GJ42-69           )
                                   )    UNDER SEAL AND EX PARTE
                                   )
                                   )

## OPPOSITION TO AMENDED MOTION FOR
## DISCLOSURE OF GRAND JURY MATERIALS

"[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979). This bedrock principle, embodied in Federal Rule of Criminal Procedure 6(e), protects several vital interests, including ensuring that witnesses "come forward voluntarily" to "testify fully and frankly" without fear of "retribution" or "inducements." *Id.* at 219. Former President Donald J. Trump nevertheless claims that these vital interests are outweighed by his own particularized need to review the testimony and associated minutes of four current or former employees who purportedly appeared before the grand jury. *See* Amended Motion for Disclosure of Grand Jury Materials, 23-gj-10 (D.D.C.) (filed June 5, 2023) ("Disclosure Motion" or "Mot."). That extraordinary request proceeds in three parts. First, the former President makes a series of baseless allegations of prosecutorial misconduct, grounded in a combination of factual errors, mischaracterizations, and *ad hominem* attacks. Second, even though only one of his allegations even purports to relate to conduct before the grand jury—and that allegation involves a witness whose transcript he already has—he relies on illogical inferences to suggest that if a prosecutor acted with what he deems to be unreasonable urgency in scheduling a witness's appearance or document production, it follows that the prosecutor likely engaged in some unspecified form of "misconduct" or "abuse" when the same witness appeared before the grand jury. And third, the

former President speculates that if he indeed finds the unspecified misconduct or abuse that he is looking for, it could somehow assist him in preparing "potential litigation regarding the abuse of the grand jury and possibly a motion for disqualification of certain" government attorneys, although without identifying any cognizable legal basis for such a motion. *Id.* at 8.

The former President's allegations of prosecutorial misconduct are unfounded. But even if they were taken at face value—which, as explained below, they should not be—the Disclosure Motion would fall far short of establishing any sort of particularized need for the materials, much less one that outweighs the powerful need for continued secrecy. The motion should therefore be denied.[1]

## BACKGROUND

This matter arises from the former President's retention of classified materials after his term in office ended, and the government's efforts to retrieve those materials. After the United States National Archives and Records Administration ("NARA") informed the Department of Justice that 15 boxes that the former President had previously stored at his residence at Mar-a-Lago and provided to NARA in January 2022 contained classified documents, a grand jury in this district, on May 11, 2022, issued a subpoena to the custodian of records for the former President's post-presidential office—the Office of Donald J. Trump (the "Office")—requesting "[a]ny and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump bearing classification markings [list of classification markings]." As this Court has explained, "[e]nsuring compliance with the May 2022 Subpoena has been slow-going, prompting

---

[1] Although this response uses the same caption as the motion to which it responds, the former President's motion appears to be procedurally improper, insofar as he files a free-floating request for grand jury material using a case caption associated with prior litigation related to two subpoenas issued to witnesses who have nothing to do with the instant motion.

the government to seek and execute a search warrant at Mar-a-Lago, additional government motions regarding inadequate compliance, repeat visits to this Court, and new searches conducted and updated certifications filed, with the compliance effort dragging into mid-December 2022, when additional classified documents were recovered from a closet in the Office's designated space at Mar-a-Lago." Opinion, *In re Grand Jury Subpoena*, 23-gj-10, ECF No. 19, at 7 (Mar. 17, 2023) ("Crime-Fraud Opinion").

In summary, on June 3, 2022, attorneys Evan Corcoran and Christina Bobb met with three FBI agents and an attorney from the Department of Justice (Jay Bratt) and turned over a certification and a folder containing 38 documents with classification markings. The certification was signed by Bobb, who was identified as the Office's custodian of records, and stated that "[b]ased upon the information that has been provided to me, I am authorized to certify, on behalf of the Office of Donald J. Trump," that "[a] diligent search was conducted of the boxes that were moved from the White House to Florida," the search was conducted "in order to locate any and all documents that are responsive to the subpoena," and "[a]ny and all responsive documents accompany this certification." Despite the certification, on August 8, 2022, federal agents searched Mar-a-Lago pursuant to a warrant and seized over 100 documents with classification markings. About a month later, in response to another request from the government, the Office refused to conduct another search for responsive records or provide a certification. Litigation before this Court ensued, resulting in additional searches and certifications signed by attorney Timothy C. Parlatore, who testified before the grand jury in December 2022. The grand jury's investigation continued after Parlatore's testimony, and among other things, this Court granted the government's motion to compel two attorneys for the former President to appear before the grand jury and provide certain testimony under the crime-fraud exception to the attorney-client privilege.

The former President now seeks transcripts of testimony from four individuals who he believes have testified before the grand jury. The former President accuses (Mot. at 2) government prosecutors of "misconduct and bias" in the grand jury. According to the former President, he "anticipates that he will pursue relief from this Court," and he requests the transcripts "[t]o enable him to do so with a fuller record." Mot. at 3. The former President mentions "potential litigation regarding the abuse of the Grand Jury process" and states he will "possibly" file a "motion for disqualification of certain" government attorneys, Mot. at 8, although he does not disclose the forum in which he will pursue this litigation.

## APPLICABLE LEGAL STANDARD

"Federal Rule of Criminal Procedure 6(e) prohibits disclosure of 'matter[s] occurring before the grand jury,' Fed. R. Crim. P. 6(e)(2), and thus requires that '[r]ecords, orders, and subpoenas relating to grand-jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury,' Fed. R. Crim. P. 6(e)(6)." *In re Grand Jury Subpoena, Judith Miller*, 493 F.3d 152, 154 (D.C. Cir. 2007). That rule of secrecy "safeguards vital interests in (1) preserving the willingness and candor of witnesses called before the grand jury; (2) not alerting the target of an investigation who might otherwise flee or interfere with the grand jury; and (3) preserving the rights of a suspect who might later be exonerated." *McKeever v. Barr*, 920 F.3d 842, 844 (D.C. Cir. 2019). After all, "[t]he grand jury as a public institution serving the community might suffer if those testifying today knew that the secrecy of their testimony would be lifted tomorrow," which is a particularly acute concern where, as here, "[t]he witnesses . . . may be employees . . . of potential defendants." *United States*

*v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958); *see also Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979).[2]

To preserve the "indispensable secrecy of grand jury proceedings," *Procter & Gamble Co.*, 356 U.S. at 682 (quotations omitted), "Federal Rule of Criminal Procedure 6(e) makes quite clear that disclosure of matters occurring before the grand jury is the exception and not the rule," *McKeever*, 920 F.3d at 844 (quotations omitted). For such an exception to apply, a movant must generally "carry[] the heavy burden of showing 'that a particularized need exists' that 'outweighs the policy of secrecy.'" *United States v. Apodaca*, 287 F. Supp. 3d 21, 47 (D.D.C. 2017) (quoting *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959)).

As the former President acknowledges (Mot. 7), the only exception even arguably implicated here pertains to disclosure "preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E)(i). Parties attempting to meet this standard "must show [1] that the material they seek is needed to avoid a possible injustice in another judicial proceeding, [2] that the need for disclosure is greater than the need for continued secrecy, and [3] that their request is structured to cover only material so needed." *Douglas Oil Co.*, 441 U.S. at 222; *see Judicial Watch, Inc. v. Tillerson*, 270 F. Supp. 3d 1, 4-5 (D.D.C. 2017). Under this standard, "[i]t is clear . . . that disclosure is appropriate only in those cases where the need for it outweighs the public interest in secrecy, and that the burden of demonstrating this balance rests upon the private party seeking disclosure." *Douglas Oil Co.*, 441 U.S. at 223.

---

[2] On June 8, 2023, a grand jury in the Southern District of Florida (SDFL) returned a sealed indictment of Nauta and the former President ("defendants"). The defendants have been notified by summons, but the indictment remains sealed at this time. We anticipate discovery being provided promptly upon unsealing and entry of a protective order. The grand jury remains open as the government continues to investigate other potential charges in both the District of Columbia and SDFL, including perjury and obstruction of justice.

## ARGUMENT

The former President's Disclosure Motion should be denied. Indeed, even if the allegations of misconduct were to be taken at face value, which they should not be, the former President has failed to show any sort of particularized need for the requested materials, much less one that outweighs the values underlying the policy of secrecy, which are at their apex in the circumstances presented here. To the contrary, the former President is engaged in a transparent fishing expedition whose real goal appears to be uncovering what his current and former employees may have told the grand jury, ostensibly grounded in the speculative possibility that his review might turn up unspecified examples of "misconduct" that could justify future extraordinary relief, in the form of a motion to disqualify government counsel. This falls far short of the necessary showing. Moreover, the Disclosure Motion's allegations of misconduct rest on several errors, mischaracterizations, and baseless accusations, and it does not establish any credible claim of prosecutorial misconduct.

### I. The Disclosure Motion Would Fail Even If Its Facts Were Taken at Face Value.

#### A. The former President has not shown that the material is needed to avoid a possible injustice in another judicial proceeding.

To establish a particularized need for grand jury materials preliminarily to or in connection with another judicial proceeding, a party must identify a particularized use "related fairly directly to some identifiable litigation, pending or anticipated." *United States v. Baggot*, 463 U.S. 476, 480 (1983). "[I]t is not enough to show that some litigation may emerge from the matter in which the material is to be used, or even that litigation is factually likely to emerge." *Id.* "The focus is on the actual use to be made of the material," and "[i]f the primary purpose of disclosure is not to assist in preparation or conduct of a judicial proceeding, disclosure under [(E)](i) is not permitted." *Id.* Moreover, "the request for grand jury material must be more than a request for authorization

to engage in a fishing expedition." *In re EyeCare Physicians of Am.*, 100 F.3d 514, 518 (7th Cir. 1996) (cleaned up); *see In re Grand Jury 95-1*, 118 F.3d 1433, 1437 (10th Cir. 1997) (same). As such, "where a defendant fails to provide a discrete reason, and instead relies on speculation or unsupported assumptions, courts have made clear that disclosure of grand jury minutes is not warranted." *Apodaca*, 287 F. Supp. 3d at 47.

Here, the former President's motion rests on mere speculation and unsupported assumptions about what the grand jury materials might show. Indeed, unlike in other cases in which disclosure has been authorized, he offers neither evidence nor even a *theory* of what specifically the grand jury transcripts might show, beyond the vague suggestion that they might show some form of unspecified "misconduct." *See In re Grand Jury 95-1*, 118 F.3d at 1437 (reversing authorization under Rule 6(e)(3)(E)(i) where the movant's alleged need for grand jury materials to prepare a motion for judicial disqualification was "general and vague" and the absence of allegations about what the material would contain "clearly indicates the speculative nature of [the movant's] allegations . . . and suggests [the movant] was simply interested in engaging in a fishing expedition"). Some of the very cases the former President relies on (Mot. 9) illustrate the same point. *See, e.g.*, *United States v. Schlegel*, 687 F. App'x 26, 30 (2d Cir. 2017) (affirming denial of request for grand jury materials where the defendant "failed to articulate any concrete allegations of Government misconduct" and instead "merely speculate[d]" about what the government may have presented to the grand jury); *United States v. Hunt*, 534 F. Supp. 3d 233, 259 (E.D.N.Y. 2021) (denying request for grand jury materials where the defendant's allegations of prosecutorial misconduct "ultimately amount to mere speculation that the Government 'potentially' gave a misleading instruction to the grand jury").

Moreover, the former President makes no effort to connect the facts that he purportedly hopes to find with the specific use he intends to make of them. But a showing of particularized need "cannot even be made without consideration of the particulars of the judicial proceeding with respect to which disclosure is sought." *Douglas Oil Co.*, 441 U.S. at 480 n.4. Here, the former President suggests (Mot. 8) that he needs the material because he "anticipates potential litigation regarding the abuse of the Grand Jury process and possibly a motion for disqualification of certain OSC attorneys."

He does not, however, identify any cognizable basis for a pre-indictment motion alleging abuse of the grand jury process. *Cf.* 2 Fed. Grand Jury § 21:3 (2d ed.) (noting that "[a] person who wants to challenge grand jury abuse during an investigation, before an indictment has been returned . . . will have standing to do so only if she has been subpoenaed to testify or otherwise provide evidence to the grand jury, or if she has standing to act on behalf of a third party which has been subpoenaed to provide evidence to the grand jury") (footnotes omitted)).

Nor does he identify any cognizable basis for disqualification, such as a conflict of interest. This failure is particularly striking given that "[t]he disqualification of Government counsel is a drastic measure and a court should hesitate to impose it except where necessary." *United States v. Bolden*, 353 F.3d 870, 878 (10th Cir. 2003) (quotations omitted). Indeed, as the Ninth Circuit recently explained, "[t]he doctrine of separation of powers requires judicial respect for the independence of the prosecutor," such that "absent a violation of the Constitution, a federal statute, or a procedural rule," courts "do not dictate to the Executive branch who will serve as its prosecutors." *United States v. Williams*, -- F.4th --, 2023 WL 3516095, at *5 (9th Cir. May 18, 2023) (cleaned up). "Put differently, [courts] do not stamp a chancellor's foot veto over activities of coequal branches of government unless compelled by the law to do so." *Id.* (quotations

omitted).  Here, the former President has not identified any law that could possibly compel the Court to grant a motion to disqualify any government attorney from participating in this case.

The Disclosure Motion therefore fails to show that the requested material "is needed to avoid a possible injustice in another judicial proceeding." *Douglas Oil Co.*, 441 U.S. at 222.  The motion may be denied on that basis alone.

**B.  The former President has not shown that the need for disclosure is greater than the need for continued secrecy.**

Even if the former President had shown a particularized need (which he has not), the Disclosure Motion fails to show "that the need for disclosure is greater than the need for continued secrecy." *Douglas Oil Co.*, 441 U.S. at 222.  The balance between particularized need and secrecy "should always be weighted presumptively toward the government when the targets of a grand jury investigation are requesting disclosure of grand jury testimony for use in that proceeding." *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6th Cir. 1986).  "Concern as to the future consequences of frank and full testimony is heightened where the witness is an employee of a [subject] under investigation." *Douglas Oil Co.*, 441 U.S. at 222.  In all cases, "courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries," with a particular eye toward the possibility that the "[f]ear of future retribution or social stigma may act as powerful deterrents to those who would come forward to aid the grand jury in the performance of its duties." *Id.*  It is difficult to conceive of something more likely to chill full and frank testimony, both now and in future cases, than an employer attempting to see what his employees may or may not have told the grand jury.

These factors make the public interest in secrecy extremely weighty.  In combination they likely would outweigh even the strongest possible showing of particularized need, and certainly outweigh the nonexistent showing that the former President has made here.

- 9 -

The former President seeks to avoid this conclusion by invoking (Mot. 11-12) "the common-sense proposition that secrecy is no longer 'necessary' when the contents of grand jury matters have become public." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d at 1140. Of course, "[t]here must come a time . . . when information is sufficiently widely known that it has lost its character as Rule 6(e) material." *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994). But in seeking to make such a showing here, the former President conflates public knowledge of the *fact* of an investigation (which is indeed widely known) with public knowledge of the *substance* of the testimony that specific witnesses purportedly gave to the grand jury, which neither the public nor the former President knows. Indeed, the whole premise of his motion is that he would like to know, but at present can only speculate about, "Rule 6(e)'s bread and butter: the identities of witnesses or jurors, the substance of testimony as well as actual transcripts, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like." *Judicial Watch, Inc.*, 270 F. Supp. 3d at 5 (quotations omitted). Based on the reporting that the former President relies on (Mot. 11 nn. 3-5), it does not appear that any of the four named witnesses has even confirmed that he or she appeared before the grand jury, much less publicly disclosed the substance of any testimony that he or she may have given.

Moreover, even in cases where details of a witness's grand jury testimony have been reported in the press, that alone does not make the testimony discoverable, since "Rule 6(e) does not create a type of secrecy which is waived once public disclosure occurs," *Barry v. United States*, 740 F. Supp. 888, 891 (D.D.C. 1990), particularly where, as here, the government has neither confirmed nor denied the accuracy of any public reporting, *see In re North*, 16 F.3d at 1245. As such, the former President's misplaced reliance on cases involving requests for the disclosure of already-public information does nothing to alter the conclusion his "need" for the material, such

as it is, is heavily outweighed by the need for continued grand jury secrecy. *See In re New York Times Co.*, No. MC 22-100, 2023 WL 2185826, at *14-15 (D.D.C. Feb. 23, 2023) (denying request for grand jury materials related to "former President Trump's privilege challenge to the Jan. 6 grand jury investigation"); *In re Press Application for Access to Judicial Records Ancillary to Certain Grand Jury Proceedings Concerning Donald J. Trump & the Trump Organization*, No. MC 220128, ECF No. 6 (D.D.C. Mar. 11, 2023) (denying request for grand jury materials related to certain aspects of the classified-documents investigation).

### C. The former President has not shown that his request is structured to cover only needed material.

Finally, the Disclosure Motion is structured to cover more than the purportedly needed material. To be sure, given the speculative nature of the request, it is hard to say that any material is more or less "needed" than any other. But the Disclosure Motion goes further than even its own internal logic would allow. After all, the former President's theory appears to be (Mot. 5) that if prosecutors unreasonably conveyed "a false sense of urgency" when dealing with certain witnesses, it somehow follows that the prosecutors must also "have been abusive in their treatment of witnesses appearing before the grand jury." But even that dubious logic provides no support for the request (*id.* at 10) to review "the 'minutes' during which prosecutors often share thoughts about the direction of the investigation and their impressions of witnesses who have been questioned." Indeed, his request for the minutes only supports the inference that he is engaged in a fishing expedition seeking insight into the inner workings of the investigation.

### II. The Disclosure Motion Rests on Numerous Factual Inaccuracies and Mischaracterizations.

Although the former President's motion is legally deficient and should be dismissed on that ground alone, the former President's factual allegations of prosecutorial misconduct are also

false and unfounded. The discussion below supplies additional factual context in response to the allegations made in the Disclosure Motion and explains why those allegations do not support the relief sought.

### A.  Grand Jury Testimony of Timothy Parlatore

#### 1.  Relevant Facts

Until his recent withdrawal from representing the former President, Timothy Parlatore represented the former President with respect to the May 2022 subpoena starting in October 2022, a couple months after the execution of the search warrant at Mar-a-Lago.  Parlatore Grand Jury Tr., *In re Grand Jury Subpoena*, 23-gj-10, ECF No. 12, at 16-17 (Mar. 10, 2023) ("GJ Tr.").  About a month earlier, on September 15, 2022, the government had expressed its continuing concern that the former President or his Office retained additional classified documents beyond those uncovered through execution of the search warrant. *See* Crime-Fraud Opinion at 23.  After the Office refused to conduct another search for responsive records or provide a certification, the government filed a motion to compel compliance with the May 2022 subpoena. *Id.* at 23-24. Minutes before the hearing on the motion to compel began on October 27, 2022, counsel for the former President provided the government and the Court with a declaration from Parlatore stating that the Office had authorized him to provide the declaration and describing a search "undertaken on the premises at Bedminster," where the former President maintained a residence, by "elite professionals who have extensive prior experience searching for sensitive documents and contraband." Declaration of Timothy C. Parlatore, Esq. *In re Grand Jury Subpoena*, No. 22-gj-40, ECF No. 9, at 2 (Oct. 26, 2022).

The Court granted the government's motion to compel on November 9, 2022, and issued an order stating that "a custodian with first-hand knowledge of the Office's diligent and

comprehensive efforts to locate responsive documents and with the ability to certify that no additional responsive records remain in the Office's possession, must comply with the subpoena." Order, *In re Grand Jury Subpoena*, 22-gj-40, ECF No. 15, at 2 (Nov. 9, 2022). The order required that the Office provide the government with a new certification "from a custodian of records with personal knowledge of respondent's efforts to comply with the grand jury subpoena" and that the custodian "appear before the grand jury to provide testimony regarding" the Office's "compliance efforts and verification of the contents of the certification." *Id.* at 2-3.

Parlatore filed a status report on behalf of the Office six days later describing efforts to search for responsive documents and disclosing that two additional classified documents had been found in a storage unit leased by the Office. *In re Grand Jury Subpoena*, Case No. 22-gj-40, ECF No. 19 (Nov. 15, 2022). The status report identified five locations to search for "potentially responsive documents" and stated that one of those locations, Mar-a-Lago, would not be searched because there was "no reason to believe that potentially responsive documents remain[ed] there." *Id.* at 1-2. In a minute order on November 18, 2022, the Court partially granted a motion by the Office for additional time to file a final certification and set a new deadline of November 23, 2022, noting an "obvious concern" that the status report was submitted by an attorney who did not attest to be "a custodian of records with personal knowledge of respondent's efforts to comply with the grand jury subpoena," a requirement of both the May 2022 subpoena and the Court's November 9 order. Minute Order, *In re Grand Jury Subpoena*, Case No. 22-gj-40 (Nov. 18, 2022).

On November 23, 2022, Parlatore submitted a sworn certification that largely reiterated the information from the November 9 status report but included some additional details, including information about an intervening search of Trump Tower. *See In re Grand Jury Subpoena*, Case No. 22-gj-40, ECF No. 22 (Nov. 23, 2022). Contrary to the Court's previous orders, the

certification contained a section, entitled "Role of Certificant," asserting that the Office was not obligated to use a custodian of records. *Id.* at 7-8. The certification stated that Parlatore would testify "to the limited information contained" in the certification, "without any further waiver of privilege[,]" although the Office's position was that "no further testimony should be necessary." *Id.* at 8. As the Court later explained, "[n]o additional details were provided to clarify that qualifying language, leaving the government guessing as to what information exactly Parlatore would provide during any subsequent testimony—*e.g.*, whether his testimony would include details not specifically provided in the certification or whether the Office planned to instruct Parlatore to invoke privileges not previously asserted in this litigation, such as attorney-client privilege, work-product privilege, or executive privilege, should he be questioned about any matter outside the four corners of the certification." Crime-Fraud Opinion at 30-31.

The government filed a motion for an order requiring the Office to show cause why it should not be held in civil contempt for failure to comply with the Court's November 9 order. At a hearing on the motion on December 9, 2022, the Court stated that it lacked a "complete record" to issue a contempt citation because the government had not put Parlatore in the grand jury and "asked him a whole series of questions." Hearing Tr. at 11-13, *In re Grand Jury Subpoena*, Case No. 22-gj-40 (Dec. 9, 2022) (Contempt Hearing Tr.). The Court explained that to evaluate compliance with its orders and a potential contempt citation, it was "going to want concrete grand jury transcripts about what is said and what isn't said, what is left unanswered." *Id.* at 28. Counsel for the former President and his post-presidential office confirmed that Parlatore would be "willing to" testify about "where the search was conducted, why areas were searched, why areas weren't searched—all of the normal things that a custodian of records would do, he will do it," although it "may involve a different issue" if Parlatore were asked a question about "specific conversations

with his client," the former President. *Id.* at 31; *see id.* at 38-39, 43 (colloquies regarding Parlatore's prospective testimony).

The Court did not issue a contempt citation given what it later described as "the productive discussion about expectations for additional searches and the contents of a certification for compliance with the May 2022 subpoena and the Court's Orders issued on November 9 and 18, 2022, and the Office's apparent willingness to try to meet those expectations." Crime-Fraud Opinion at 32 n.9. The Court ordered the Office to file a revised certification with additional details, and the Court specified that "full compliance" with the Court's orders would require, among other things, that "Parlatore would testify before the grand jury regarding the Office's efforts and due diligence to respond to the May 2022 subpoena, including testifying to information not already mentioned in the revised certification and details regarding how Parlatore determined which locations needed to be searched and when, why certain locations were selected to be searched and others not, efforts by Bobb to prepare to sign the June 3, 2022 certification, the identities of the search-team members, and those members' exact search methodologies." *Id.* at 32-33. It was understood that Parlatore "might be asked questions about the content of direct conversations with the former president" and that there might be the "potential need for additional litigation regarding counsel testifying to conversations with the former president." *Id.* at 33-34.

The Office provided a revised certification, sworn by Parlatore, on December 16, 2022. *In re Grand Jury Subpoena*, Case No. 22-gj-40, ECF No. 34 (Dec. 16, 2022). The revised certification described searches, including a search of Mar-a-Lago on December 15-16, 2022, conducted by two "elite professionals" with military experience and experience "searching for sensitive documents" and "contraband." *Id.* at 5-11. The search of Mar-a-Lago "[r]emarkably . . .

- 15 -

uncovered four more responsive records," which the certification "misleadingly refer[red] to . . . as 'low-level ministerial documents.'" Crime-Fraud Opinion at 35.

Parlatore appeared before the grand jury on December 22, 2022. Parlatore explained that he represented the former President but that he understood his appearance before the grand jury as principally to provide his "personal knowledge" about efforts undertaken by the post-presidency office "to comply with" the May 2022 subpoena. GJ Tr. 10-11. He acknowledged that such testimony "[o]rdinarily" would be handled "by a custodian of records for the organization." GJ Tr. 12. Parlatore thus acknowledged that he was "wear[ing] two hats," namely, an attorney for the former President and a stand-in custodian. GJ Tr. 11.

Before questioning turned to the substance of Parlatore's "personal knowledge" of subpoena compliance, the government prosecutor clarified that the government was "not seeking today to elicit . . . privileged information." GJ Tr. 13. At the same time, the prosecutor alerted Parlatore that if Parlatore claimed privilege in response to any question, the prosecutor would ask Parlatore which privilege he was invoking and "the basis for the invocation." GJ Tr. 13. Parlatore responded, "Sure," and when the prosecutor followed up to ask whether Parlatore understood, Parlatore said, "Absolutely." GJ Tr. 13. In keeping with these exchanges—and consistent with the Court's expectation that the government would "put [Parlatore] in the grand jury," ask him "a whole series of questions," and create "concrete grand jury transcripts about what is said and what isn't said, what is left unanswered," Contempt Hearing Tr. 11, 28—government prosecutors probed Parlatore's knowledge and conduct as the functional equivalent of a custodian of records, and when Parlatore refused to answer questions based on privilege, they sought to clarify the precise nature and scope of Parlatore's privilege invocations. At one point, Parlatore claimed attorney-client privilege after being asked whether the former President was the source for

- 16 -

Parlatore's testimony about statements the former President purportedly made to government investigators about being cooperative.  GJ Tr. 40.  The prosecutor then asked if a client could waive privilege and questioned why the former President had not allowed Parlatore to testify as to these conversations if he (the former President) meant to be cooperative, but the government prosecutor also quickly made clear that she was "absolutely not saying" that waiver of privilege is required to be cooperative and that, consistent with her earlier statement, she did not mean to "induce any waivers." GJ Tr. 40-43.  Nonetheless, Parlatore on several occasions accused the government prosecutors of "trying to improperly invade the attorney/client privilege." GJ Tr. 45; *see also* GJ Tr. 77.  After one such accusation, a government prosecutor conveyed to Parlatore that "if [he] want[ed] to invoke the privilege, [he] can just say that" instead of casting aspersions about "what the people on this side of the table are and are not trying to do." GJ Tr. 77.

Over the course of the 245-page grand jury transcript, Parlatore claimed privilege numerous times.  *See, e.g.*, GJ Tr. 25 (attorney-client and work-product privilege concerning who told Parlatore about Christina Bobb's efforts to respond to the subpoena in Bobb's capacity as custodian of records); *id.* at 40 (attorney-client privilege concerning whether the former President recounted to Parlatore a conversation between the former President and a federal government prosecutor about which Parlatore had just testified); *id.* at 45 (attorney-client and work-product privilege concerning the individuals with whom Parlatore spoke before his grand jury testimony); *id.* at 47 (privilege concerning what Boris Epshteyn told Parlatore); *id.* at 58-59 (attorney-client and work-product privilege concerning whether Parlatore had asked anyone if boxes had been moved out of the storage room before June 2, 2022); *id.* at 77 (attorney-client and work-product privilege concerning with whom the legal team spoke before deciding to search Bedminster); *id.* at 104 (privilege concerning why locations other than Mar-a-Lago, including storage units, Trump

Tower, and the Flagler office, were not searched before November 9, 2022); *id.* at 113 (work-product privilege concerning with whom the legal team spoke to determine not to search Mar-a-Lago in November 2022); *id.* at 114 (work-product privilege concerning whether the legal team consulted any documents in making the determination not to search Mar-a-Lago in November 2022); *id.* at 146 (work-product privilege concerning whether individuals hired to carry out searches took notes, photographs, or video recordings, or sent emails, text messages, or any kind of messages); *id.* at 155-56 (privilege concerning whether Parlatore spoke with anyone to determine if the General Services Administration (GSA) packed boxes that were shipped out from the White House); *id.* at 163 (privilege concerning whether somebody talked to the former President); *id.* at 185 (privilege concerning the identity of the person with whom Parlatore spoke to determine the former President's "normal movements" between properties); *id.* at 196 (privilege concerning what the search team generally told Parlatore about documents found at Mar-a-Lago); *id.* at 217 (attorney-client and work-product privilege concerning what steps Parlatore took to determine whether any boxes with documents that had classified markings had been moved); *id.* at 236 (privilege concerning whether Parlatore told the former President that Parlatore was testifying before the grand jury). In some instances, those privilege invocations came in response to "questions about the mechanics (who, how, when, where) of the search." *In re Feldberg*, 862 F.2d 622, 628 (7th Cir. 1988) (concluding that such questions are not covered by attorney-client privilege).

### 2. Discussion

The former President contends (Mot. at 5, 9-10) that the government engaged in prosecutorial misconduct by asking Parlatore questions that he declined to answer on privilege grounds and, in one instance, allegedly invited the grand jury to draw improper inferences from

Parlatore's refusal to answer a question based on attorney-client privilege. As explained above, these claims do not support the relief requested by the former President. The former President already possesses Parlatore's grand jury transcript, and any alleged misconduct during the questioning of Parlatore would not warrant the production of grand jury transcripts for other witnesses based on unfounded speculation that alleged misconduct with respect to one witness supports the conclusion that there was misconduct during the questioning of different witnesses. But regardless, the former President's claim also fails because his misconduct allegations are unfounded.

It was entirely proper to ask Parlatore questions about his knowledge and conduct as the individual designated to perform the responsibilities of a custodian of records for the Office, even if Parlatore refused to answer some questions based on claims of privilege. That was precisely the procedure the Court contemplated when it deferred consideration of a contempt citation after the former President's counsel represented that Parlatore would be available to testify in the grand jury as the equivalent of a custodian of records, even if Parlatore did not embrace that nomenclature.  The Court expected the government to ask Parlatore a "series of questions" to create a "fairly complete record . . . of where the holes were," *i.e.*, the questions Parlatore would refuse to answer based on privilege.  Contempt Hearing Tr. 11.  It was understood by all that there would be a "potential need for additional litigation regarding counsel testifying to conversations with the former president."  Crime-Fraud Opinion at 33-34.  The government did not commit misconduct by proceeding along these established ground rules and asking questions that elicited privilege claims to potentially tee up future litigation.  Indeed, when the government filed a motion to compel testimony from the former President's attorney Jennifer Little under the crime-fraud exception, the former President argued that the motion was not yet ripe because the government

did not put her in the grand jury and require her to decline to answer questions and instead received confirmation from her attorney that she would decline to answer questions. *See* Crime-Fraud Op. 78 n.24. The former President cannot claim that the government committed misconduct by following the procedure with Parlatore that he claims the government was required to follow with Little.

To the extent the former President suggests that the frequency with which Parlatore invoked privilege was problematic, *see* Mot. at 5 (noting that Parlatore invoked privilege "[n]o fewer than *forty-five* times"), that was a problem of the former President's own making. Rather than select a non-lawyer to act as a custodian of records, he selected a lawyer; indeed, a lawyer who represented him personally. Regardless of Parlatore's status as a lawyer, however, the government was entitled to question Parlatore to determine whether there had been full compliance with the May 2022 subpoena. "A grand jury may compel a corporate records custodian to testify about the nature of his search and the adequacy of the disclosure," indeed, "[s]uch an inquiry may be essential to determine whether the grand jury has received the documents to which it is entitled." *Feldberg*, 862 F.2d at 627. And "[i]f the inquiry itself is legitimate, the addressee of the subpoena cannot put the subject off limits by having counsel turn over the documents." *Id.* "Since questions about the adequacy of the search do not entail legal advice, the topic is not off limits just because an attorney plays a role." *Id.* To be sure, an attorney-custodian's advisory communications with a client may be privileged, but the Office could not "throw the veil of privilege over details of how files were searched, and by whom, through the expedient of involving a lawyer in the process." *Id.* at 628; *see id.* ("questions about the mechanics (who, how, when, where) of the search" are not privileged).

Ignoring this larger context, the former President focuses (Mot. 5, 9) on a single exchange between Parlatore and the government prosecutor.  In response to questions concerning whether the former President would permit the government to "look inside" boxes in a storage area at Mar-a-Lago, Parlatore testified that the former President had told government investigators during a meeting on June 2, 2022 (for which Parlatore was not present), that "if there's anything else you need, come let me—you let us know."  GJ Tr. 40.  When asked in a follow-up question whether the former President had told Parlatore about the former President's seemingly cooperative statement, Parlatore refused to answer on the basis that any communications between him and his client, the former President, were privileged.  GJ Tr. 40.  The prosecutor then inquired whether the attorney-client privilege was limited to communications for the purpose of obtaining legal advice.  GJ Tr. 41.  Parlatore suggested instead that "[a]ny information obtained from a client is part of . . . legal advice or representation."  GJ Tr. 41.  After Parlatore confirmed, in response to a question, that a client can waive the attorney-client privilege, the prosecutor asked, "if the former President's so cooperative, why hasn't he allowed you to share his conversations with the Grand Jury today."  GJ Tr. 41.

To be clear, no grand jury witness or subject is required to waive privilege to be deemed cooperative, and the government regrets this particular exchange with Parlatore to the extent it may be construed to support such a suggestion.  But whatever implication could be drawn from the prosecutor's question taken in a vacuum, the prosecutor quickly and emphatically corrected any potential misunderstanding, and the questioning proceeded thereafter as reflected in more than 200 additional pages of the transcript.  When Parlatore suggested that the prosecutor's question implied that to be cooperative required waiving the attorney-client privilege, the prosecutor immediately made clear that she was "absolutely not saying that," GJ Tr. 42, and that the

government was not seeking "to induce any waivers . . . of attorney/client privilege," GJ Tr. 43. That statement, moreover, reflected the similar caution the government prosecutor had made at the outset of Parlatore's testimony. *See* GJ Tr. 13 (government prosecutor explaining to Parlatore that "we are not seeking today to elicit from you privileged information"). This context cured any potential for grand juror confusion and refutes the former President's claim of misconduct.

### B. August 2022 Meeting with Stanley Woodward at the Department of Justice

#### 1. Relevant facts

Waltine Nauta served as a valet—often referred to as a "body man"—for the former President both during and after his presidency. At the time of the meeting described in the Disclosure Motion, Nauta was a subject of the Special Counsel's Office's investigation. The FBI interviewed Nauta on May 26, 2022, and he testified before the grand jury in the District of Columbia on June 21, 2022. At his interview, he was represented by Derek Ross. During his grand jury appearance, Nauta was represented by Derek Ross and Cameron Seward.

After Nauta had testified in the grand jury and DOJ attorneys had informed Ross and Seward that he had become a subject of the grand jury investigation, Nauta obtained new counsel, Stanley Woodward. On August 15, 2022, attorneys for the National Security Division (NSD) who were handling the investigation at that time contacted Woodward by email to invite Woodward to meet with them to discuss Nauta. The email stated: "As you know from Mr. Nauta's previous counsel, Derek Ross, we and the FBI would like to further question Mr. Nauta about various records stored at Mar-a-Lago. We think it would be beneficial first to meet with you in person to discuss the way forward with Mr. Nauta. Please let us know your availability for later this week." In response to that invitation, Woodward agreed to meet with prosecutors assigned to the investigation at their office in the Main Justice Building on August 24, 2022.

Woodward met with the prosecutors on August 24, 2022 at the Main Justice Building to discuss Nauta. Three prosecutors were present in person and one prosecutor participated by video. The prosecutors in the room were Jay Bratt (Chief of the Counterintelligence and Export Control Section (CES)), Julie Edelstein (Deputy Chief of CES), and Brett Reynolds (Trial Attorney in CES). Michael Thakur (Assistant United States Attorney for the Southern District of Florida) participated by video. The prosecutors informed Woodward that Nauta had criminal exposure and that he was a subject of the grand jury investigation. They also informed Woodward that they were interested in obtaining Nauta's potential cooperation and resolving his situation. Woodward asked about the topics on which they were interested in Nauta's cooperation, and the prosecutors informed him that the focus was on Nauta's involvement in moving boxes. Woodward indicated that he had not yet met with Nauta to discuss the matter, but that he would speak with Nauta and might be interested in providing an attorney proffer after he spoke with his client. At the conclusion of the meeting, Woodward indicated that he would get back to the prosecutors after speaking with Nauta. Woodward did not object to anything that happened in the meeting or raise any allegations or complaints about how the prosecutors had handled the meeting—either at that time, in any of his many subsequent dealings with the prosecutors in this investigation, or at any time until the filing of the present Disclosure Motion.

After the August 24 meeting, on September 30, 2022, the prosecutors and Woodward spoke by telephone about Nauta, and the prosecutors reiterated their interest in sitting down again with Nauta. In that call, Woodward did not raise any allegations or complaints about what had transpired in his meeting with the prosecutors on August 24. Woodward later requested to review the transcript of Nauta's grand jury testimony, and, consistent with D.C. Circuit law, *see In re Grand Jury*, 490 F.3d 978, 990 (D.C. Cir. 2007), in October 2022 the prosecutors arranged for him

to do so.  Again, Woodward made no complaint about anything that had happened in his earlier meeting with the prosecutors.  Indeed, in more than nine months since the August 2022 meeting, Woodward—who has dealt with several prosecutors from the Special Counsel's Office during that span—never raised any allegation, concern, or complaint about that meeting.  The government had never seen or heard of any such complaints about that meeting until the Disclosure Motion.

## 2.  Discussion

The Disclosure Motion (Mot. 3) claims that one of the prosecutors in the August 24 meeting, Jay Bratt, "threatened [Woodward] that he would lessen his odds of a judicial appointment if he failed to pressure [Nauta] to cooperate with the OSC…"  The government flatly rejects the claim that anyone threatened Woodward in that meeting in any way or that the government "insinuated" any connection whatsoever between Woodward's potential judicial nomination and Nauta's potential cooperation.  Indeed, the notion that a 30-year veteran federal prosecutor would engage in such a ham-handed tactic in this sensitive investigation in a meeting alongside three other prosecutors and in the context of his first interaction with a defense attorney is nonsensical.  And the belated suggestion that such conduct took place in the meeting—nine months after the fact and only days after Woodward has been informed that Nauta is a target— bolsters that conclusion.   Below we discuss the claim and address the version of events and arguments that are now being proffered by the former President and Woodward.[3]

---

[3] With leave from the Court, the government contacted Mr. Woodward on June 7, 2023, to review with him the claims that were made on pages 4 and 10 of the Disclosure Motion, and the government provided Woodward with the relevant excerpts from those pages of the motion.  The government informed Woodward that it was committed to providing the Court with an accurate account of what Woodward recalled from his meeting with the prosecutors in August 2022, and, at the government's invitation, Woodward agreed to provide his own written version of what took place so that the government could provide that to the Court with its response to the motion. Woodward's letter is attached as Exhibit A.

The allegations in the Disclosure Motion hinge entirely on one benign fact: during the August 2022 meeting, Bratt mentioned something about Woodward's connection to the D.C. Superior Court Judicial Nomination Commission ("Commission"). Bratt recalls that he had never dealt with Woodward previously but was aware of the favorable reputation of Woodward's partner, Stanley Brand. Prior to the meeting, Bratt did an internet search and found information that he believed indicated that Woodward was on the Commission, which handles nominations for appointment to the Superior Court bench in the District of Columbia. Bratt's recollection is corroborated by information that is currently on the Commission's website at https://jnc.dc.gov/biography/stanley-woodward-jr (Copy at Exhibit B). A google search for Woodward brings up a link that displays "Stanley Woodward, Jr. / jnc – Judicial Nomination Commission," and clicking on the link brings up a page with the prominent header, "Judicial Nomination Commission" and below it provides Woodward's biography. As such, the webpage suggests on its face that Woodward is connected to the Commission. Bratt mentioned this to Woodward early in their meeting purely as a matter of professional courtesy and only to indicate to Woodward that he understood that Woodward must have a good reputation. Nothing more was intended.

The prosecutors recall (and Woodward confirms) that Woodward corrected Bratt about the details. Bratt recalls that Woodward corrected him by explaining that Woodward was not *on* the Commission, but instead that he was, in fact, a potential nominee. Woodward has a different recollection of those details. He says that Bratt mentioned that Woodward was a nominee, and Woodward corrected him that he was not, in fact, a nominee, but that, consistent with the Superior Court nomination process, Woodward's name had been submitted by the Commission to the White

House for a *potential* nomination.[4]  Putting aside the details of this confusion, the prosecutors who participated in the meeting are clear that Bratt's comments contained no threat or suggestion of any *quid pro quo*, and that the exchange was purely professional.  They are also clear that Woodward said nothing to the contrary in the meeting or any time thereafter.

The Disclosure Motion takes this benign exchange that stemmed from professional courtesy in a meeting nine months ago and now attempts to spin it into a tale of pressure, threats, and insinuation with the transparent goal of derailing the investigation at a critical moment.  The Court should reject this ploy.

The timing of this claim betrays its purpose.  Woodward did not balk at anything that was said in the meeting either in the meeting itself or for many months thereafter, during which time he has dealt with prosecutors from the Special Counsel's Office.  Woodward likewise never (until the Disclosure Motion) suggested that he understood the prosecutors in the August 2022 to have made any threats or *quid pro quo* insinuations.  That is because no such thing took place.  Tellingly, the allegation surfaced for the very first time in this motion, which was filed shortly after Woodward was informed that Nauta was a target of the investigation, and on the eve of a meeting that the former President's attorneys had with the Department of Justice and the Special Counsel to urge the government not to proceed with the case.

Woodward's letter (at 2) claims that, "to the best of Mr. Woodward's recollection," Bratt concluded the conversation on the topic of the Superior Court nomination or Commission with words to the effect of, "I wouldn't want you to do anything to mess that up." *See also* Disclosure Motion, at 4 (attributing the same quotation to Bratt).  The government flatly denies that any such

---

[4] Woodward's letter confirms that his name was submitted by the Commission on November 23, 2020, nearly two years before his meeting with the prosecutors in this investigation.

words were used in the meeting.  The allegation that Bratt conveyed such a thing in this meeting

is entirely incredible, and Woodward's qualification that this particular rendition is "to the best of

my recollection" (a qualifier that is notably absent from the Disclosure Motion) belies its

unreliability.  As Woodward's letter makes clear, he is well aware of the Justice Department's

Office of Professional Responsibility (OPR) and of the opportunity to submit a complaint to them,

yet faced with this supposed threat by a prosecutor, he did no such thing.  To the contrary, the issue

was never raised until the former President and Woodward learned that the investigation was

coming to a head, and the former President filed the Disclosure Motion in an effort to derail it.

Indeed, Woodward's letter (at 2) confirms the motive:  he suggests that the matter *now* be referred

to OPR for its assessment, and that the Court should take action so that "any indictment arising

from this investigation not lie until such assessment is reached."  The goal is clear.

The Disclosure Motion includes other allegations regarding what happened in the August

2022 meeting with the prosecutors that warrant a response.  Specifically, the Disclosure Motion

contends (Mot. 4) that the following took place in the meeting:

- Bratt had "what appeared to be a folder containing information about Mr. Woodward."

- "Mr. Bratt thereupon told Mr. Woodward he didn't consider him to be a 'Trump lawyer.'"

- "Mr. Bratt advised Mr. Woodward that 'one way or the other' his client, Walt Nauta, would
  be giving up his lavish lifestyle of 'private planes and golf clubs' and he encouraged Mr.
  Woodward to persuade Mr. Nauta to cooperate with the government's investigation (this
  was prior to the appointment of the Special Counsel)."

Bratt did not put together a "folder" regarding Woodward or display any such thing in the

meeting.  As discussed above, Bratt did a routine, public-source internet search regarding

Woodward's background before the meeting and found the Judicial Nomination Commission page

that showed Woodward's connection to the Commission.  That single internet reference led to Bratt's benign comment in the meeting, and nothing more.

The Disclosure Motion points to the fact that Bratt raised the issue of whether Woodward was a "Trump lawyer" or some other words to that effect.  Whatever the particular words that were used, the topic of Woodward's independence was, indeed, raised by the government, and rightly so.  Because Woodward was replacing counsel who had represented Nauta previously, and who had brought him in for a voluntary interview and grand jury appearance, it was relevant for the government to know whether Woodward was independent from the regular team of lawyers representing the former President, against whom Nauta might provide incriminating information. Woodward indicated that he was independent, and he raised no complaint about the question being asked.  The government was right to inquire about Woodward's connection to the former President's team.  To date, Woodward and/or his firm are representing approximately twelve subjects and witnesses in the investigation into the former President's retention of classified documents and the investigation into interference with the 2020 presidential election.  The list includes at least one witness who the government believes may have incriminating information about both Nauta and the former President.  And the government's evidence indicates that, in the period between October 2021 and November 2022, Woodward's firm received more than $170,000 in legal fees from the former President's Save America PAC, which has paid the legal fees of dozens of subjects and witnesses in these matters.  In this context, the government was and is right to inquire about the independence of counsel.

In the meeting, as the prosecutors discussed with Woodward the strength of their case against Nauta and the possibility of Nauta's cooperation, Bratt mentioned that he understood that Nauta was living a lifestyle as the former President's body man that would be difficult to give up,

which Nauta would almost certainly have to do if he were to cooperate in the investigation.  Again, there was nothing inappropriate or threatening about this comment to Woodward in Woodward's capacity as Nauta's new attorney; it was a simple and accurate statement about the situation that Nauta faced.  Woodward did not object to the comment or dispute the truth regarding Nauta's predicament.  Like the other comments, Woodward never mentioned or complained about it, and the government was unaware of this purported concern until the Disclosure Motion was filed.

In sum, the characterization of the meeting set forth in the Disclosure Motion and Woodward's letter is not credible.  At best, and giving Woodward's letter the most charitable reading possible, the facts indicate that Woodward had a profound misunderstanding of what Bratt said and meant to convey in the meeting, and he is now—nine months later—warping that misunderstanding into an allegation of misconduct for strategic reasons.  Both sides agree that the topic of the Nominations Commission came up in the meeting, but only the government's version of events is logical and credible.  The only reasonable conclusion is that Bratt mentioned the topic of Woodward's connection to the Commission solely as matter of polite conversation regarding Woodward's legal experience and reputation.  This was done by way of introduction and intended as a professional compliment in light of the fact that Bratt had not worked with Woodward previously.  Bratt and the other prosecutors understood it that way.  They certainly did not perceive Bratt to have said or done anything threatening or intimidating.

The claim that Bratt began the meeting in August 2022 with a brazen threat is false.  Bratt, a veteran prosecutor of more than 30 years and Chief of CES, did nothing inappropriate in the August 2022 meeting, and the Special Counsel's Office and its prosecutors are committed to the

highest standards of professionalism in this investigation.[5]  The much belated and eleventh-hour claim by the former President and Woodward at this stage of the investigation should not be credited, and the Disclosure Motion should be denied.

### C.  Grand Jury Appearance of Kashyap Patel in September 2022

#### 1.  Relevant facts

Without supplying any surrounding context, the Disclosure Motion argues (Mot. 6) that a prosecutor from the Special Counsel's Office "balked at delaying the Grand Jury appearances of several witnesses represented by Stanley Woodward after Mr. Woodward suffered a compound fracture in a motor vehicle accident."  It further contends (*id.*) that the prosecutor "callously asked, 'What will you come up with next week?'"  Viewed in context, however, the facts of the scheduling exchange provide no support for the former President's claim.

On Monday, September 19, 2022, the FBI personally served witness Kashyap "Kash" Patel with a grand jury subpoena, commanding him to appear on September 29, 2022.  Prior to engaging counsel, Patel contacted government counsel on Friday, September 23, 2022, to request a two-week extension.  The government agreed to that extension and set his appearance for October 13, 2022.  Thereafter, Woodward contacted government counsel on September 27, 2022, explaining that he had just begun a lengthy jury trial—*United States v. Rhodes* et al., No. 22-cr-15 (D.D.C.)—but that Patel had retained him.  On September 30, 2022, Woodward requested an additional indefinite extension of Patel's grand jury appearance until some point after the *Rhodes* trial concluded.  (Ultimately, the verdict in that trial was not returned until November 29, 2022,

---

[5] On June 7, 2022, at Bratt's request, the Special Counsel's Office reached out to OPR so that he could make a self-referral of this issue for OPR's review.  Such self-referrals are made routinely when allegations are made against Department of Justice prosecutors in order to ensure the integrity of our work.  The self-referral is in no way an indication that Bratt or the Special Counsel Office's believe that he did anything inappropriate.

approximately six weeks after Patel's already-postponed appearance date of October 13, 2022.) The government was unwilling to consent to the indefinite extension that Woodward sought. Woodward, for his part, declined various alternatives offered by the government, including scheduling Patel's grand jury appearance for Friday afternoons, when the *Rhodes* trial was not sitting, and a voluntary interview by prosecutors and agents over a weekend.

On October 7, 2022, Patel (through Woodward) filed a motion to quash his grand jury appearance, arguing that requiring Patel to appear pursuant to the grand jury's subpoena would violate his constitutional rights by depriving him of his counsel of choice, *i.e.*, Woodward, who was occupied with a jury trial elsewhere in the courthouse. The Court denied the motion to quash on October 11, 2022, *see In re Grand Jury No. 22-03 Subpoena 63-*13, No. 22-gj-41, Minute Order (Oct. 11, 2022), and required Patel to appear as scheduled on October 13. *See id.* ("Mr. Patel requests a delay of some unspecified time period in his testimony because his counsel, Stanley Woodward, will be engaged in the *United States v. Rhodes* trial, Case No. 22-cr-15, scheduled to last several weeks, with no promises as to when his counsel will have time available. Mr. Patel retained Mr. Woodward on the attorney's first day of jury selection in *Rhodes* when such circumstance made fully apparent that counsel would be unavailable during Mr. Patel's scheduled grand jury testimony. In addition, the government has already demonstrated flexibility in meeting Patel's scheduling needs . . . . Testifying before a grand jury is not a game of find-or-seek-a-better-time or catch-me-if-you-can, and a witness cannot indefinitely delay a proceeding based on his counsel's convenience . . . .").

Patel appeared before the grand jury on October 13, 2022, where he repeatedly declined to answer questions on the basis of the rights afforded to him by the Fifth Amendment. Thereafter, the government moved to compel Patel's testimony. The Court granted the government's motion

to compel, contingent on the government offering statutory immunity. The government ultimately did so, granting Patel statutory immunity pursuant to 18 U.S.C. § 6003 for his grand jury testimony. The Court's order on the motion to compel specifically directed Patel to appear before the grand jury on either October 27 or November 3, 2022—dates that had been cleared with all counsel during a hearing on the motion to compel.

On October 24, 2022, NSD Trial Attorney Brett Reynolds contacted Woodward and indicated that Patel's testimony had been set for October 27. In that same email communication, Reynolds indicated that he had heard about Woodward's injury (which happened during the *Rhodes* trial) and wished him well. Woodward responded that he would not know until two days later, October 26, whether he would require surgery that would occupy him on October 27, and suggested that it would be "prudent" for the government to book grand jury time for November 3 as well. Reynolds responded that they would prefer to proceed on October 27 if possible, but that if Woodward's injury made it impossible to do so, the government would "move some things around to get the appearance locked in for [November 3]." Woodward and Reynolds spoke by phone the next day, October 25, 2022. During the call, Reynolds conveyed his preference to proceed that week, because there was no predicting whether anything unforeseen would happen the next week. Reynolds recalls that Woodward had informed them that his wife was due to have a baby that coming weekend, and he feared that Woodward's trial obligations, injury, baby, and any other unforeseen events would further delay things. As noted above, the Court's order directed the appearance to occur on either October 27 or November 3, so any further delay would have required additional motions practice. During the same call, however, Woodward advised for the first time that Patel's appearance on October 27 would be categorically impossible because of Woodward's condition. With that representation by Woodward, the prosecutors did not force him

to proceed that week, and instead agreed to his request to delay Patel's grand jury testimony to the next week, November 3.  That offer was confirmed to Woodward by email that evening, offering additional sympathy for Woodward's injury.  Neither at the time or any time subsequently did Woodward and Patel object to the government accommodating their request to move the testimony to November 3, and Patel ultimately testified before the grand jury on November 3 under the government's grant of statutory immunity.

### 2.  Discussion

There was nothing inappropriate about the government's efforts to move the grand jury investigation along promptly or the prosecutor's exchanges with Woodward regarding the scheduling of Patel's appearance.  Ultimately, Reynolds agreed to delay the testimony by a week to accommodate Woodward's needs, and he expressed sympathy for Woodward's injury on more than one occasion.  It may be that the prosecutor's use of a phrase indicating his desire to move forward with the testimony that week was interpreted as harsh by Woodward, but even if that is so, it provides no basis for the extraordinary relief requested in the Disclosure Motion.

### D.  Obtaining the Password for Chamberlain Harris's Laptop in December 2022

### 1.  Relevant facts

On January 7, 2023, during the course of the litigation on the government's motion to compel compliance with the May 11 grand jury subpoena, Chamberlain Harris, an administrative assistant at Mar-a-Lago, voluntarily provided a laptop to the government.  The government asked Harris for the password so that it could access the laptop and identify any relevant material, including classified information, on the laptop.  When Harris declined to provide the password and Harris's counsel, John Irving, indicated that Save America PAC, not Harris, owned the laptop and directed government counsel to request the password from either Trump attorney Jim Trusty or

Evan Corcoran, the government informed Irving that it would issue a grand jury subpoena requiring her appearance before the grand jury so that the grand jury could direct her to provide the password. Harris, through her counsel, then agreed to provide the password.

### 2. Discussion

The former President (Mot. 6) suggests that there was some impropriety in this exchange with Harris and her counsel, but he does not identify what that impropriety might be. Harris was represented by counsel and made the informed decision to provide the password for a laptop that she had already turned over to the government. She was free to assert any privilege she might have, including any potential Fifth Amendment privilege, or to file any objection to the procedure, but she and her counsel made the decision to simply provide the password. There was nothing inappropriate or heavy-handed about this process. Moreover, because Harris never testified before the grand jury, the exchange with Harris and her counsel provides no support for this motion for access to grand jury materials.

### E. Seizure of Carlos De Oliveira's Cell Phone in January and February 2023

### 1. Relevant facts

On January 13, 2023, the FBI conducted an audio-recorded knock-and-talk interview with Carlos De Oliveira, the property manager at Mar-a-Lago. The next day, the FBI served De Oliveira with a subpoena to testify before the grand jury on January 20, 2023. On January 17, attorney John Irving alerted prosecutors at the Special Counsel's Office that he represented De Oliveira. On January 19, Irving accepted service of a grand jury subpoena for records including De Oliveira's communications. The return date for the subpoena was January 26 (one week from issuance). Irving indicated that he could not meet the deadline for producing communications and

asked whether De Oliveira's January 20 testimony before the grand jury could be postponed until after he had produced records.  The prosecutors declined to delay his testimony.

De Oliveira testified before the grand jury on January 20.  That day, Irving provided screen shots of a limited set of messages between De Oliveira and Nauta that were responsive to the subpoena.  On January 25, the government agreed to an extension until February 3 for the production of communications in response to the subpoena.

On January 30, the government investigative team received a tranche of Nauta communications that had been released by the government filter team that was reviewing Nauta's phone.  Among those communications were texts between Nauta and De Oliveira about a trip that Nauta made to Mar-a-Lago on June 25, and texts from Nauta to De Oliveira about keeping quiet a July 10 trip that Nauta and the former President made to Mar-a-Lago.  In the grand jury, De Oliveira denied (falsely) that the former President traveled to Mar-a-Lago in the summer of 2022.

The next day, January 31, the FBI identified closed-circuit television (CCTV) video footage of Nauta and De Oliveira in the area of the storage room at Mar-a-Lago during Nauta's June trip.  These clips were directly relevant to the government's investigation into whether Nauta and De Oliveira attempted to obstruct the investigation by disabling or attempting to disable CCTV cameras or deleting footage after they became aware that the government had subpoenaed CCTV footage in the area of the storage room.  On February 2 and February 9, Irving produced collections of records from De Oliveira's phone, but they did not include any communications between De Oliveira and Nauta regarding the July 10 trip—the very communications that the government had reviewed on Nauta's phone, and therefore knew should have been on De Oliveira's phone.

On February 10, the FBI executed a warrant and obtained De Oliveira's phone.  The government told Irving that among the reasons a search warrant was executed was because De

Oliveira had provided false testimony in the grand jury, including about the July 10 trip. Thereafter, on February 17 and March 20, Irving made further productions of records in response to the grand jury subpoena.

### 2. Discussion

There was nothing inappropriate about the government's decision to proceed on two tracks in order to ensure that it obtained all relevant evidence from De Oliveira's cell phone. By seizing and searching the phone, the government ensured that the device was subject to a full forensic review in light of its concerns about potential perjury and obstructive conduct by De Oliveira. There is nothing that would require the government to set aside De Oliveira's obligation to comply with the grand jury subpoena at the same time, and he made no motion to the Court to do so. These facts provide no support for Trump's motion for access to grand jury material.

### F. Grand Jury Appearance of Margo Martin in March 2023

#### 1. Relevant facts

The Disclosure Motion claims (Mot. 9) that the Special Counsel's Office required witness Margo Martin to appear before the grand jury "with only 72 hours of notice" and refused to delay her appearance so that her newly retained counsel would have sufficient time to consult with her before her appearance. That claim is inaccurate. Martin's counsel agreed to accept service and was served with a grand jury subpoena by email on Friday, March 10, 2023. The grand jury subpoena called for her appearance the following Thursday, March 16, 2023, the date that she appeared before the grand jury.

#### 2. Discussion

There is no basis for any claim that the government engaged in misconduct in connection with the subpoena to Martin, nor does the timing of the subpoena and her appearance provide any

basis for the request to review grand jury materials.  Martin was represented by experienced counsel throughout, and the government's efforts to move quickly and efficiently in this important investigation were reasonable and appropriate.

## Conclusion

The Court should deny the Disclosure Motion.


Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:    */s/ Jack Smith*

James I. Pearce (N.C. Bar No. 44691)
Cecil VanDevender (Tenn. Bar No. 029700)
John M. Pellettieri (N.Y. Bar No. 4145371)
Assistant Special Counsel

June 8, 2023

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

IN RE GRAND JURY SUBPOENAS    )   **CASE NO. 23-gj-10**
GJ42-17 and GJ42-69          )
                         )   **UNDER SEAL**
                         )
                         )

## OPPOSITION TO AMENDED MOTION FOR DISCLOSURE OF GRAND JURY MATERIALS

"[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979). This bedrock principle, embodied in Federal Rule of Criminal Procedure 6(e), protects several vital interests, including ensuring that witnesses "come forward voluntarily" to "testify fully and frankly" without fear of "retribution" or "inducements." *Id.* at 219. Former President Donald J. Trump nevertheless claims that these vital interests are outweighed by his own particularized need to review the testimony and associated minutes of four current or former employees who purportedly appeared before the grand jury.[1] *See* Amended Motion for Disclosure of Grand Jury Materials, 23-gj-10 (D.D.C.) (filed June 5, 2023) ("Disclosure Motion" or "Mot."). That extraordinary request proceeds in three parts. First, the former President makes a series of baseless allegations of prosecutorial misconduct, grounded in a combination of factual errors, mischaracterizations, and *ad hominem* attacks. Second, even though only one of his allegations even purports to relate to conduct before the grand jury—and that allegation involves a witness whose transcript he already has—he relies on illogical inferences to suggest that if a prosecutor acted with what he deems to be unreasonable urgency in scheduling a witness's appearance or

---

[1] In light of Rule 6(e), the government neither confirms nor denies whether the four individuals named in the motion in fact testified before the grand jury. For purposes of this response, however, the government will refer to the named employees as witnesses.

document production, it follows that the prosecutor likely engaged in some unspecified form of "misconduct" or "abuse" when the same witness appeared before the grand jury.  And third, the former President speculates that if he indeed finds the unspecified misconduct or abuse that he is looking for, it could somehow assist him in preparing "potential litigation regarding the abuse of the grand jury and possibly a motion for disqualification of certain" government attorneys, although without identifying any cognizable legal basis for such a motion.  *Id.* at 8.

The former President's allegations of prosecutorial misconduct are unfounded.  But even if they were taken at face value—which, as explained below and in the government's *ex parte* submission, they should not be—the Disclosure Motion would fall far short of establishing any sort of particularized need for the materials, much less one that outweighs the powerful need for continued secrecy.  The motion should therefore be denied.[2]

## BACKGROUND

This matter arises from the former President's retention of classified materials after his term in office ended, and the government's efforts to retrieve those materials.  After the United States National Archives and Records Administration ("NARA") informed the Department of Justice that 15 boxes that the former President had previously stored at his residence at Mar-a-Lago and provided to NARA in January 2022 contained classified documents, a grand jury in this district, on May 11, 2022, issued a subpoena to the custodian of records for the former President's post-presidential office—the Office of Donald J. Trump (the "Office")—requesting "[a]ny and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald

---

[2] Although this response uses the same caption as the motion to which it responds, the former President's motion appears to be procedurally improper, insofar as he files a free-floating request for grand jury material using a case caption associated with prior litigation related to two subpoenas issued to witnesses who have nothing to do with the instant motion.

J. Trump bearing classification markings [list of classification markings]." As this Court has explained, "[e]nsuring compliance with the May 2022 Subpoena has been slow-going, prompting the government to seek and execute a search warrant at Mar-a-Lago, additional government motions regarding inadequate compliance, repeat visits to this Court, and new searches conducted and updated certifications filed, with the compliance effort dragging into mid-December 2022, when additional classified documents were recovered from a closet in the Office's designated space at Mar-a-Lago." Opinion, *In re Grand Jury Subpoena*, 23-gj-10, ECF No. 19, at 7 (Mar. 17, 2023) ("Crime-Fraud Opinion").

In summary, on June 3, 2022, attorneys Evan Corcoran and Christina Bobb met with three FBI agents and an attorney from the Department of Justice (Jay Bratt) and turned over a certification and a folder containing 38 documents with classification markings. The certification was signed by Bobb, who was identified as the Office's custodian of records, and stated that "[b]ased upon the information that has been provided to me, I am authorized to certify, on behalf of the Office of Donald J. Trump," that "[a] diligent search was conducted of the boxes that were moved from the White House to Florida," the search was conducted "in order to locate any and all documents that are responsive to the subpoena," and "[a]ny and all responsive documents accompany this certification." Despite the certification, on August 8, 2022, federal agents searched Mar-a-Lago pursuant to a warrant and seized over 100 documents with classification markings. About a month later, in response to another request from the government, the Office refused to conduct another search for responsive records or provide a certification. Litigation before this Court ensued, resulting in additional searches and certifications signed by attorney Timothy C. Parlatore, who testified before the grand jury in December 2022. The grand jury's investigation continued after Parlatore's testimony, and among other things, this Court granted the

government's motion to compel two attorneys for the former President to appear before the grand jury and provide certain testimony under the crime-fraud exception to the attorney-client privilege.

The former President now seeks transcripts of testimony from four individuals who he believes have testified before the grand jury.  The former President accuses (Mot. at 2) government prosecutors of "misconduct and bias" in the grand jury.  According to the former President, he "anticipates that he will pursue relief from this Court," and he requests the transcripts "[t]o enable him to do so with a fuller record." Mot. at 3.  The former President mentions "potential litigation regarding the abuse of the Grand Jury process" and states he will "possibly" file a "motion for disqualification of certain" government attorneys, Mot. at 8, although he does not disclose the forum in which he will pursue this litigation.

## APPLICABLE LEGAL STANDARD

"Federal Rule of Criminal Procedure 6(e) prohibits disclosure of 'matter[s] occurring before the grand jury,' Fed. R. Crim. P. 6(e)(2), and thus requires that '[r]ecords, orders, and subpoenas relating to grand-jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury,' Fed. R. Crim. P. 6(e)(6)." *In re Grand Jury Subpoena, Judith Miller*, 493 F.3d 152, 154 (D.C. Cir. 2007).  That rule of secrecy "safeguards vital interests in (1) preserving the willingness and candor of witnesses called before the grand jury; (2) not alerting the target of an investigation who might otherwise flee or interfere with the grand jury; and (3) preserving the rights of a suspect who might later be exonerated." *McKeever v. Barr*, 920 F.3d 842, 844 (D.C. Cir. 2019).  After all, "[t]he grand jury as a public institution serving the community might suffer if those testifying today knew that the secrecy of their testimony would be lifted tomorrow," which is a particularly acute concern where, as here, "[t]he witnesses . . . may be employees . . . of potential defendants." *United States*

*v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958); *see also Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979).

To preserve the "indispensable secrecy of grand jury proceedings," *Procter & Gamble Co.*, 356 U.S. at 682 (quotations omitted), "Federal Rule of Criminal Procedure 6(e) makes quite clear that disclosure of matters occurring before the grand jury is the exception and not the rule," *McKeever*, 920 F.3d at 844 (quotations omitted).  For such an exception to apply, a movant must generally "carry[] the heavy burden of showing 'that a particularized need exists' that 'outweighs the policy of secrecy.'"  *United States v. Apodaca*, 287 F. Supp. 3d 21, 47 (D.D.C. 2017) (quoting *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959)).

As the former President acknowledges (Mot. 7), the only exception even arguably implicated here pertains to disclosure "preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E)(i).  Parties attempting to meet this standard "must show [1] that the material they seek is needed to avoid a possible injustice in another judicial proceeding, [2] that the need for disclosure is greater than the need for continued secrecy, and [3] that their request is structured to cover only material so needed."  *Douglas Oil Co.*, 441 U.S. at 222; *see Judicial Watch, Inc. v. Tillerson*, 270 F. Supp. 3d 1, 4-5 (D.D.C. 2017).  Under this standard, "[i]t is clear . . . that disclosure is appropriate only in those cases where the need for it outweighs the public interest in secrecy, and that the burden of demonstrating this balance rests upon the private party seeking disclosure." *Douglas Oil Co.*, 441 U.S. at 223.

## ARGUMENT

The former President's Disclosure Motion should be denied.  Indeed, even if the allegations of misconduct were to be taken at face value, which they should not be, the former President has failed to show any sort of particularized need for the requested materials, much less one that

outweighs the values underlying the policy of secrecy, which are at their apex in the circumstances presented here. To the contrary, the former President is engaged in a transparent fishing expedition whose real goal appears to be uncovering what his current and former employees may have told the grand jury, ostensibly grounded in the speculative possibility that his review might turn up unspecified examples of "misconduct" that could justify future extraordinary relief, in the form of a motion to disqualify government counsel. This falls far short of the necessary showing. Moreover, the Disclosure Motion's allegations of misconduct rest on several errors, mischaracterizations, and baseless accusations, and it does not establish any credible claim of prosecutorial misconduct.

## I.   The Disclosure Motion Would Fail Even If Its Facts Were Taken at Face Value.

### A.   The former President has not shown that the material is needed to avoid a possible injustice in another judicial proceeding.

To establish a particularized need for grand jury materials preliminarily to or in connection with another judicial proceeding, a party must identify a particularized use "related fairly directly to some identifiable litigation, pending or anticipated." *United States v. Baggot*, 463 U.S. 476, 480 (1983). "[I]t is not enough to show that some litigation may emerge from the matter in which the material is to be used, or even that litigation is factually likely to emerge." *Id.* "The focus is on the actual use to be made of the material," and "[i]f the primary purpose of disclosure is not to assist in preparation or conduct of a judicial proceeding, disclosure under [(E)](i) is not permitted." *Id.* Moreover, "the request for grand jury material must be more than a request for authorization to engage in a fishing expedition." *In re EyeCare Physicians of Am.*, 100 F.3d 514, 518 (7th Cir. 1996) (cleaned up); *see In re Grand Jury 95-1*, 118 F.3d 1433, 1437 (10th Cir. 1997) (same). As such, "where a defendant fails to provide a discrete reason, and instead relies on speculation or

unsupported assumptions, courts have made clear that disclosure of grand jury minutes is not warranted." *Apodaca*, 287 F. Supp. 3d at 47.

Here, the former President's motion rests on mere speculation and unsupported assumptions about what the grand jury materials might show. Indeed, unlike in other cases in which disclosure has been authorized, he offers neither evidence nor even a *theory* of what specifically the grand jury transcripts might show, beyond the vague suggestion that they might show some form of unspecified "misconduct." *See In re Grand Jury 95-1*, 118 F.3d at 1437 (reversing authorization under Rule 6(e)(3)(E)(i) where the movant's alleged need for grand jury materials to prepare a motion for judicial disqualification was "general and vague" and the absence of allegations about what the material would contain "clearly indicates the speculative nature of [the movant's] allegations . . . and suggests [the movant] was simply interested in engaging in a fishing expedition"). Some of the very cases the former President relies on (Mot. 9) illustrate the same point. *See, e.g.*, *United States v. Schlegel*, 687 F. App'x 26, 30 (2d Cir. 2017) (affirming denial of request for grand jury materials where the defendant "failed to articulate any concrete allegations of Government misconduct" and instead "merely speculate[d]" about what the government may have presented to the grand jury); *United States v. Hunt*, 534 F. Supp. 3d 233, 259 (E.D.N.Y. 2021) (denying request for grand jury materials where the defendant's allegations of prosecutorial misconduct "ultimately amount to mere speculation that the Government 'potentially' gave a misleading instruction to the grand jury").

Moreover, the former President makes no effort to connect the facts that he purportedly hopes to find with the specific use he intends to make of them. But a showing of particularized need "cannot even be made without consideration of the particulars of the judicial proceeding with respect to which disclosure is sought." *Douglas Oil Co.*, 441 U.S. at 480 n.4. Here, the former

President suggests (Mot. 8) that he needs the material because he "anticipates potential litigation regarding the abuse of the Grand Jury process and possibly a motion for disqualification of certain OSC attorneys."

He does not, however, identify any cognizable basis for a pre-indictment motion alleging abuse of the grand jury process. *Cf.* 2 Fed. Grand Jury § 21:3 (2d ed.) (noting that "[a] person who wants to challenge grand jury abuse during an investigation, before an indictment has been returned . . . will have standing to do so only if she has been subpoenaed to testify or otherwise provide evidence to the grand jury, or if she has standing to act on behalf of a third party which has been subpoenaed to provide evidence to the grand jury") (footnotes omitted)).

Nor does he identify any cognizable basis for disqualification, such as a conflict of interest. This failure is particularly striking given that "[t]he disqualification of Government counsel is a drastic measure and a court should hesitate to impose it except where necessary." *United States v. Bolden*, 353 F.3d 870, 878 (10th Cir. 2003) (quotations omitted). Indeed, as the Ninth Circuit recently explained, "[t]he doctrine of separation of powers requires judicial respect for the independence of the prosecutor," such that "absent a violation of the Constitution, a federal statute, or a procedural rule," courts "do not dictate to the Executive branch who will serve as its prosecutors." *United States v. Williams*, -- F.4th --, 2023 WL 3516095, at *5 (9th Cir. May 18, 2023) (cleaned up). "Put differently, [courts] do not stamp a chancellor's foot veto over activities of coequal branches of government unless compelled by the law to do so." *Id.* (quotations omitted). Here, the former President has not identified any law that could possibly compel the Court to grant a motion to disqualify any government attorney from participating in this case.

The Disclosure Motion therefore fails to show that the requested material "is needed to avoid a possible injustice in another judicial proceeding." *Douglas Oil Co.*, 441 U.S. at 222. The motion may be denied on that basis alone.

**B. The former President has not shown that the need for disclosure is greater than the need for continued secrecy.**

Even if the former President had shown a particularized need (which he has not), the Disclosure Motion fails to show "that the need for disclosure is greater than the need for continued secrecy." *Douglas Oil Co.*, 441 U.S. at 222. The balance between particularized need and secrecy "should always be weighted presumptively toward the government when the targets of a grand jury investigation are requesting disclosure of grand jury testimony for use in that proceeding." *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6th Cir. 1986). "Concern as to the future consequences of frank and full testimony is heightened where the witness is an employee of a [subject] under investigation." *Douglas Oil Co.*, 441 U.S. at 222. In all cases, "courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries," with a particular eye toward the possibility that the "[f]ear of future retribution or social stigma may act as powerful deterrents to those who would come forward to aid the grand jury in the performance of its duties." *Id.* It is difficult to conceive of something more likely to chill full and frank testimony, both now and in future cases, than an employer attempting to see what his employees may or may not have told the grand jury.

These factors make the public interest in secrecy extremely weighty. In combination they likely would outweigh even the strongest possible showing of particularized need, and certainly outweigh the nonexistent showing that the former President has made here.

The former President seeks to avoid this conclusion by invoking (Mot. 11-12) "the common-sense proposition that secrecy is no longer 'necessary' when the contents of grand jury

- 9 -

matters have become public." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d at 1140. Of course, "[t]here must come a time . . . when information is sufficiently widely known that it has lost its character as Rule 6(e) material." *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994). But in seeking to make such a showing here, the former President conflates public knowledge of the *fact* of an investigation (which is indeed widely known) with public knowledge of the *substance* of the testimony that specific witnesses purportedly gave to the grand jury, which neither the public nor the former President knows. Indeed, the whole premise of his motion is that he would like to know, but at present can only speculate about, "Rule 6(e)'s bread and butter: the identities of witnesses or jurors, the substance of testimony as well as actual transcripts, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like." *Judicial Watch, Inc.*, 270 F. Supp. 3d at 5 (quotations omitted). Based on the reporting that the former President relies on (Mot. 11 nn. 3-5), it does not appear that any of the four named witnesses has even confirmed that he or she appeared before the grand jury, much less publicly disclosed the substance of any testimony that he or she may have given.

Moreover, even in cases where details of a witness's grand jury testimony have been reported in the press, that alone does not make the testimony discoverable, since "Rule 6(e) does not create a type of secrecy which is waived once public disclosure occurs," *Barry v. United States*, 740 F. Supp. 888, 891 (D.D.C. 1990), particularly where, as here, the government has neither confirmed nor denied the accuracy of any public reporting, *see In re North*, 16 F.3d at 1245. As such, the former President's misplaced reliance on cases involving requests for the disclosure of already-public information does nothing to alter the conclusion his "need" for the material, such as it is, is heavily outweighed by the need for continued grand jury secrecy. *See In re New York Times Co.*, No. MC 22-100, 2023 WL 2185826, at *14-15 (D.D.C. Feb. 23, 2023) (denying request

for grand jury materials related to "former President Trump's privilege challenge to the Jan. 6 grand jury investigation"); *In re Press Application for Access to Judicial Records Ancillary to Certain Grand Jury Proceedings Concerning Donald J. Trump & the Trump Organization*, No. MC 220128, ECF No. 6 (D.D.C. Mar. 11, 2023) (denying request for grand jury materials related to certain aspects of the classified-documents investigation).

### C. The former President has not shown that his request is structured to cover only needed material.

Finally, the Disclosure Motion is structured to cover more than the purportedly needed material. To be sure, given the speculative nature of the request, it is hard to say that any material is more or less "needed" than any other. But the Disclosure Motion goes further than even its own internal logic would allow. After all, the former President's theory appears to be (Mot. 5) that if prosecutors unreasonably conveyed "a false sense of urgency" when dealing with certain witnesses, it somehow follows that the prosecutors must also "have been abusive in their treatment of witnesses appearing before the grand jury." But even that dubious logic provides no support for the request (*id.* at 10) to review "the 'minutes' during which prosecutors often share thoughts about the direction of the investigation and their impressions of witnesses who have been questioned." Indeed, his request for the minutes only supports the inference that he is engaged in a fishing expedition seeking insight into the inner workings of the investigation.

### II. The Disclosure Motion Rests on Numerous Factual Inaccuracies and Mischaracterizations.

Although the former President's motion is legally deficient and can—and should—be dismissed on that ground alone, the former President's factual allegations of prosecutorial misconduct are also false and unfounded. The government addresses the allegations regarding the questioning of attorney Timothy C. Parlatore before the grand jury in this sealed brief because the

former President possesses the transcript of Parlatore's grand jury testimony. The government necessarily addresses the remaining allegations in its *ex parte* submission.

### A. Grand Jury Testimony of Timothy Parlatore

#### 1. Relevant Facts

Until his recent withdrawal from representing the former President, Timothy Parlatore represented the former President with respect to the May 2022 subpoena starting in October 2022, a couple months after the execution of the search warrant at Mar-a-Lago. Parlatore Grand Jury Tr., *In re Grand Jury Subpoena*, 23-gj-10, ECF No. 12, at 16-17 (Mar. 10, 2023) ("GJ Tr."). About a month earlier, on September 15, 2022, the government had expressed its continuing concern that the former President or his Office retained additional classified documents beyond those uncovered through execution of the search warrant. *See* Crime-Fraud Opinion at 23. After the Office refused to conduct another search for responsive records or provide a certification, the government filed a motion to compel compliance with the May 2022 subpoena. *Id.* at 23-24. Minutes before the hearing on the motion to compel began on October 27, 2022, counsel for the former President provided the government and the Court with a declaration from Parlatore stating that the Office had authorized him to provide the declaration and describing a search "undertaken on the premises at Bedminster," where the former President maintained a residence, by "elite professionals who have extensive prior experience searching for sensitive documents and contraband." Declaration of Timothy C. Parlatore, Esq. *In re Grand Jury Subpoena*, No. 22-gj-40, ECF No. 9, at 2 (Oct. 26, 2022).

The Court granted the government's motion to compel on November 9, 2022, and issued an order stating that "a custodian with first-hand knowledge of the Office's diligent and comprehensive efforts to locate responsive documents and with the ability to certify that no

additional responsive records remain in the Office's possession, must comply with the subpoena." Order, *In re Grand Jury Subpoena*, 22-gj-40, ECF No. 15, at 2 (Nov. 9, 2022). The order required that the Office provide the government with a new certification "from a custodian of records with personal knowledge of respondent's efforts to comply with the grand jury subpoena" and that the custodian "appear before the grand jury to provide testimony regarding" the Office's "compliance efforts and verification of the contents of the certification." *Id.* at 2-3.

Parlatore filed a status report on behalf of the Office six days later describing efforts to search for responsive documents and disclosing that two additional classified documents had been found in a storage unit leased by the Office. *In re Grand Jury Subpoena*, Case No. 22-gj-40, ECF No. 19 (Nov. 15, 2022). The status report identified five locations to search for "potentially responsive documents" and stated that one of those locations, Mar-a-Lago, would not be searched because there was "no reason to believe that potentially responsive documents remain[ed] there." *Id.* at 1-2. In a minute order on November 18, 2022, the Court partially granted a motion by the Office for additional time to file a final certification and set a new deadline of November 23, 2022, noting an "obvious concern" that the status report was submitted by an attorney who did not attest to be "a custodian of records with personal knowledge of respondent's efforts to comply with the grand jury subpoena," a requirement of both the May 2022 subpoena and the Court's November 9 order. Minute Order, *In re Grand Jury Subpoena*, Case No. 22-gj-40 (Nov. 18, 2022).

On November 23, 2022, Parlatore submitted a sworn certification that largely reiterated the information from the November 9 status report but included some additional details, including information about an intervening search of Trump Tower. *See In re Grand Jury Subpoena*, Case No. 22-gj-40, ECF No. 22 (Nov. 23, 2022). Contrary to the Court's previous orders, the certification contained a section, entitled "Role of Certificant," asserting that the Office was not

obligated to use a custodian of records. *Id.* at 7-8.  The certification stated that Parlatore would testify "to the limited information contained" in the certification, "without any further waiver of privilege[,]" although the Office's position was that "no further testimony should be necessary." *Id.* at 8.  As the Court later explained, "[n]o additional details were provided to clarify that qualifying language, leaving the government guessing as to what information exactly Parlatore would provide during any subsequent testimony—*e.g.*, whether his testimony would include details not specifically provided in the certification or whether the Office planned to instruct Parlatore to invoke privileges not previously asserted in this litigation, such as attorney-client privilege, work-product privilege, or executive privilege, should he be questioned about any matter outside the four corners of the certification." Crime-Fraud Opinion at 30-31.

The government filed a motion for an order requiring the Office to show cause why it should not be held in civil contempt for failure to comply with the Court's November 9 order.  At a hearing on the motion on December 9, 2022, the Court stated that it lacked a "complete record" to issue a contempt citation because the government had not put Parlatore in the grand jury and "asked him a whole series of questions." Hearing Tr. at 11-13, *In re Grand Jury Subpoena*, Case No. 22-gj-40 (Dec. 9, 2022) (Contempt Hearing Tr.).  The Court explained that to evaluate compliance with its orders and a potential contempt citation, it was "going to want concrete grand jury transcripts about what is said and what isn't said, what is left unanswered." *Id.* at 28. Counsel for the former President and his post-presidential office confirmed that Parlatore would be "willing to" testify about "where the search was conducted, why areas were searched, why areas weren't searched—all of the normal things that a custodian of records would do, he will do it," although it "may involve a different issue" if Parlatore were asked a question about "specific conversations

with his client," the former President. *Id.* at 31; *see id.* at 38-39, 43 (colloquies regarding Parlatore's prospective testimony).

The Court did not issue a contempt citation given what it later described as "the productive discussion about expectations for additional searches and the contents of a certification for compliance with the May 2022 subpoena and the Court's Orders issued on November 9 and 18, 2022, and the Office's apparent willingness to try to meet those expectations." Crime-Fraud Opinion at 32 n.9. The Court ordered the Office to file a revised certification with additional details, and the Court specified that "full compliance" with the Court's orders would require, among other things, that "Parlatore would testify before the grand jury regarding the Office's efforts and due diligence to respond to the May 2022 subpoena, including testifying to information not already mentioned in the revised certification and details regarding how Parlatore determined which locations needed to be searched and when, why certain locations were selected to be searched and others not, efforts by Bobb to prepare to sign the June 3, 2022 certification, the identities of the search-team members, and those members' exact search methodologies." *Id.* at 32-33. It was understood that Parlatore "might be asked questions about the content of direct conversations with the former president" and that there might be the "potential need for additional litigation regarding counsel testifying to conversations with the former president." *Id.* at 33-34.

The Office provided a revised certification, sworn by Parlatore, on December 16, 2022. *In re Grand Jury Subpoena*, Case No. 22-gj-40, ECF No. 34 (Dec. 16, 2022). The revised certification described searches, including a search of Mar-a-Lago on December 15-16, 2022, conducted by two "elite professionals" with military experience and experience "searching for sensitive documents" and "contraband." *Id.* at 5-11. The search of Mar-a-Lago "[r]emarkably . . .

uncovered four more responsive records," which the certification "misleadingly refer[red] to . . . as 'low-level ministerial documents.'"  Crime-Fraud Opinion at 35.

Parlatore appeared before the grand jury on December 22, 2022.  Parlatore explained that he represented the former President but that he understood his appearance before the grand jury as principally to provide his "personal knowledge" about efforts undertaken by the post-presidency office "to comply with" the May 2022 subpoena.  GJ Tr. 10-11.  He acknowledged that such testimony "[o]rdinarily" would be handled "by a custodian of records for the organization."  GJ Tr. 12.  Parlatore thus acknowledged that he was "wear[ing] two hats," namely, an attorney for the former President and a stand-in custodian.  GJ Tr. 11.

Before questioning turned to the substance of Parlatore's "personal knowledge" of subpoena compliance, the government prosecutor clarified that the government was "not seeking today to elicit . . . privileged information."  GJ Tr. 13.  At the same time, the prosecutor alerted Parlatore that if Parlatore claimed privilege in response to any question, the prosecutor would ask Parlatore which privilege he was invoking and "the basis for the invocation."  GJ Tr. 13.  Parlatore responded, "Sure," and when the prosecutor followed up to ask whether Parlatore understood, Parlatore said, "Absolutely."  GJ Tr. 13.  In keeping with these exchanges—and consistent with the Court's expectation that the government would "put [Parlatore] in the grand jury," ask him "a whole series of questions," and create "concrete grand jury transcripts about what is said and what isn't said, what is left unanswered," Contempt Hearing Tr. 11, 28—government prosecutors probed Parlatore's knowledge and conduct as the functional equivalent of a custodian of records, and when Parlatore refused to answer questions based on privilege, they sought to clarify the precise nature and scope of Parlatore's privilege invocations.  At one point, Parlatore claimed attorney-client privilege after being asked whether the former President was the source for

Parlatore's testimony about statements the former President purportedly made to government investigators about being cooperative.  GJ Tr. 40.  The prosecutor then asked if a client could waive privilege and questioned why the former President had not allowed Parlatore to testify as to these conversations if he (the former President) meant to be cooperative, but the government prosecutor also quickly made clear that she was "absolutely not saying" that waiver of privilege is required to be cooperative and that, consistent with her earlier statement, she did not mean to "induce any waivers." GJ Tr. 40-43.  Nonetheless, Parlatore on several occasions accused the government prosecutors of "trying to improperly invade the attorney/client privilege."  GJ Tr. 45; *see also* GJ Tr. 77.  After one such accusation, a government prosecutor conveyed to Parlatore that "if [he] want[ed] to invoke the privilege, [he] can just say that" instead of casting aspersions about "what the people on this side of the table are and are not trying to do."  GJ Tr. 77.

Over the course of the 245-page grand jury transcript, Parlatore claimed privilege numerous times.  *See, e.g.*, GJ Tr. 25 (attorney-client and work-product privilege concerning who told Parlatore about Christina Bobb's efforts to respond to the subpoena in Bobb's capacity as custodian of records); *id.* at 40 (attorney-client privilege concerning whether the former President recounted to Parlatore a conversation between the former President and a federal government prosecutor about which Parlatore had just testified); *id.* at 45 (attorney-client and work-product privilege concerning the individuals with whom Parlatore spoke before his grand jury testimony); *id.* at 47 (privilege concerning what Boris Epshteyn told Parlatore); *id.* at 58-59 (attorney-client and work-product privilege concerning whether Parlatore had asked anyone if boxes had been moved out of the storage room before June 2, 2022); *id.* at 77 (attorney-client and work-product privilege concerning with whom the legal team spoke before deciding to search Bedminster); *id.* at 104 (privilege concerning why locations other than Mar-a-Lago, including storage units, Trump

Tower, and the Flagler office, were not searched before November 9, 2022); *id.* at 113 (work-product privilege concerning with whom the legal team spoke to determine not to search Mar-a-Lago in November 2022); *id.* at 114 (work-product privilege concerning whether the legal team consulted any documents in making the determination not to search Mar-a-Lago in November 2022); *id.* at 146 (work-product privilege concerning whether individuals hired to carry out searches took notes, photographs, or video recordings, or sent emails, text messages, or any kind of messages); *id.* at 155-56 (privilege concerning whether Parlatore spoke with anyone to determine if the General Services Administration (GSA) packed boxes that were shipped out from the White House); *id.* at 163 (privilege concerning whether somebody talked to the former President); *id.* at 185 (privilege concerning the identity of the person with whom Parlatore spoke to determine the former President's "normal movements" between properties); *id.* at 196 (privilege concerning what the search team generally told Parlatore about documents found at Mar-a-Lago); *id.* at 217 (attorney-client and work-product privilege concerning what steps Parlatore took to determine whether any boxes with documents that had classified markings had been moved); *id.* at 236 (privilege concerning whether Parlatore told the former President that Parlatore was testifying before the grand jury). In some instances, those privilege invocations came in response to "questions about the mechanics (who, how, when, where) of the search." *In re Feldberg*, 862 F.2d 622, 628 (7th Cir. 1988) (concluding that such questions are not covered by attorney-client privilege).

## 2. Discussion

The former President contends (Mot. at 5, 9-10) that the government engaged in prosecutorial misconduct by asking Parlatore questions that he declined to answer on privilege grounds and, in one instance, allegedly invited the grand jury to draw improper inferences from

Parlatore's refusal to answer a question based on attorney-client privilege. As explained above, these claims do not support the relief requested by the former President. The former President already possesses Parlatore's grand jury transcript, and any alleged misconduct during the questioning of Parlatore would not warrant the production of grand jury transcripts for other witnesses based on unfounded speculation that alleged misconduct with respect to one witness supports the conclusion that there was misconduct during the questioning of different witnesses. But regardless, the former President's claim also fails because his misconduct allegations are unfounded.

It was entirely proper to ask Parlatore questions about his knowledge and conduct as the individual designated to perform the responsibilities of a custodian of records for the Office, even if Parlatore refused to answer some questions based on claims of privilege. That was precisely the procedure the Court contemplated when it deferred consideration of a contempt citation after the former President's counsel represented that Parlatore would be available to testify in the grand jury as the equivalent of a custodian of records, even if Parlatore did not embrace that nomenclature. The Court expected the government to ask Parlatore a "series of questions" to create a "fairly complete record . . . of where the holes were," *i.e.*, the questions Parlatore would refuse to answer based on privilege. Contempt Hearing Tr. 11. It was understood by all that there would be a "potential need for additional litigation regarding counsel testifying to conversations with the former president." Crime-Fraud Opinion at 33-34. The government did not commit misconduct by proceeding along these established ground rules and asking questions that elicited privilege claims to potentially tee up future litigation. Indeed, when the government filed a motion to compel testimony from the former President's attorney Jennifer Little under the crime-fraud exception, the former President argued that the motion was not yet ripe because the government

did not put her in the grand jury and require her to decline to answer questions and instead received confirmation from her attorney that she would decline to answer questions. *See* Crime-Fraud Op. 78 n.24. The former President cannot claim that the government committed misconduct by following the procedure with Parlatore that he claims the government was required to follow with Little.

To the extent the former President suggests that the frequency with which Parlatore invoked privilege was problematic, *see* Mot. at 5 (noting that Parlatore invoked privilege "[n]o fewer than *forty-five* times"), that was a problem of the former President's own making. Rather than select a non-lawyer to act as a custodian of records, he selected a lawyer; indeed, a lawyer who represented him personally. Regardless of Parlatore's status as a lawyer, however, the government was entitled to question Parlatore to determine whether there had been full compliance with the May 2022 subpoena. "A grand jury may compel a corporate records custodian to testify about the nature of his search and the adequacy of the disclosure," indeed, "[s]uch an inquiry may be essential to determine whether the grand jury has received the documents to which it is entitled." *Feldberg*, 862 F.2d at 627. And "[i]f the inquiry itself is legitimate, the addressee of the subpoena cannot put the subject off limits by having counsel turn over the documents." *Id.* "Since questions about the adequacy of the search do not entail legal advice, the topic is not off limits just because an attorney plays a role." *Id.* To be sure, an attorney-custodian's advisory communications with a client may be privileged, but the Office could not "throw the veil of privilege over details of how files were searched, and by whom, through the expedient of involving a lawyer in the process." *Id.* at 628; *see id.* ("questions about the mechanics (who, how, when, where) of the search" are not privileged).

Ignoring this larger context, the former President focuses (Mot. 5, 9) on a single exchange between Parlatore and the government prosecutor.  In response to questions concerning whether the former President would permit the government to "look inside" boxes in a storage area at Mar-a-Lago, Parlatore testified that the former President had told government investigators during a meeting on June 2, 2022 (for which Parlatore was not present), that "if there's anything else you need, come let me—you let us know."  GJ Tr. 40.  When asked in a follow-up question whether the former President had told Parlatore about the former President's seemingly cooperative statement, Parlatore refused to answer on the basis that any communications between him and his client, the former President, were privileged.  GJ Tr. 40.  The prosecutor then inquired whether the attorney-client privilege was limited to communications for the purpose of obtaining legal advice.  GJ Tr. 41.  Parlatore suggested instead that "[a]ny information obtained from a client is part of . . . legal advice or representation."  GJ Tr. 41.  After Parlatore confirmed, in response to a question, that a client can waive the attorney-client privilege, the prosecutor asked, "if the former President's so cooperative, why hasn't he allowed you to share his conversations with the Grand Jury today."  GJ Tr. 41.

To be clear, no grand jury witness or subject is required to waive privilege to be deemed cooperative, and the government regrets this particular exchange with Parlatore to the extent it may be construed to support such a suggestion.  But whatever implication could be drawn from the prosecutor's question taken in a vacuum, the prosecutor quickly and emphatically corrected any potential misunderstanding, and the questioning proceeded thereafter as reflected in more than 200 additional pages of the transcript.  When Parlatore suggested that the prosecutor's question implied that to be cooperative required waiving the attorney-client privilege, the prosecutor immediately made clear that she was "absolutely not saying that," GJ Tr. 42, and that the

government was not seeking "to induce any waivers . . . of attorney/client privilege," GJ Tr. 43. That statement, moreover, reflected the similar caution the government prosecutor had made at the outset of Parlatore's testimony. *See* GJ Tr. 13 (government prosecutor explaining to Parlatore that "we are not seeking today to elicit from you privileged information"). This context cured any potential for grand juror confusion and refutes the former President's claim of misconduct.

## Conclusion

The Court should deny the Disclosure Motion.

Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:    */s/ Jack Smith*

James I. Pearce (N.C. Bar No. 44691)
Cecil VanDevender (Tenn. Bar No. 029700)
John M. Pellettieri (N.Y. Bar No. 4145371)
Assistant Special Counsel

June 8, 2023

- 22 -

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

IN RE GRAND JURY SUBPOENAS ) CASE NO. 23-gj-38
)
) UNDER SEAL AND EX PARTE
)
)

## OPPOSITION TO AMENDED MOTION FOR
## DISCLOSURE OF GRAND JURY MATERIALS

"[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979). This bedrock principle, embodied in Federal Rule of Criminal Procedure 6(e), protects several vital interests, including ensuring that witnesses "come forward voluntarily" to "testify fully and frankly" without fear of "retribution" or "inducements." *Id.* at 219. Former President Donald J. Trump nevertheless claims that these vital interests are outweighed by his own particularized need to review the testimony and associated minutes of four current or former employees who purportedly appeared before the grand jury. *See* Amended Motion for Disclosure of Grand Jury Materials, 23-gj-10 (D.D.C.) (filed June 5, 2023) ("Disclosure Motion" or "Mot."). That extraordinary request proceeds in three parts. First, the former President makes a series of baseless allegations of prosecutorial misconduct, grounded in a combination of factual errors, mischaracterizations, and *ad hominem* attacks. Second, even though only one of his allegations even purports to relate to conduct before the grand jury—and that allegation involves a witness whose transcript he already has—he relies on illogical inferences to suggest that if a prosecutor acted with what he deems to be unreasonable urgency in scheduling a witness's appearance or document production, it follows that the prosecutor likely engaged in some unspecified form of "misconduct" or "abuse" when the same witness appeared before the grand jury. And third, the

former President speculates that if he indeed finds the unspecified misconduct or abuse that he is looking for, it could somehow assist him in preparing "potential litigation regarding the abuse of the grand jury and possibly a motion for disqualification of certain" government attorneys, although without identifying any cognizable legal basis for such a motion. *Id.* at 8.

The former President's allegations of prosecutorial misconduct are unfounded. But even if they were taken at face value—which, as explained below, they should not be—the Disclosure Motion would fall far short of establishing any sort of particularized need for the materials, much less one that outweighs the powerful need for continued secrecy. The motion should therefore be denied.

## BACKGROUND

This matter arises from the former President's retention of classified materials after his term in office ended, and the government's efforts to retrieve those materials. After the United States National Archives and Records Administration ("NARA") informed the Department of Justice that 15 boxes that the former President had previously stored at his residence at Mar-a-Lago and provided to NARA in January 2022 contained classified documents, a grand jury in this district, on May 11, 2022, issued a subpoena to the custodian of records for the former President's post-presidential office—the Office of Donald J. Trump (the "Office")—requesting "[a]ny and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump bearing classification markings [list of classification markings]." As this Court has explained, "[e]nsuring compliance with the May 2022 Subpoena has been slow-going, prompting the government to seek and execute a search warrant at Mar-a-Lago, additional government motions regarding inadequate compliance, repeat visits to this Court, and new searches conducted and updated certifications filed, with the compliance effort dragging into mid-December 2022,

when additional classified documents were recovered from a closet in the Office's designated space at Mar-a-Lago." Opinion, *In re Grand Jury Subpoena*, 23-gj-10, ECF No. 19, at 7 (Mar. 17, 2023) ("Crime-Fraud Opinion").

In summary, on June 3, 2022, attorneys Evan Corcoran and Christina Bobb met with three FBI agents and an attorney from the Department of Justice (Jay Bratt) and turned over a certification and a folder containing 38 documents with classification markings. The certification was signed by Bobb, who was identified as the Office's custodian of records, and stated that "[b]ased upon the information that has been provided to me, I am authorized to certify, on behalf of the Office of Donald J. Trump," that "[a] diligent search was conducted of the boxes that were moved from the White House to Florida," the search was conducted "in order to locate any and all documents that are responsive to the subpoena," and "[a]ny and all responsive documents accompany this certification." Despite the certification, on August 8, 2022, federal agents searched Mar-a-Lago pursuant to a warrant and seized over 100 documents with classification markings. About a month later, in response to another request from the government, the Office refused to conduct another search for responsive records or provide a certification. Litigation before this Court ensued, resulting in additional searches and certifications signed by attorney Timothy C. Parlatore, who testified before the grand jury in December 2022. The grand jury's investigation continued after Parlatore's testimony, and among other things, this Court granted the government's motion to compel two attorneys for the former President to appear before the grand jury and provide certain testimony under the crime-fraud exception to the attorney-client privilege.

The former President now seeks transcripts of testimony from four individuals who he believes have testified before the grand jury. The former President accuses (Mot. at 2) government prosecutors of "misconduct and bias" in the grand jury. According to the former President, he

- 3 -

"anticipates that he will pursue relief from this Court," and he requests the transcripts "[t]o enable him to do so with a fuller record." Mot. at 3. The former President mentions "potential litigation regarding the abuse of the Grand Jury process" and states he will "possibly" file a "motion for disqualification of certain" government attorneys, Mot. at 8, although he does not disclose the forum in which he will pursue this litigation.

## APPLICABLE LEGAL STANDARD

"Federal Rule of Criminal Procedure 6(e) prohibits disclosure of 'matter[s] occurring before the grand jury,' Fed. R. Crim. P. 6(e)(2), and thus requires that '[r]ecords, orders, and subpoenas relating to grand-jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury,' Fed. R. Crim. P. 6(e)(6)." *In re Grand Jury Subpoena, Judith Miller*, 493 F.3d 152, 154 (D.C. Cir. 2007). That rule of secrecy "safeguards vital interests in (1) preserving the willingness and candor of witnesses called before the grand jury; (2) not alerting the target of an investigation who might otherwise flee or interfere with the grand jury; and (3) preserving the rights of a suspect who might later be exonerated." *McKeever v. Barr*, 920 F.3d 842, 844 (D.C. Cir. 2019). After all, "[t]he grand jury as a public institution serving the community might suffer if those testifying today knew that the secrecy of their testimony would be lifted tomorrow," which is a particularly acute concern where, as here, "[t]he witnesses . . . may be employees . . . of potential defendants." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958); *see also Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979). [1]

---

[1] On June 8, 2023, a grand jury in the Southern District of Florida (SDFL) returned a sealed indictment of Nauta and the former President ("defendants"). The defendants have been notified by summons, but the indictment remains sealed at this time. We anticipate discovery being provided promptly upon unsealing and entry of a protective order. The grand jury remains open

To preserve the "indispensable secrecy of grand jury proceedings," *Procter & Gamble Co.*, 356 U.S. at 682 (quotations omitted), "Federal Rule of Criminal Procedure 6(e) makes quite clear that disclosure of matters occurring before the grand jury is the exception and not the rule," *McKeever*, 920 F.3d at 844 (quotations omitted). For such an exception to apply, a movant must generally "carry[] the heavy burden of showing 'that a particularized need exists' that 'outweighs the policy of secrecy.'" *United States v. Apodaca*, 287 F. Supp. 3d 21, 47 (D.D.C. 2017) (quoting *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959)).

As the former President acknowledges (Mot. 7), the only exception even arguably implicated here pertains to disclosure "preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E)(i).  Parties attempting to meet this standard "must show [1] that the material they seek is needed to avoid a possible injustice in another judicial proceeding, [2] that the need for disclosure is greater than the need for continued secrecy, and [3] that their request is structured to cover only material so needed." *Douglas Oil Co.*, 441 U.S. at 222; *see Judicial Watch, Inc. v. Tillerson*, 270 F. Supp. 3d 1, 4-5 (D.D.C. 2017).  Under this standard, "[i]t is clear . . . that disclosure is appropriate only in those cases where the need for it outweighs the public interest in secrecy, and that the burden of demonstrating this balance rests upon the private party seeking disclosure." *Douglas Oil Co.*, 441 U.S. at 223.

## ARGUMENT

The former President's Disclosure Motion should be denied.  Indeed, even if the allegations of misconduct were to be taken at face value, which they should not be, the former President has failed to show any sort of particularized need for the requested materials, much less one that

---

as the government continues to investigate other potential charges in both the District of Columbia and SDFL, including perjury and obstruction of justice.

outweighs the values underlying the policy of secrecy, which are at their apex in the circumstances presented here. To the contrary, the former President is engaged in a transparent fishing expedition whose real goal appears to be uncovering what his current and former employees may have told the grand jury, ostensibly grounded in the speculative possibility that his review might turn up unspecified examples of "misconduct" that could justify future extraordinary relief, in the form of a motion to disqualify government counsel. This falls far short of the necessary showing. Moreover, the Disclosure Motion's allegations of misconduct rest on several errors, mischaracterizations, and baseless accusations, and it does not establish any credible claim of prosecutorial misconduct.

## I. The Disclosure Motion Would Fail Even If Its Facts Were Taken at Face Value.

### A. The former President has not shown that the material is needed to avoid a possible injustice in another judicial proceeding.

To establish a particularized need for grand jury materials preliminarily to or in connection with another judicial proceeding, a party must identify a particularized use "related fairly directly to some identifiable litigation, pending or anticipated." *United States v. Baggot*, 463 U.S. 476, 480 (1983). "[I]t is not enough to show that some litigation may emerge from the matter in which the material is to be used, or even that litigation is factually likely to emerge." *Id.* "The focus is on the actual use to be made of the material," and "[i]f the primary purpose of disclosure is not to assist in preparation or conduct of a judicial proceeding, disclosure under [(E)](i) is not permitted." *Id.* Moreover, "the request for grand jury material must be more than a request for authorization to engage in a fishing expedition." *In re EyeCare Physicians of Am.*, 100 F.3d 514, 518 (7th Cir. 1996) (cleaned up); *see In re Grand Jury 95-1*, 118 F.3d 1433, 1437 (10th Cir. 1997) (same). As such, "where a defendant fails to provide a discrete reason, and instead relies on speculation or

- 6 -

unsupported assumptions, courts have made clear that disclosure of grand jury minutes is not warranted." *Apodaca*, 287 F. Supp. 3d at 47.

Here, the former President's motion rests on mere speculation and unsupported assumptions about what the grand jury materials might show. Indeed, unlike in other cases in which disclosure has been authorized, he offers neither evidence nor even a *theory* of what specifically the grand jury transcripts might show, beyond the vague suggestion that they might show some form of unspecified "misconduct." *See In re Grand Jury 95-1*, 118 F.3d at 1437 (reversing authorization under Rule 6(e)(3)(E)(i) where the movant's alleged need for grand jury materials to prepare a motion for judicial disqualification was "general and vague" and the absence of allegations about what the material would contain "clearly indicates the speculative nature of [the movant's] allegations . . . and suggests [the movant] was simply interested in engaging in a fishing expedition"). Some of the very cases the former President relies on (Mot. 9) illustrate the same point. *See, e.g., United States v. Schlegel*, 687 F. App'x 26, 30 (2d Cir. 2017) (affirming denial of request for grand jury materials where the defendant "failed to articulate any concrete allegations of Government misconduct" and instead "merely speculate[d]" about what the government may have presented to the grand jury); *United States v. Hunt*, 534 F. Supp. 3d 233, 259 (E.D.N.Y. 2021) (denying request for grand jury materials where the defendant's allegations of prosecutorial misconduct "ultimately amount to mere speculation that the Government 'potentially' gave a misleading instruction to the grand jury").

Moreover, the former President makes no effort to connect the facts that he purportedly hopes to find with the specific use he intends to make of them. But a showing of particularized need "cannot even be made without consideration of the particulars of the judicial proceeding with respect to which disclosure is sought." *Douglas Oil Co.*, 441 U.S. at 480 n.4. Here, the former

President suggests (Mot. 8) that he needs the material because he "anticipates potential litigation regarding the abuse of the Grand Jury process and possibly a motion for disqualification of certain OSC attorneys."

He does not, however, identify any cognizable basis for a pre-indictment motion alleging abuse of the grand jury process. *Cf.* 2 Fed. Grand Jury § 21:3 (2d ed.) (noting that "[a] person who wants to challenge grand jury abuse during an investigation, before an indictment has been returned . . . will have standing to do so only if she has been subpoenaed to testify or otherwise provide evidence to the grand jury, or if she has standing to act on behalf of a third party which has been subpoenaed to provide evidence to the grand jury") (footnotes omitted)).

Nor does he identify any cognizable basis for disqualification, such as a conflict of interest. This failure is particularly striking given that "[t]he disqualification of Government counsel is a drastic measure and a court should hesitate to impose it except where necessary." *United States v. Bolden*, 353 F.3d 870, 878 (10th Cir. 2003) (quotations omitted). Indeed, as the Ninth Circuit recently explained, "[t]he doctrine of separation of powers requires judicial respect for the independence of the prosecutor," such that "absent a violation of the Constitution, a federal statute, or a procedural rule," courts "do not dictate to the Executive branch who will serve as its prosecutors." *United States v. Williams*, -- F.4th --, 2023 WL 3516095, at *5 (9th Cir. May 18, 2023) (cleaned up). "Put differently, [courts] do not stamp a chancellor's foot veto over activities of coequal branches of government unless compelled by the law to do so." *Id.* (quotations omitted). Here, the former President has not identified any law that could possibly compel the Court to grant a motion to disqualify any government attorney from participating in this case.

The Disclosure Motion therefore fails to show that the requested material "is needed to avoid a possible injustice in another judicial proceeding." *Douglas Oil Co.*, 441 U.S. at 222. The motion may be denied on that basis alone.

**B. The former President has not shown that the need for disclosure is greater than the need for continued secrecy.**

Even if the former President had shown a particularized need (which he has not), the Disclosure Motion fails to show "that the need for disclosure is greater than the need for continued secrecy." *Douglas Oil Co.*, 441 U.S. at 222. The balance between particularized need and secrecy "should always be weighted presumptively toward the government when the targets of a grand jury investigation are requesting disclosure of grand jury testimony for use in that proceeding." *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6th Cir. 1986). "Concern as to the future consequences of frank and full testimony is heightened where the witness is an employee of a [subject] under investigation." *Douglas Oil Co.*, 441 U.S. at 222. In all cases, "courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries," with a particular eye toward the possibility that the "[f]ear of future retribution or social stigma may act as powerful deterrents to those who would come forward to aid the grand jury in the performance of its duties." *Id.* It is difficult to conceive of something more likely to chill full and frank testimony, both now and in future cases, than an employer attempting to see what his employees may or may not have told the grand jury.

These factors make the public interest in secrecy extremely weighty. In combination they likely would outweigh even the strongest possible showing of particularized need, and certainly outweigh the nonexistent showing that the former President has made here.

The former President seeks to avoid this conclusion by invoking (Mot. 11-12) "the common-sense proposition that secrecy is no longer 'necessary' when the contents of grand jury

matters have become public." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d at 1140. Of course, "[t]here must come a time . . . when information is sufficiently widely known that it has lost its character as Rule 6(e) material." *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994). But in seeking to make such a showing here, the former President conflates public knowledge of the *fact* of an investigation (which is indeed widely known) with public knowledge of the *substance* of the testimony that specific witnesses purportedly gave to the grand jury, which neither the public nor the former President knows. Indeed, the whole premise of his motion is that he would like to know, but at present can only speculate about, "Rule 6(e)'s bread and butter: the identities of witnesses or jurors, the substance of testimony as well as actual transcripts, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like." *Judicial Watch, Inc.*, 270 F. Supp. 3d at 5 (quotations omitted). Based on the reporting that the former President relies on (Mot. 11 nn. 3-5), it does not appear that any of the four named witnesses has even confirmed that he or she appeared before the grand jury, much less publicly disclosed the substance of any testimony that he or she may have given.

Moreover, even in cases where details of a witness's grand jury testimony have been reported in the press, that alone does not make the testimony discoverable, since "Rule 6(e) does not create a type of secrecy which is waived once public disclosure occurs," *Barry v. United States*, 740 F. Supp. 888, 891 (D.D.C. 1990), particularly where, as here, the government has neither confirmed nor denied the accuracy of any public reporting, *see In re North*, 16 F.3d at 1245. As such, the former President's misplaced reliance on cases involving requests for the disclosure of already-public information does nothing to alter the conclusion his "need" for the material, such as it is, is heavily outweighed by the need for continued grand jury secrecy. *See In re New York Times Co.*, No. MC 22-100, 2023 WL 2185826, at *14-15 (D.D.C. Feb. 23, 2023) (denying request

for grand jury materials related to "former President Trump's privilege challenge to the Jan. 6 grand jury investigation"); *In re Press Application for Access to Judicial Records Ancillary to Certain Grand Jury Proceedings Concerning Donald J. Trump & the Trump Organization*, No. MC 220128, ECF No. 6 (D.D.C. Mar. 11, 2023) (denying request for grand jury materials related to certain aspects of the classified-documents investigation).

### C. The former President has not shown that his request is structured to cover only needed material.

Finally, the Disclosure Motion is structured to cover more than the purportedly needed material. To be sure, given the speculative nature of the request, it is hard to say that any material is more or less "needed" than any other. But the Disclosure Motion goes further than even its own internal logic would allow. After all, the former President's theory appears to be (Mot. 5) that if prosecutors unreasonably conveyed "a false sense of urgency" when dealing with certain witnesses, it somehow follows that the prosecutors must also "have been abusive in their treatment of witnesses appearing before the grand jury." But even that dubious logic provides no support for the request (*id.* at 10) to review "the 'minutes' during which prosecutors often share thoughts about the direction of the investigation and their impressions of witnesses who have been questioned." Indeed, his request for the minutes only supports the inference that he is engaged in a fishing expedition seeking insight into the inner workings of the investigation.

### II. The Disclosure Motion Rests on Numerous Factual Inaccuracies and Mischaracterizations.

Although the former President's motion is legally deficient and should be dismissed on that ground alone, the former President's factual allegations of prosecutorial misconduct are also false and unfounded. The discussion below supplies additional factual context in response to the

allegations made in the Disclosure Motion and explains why those allegations do not support the relief sought.

### A. Grand Jury Testimony of Timothy Parlatore

#### 1. Relevant Facts

Until his recent withdrawal from representing the former President, Timothy Parlatore represented the former President with respect to the May 2022 subpoena starting in October 2022, a couple months after the execution of the search warrant at Mar-a-Lago.  Parlatore Grand Jury Tr., *In re Grand Jury Subpoena*, 23-gj-10, ECF No. 12, at 16-17 (Mar. 10, 2023) ("GJ Tr.").  About a month earlier, on September 15, 2022, the government had expressed its continuing concern that the former President or his Office retained additional classified documents beyond those uncovered through execution of the search warrant. *See* Crime-Fraud Opinion at 23.  After the Office refused to conduct another search for responsive records or provide a certification, the government filed a motion to compel compliance with the May 2022 subpoena.  *Id.* at 23-24.  Minutes before the hearing on the motion to compel began on October 27, 2022, counsel for the former President provided the government and the Court with a declaration from Parlatore stating that the Office had authorized him to provide the declaration and describing a search "undertaken on the premises at Bedminster," where the former President maintained a residence, by "elite professionals who have extensive prior experience searching for sensitive documents and contraband."  Declaration of Timothy C. Parlatore, Esq. *In re Grand Jury Subpoena*, No. 22-gj-40, ECF No. 9, at 2 (Oct. 26, 2022).

The Court granted the government's motion to compel on November 9, 2022, and issued an order stating that "a custodian with first-hand knowledge of the Office's diligent and comprehensive efforts to locate responsive documents and with the ability to certify that no

additional responsive records remain in the Office's possession, must comply with the subpoena." Order, *In re Grand Jury Subpoena*, 22-gj-40, ECF No. 15, at 2 (Nov. 9, 2022). The order required that the Office provide the government with a new certification "from a custodian of records with personal knowledge of respondent's efforts to comply with the grand jury subpoena" and that the custodian "appear before the grand jury to provide testimony regarding" the Office's "compliance efforts and verification of the contents of the certification." *Id.* at 2-3.

Parlatore filed a status report on behalf of the Office six days later describing efforts to search for responsive documents and disclosing that two additional classified documents had been found in a storage unit leased by the Office. *In re Grand Jury Subpoena*, Case No. 22-gj-40, ECF No. 19 (Nov. 15, 2022). The status report identified five locations to search for "potentially responsive documents" and stated that one of those locations, Mar-a-Lago, would not be searched because there was "no reason to believe that potentially responsive documents remain[ed] there." *Id.* at 1-2. In a minute order on November 18, 2022, the Court partially granted a motion by the Office for additional time to file a final certification and set a new deadline of November 23, 2022, noting an "obvious concern" that the status report was submitted by an attorney who did not attest to be "a custodian of records with personal knowledge of respondent's efforts to comply with the grand jury subpoena," a requirement of both the May 2022 subpoena and the Court's November 9 order. Minute Order, *In re Grand Jury Subpoena*, Case No. 22-gj-40 (Nov. 18, 2022).

On November 23, 2022, Parlatore submitted a sworn certification that largely reiterated the information from the November 9 status report but included some additional details, including information about an intervening search of Trump Tower. *See In re Grand Jury Subpoena*, Case No. 22-gj-40, ECF No. 22 (Nov. 23, 2022). Contrary to the Court's previous orders, the certification contained a section, entitled "Role of Certificant," asserting that the Office was not

obligated to use a custodian of records. *Id.* at 7-8.  The certification stated that Parlatore would testify "to the limited information contained" in the certification, "without any further waiver of privilege[,]" although the Office's position was that "no further testimony should be necessary." *Id.* at 8.  As the Court later explained, "[n]o additional details were provided to clarify that qualifying language, leaving the government guessing as to what information exactly Parlatore would provide during any subsequent testimony—*e.g.*, whether his testimony would include details not specifically provided in the certification or whether the Office planned to instruct Parlatore to invoke privileges not previously asserted in this litigation, such as attorney-client privilege, work-product privilege, or executive privilege, should he be questioned about any matter outside the four corners of the certification." Crime-Fraud Opinion at 30-31.

The government filed a motion for an order requiring the Office to show cause why it should not be held in civil contempt for failure to comply with the Court's November 9 order.  At a hearing on the motion on December 9, 2022, the Court stated that it lacked a "complete record" to issue a contempt citation because the government had not put Parlatore in the grand jury and "asked him a whole series of questions." Hearing Tr. at 11-13, *In re Grand Jury Subpoena*, Case No. 22-gj-40 (Dec. 9, 2022) (Contempt Hearing Tr.). The Court explained that to evaluate compliance with its orders and a potential contempt citation, it was "going to want concrete grand jury transcripts about what is said and what isn't said, what is left unanswered." *Id.* at 28. Counsel for the former President and his post-presidential office confirmed that Parlatore would be "willing to" testify about "where the search was conducted, why areas were searched, why areas weren't searched—all of the normal things that a custodian of records would do, he will do it," although it "may involve a different issue" if Parlatore were asked a question about "specific conversations

with his client," the former President. *Id.* at 31; *see id.* at 38-39, 43 (colloquies regarding Parlatore's prospective testimony).

The Court did not issue a contempt citation given what it later described as "the productive discussion about expectations for additional searches and the contents of a certification for compliance with the May 2022 subpoena and the Court's Orders issued on November 9 and 18, 2022, and the Office's apparent willingness to try to meet those expectations." Crime-Fraud Opinion at 32 n.9. The Court ordered the Office to file a revised certification with additional details, and the Court specified that "full compliance" with the Court's orders would require, among other things, that "Parlatore would testify before the grand jury regarding the Office's efforts and due diligence to respond to the May 2022 subpoena, including testifying to information not already mentioned in the revised certification and details regarding how Parlatore determined which locations needed to be searched and when, why certain locations were selected to be searched and others not, efforts by Bobb to prepare to sign the June 3, 2022 certification, the identities of the search-team members, and those members' exact search methodologies." *Id.* at 32-33. It was understood that Parlatore "might be asked questions about the content of direct conversations with the former president" and that there might be the "potential need for additional litigation regarding counsel testifying to conversations with the former president." *Id.* at 33-34.

The Office provided a revised certification, sworn by Parlatore, on December 16, 2022. *In re Grand Jury Subpoena*, Case No. 22-gj-40, ECF No. 34 (Dec. 16, 2022). The revised certification described searches, including a search of Mar-a-Lago on December 15-16, 2022, conducted by two "elite professionals" with military experience and experience "searching for sensitive documents" and "contraband." *Id.* at 5-11. The search of Mar-a-Lago "[r]emarkably . . .

- 15 -

uncovered four more responsive records," which the certification "misleadingly refer[red] to . . . as 'low-level ministerial documents.'" Crime-Fraud Opinion at 35.

Parlatore appeared before the grand jury on December 22, 2022. Parlatore explained that he represented the former President but that he understood his appearance before the grand jury as principally to provide his "personal knowledge" about efforts undertaken by the post-presidency office "to comply with" the May 2022 subpoena. GJ Tr. 10-11. He acknowledged that such testimony "[o]rdinarily" would be handled "by a custodian of records for the organization." GJ Tr. 12. Parlatore thus acknowledged that he was "wear[ing] two hats," namely, an attorney for the former President and a stand-in custodian. GJ Tr. 11.

Before questioning turned to the substance of Parlatore's "personal knowledge" of subpoena compliance, the government prosecutor clarified that the government was "not seeking today to elicit . . . privileged information." GJ Tr. 13. At the same time, the prosecutor alerted Parlatore that if Parlatore claimed privilege in response to any question, the prosecutor would ask Parlatore which privilege he was invoking and "the basis for the invocation." GJ Tr. 13. Parlatore responded, "Sure," and when the prosecutor followed up to ask whether Parlatore understood, Parlatore said, "Absolutely." GJ Tr. 13. In keeping with these exchanges—and consistent with the Court's expectation that the government would "put [Parlatore] in the grand jury," ask him "a whole series of questions," and create "concrete grand jury transcripts about what is said and what isn't said, what is left unanswered," Contempt Hearing Tr. 11, 28—government prosecutors probed Parlatore's knowledge and conduct as the functional equivalent of a custodian of records, and when Parlatore refused to answer questions based on privilege, they sought to clarify the precise nature and scope of Parlatore's privilege invocations. At one point, Parlatore claimed attorney-client privilege after being asked whether the former President was the source for

- 16 -

Parlatore's testimony about statements the former President purportedly made to government investigators about being cooperative. GJ Tr. 40. The prosecutor then asked if a client could waive privilege and questioned why the former President had not allowed Parlatore to testify as to these conversations if he (the former President) meant to be cooperative, but the government prosecutor also quickly made clear that she was "absolutely not saying" that waiver of privilege is required to be cooperative and that, consistent with her earlier statement, she did not mean to "induce any waivers." GJ Tr. 40-43. Nonetheless, Parlatore on several occasions accused the government prosecutors of "trying to improperly invade the attorney/client privilege." GJ Tr. 45; *see also* GJ Tr. 77. After one such accusation, a government prosecutor conveyed to Parlatore that "if [he] want[ed] to invoke the privilege, [he] can just say that" instead of casting aspersions about "what the people on this side of the table are and are not trying to do." GJ Tr. 77.

Over the course of the 245-page grand jury transcript, Parlatore claimed privilege numerous times. *See, e.g.*, GJ Tr. 25 (attorney-client and work-product privilege concerning who told Parlatore about Christina Bobb's efforts to respond to the subpoena in Bobb's capacity as custodian of records); *id.* at 40 (attorney-client privilege concerning whether the former President recounted to Parlatore a conversation between the former President and a federal government prosecutor about which Parlatore had just testified); *id.* at 45 (attorney-client and work-product privilege concerning the individuals with whom Parlatore spoke before his grand jury testimony); *id.* at 47 (privilege concerning what Boris Epshteyn told Parlatore); *id.* at 58-59 (attorney-client and work-product privilege concerning whether Parlatore had asked anyone if boxes had been moved out of the storage room before June 2, 2022); *id.* at 77 (attorney-client and work-product privilege concerning with whom the legal team spoke before deciding to search Bedminster); *id.* at 104 (privilege concerning why locations other than Mar-a-Lago, including storage units, Trump

Tower, and the Flagler office, were not searched before November 9, 2022); *id.* at 113 (work-product privilege concerning with whom the legal team spoke to determine not to search Mar-a-Lago in November 2022); *id.* at 114 (work-product privilege concerning whether the legal team consulted any documents in making the determination not to search Mar-a-Lago in November 2022); *id.* at 146 (work-product privilege concerning whether individuals hired to carry out searches took notes, photographs, or video recordings, or sent emails, text messages, or any kind of messages); *id.* at 155-56 (privilege concerning whether Parlatore spoke with anyone to determine if the General Services Administration (GSA) packed boxes that were shipped out from the White House); *id.* at 163 (privilege concerning whether somebody talked to the former President); *id.* at 185 (privilege concerning the identity of the person with whom Parlatore spoke to determine the former President's "normal movements" between properties); *id.* at 196 (privilege concerning what the search team generally told Parlatore about documents found at Mar-a-Lago); *id.* at 217 (attorney-client and work-product privilege concerning what steps Parlatore took to determine whether any boxes with documents that had classified markings had been moved); *id.* at 236 (privilege concerning whether Parlatore told the former President that Parlatore was testifying before the grand jury). In some instances, those privilege invocations came in response to "questions about the mechanics (who, how, when, where) of the search." *In re Feldberg*, 862 F.2d 622, 628 (7th Cir. 1988) (concluding that such questions are not covered by attorney-client privilege).

### 2. Discussion

The former President contends (Mot. at 5, 9-10) that the government engaged in prosecutorial misconduct by asking Parlatore questions that he declined to answer on privilege grounds and, in one instance, allegedly invited the grand jury to draw improper inferences from

Parlatore's refusal to answer a question based on attorney-client privilege. As explained above, these claims do not support the relief requested by the former President. The former President already possesses Parlatore's grand jury transcript, and any alleged misconduct during the questioning of Parlatore would not warrant the production of grand jury transcripts for other witnesses based on unfounded speculation that alleged misconduct with respect to one witness supports the conclusion that there was misconduct during the questioning of different witnesses. But regardless, the former President's claim also fails because his misconduct allegations are unfounded.

It was entirely proper to ask Parlatore questions about his knowledge and conduct as the individual designated to perform the responsibilities of a custodian of records for the Office, even if Parlatore refused to answer some questions based on claims of privilege. That was precisely the procedure the Court contemplated when it deferred consideration of a contempt citation after the former President's counsel represented that Parlatore would be available to testify in the grand jury as the equivalent of a custodian of records, even if Parlatore did not embrace that nomenclature. The Court expected the government to ask Parlatore a "series of questions" to create a "fairly complete record . . . of where the holes were," *i.e.*, the questions Parlatore would refuse to answer based on privilege. Contempt Hearing Tr. 11. It was understood by all that there would be a "potential need for additional litigation regarding counsel testifying to conversations with the former president." Crime-Fraud Opinion at 33-34. The government did not commit misconduct by proceeding along these established ground rules and asking questions that elicited privilege claims to potentially tee up future litigation. Indeed, when the government filed a motion to compel testimony from the former President's attorney Jennifer Little under the crime-fraud exception, the former President argued that the motion was not yet ripe because the government

did not put her in the grand jury and require her to decline to answer questions and instead received confirmation from her attorney that she would decline to answer questions. *See* Crime-Fraud Op. 78 n.24. The former President cannot claim that the government committed misconduct by following the procedure with Parlatore that he claims the government was required to follow with Little.

To the extent the former President suggests that the frequency with which Parlatore invoked privilege was problematic, *see* Mot. at 5 (noting that Parlatore invoked privilege "[n]o fewer than *forty-five* times"), that was a problem of the former President's own making. Rather than select a non-lawyer to act as a custodian of records, he selected a lawyer; indeed, a lawyer who represented him personally. Regardless of Parlatore's status as a lawyer, however, the government was entitled to question Parlatore to determine whether there had been full compliance with the May 2022 subpoena. "A grand jury may compel a corporate records custodian to testify about the nature of his search and the adequacy of the disclosure," indeed, "[s]uch an inquiry may be essential to determine whether the grand jury has received the documents to which it is entitled." *Feldberg*, 862 F.2d at 627. And "[i]f the inquiry itself is legitimate, the addressee of the subpoena cannot put the subject off limits by having counsel turn over the documents." *Id.* "Since questions about the adequacy of the search do not entail legal advice, the topic is not off limits just because an attorney plays a role." *Id.* To be sure, an attorney-custodian's advisory communications with a client may be privileged, but the Office could not "throw the veil of privilege over details of how files were searched, and by whom, through the expedient of involving a lawyer in the process." *Id.* at 628; *see id.* ("questions about the mechanics (who, how, when, where) of the search" are not privileged).

Ignoring this larger context, the former President focuses (Mot. 5, 9) on a single exchange between Parlatore and the government prosecutor.  In response to questions concerning whether the former President would permit the government to "look inside" boxes in a storage area at Mar-a-Lago, Parlatore testified that the former President had told government investigators during a meeting on June 2, 2022 (for which Parlatore was not present), that "if there's anything else you need, come let me—you let us know."  GJ Tr. 40.  When asked in a follow-up question whether the former President had told Parlatore about the former President's seemingly cooperative statement, Parlatore refused to answer on the basis that any communications between him and his client, the former President, were privileged.  GJ Tr. 40.  The prosecutor then inquired whether the attorney-client privilege was limited to communications for the purpose of obtaining legal advice.  GJ Tr. 41.  Parlatore suggested instead that "[a]ny information obtained from a client is part of . . . legal advice or representation."  GJ Tr. 41.  After Parlatore confirmed, in response to a question, that a client can waive the attorney-client privilege, the prosecutor asked, "if the former President's so cooperative, why hasn't he allowed you to share his conversations with the Grand Jury today."  GJ Tr. 41.

To be clear, no grand jury witness or subject is required to waive privilege to be deemed cooperative, and the government regrets this particular exchange with Parlatore to the extent it may be construed to support such a suggestion.  But whatever implication could be drawn from the prosecutor's question taken in a vacuum, the prosecutor quickly and emphatically corrected any potential misunderstanding, and the questioning proceeded thereafter as reflected in more than 200 additional pages of the transcript.  When Parlatore suggested that the prosecutor's question implied that to be cooperative required waiving the attorney-client privilege, the prosecutor immediately made clear that she was "absolutely not saying that," GJ Tr. 42, and that the

government was not seeking "to induce any waivers . . . of attorney/client privilege," GJ Tr. 43. That statement, moreover, reflected the similar caution the government prosecutor had made at the outset of Parlatore's testimony. *See* GJ Tr. 13 (government prosecutor explaining to Parlatore that "we are not seeking today to elicit from you privileged information"). This context cured any potential for grand juror confusion and refutes the former President's claim of misconduct.

**B. August 2022 Meeting with Stanley Woodward at the Department of Justice**

**1. Relevant facts**

Waltine Nauta served as a valet—often referred to as a "body man"—for the former President both during and after his presidency. At the time of the meeting described in the Disclosure Motion, Nauta was a subject of the Special Counsel's Office's investigation. The FBI interviewed Nauta on May 26, 2022, and he testified before the grand jury in the District of Columbia on June 21, 2022. At his interview, he was represented by Derek Ross. During his grand jury appearance, Nauta was represented by Derek Ross and Cameron Seward.

After Nauta had testified in the grand jury and DOJ attorneys had informed Ross and Seward that he had become a subject of the grand jury investigation, Nauta obtained new counsel, Stanley Woodward. On August 15, 2022, attorneys for the National Security Division (NSD) who were handling the investigation at that time contacted Woodward by email to invite Woodward to meet with them to discuss Nauta. The email stated: "As you know from Mr. Nauta's previous counsel, Derek Ross, we and the FBI would like to further question Mr. Nauta about various records stored at Mar-a-Lago. We think it would be beneficial first to meet with you in person to discuss the way forward with Mr. Nauta. Please let us know your availability for later this week." In response to that invitation, Woodward agreed to meet with prosecutors assigned to the investigation at their office in the Main Justice Building on August 24, 2022.

Woodward met with the prosecutors on August 24, 2022 at the Main Justice Building to discuss Nauta. Three prosecutors were present in person and one prosecutor participated by video. The prosecutors in the room were Jay Bratt (Chief of the Counterintelligence and Export Control Section (CES)), Julie Edelstein (Deputy Chief of CES), and Brett Reynolds (Trial Attorney in CES). Michael Thakur (Assistant United States Attorney for the Southern District of Florida) participated by video. The prosecutors informed Woodward that Nauta had criminal exposure and that he was a subject of the grand jury investigation. They also informed Woodward that they were interested in obtaining Nauta's potential cooperation and resolving his situation. Woodward asked about the topics on which they were interested in Nauta's cooperation, and the prosecutors informed him that the focus was on Nauta's involvement in moving boxes. Woodward indicated that he had not yet met with Nauta to discuss the matter, but that he would speak with Nauta and might be interested in providing an attorney proffer after he spoke with his client. At the conclusion of the meeting, Woodward indicated that he would get back to the prosecutors after speaking with Nauta. Woodward did not object to anything that happened in the meeting or raise any allegations or complaints about how the prosecutors had handled the meeting—either at that time, in any of his many subsequent dealings with the prosecutors in this investigation, or at any time until the filing of the present Disclosure Motion.

After the August 24 meeting, on September 30, 2022, the prosecutors and Woodward spoke by telephone about Nauta, and the prosecutors reiterated their interest in sitting down again with Nauta. In that call, Woodward did not raise any allegations or complaints about what had transpired in his meeting with the prosecutors on August 24. Woodward later requested to review the transcript of Nauta's grand jury testimony, and, consistent with D.C. Circuit law, *see In re Grand Jury*, 490 F.3d 978, 990 (D.C. Cir. 2007), in October 2022 the prosecutors arranged for him

to do so.  Again, Woodward made no complaint about anything that had happened in his earlier meeting with the prosecutors.  Indeed, in more than nine months since the August 2022 meeting, Woodward—who has dealt with several prosecutors from the Special Counsel's Office during that span—never raised any allegation, concern, or complaint about that meeting.  The government had never seen or heard of any such complaints about that meeting until the Disclosure Motion.

## 2.  Discussion

The Disclosure Motion (Mot. 3) claims that one of the prosecutors in the August 24 meeting, Jay Bratt, "threatened [Woodward] that he would lessen his odds of a judicial appointment if he failed to pressure [Nauta] to cooperate with the OSC…"  The government flatly rejects the claim that anyone threatened Woodward in that meeting in any way or that the government "insinuated" any connection whatsoever between Woodward's potential judicial nomination and Nauta's potential cooperation.  Indeed, the notion that a 30-year veteran federal prosecutor would engage in such a ham-handed tactic in this sensitive investigation in a meeting alongside three other prosecutors and in the context of his first interaction with a defense attorney is nonsensical.  And the belated suggestion that such conduct took place in the meeting—nine months after the fact and only days after Woodward has been informed that Nauta is a target— bolsters that conclusion.   Below we discuss the claim and address the version of events and arguments that are now being proffered by the former President and Woodward.[2]

---

[2] With leave from the Court, the government contacted Mr. Woodward on June 7, 2023, to review with him the claims that were made on pages 4 and 10 of the Disclosure Motion, and the government provided Woodward with the relevant excerpts from those pages of the motion.  The government informed Woodward that it was committed to providing the Court with an accurate account of what Woodward recalled from his meeting with the prosecutors in August 2022, and, at the government's invitation, Woodward agreed to provide his own written version of what took place so that the government could provide that to the Court with its response to the motion. Woodward's letter is attached as Exhibit A.

The allegations in the Disclosure Motion hinge entirely on one benign fact: during the August 2022 meeting, Bratt mentioned something about Woodward's connection to the D.C. Superior Court Judicial Nomination Commission ("Commission"). Bratt recalls that he had never dealt with Woodward previously but was aware of the favorable reputation of Woodward's partner, Stanley Brand. Prior to the meeting, Bratt did an internet search and found information that he believed indicated that Woodward was on the Commission, which handles nominations for appointment to the Superior Court bench in the District of Columbia. Bratt's recollection is corroborated by information that is currently on the Commission's website at https://jnc.dc.gov/biography/stanley-woodward-jr (Copy at Exhibit B). A google search for Woodward brings up a link that displays "Stanley Woodward, Jr. / jnc – Judicial Nomination Commission," and clicking on the link brings up a page with the prominent header, "Judicial Nomination Commission" and below it provides Woodward's biography. As such, the webpage suggests on its face that Woodward is connected to the Commission. Bratt mentioned this to Woodward early in their meeting purely as a matter of professional courtesy and only to indicate to Woodward that he understood that Woodward must have a good reputation. Nothing more was intended.

The prosecutors recall (and Woodward confirms) that Woodward corrected Bratt about the details. Bratt recalls that Woodward corrected him by explaining that Woodward was not *on* the Commission, but instead that he was, in fact, a potential nominee. Woodward has a different recollection of those details. He says that Bratt mentioned that Woodward was a nominee, and Woodward corrected him that he was not, in fact, a nominee, but that, consistent with the Superior Court nomination process, Woodward's name had been submitted by the Commission to the White

which Nauta would almost certainly have to do if he were to cooperate in the investigation. Again, there was nothing inappropriate or threatening about this comment to Woodward in Woodward's capacity as Nauta's new attorney; it was a simple and accurate statement about the situation that Nauta faced. Woodward did not object to the comment or dispute the truth regarding Nauta's predicament. Like the other comments, Woodward never mentioned or complained about it, and the government was unaware of this purported concern until the Disclosure Motion was filed.

In sum, the characterization of the meeting set forth in the Disclosure Motion and Woodward's letter is not credible. At best, and giving Woodward's letter the most charitable reading possible, the facts indicate that Woodward had a profound misunderstanding of what Bratt said and meant to convey in the meeting, and he is now—nine months later—warping that misunderstanding into an allegation of misconduct for strategic reasons. Both sides agree that the topic of the Nominations Commission came up in the meeting, but only the government's version of events is logical and credible. The only reasonable conclusion is that Bratt mentioned the topic of Woodward's connection to the Commission solely as matter of polite conversation regarding Woodward's legal experience and reputation. This was done by way of introduction and intended as a professional compliment in light of the fact that Bratt had not worked with Woodward previously. Bratt and the other prosecutors understood it that way. They certainly did not perceive Bratt to have said or done anything threatening or intimidating.

The claim that Bratt began the meeting in August 2022 with a brazen threat is false. Bratt, a veteran prosecutor of more than 30 years and Chief of CES, did nothing inappropriate in the August 2022 meeting, and the Special Counsel's Office and its prosecutors are committed to the

highest standards of professionalism in this investigation.[4]  The much belated and eleventh-hour claim by the former President and Woodward at this stage of the investigation should not be credited, and the Disclosure Motion should be denied.

### C. Grand Jury Appearance of Kashyap Patel in September 2022

#### 1. Relevant facts

Without supplying any surrounding context, the Disclosure Motion argues (Mot. 6) that a prosecutor from the Special Counsel's Office "balked at delaying the Grand Jury appearances of several witnesses represented by Stanley Woodward after Mr. Woodward suffered a compound fracture in a motor vehicle accident."  It further contends (*id.*) that the prosecutor "callously asked, 'What will you come up with next week?'"  Viewed in context, however, the facts of the scheduling exchange provide no support for the former President's claim.

On Monday, September 19, 2022, the FBI personally served witness Kashyap "Kash" Patel with a grand jury subpoena, commanding him to appear on September 29, 2022.  Prior to engaging counsel, Patel contacted government counsel on Friday, September 23, 2022, to request a two-week extension.  The government agreed to that extension and set his appearance for October 13, 2022.  Thereafter, Woodward contacted government counsel on September 27, 2022, explaining that he had just begun a lengthy jury trial—*United States v. Rhodes* et al., No. 22-cr-15 (D.D.C.)—but that Patel had retained him.  On September 30, 2022, Woodward requested an additional indefinite extension of Patel's grand jury appearance until some point after the *Rhodes* trial concluded.  (Ultimately, the verdict in that trial was not returned until November 29, 2022,

---

[4] On June 7, 2022, at Bratt's request, the Special Counsel's Office reached out to OPR so that he could make a self-referral of this issue for OPR's review.  Such self-referrals are made routinely when allegations are made against Department of Justice prosecutors in order to ensure the integrity of our work.  The self-referral is in no way an indication that Bratt or the Special Counsel Office's believe that he did anything inappropriate.

approximately six weeks after Patel's already-postponed appearance date of October 13, 2022.) The government was unwilling to consent to the indefinite extension that Woodward sought. Woodward, for his part, declined various alternatives offered by the government, including scheduling Patel's grand jury appearance for Friday afternoons, when the *Rhodes* trial was not sitting, and a voluntary interview by prosecutors and agents over a weekend.

On October 7, 2022, Patel (through Woodward) filed a motion to quash his grand jury appearance, arguing that requiring Patel to appear pursuant to the grand jury's subpoena would violate his constitutional rights by depriving him of his counsel of choice, *i.e.*, Woodward, who was occupied with a jury trial elsewhere in the courthouse. The Court denied the motion to quash on October 11, 2022, *see In re Grand Jury No. 22-03 Subpoena 63*-13, No. 22-gj-41, Minute Order (Oct. 11, 2022), and required Patel to appear as scheduled on October 13. *See id.* ("Mr. Patel requests a delay of some unspecified time period in his testimony because his counsel, Stanley Woodward, will be engaged in the *United States v. Rhodes* trial, Case No. 22-cr-15, scheduled to last several weeks, with no promises as to when his counsel will have time available. Mr. Patel retained Mr. Woodward on the attorney's first day of jury selection in *Rhodes* when such circumstance made fully apparent that counsel would be unavailable during Mr. Patel's scheduled grand jury testimony. In addition, the government has already demonstrated flexibility in meeting Patel's scheduling needs . . . . Testifying before a grand jury is not a game of find-or-seek-a-better-time or catch-me-if-you-can, and a witness cannot indefinitely delay a proceeding based on his counsel's convenience . . . .").

Patel appeared before the grand jury on October 13, 2022, where he repeatedly declined to answer questions on the basis of the rights afforded to him by the Fifth Amendment. Thereafter, the government moved to compel Patel's testimony. The Court granted the government's motion

to compel, contingent on the government offering statutory immunity. The government ultimately did so, granting Patel statutory immunity pursuant to 18 U.S.C. § 6003 for his grand jury testimony. The Court's order on the motion to compel specifically directed Patel to appear before the grand jury on either October 27 or November 3, 2022—dates that had been cleared with all counsel during a hearing on the motion to compel.

On October 24, 2022, NSD Trial Attorney Brett Reynolds contacted Woodward and indicated that Patel's testimony had been set for October 27. In that same email communication, Reynolds indicated that he had heard about Woodward's injury (which happened during the *Rhodes* trial) and wished him well. Woodward responded that he would not know until two days later, October 26, whether he would require surgery that would occupy him on October 27, and suggested that it would be "prudent" for the government to book grand jury time for November 3 as well. Reynolds responded that they would prefer to proceed on October 27 if possible, but that if Woodward's injury made it impossible to do so, the government would "move some things around to get the appearance locked in for [November 3]." Woodward and Reynolds spoke by phone the next day, October 25, 2022. During the call, Reynolds conveyed his preference to proceed that week, because there was no predicting whether anything unforeseen would happen the next week. Reynolds recalls that Woodward had informed them that his wife was due to have a baby that coming weekend, and he feared that Woodward's trial obligations, injury, baby, and any other unforeseen events would further delay things. As noted above, the Court's order directed the appearance to occur on either October 27 or November 3, so any further delay would have required additional motions practice. During the same call, however, Woodward advised for the first time that Patel's appearance on October 27 would be categorically impossible because of Woodward's condition. With that representation by Woodward, the prosecutors did not force him

to proceed that week, and instead agreed to his request to delay Patel's grand jury testimony to the next week, November 3. That offer was confirmed to Woodward by email that evening, offering additional sympathy for Woodward's injury. Neither at the time or any time subsequently did Woodward and Patel object to the government accommodating their request to move the testimony to November 3, and Patel ultimately testified before the grand jury on November 3 under the government's grant of statutory immunity.

### 2. Discussion

There was nothing inappropriate about the government's efforts to move the grand jury investigation along promptly or the prosecutor's exchanges with Woodward regarding the scheduling of Patel's appearance. Ultimately, Reynolds agreed to delay the testimony by a week to accommodate Woodward's needs, and he expressed sympathy for Woodward's injury on more than one occasion. It may be that the prosecutor's use of a phrase indicating his desire to move forward with the testimony that week was interpreted as harsh by Woodward, but even if that is so, it provides no basis for the extraordinary relief requested in the Disclosure Motion.

### D. Obtaining the Password for Chamberlain Harris's Laptop in December 2022

#### 1. Relevant facts

On January 7, 2023, during the course of the litigation on the government's motion to compel compliance with the May 11 grand jury subpoena, Chamberlain Harris, an administrative assistant at Mar-a-Lago, voluntarily provided a laptop to the government. The government asked Harris for the password so that it could access the laptop and identify any relevant material, including classified information, on the laptop. When Harris declined to provide the password and Harris's counsel, John Irving, indicated that Save America PAC, not Harris, owned the laptop and directed government counsel to request the password from either Trump attorney Jim Trusty or

Evan Corcoran, the government informed Irving that it would issue a grand jury subpoena requiring her appearance before the grand jury so that the grand jury could direct her to provide the password.  Harris, through her counsel, then agreed to provide the password.

### 2.  Discussion

The former President (Mot. 6)  suggests that there was some impropriety in this exchange with Harris and her counsel, but he does not identify what that impropriety might be.  Harris was represented by counsel and made the informed decision to provide the password for a laptop that she had already turned over to the government.  She was free to assert any privilege she might have, including any potential Fifth Amendment privilege, or to file any objection to the procedure, but she and her counsel made the decision to simply provide the password.  There was nothing inappropriate or heavy-handed about this process.  Moreover, because Harris never testified before the grand jury, the exchange with Harris and her counsel provides no support for this motion for access to grand jury materials.

### E.  Seizure of Carlos De Oliveira's Cell Phone in January and February 2023

### 1.  Relevant facts

On January 13, 2023, the FBI conducted an audio-recorded knock-and-talk interview with Carlos De Oliveira, the property manager at Mar-a-Lago.  The next day, the FBI served De Oliveira with a subpoena to testify before the grand jury on January 20, 2023.   On January 17, attorney John Irving alerted prosecutors at the Special Counsel's Office that he represented De Oliveira.  On January 19, Irving accepted service of a grand jury subpoena for records including De Oliveira's communications.  The return date for the subpoena was January 26 (one week from issuance).  Irving indicated that he could not meet the deadline for producing communications and

asked whether De Oliveira's January 20 testimony before the grand jury could be postponed until after he had produced records. The prosecutors declined to delay his testimony.

De Oliveira testified before the grand jury on January 20. That day, Irving provided screen shots of a limited set of messages between De Oliveira and Nauta that were responsive to the subpoena. On January 25, the government agreed to an extension until February 3 for the production of communications in response to the subpoena.

On January 30, the government investigative team received a tranche of Nauta communications that had been released by the government filter team that was reviewing Nauta's phone. Among those communications were texts between Nauta and De Oliveira about a trip that Nauta made to Mar-a-Lago on June 25, and texts from Nauta to De Oliveira about keeping quiet a July 10 trip that Nauta and the former President made to Mar-a-Lago. In the grand jury, De Oliveira denied (falsely) that the former President traveled to Mar-a-Lago in the summer of 2022.

The next day, January 31, the FBI identified closed-circuit television (CCTV) video footage of Nauta and De Oliveira in the area of the storage room at Mar-a-Lago during Nauta's June trip. These clips were directly relevant to the government's investigation into whether Nauta and De Oliveira attempted to obstruct the investigation by disabling or attempting to disable CCTV cameras or deleting footage after they became aware that the government had subpoenaed CCTV footage in the area of the storage room. On February 2 and February 9, Irving produced collections of records from De Oliveira's phone, but they did not include any communications between De Oliveira and Nauta regarding the July 10 trip—the very communications that the government had reviewed on Nauta's phone, and therefore knew should have been on De Oliveira's phone.

On February 10, the FBI executed a warrant and obtained De Oliveira's phone. The government told Irving that among the reasons a search warrant was executed was because De

Oliveira had provided false testimony in the grand jury, including about the July 10 trip. Thereafter, on February 17 and March 20, Irving made further productions of records in response to the grand jury subpoena.

### 2.  Discussion

There was nothing inappropriate about the government's decision to proceed on two tracks in order to ensure that it obtained all relevant evidence from De Oliveira's cell phone. By seizing and searching the phone, the government ensured that the device was subject to a full forensic review in light of its concerns about potential perjury and obstructive conduct by De Oliveira. There is nothing that would require the government to set aside De Oliveira's obligation to comply with the grand jury subpoena at the same time, and he made no motion to the Court to do so. These facts provide no support for Trump's motion for access to grand jury material.

### F.  Grand Jury Appearance of Margo Martin in March 2023

### 1.  Relevant facts

The Disclosure Motion claims (Mot. 9) that the Special Counsel's Office required witness Margo Martin to appear before the grand jury "with only 72 hours of notice" and refused to delay her appearance so that her newly retained counsel would have sufficient time to consult with her before her appearance. That claim is inaccurate. Martin's counsel agreed to accept service and was served with a grand jury subpoena by email on Friday, March 10, 2023. The grand jury subpoena called for her appearance the following Thursday, March 16, 2023, the date that she appeared before the grand jury.

### 2.  Discussion

There is no basis for any claim that the government engaged in misconduct in connection with the subpoena to Martin, nor does the timing of the subpoena and her appearance provide any

basis for the request to review grand jury materials.  Martin was represented by experienced counsel throughout, and the government's efforts to move quickly and efficiently in this important investigation were reasonable and appropriate.

## Conclusion

The Court should deny the Disclosure Motion.

Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:     /s/ *Jack Smith*

James I. Pearce (N.C. Bar No. 44691)
Cecil VanDevender (Tenn. Bar No. 029700)
John M. Pellettieri (N.Y. Bar No. 4145371)
Assistant Special Counsel

June 15, 2023
(Originally June 8, 2023)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

IN RE GRAND JURY SUBPOENAS  )   **CASE NO. 23-gj-38**
                            )
                            )   **UNDER SEAL**
                            )
                            )

**OPPOSITION TO AMENDED MOTION FOR**
**DISCLOSURE OF GRAND JURY MATERIALS**

"[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979). This bedrock principle, embodied in Federal Rule of Criminal Procedure 6(e), protects several vital interests, including ensuring that witnesses "come forward voluntarily" to "testify fully and frankly" without fear of "retribution" or "inducements." *Id.* at 219. Former President Donald J. Trump nevertheless claims that these vital interests are outweighed by his own particularized need to review the testimony and associated minutes of four current or former employees who purportedly appeared before the grand jury.[1] *See* Amended Motion for Disclosure of Grand Jury Materials, 23-gj-10 (D.D.C.) (filed June 5, 2023) ("Disclosure Motion" or "Mot."). That extraordinary request proceeds in three parts. First, the former President makes a series of baseless allegations of prosecutorial misconduct, grounded in a combination of factual errors, mischaracterizations, and *ad hominem* attacks. Second, even though only one of his allegations even purports to relate to conduct before the grand jury—and that allegation involves a witness whose transcript he already has—he relies on illogical inferences to suggest that if a prosecutor acted with what he deems to be unreasonable urgency in scheduling a witness's appearance or

---

[1] In light of Rule 6(e), the government neither confirms nor denies whether the four individuals named in the motion in fact testified before the grand jury. For purposes of this response, however, the government will refer to the named employees as witnesses.

document production, it follows that the prosecutor likely engaged in some unspecified form of "misconduct" or "abuse" when the same witness appeared before the grand jury. And third, the former President speculates that if he indeed finds the unspecified misconduct or abuse that he is looking for, it could somehow assist him in preparing "potential litigation regarding the abuse of the grand jury and possibly a motion for disqualification of certain" government attorneys, although without identifying any cognizable legal basis for such a motion. *Id.* at 8.

The former President's allegations of prosecutorial misconduct are unfounded. But even if they were taken at face value—which, as explained below and in the government's *ex parte* submission, they should not be—the Disclosure Motion would fall far short of establishing any sort of particularized need for the materials, much less one that outweighs the powerful need for continued secrecy. The motion should therefore be denied.

## BACKGROUND

This matter arises from the former President's retention of classified materials after his term in office ended, and the government's efforts to retrieve those materials. After the United States National Archives and Records Administration ("NARA") informed the Department of Justice that 15 boxes that the former President had previously stored at his residence at Mar-a-Lago and provided to NARA in January 2022 contained classified documents, a grand jury in this district, on May 11, 2022, issued a subpoena to the custodian of records for the former President's post-presidential office—the Office of Donald J. Trump (the "Office")—requesting "[a]ny and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump bearing classification markings [list of classification markings]." As this Court has explained, "[e]nsuring compliance with the May 2022 Subpoena has been slow-going, prompting the government to seek and execute a search warrant at Mar-a-Lago, additional government

motions regarding inadequate compliance, repeat visits to this Court, and new searches conducted and updated certifications filed, with the compliance effort dragging into mid-December 2022, when additional classified documents were recovered from a closet in the Office's designated space at Mar-a-Lago." Opinion, *In re Grand Jury Subpoena*, 23-gj-10, ECF No. 19, at 7 (Mar. 17, 2023) ("Crime-Fraud Opinion").

In summary, on June 3, 2022, attorneys Evan Corcoran and Christina Bobb met with three FBI agents and an attorney from the Department of Justice (Jay Bratt) and turned over a certification and a folder containing 38 documents with classification markings. The certification was signed by Bobb, who was identified as the Office's custodian of records, and stated that "[b]ased upon the information that has been provided to me, I am authorized to certify, on behalf of the Office of Donald J. Trump," that "[a] diligent search was conducted of the boxes that were moved from the White House to Florida," the search was conducted "in order to locate any and all documents that are responsive to the subpoena," and "[a]ny and all responsive documents accompany this certification." Despite the certification, on August 8, 2022, federal agents searched Mar-a-Lago pursuant to a warrant and seized over 100 documents with classification markings. About a month later, in response to another request from the government, the Office refused to conduct another search for responsive records or provide a certification. Litigation before this Court ensued, resulting in additional searches and certifications signed by attorney Timothy C. Parlatore, who testified before the grand jury in December 2022. The grand jury's investigation continued after Parlatore's testimony, and among other things, this Court granted the government's motion to compel two attorneys for the former President to appear before the grand jury and provide certain testimony under the crime-fraud exception to the attorney-client privilege.

The former President now seeks transcripts of testimony from four individuals who he believes have testified before the grand jury. The former President accuses (Mot. at 2) government prosecutors of "misconduct and bias" in the grand jury. According to the former President, he "anticipates that he will pursue relief from this Court," and he requests the transcripts "[t]o enable him to do so with a fuller record." Mot. at 3. The former President mentions "potential litigation regarding the abuse of the Grand Jury process" and states he will "possibly" file a "motion for disqualification of certain" government attorneys, Mot. at 8, although he does not disclose the forum in which he will pursue this litigation.

## APPLICABLE LEGAL STANDARD

"Federal Rule of Criminal Procedure 6(e) prohibits disclosure of 'matter[s] occurring before the grand jury,' Fed. R. Crim. P. 6(e)(2), and thus requires that '[r]ecords, orders, and subpoenas relating to grand-jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury,' Fed. R. Crim. P. 6(e)(6)." *In re Grand Jury Subpoena, Judith Miller*, 493 F.3d 152, 154 (D.C. Cir. 2007). That rule of secrecy "safeguards vital interests in (1) preserving the willingness and candor of witnesses called before the grand jury; (2) not alerting the target of an investigation who might otherwise flee or interfere with the grand jury; and (3) preserving the rights of a suspect who might later be exonerated." *McKeever v. Barr*, 920 F.3d 842, 844 (D.C. Cir. 2019). After all, "[t]he grand jury as a public institution serving the community might suffer if those testifying today knew that the secrecy of their testimony would be lifted tomorrow," which is a particularly acute concern where, as here, "[t]he witnesses . . . may be employees . . . of potential defendants." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958); *see also Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979).

To preserve the "indispensable secrecy of grand jury proceedings," *Procter & Gamble Co.*, 356 U.S. at 682 (quotations omitted), "Federal Rule of Criminal Procedure 6(e) makes quite clear that disclosure of matters occurring before the grand jury is the exception and not the rule," *McKeever*, 920 F.3d at 844 (quotations omitted).  For such an exception to apply, a movant must generally "carry[] the heavy burden of showing 'that a particularized need exists' that 'outweighs the policy of secrecy.'"  *United States v. Apodaca*, 287 F. Supp. 3d 21, 47 (D.D.C. 2017) (quoting *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959)).

As the former President acknowledges (Mot. 7), the only exception even arguably implicated here pertains to disclosure "preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E)(i).  Parties attempting to meet this standard "must show [1] that the material they seek is needed to avoid a possible injustice in another judicial proceeding, [2] that the need for disclosure is greater than the need for continued secrecy, and [3] that their request is structured to cover only material so needed." *Douglas Oil Co.*, 441 U.S. at 222; *see Judicial Watch, Inc. v. Tillerson*, 270 F. Supp. 3d 1, 4-5 (D.D.C. 2017).  Under this standard, "[i]t is clear . . . that disclosure is appropriate only in those cases where the need for it outweighs the public interest in secrecy, and that the burden of demonstrating this balance rests upon the private party seeking disclosure." *Douglas Oil Co.*, 441 U.S. at 223.

## ARGUMENT

The former President's Disclosure Motion should be denied.  Indeed, even if the allegations of misconduct were to be taken at face value, which they should not be, the former President has failed to show any sort of particularized need for the requested materials, much less one that outweighs the values underlying the policy of secrecy, which are at their apex in the circumstances presented here.  To the contrary, the former President is engaged in a transparent fishing expedition

whose real goal appears to be uncovering what his current and former employees may have told the grand jury, ostensibly grounded in the speculative possibility that his review might turn up unspecified examples of "misconduct" that could justify future extraordinary relief, in the form of a motion to disqualify government counsel. This falls far short of the necessary showing. Moreover, the Disclosure Motion's allegations of misconduct rest on several errors, mischaracterizations, and baseless accusations, and it does not establish any credible claim of prosecutorial misconduct.

## I. The Disclosure Motion Would Fail Even If Its Facts Were Taken at Face Value.

### A. The former President has not shown that the material is needed to avoid a possible injustice in another judicial proceeding.

To establish a particularized need for grand jury materials preliminarily to or in connection with another judicial proceeding, a party must identify a particularized use "related fairly directly to some identifiable litigation, pending or anticipated." *United States v. Baggot*, 463 U.S. 476, 480 (1983). "[I]t is not enough to show that some litigation may emerge from the matter in which the material is to be used, or even that litigation is factually likely to emerge." *Id.* "The focus is on the actual use to be made of the material," and "[i]f the primary purpose of disclosure is not to assist in preparation or conduct of a judicial proceeding, disclosure under [(E)](i) is not permitted." *Id.* Moreover, "the request for grand jury material must be more than a request for authorization to engage in a fishing expedition." *In re EyeCare Physicians of Am.*, 100 F.3d 514, 518 (7th Cir. 1996) (cleaned up); *see In re Grand Jury 95-1*, 118 F.3d 1433, 1437 (10th Cir. 1997) (same). As such, "where a defendant fails to provide a discrete reason, and instead relies on speculation or unsupported assumptions, courts have made clear that disclosure of grand jury minutes is not warranted." *Apodaca*, 287 F. Supp. 3d at 47.

Here, the former President's motion rests on mere speculation and unsupported assumptions about what the grand jury materials might show. Indeed, unlike in other cases in which disclosure has been authorized, he offers neither evidence nor even a *theory* of what specifically the grand jury transcripts might show, beyond the vague suggestion that they might show some form of unspecified "misconduct." *See In re Grand Jury 95-1*, 118 F.3d at 1437 (reversing authorization under Rule 6(e)(3)(E)(i) where the movant's alleged need for grand jury materials to prepare a motion for judicial disqualification was "general and vague" and the absence of allegations about what the material would contain "clearly indicates the speculative nature of [the movant's] allegations . . . and suggests [the movant] was simply interested in engaging in a fishing expedition"). Some of the very cases the former President relies on (Mot. 9) illustrate the same point. *See, e.g.*, *United States v. Schlegel*, 687 F. App'x 26, 30 (2d Cir. 2017) (affirming denial of request for grand jury materials where the defendant "failed to articulate any concrete allegations of Government misconduct" and instead "merely speculate[d]" about what the government may have presented to the grand jury); *United States v. Hunt*, 534 F. Supp. 3d 233, 259 (E.D.N.Y. 2021) (denying request for grand jury materials where the defendant's allegations of prosecutorial misconduct "ultimately amount to mere speculation that the Government 'potentially' gave a misleading instruction to the grand jury").

Moreover, the former President makes no effort to connect the facts that he purportedly hopes to find with the specific use he intends to make of them. But a showing of particularized need "cannot even be made without consideration of the particulars of the judicial proceeding with respect to which disclosure is sought." *Douglas Oil Co.*, 441 U.S. at 480 n.4. Here, the former President suggests (Mot. 8) that he needs the material because he "anticipates potential litigation

regarding the abuse of the Grand Jury process and possibly a motion for disqualification of certain OSC attorneys."

He does not, however, identify any cognizable basis for a pre-indictment motion alleging abuse of the grand jury process. *Cf.* 2 Fed. Grand Jury § 21:3 (2d ed.) (noting that "[a] person who wants to challenge grand jury abuse during an investigation, before an indictment has been returned . . . will have standing to do so only if she has been subpoenaed to testify or otherwise provide evidence to the grand jury, or if she has standing to act on behalf of a third party which has been subpoenaed to provide evidence to the grand jury") (footnotes omitted)).

Nor does he identify any cognizable basis for disqualification, such as a conflict of interest. This failure is particularly striking given that "[t]he disqualification of Government counsel is a drastic measure and a court should hesitate to impose it except where necessary." *United States v. Bolden*, 353 F.3d 870, 878 (10th Cir. 2003) (quotations omitted). Indeed, as the Ninth Circuit recently explained, "[t]he doctrine of separation of powers requires judicial respect for the independence of the prosecutor," such that "absent a violation of the Constitution, a federal statute, or a procedural rule," courts "do not dictate to the Executive branch who will serve as its prosecutors." *United States v. Williams*, -- F.4th --, 2023 WL 3516095, at *5 (9th Cir. May 18, 2023) (cleaned up). "Put differently, [courts] do not stamp a chancellor's foot veto over activities of coequal branches of government unless compelled by the law to do so." *Id.* (quotations omitted). Here, the former President has not identified any law that could possibly compel the Court to grant a motion to disqualify any government attorney from participating in this case.

The Disclosure Motion therefore fails to show that the requested material "is needed to avoid a possible injustice in another judicial proceeding." *Douglas Oil Co.*, 441 U.S. at 222. The motion may be denied on that basis alone.

## B. The former President has not shown that the need for disclosure is greater than the need for continued secrecy.

Even if the former President had shown a particularized need (which he has not), the Disclosure Motion fails to show "that the need for disclosure is greater than the need for continued secrecy." *Douglas Oil Co.*, 441 U.S. at 222. The balance between particularized need and secrecy "should always be weighted presumptively toward the government when the targets of a grand jury investigation are requesting disclosure of grand jury testimony for use in that proceeding." *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6th Cir. 1986). "Concern as to the future consequences of frank and full testimony is heightened where the witness is an employee of a [subject] under investigation." *Douglas Oil Co.*, 441 U.S. at 222. In all cases, "courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries," with a particular eye toward the possibility that the "[f]ear of future retribution or social stigma may act as powerful deterrents to those who would come forward to aid the grand jury in the performance of its duties." *Id.* It is difficult to conceive of something more likely to chill full and frank testimony, both now and in future cases, than an employer attempting to see what his employees may or may not have told the grand jury.

These factors make the public interest in secrecy extremely weighty. In combination they likely would outweigh even the strongest possible showing of particularized need, and certainly outweigh the nonexistent showing that the former President has made here.

The former President seeks to avoid this conclusion by invoking (Mot. 11-12) "the common-sense proposition that secrecy is no longer 'necessary' when the contents of grand jury matters have become public." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d at 1140. Of course, "[t]here must come a time . . . when information is sufficiently widely known that it has lost its character as Rule 6(e) material." *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994). But in

seeking to make such a showing here, the former President conflates public knowledge of the *fact* of an investigation (which is indeed widely known) with public knowledge of the *substance* of the testimony that specific witnesses purportedly gave to the grand jury, which neither the public nor the former President knows. Indeed, the whole premise of his motion is that he would like to know, but at present can only speculate about, "Rule 6(e)'s bread and butter: the identities of witnesses or jurors, the substance of testimony as well as actual transcripts, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like." *Judicial Watch, Inc.*, 270 F. Supp. 3d at 5 (quotations omitted). Based on the reporting that the former President relies on (Mot. 11 nn. 3-5), it does not appear that any of the four named witnesses has even confirmed that he or she appeared before the grand jury, much less publicly disclosed the substance of any testimony that he or she may have given.

Moreover, even in cases where details of a witness's grand jury testimony have been reported in the press, that alone does not make the testimony discoverable, since "Rule 6(e) does not create a type of secrecy which is waived once public disclosure occurs," *Barry v. United States*, 740 F. Supp. 888, 891 (D.D.C. 1990), particularly where, as here, the government has neither confirmed nor denied the accuracy of any public reporting, *see In re North*, 16 F.3d at 1245. As such, the former President's misplaced reliance on cases involving requests for the disclosure of already-public information does nothing to alter the conclusion his "need" for the material, such as it is, is heavily outweighed by the need for continued grand jury secrecy. *See In re New York Times Co.*, No. MC 22-100, 2023 WL 2185826, at *14-15 (D.D.C. Feb. 23, 2023) (denying request for grand jury materials related to "former President Trump's privilege challenge to the Jan. 6 grand jury investigation"); *In re Press Application for Access to Judicial Records Ancillary to Certain Grand Jury Proceedings Concerning Donald J. Trump & the Trump Organization*, No.

MC 220128, ECF No. 6 (D.D.C. Mar. 11, 2023) (denying request for grand jury materials related to certain aspects of the classified-documents investigation).

### C. The former President has not shown that his request is structured to cover only needed material.

Finally, the Disclosure Motion is structured to cover more than the purportedly needed material.  To be sure, given the speculative nature of the request, it is hard to say that any material is more or less "needed" than any other.  But the Disclosure Motion goes further than even its own internal logic would allow.  After all, the former President's theory appears to be (Mot. 5) that if prosecutors unreasonably conveyed "a false sense of urgency" when dealing with certain witnesses, it somehow follows that the prosecutors must also "have been abusive in their treatment of witnesses appearing before the grand jury."  But even that dubious logic provides no support for the request (*id.* at 10) to review "the 'minutes' during which prosecutors often share thoughts about the direction of the investigation and their impressions of witnesses who have been questioned."  Indeed, his request for the minutes only supports the inference that he is engaged in a fishing expedition seeking insight into the inner workings of the investigation.

### II.     The Disclosure Motion Rests on Numerous Factual Inaccuracies and Mischaracterizations.

Although the former President's motion is legally deficient and can—and should—be dismissed on that ground alone, the former President's factual allegations of prosecutorial misconduct are also false and unfounded.  The government addresses the allegations regarding the questioning of attorney Timothy C. Parlatore before the grand jury in this sealed brief because the former President possesses the transcript of Parlatore's grand jury testimony. The government necessarily addresses the remaining allegations in its *ex parte* submission.

### A. Grand Jury Testimony of Timothy Parlatore

### 1.   Relevant Facts

Until his recent withdrawal from representing the former President, Timothy Parlatore represented the former President with respect to the May 2022 subpoena starting in October 2022, a couple months after the execution of the search warrant at Mar-a-Lago.  Parlatore Grand Jury Tr., *In re Grand Jury Subpoena*, 23-gj-10, ECF No. 12, at 16-17 (Mar. 10, 2023) ("GJ Tr.").  About a month earlier, on September 15, 2022, the government had expressed its continuing concern that the former President or his Office retained additional classified documents beyond those uncovered through execution of the search warrant. *See* Crime-Fraud Opinion at 23.  After the Office refused to conduct another search for responsive records or provide a certification, the government filed a motion to compel compliance with the May 2022 subpoena.  *Id.* at 23-24.  Minutes before the hearing on the motion to compel began on October 27, 2022, counsel for the former President provided the government and the Court with a declaration from Parlatore stating that the Office had authorized him to provide the declaration and describing a search "undertaken on the premises at Bedminster," where the former President maintained a residence, by "elite professionals who have extensive prior experience searching for sensitive documents and contraband."  Declaration of Timothy C. Parlatore, Esq. *In re Grand Jury Subpoena*, No. 22-gj-40, ECF No. 9, at 2 (Oct. 26, 2022).

The Court granted the government's motion to compel on November 9, 2022, and issued an order stating that "a custodian with first-hand knowledge of the Office's diligent and comprehensive efforts to locate responsive documents and with the ability to certify that no additional responsive records remain in the Office's possession, must comply with the subpoena."  Order, *In re Grand Jury Subpoena*, 22-gj-40, ECF No. 15, at 2 (Nov. 9, 2022).  The order required that the Office provide the government with a new certification "from a custodian of records with

personal knowledge of respondent's efforts to comply with the grand jury subpoena" and that the custodian "appear before the grand jury to provide testimony regarding" the Office's "compliance efforts and verification of the contents of the certification." *Id.* at 2-3.

Parlatore filed a status report on behalf of the Office six days later describing efforts to search for responsive documents and disclosing that two additional classified documents had been found in a storage unit leased by the Office. *In re Grand Jury Subpoena*, Case No. 22-gj-40, ECF No. 19 (Nov. 15, 2022).  The status report identified five locations to search for "potentially responsive documents" and stated that one of those locations, Mar-a-Lago, would not be searched because there was "no reason to believe that potentially responsive documents remain[ed] there." *Id.* at 1-2. In a minute order on November 18, 2022, the Court partially granted a motion by the Office for additional time to file a final certification and set a new deadline of November 23, 2022, noting an "obvious concern" that the status report was submitted by an attorney who did not attest to be "a custodian of records with personal knowledge of respondent's efforts to comply with the grand jury subpoena," a requirement of both the May 2022 subpoena and the Court's November 9 order. Minute Order, *In re Grand Jury Subpoena*, Case No. 22-gj-40 (Nov. 18, 2022).

On November 23, 2022, Parlatore submitted a sworn certification that largely reiterated the information from the November 9 status report but included some additional details, including information about an intervening search of Trump Tower. *See In re Grand Jury Subpoena*, Case No. 22-gj-40, ECF No. 22 (Nov. 23, 2022).  Contrary to the Court's previous orders, the certification contained a section, entitled "Role of Certificant," asserting that the Office was not obligated to use a custodian of records. *Id.* at 7-8.  The certification stated that Parlatore would testify "to the limited information contained" in the certification, "without any further waiver of privilege[,]" although the Office's position was that "no further testimony should be necessary."

*Id.* at 8. As the Court later explained, "[n]o additional details were provided to clarify that qualifying language, leaving the government guessing as to what information exactly Parlatore would provide during any subsequent testimony—*e.g.*, whether his testimony would include details not specifically provided in the certification or whether the Office planned to instruct Parlatore to invoke privileges not previously asserted in this litigation, such as attorney-client privilege, work-product privilege, or executive privilege, should he be questioned about any matter outside the four corners of the certification." Crime-Fraud Opinion at 30-31.

The government filed a motion for an order requiring the Office to show cause why it should not be held in civil contempt for failure to comply with the Court's November 9 order. At a hearing on the motion on December 9, 2022, the Court stated that it lacked a "complete record" to issue a contempt citation because the government had not put Parlatore in the grand jury and "asked him a whole series of questions." Hearing Tr. at 11-13, *In re Grand Jury Subpoena*, Case No. 22-gj-40 (Dec. 9, 2022) (Contempt Hearing Tr.). The Court explained that to evaluate compliance with its orders and a potential contempt citation, it was "going to want concrete grand jury transcripts about what is said and what isn't said, what is left unanswered." *Id.* at 28. Counsel for the former President and his post-presidential office confirmed that Parlatore would be "willing to" testify about "where the search was conducted, why areas were searched, why areas weren't searched—all of the normal things that a custodian of records would do, he will do it," although it "may involve a different issue" if Parlatore were asked a question about "specific conversations with his client," the former President. *Id.* at 31; *see id.* at 38-39, 43 (colloquies regarding Parlatore's prospective testimony).

The Court did not issue a contempt citation given what it later described as "the productive discussion about expectations for additional searches and the contents of a certification for

compliance with the May 2022 subpoena and the Court's Orders issued on November 9 and 18, 2022, and the Office's apparent willingness to try to meet those expectations." Crime-Fraud Opinion at 32 n.9. The Court ordered the Office to file a revised certification with additional details, and the Court specified that "full compliance" with the Court's orders would require, among other things, that "Parlatore would testify before the grand jury regarding the Office's efforts and due diligence to respond to the May 2022 subpoena, including testifying to information not already mentioned in the revised certification and details regarding how Parlatore determined which locations needed to be searched and when, why certain locations were selected to be searched and others not, efforts by Bobb to prepare to sign the June 3, 2022 certification, the identities of the search-team members, and those members' exact search methodologies." *Id.* at 32-33. It was understood that Parlatore "might be asked questions about the content of direct conversations with the former president" and that there might be the "potential need for additional litigation regarding counsel testifying to conversations with the former president." *Id.* at 33-34.

The Office provided a revised certification, sworn by Parlatore, on December 16, 2022. *In re Grand Jury Subpoena*, Case No. 22-gj-40, ECF No. 34 (Dec. 16, 2022). The revised certification described searches, including a search of Mar-a-Lago on December 15-16, 2022, conducted by two "elite professionals" with military experience and experience "searching for sensitive documents" and "contraband." *Id.* at 5-11. The search of Mar-a-Lago "[r]emarkably . . . uncovered four more responsive records," which the certification "misleadingly refer[red] to . . . as 'low-level ministerial documents.'" Crime-Fraud Opinion at 35.

Parlatore appeared before the grand jury on December 22, 2022. Parlatore explained that he represented the former President but that he understood his appearance before the grand jury as principally to provide his "personal knowledge" about efforts undertaken by the post-presidency

office "to comply with" the May 2022 subpoena. GJ Tr. 10-11. He acknowledged that such testimony "[o]rdinarily" would be handled "by a custodian of records for the organization." GJ Tr. 12. Parlatore thus acknowledged that he was "wear[ing] two hats," namely, an attorney for the former President and a stand-in custodian. GJ Tr. 11.

Before questioning turned to the substance of Parlatore's "personal knowledge" of subpoena compliance, the government prosecutor clarified that the government was "not seeking today to elicit . . . privileged information." GJ Tr. 13. At the same time, the prosecutor alerted Parlatore that if Parlatore claimed privilege in response to any question, the prosecutor would ask Parlatore which privilege he was invoking and "the basis for the invocation." GJ Tr. 13. Parlatore responded, "Sure," and when the prosecutor followed up to ask whether Parlatore understood, Parlatore said, "Absolutely." GJ Tr. 13. In keeping with these exchanges—and consistent with the Court's expectation that the government would "put [Parlatore] in the grand jury," ask him "a whole series of questions," and create "concrete grand jury transcripts about what is said and what isn't said, what is left unanswered," Contempt Hearing Tr. 11, 28—government prosecutors probed Parlatore's knowledge and conduct as the functional equivalent of a custodian of records, and when Parlatore refused to answer questions based on privilege, they sought to clarify the precise nature and scope of Parlatore's privilege invocations. At one point, Parlatore claimed attorney-client privilege after being asked whether the former President was the source for Parlatore's testimony about statements the former President purportedly made to government investigators about being cooperative. GJ Tr. 40. The prosecutor then asked if a client could waive privilege and questioned why the former President had not allowed Parlatore to testify as to these conversations if he (the former President) meant to be cooperative, but the government prosecutor also quickly made clear that she was "absolutely not saying" that waiver of privilege is

required to be cooperative and that, consistent with her earlier statement, she did not mean to "induce any waivers." GJ Tr. 40-43. Nonetheless, Parlatore on several occasions accused the government prosecutors of "trying to improperly invade the attorney/client privilege." GJ Tr. 45; *see also* GJ Tr. 77. After one such accusation, a government prosecutor conveyed to Parlatore that "if [he] want[ed] to invoke the privilege, [he] can just say that" instead of casting aspersions about "what the people on this side of the table are and are not trying to do." GJ Tr. 77.

Over the course of the 245-page grand jury transcript, Parlatore claimed privilege numerous times. *See, e.g.*, GJ Tr. 25 (attorney-client and work-product privilege concerning who told Parlatore about Christina Bobb's efforts to respond to the subpoena in Bobb's capacity as custodian of records); *id.* at 40 (attorney-client privilege concerning whether the former President recounted to Parlatore a conversation between the former President and a federal government prosecutor about which Parlatore had just testified); *id.* at 45 (attorney-client and work-product privilege concerning the individuals with whom Parlatore spoke before his grand jury testimony); *id.* at 47 (privilege concerning what Boris Epshteyn told Parlatore); *id.* at 58-59 (attorney-client and work-product privilege concerning whether Parlatore had asked anyone if boxes had been moved out of the storage room before June 2, 2022); *id.* at 77 (attorney-client and work-product privilege concerning with whom the legal team spoke before deciding to search Bedminster); *id.* at 104 (privilege concerning why locations other than Mar-a-Lago, including storage units, Trump Tower, and the Flagler office, were not searched before November 9, 2022); *id.* at 113 (work-product privilege concerning with whom the legal team spoke to determine not to search Mar-a-Lago in November 2022); *id.* at 114 (work-product privilege concerning whether the legal team consulted any documents in making the determination not to search Mar-a-Lago in November 2022); *id.* at 146 (work-product privilege concerning whether individuals hired to carry out

searches took notes, photographs, or video recordings, or sent emails, text messages, or any kind of messages); *id.* at 155-56 (privilege concerning whether Parlatore spoke with anyone to determine if the General Services Administration (GSA) packed boxes that were shipped out from the White House); *id.* at 163 (privilege concerning whether somebody talked to the former President); *id.* at 185 (privilege concerning the identity of the person with whom Parlatore spoke to determine the former President's "normal movements" between properties); *id.* at 196 (privilege concerning what the search team generally told Parlatore about documents found at Mar-a-Lago); *id.* at 217 (attorney-client and work-product privilege concerning what steps Parlatore took to determine whether any boxes with documents that had classified markings had been moved); *id.* at 236 (privilege concerning whether Parlatore told the former President that Parlatore was testifying before the grand jury). In some instances, those privilege invocations came in response to "questions about the mechanics (who, how, when, where) of the search." *In re Feldberg*, 862 F.2d 622, 628 (7th Cir. 1988) (concluding that such questions are not covered by attorney-client privilege).

### 2. Discussion

The former President contends (Mot. at 5, 9-10) that the government engaged in prosecutorial misconduct by asking Parlatore questions that he declined to answer on privilege grounds and, in one instance, allegedly invited the grand jury to draw improper inferences from Parlatore's refusal to answer a question based on attorney-client privilege. As explained above, these claims do not support the relief requested by the former President. The former President already possesses Parlatore's grand jury transcript, and any alleged misconduct during the questioning of Parlatore would not warrant the production of grand jury transcripts for other witnesses based on unfounded speculation that alleged misconduct with respect to one witness

supports the conclusion that there was misconduct during the questioning of different witnesses. But regardless, the former President's claim also fails because his misconduct allegations are unfounded.

It was entirely proper to ask Parlatore questions about his knowledge and conduct as the individual designated to perform the responsibilities of a custodian of records for the Office, even if Parlatore refused to answer some questions based on claims of privilege. That was precisely the procedure the Court contemplated when it deferred consideration of a contempt citation after the former President's counsel represented that Parlatore would be available to testify in the grand jury as the equivalent of a custodian of records, even if Parlatore did not embrace that nomenclature.  The Court expected the government to ask Parlatore a "series of questions" to create a "fairly complete record . . . of where the holes were," *i.e.,* the questions Parlatore would refuse to answer based on privilege.  Contempt Hearing Tr. 11.  It was understood by all that there would be a "potential need for additional litigation regarding counsel testifying to conversations with the former president."  Crime-Fraud Opinion at 33-34.  The government did not commit misconduct by proceeding along these established ground rules and asking questions that elicited privilege claims to potentially tee up future litigation.  Indeed, when the government filed a motion to compel testimony from the former President's attorney Jennifer Little under the crime-fraud exception, the former President argued that the motion was not yet ripe because the government did not put her in the grand jury and require her to decline to answer questions and instead received confirmation from her attorney that she would decline to answer questions. *See* Crime-Fraud Op. 78 n.24. The former President cannot claim that the government committed misconduct by following the procedure with Parlatore that he claims the government was required to follow with Little.

To the extent the former President suggests that the frequency with which Parlatore invoked privilege was problematic, *see* Mot. at 5 (noting that Parlatore invoked privilege "[n]o fewer than *forty-five* times"), that was a problem of the former President's own making. Rather than select a non-lawyer to act as a custodian of records, he selected a lawyer; indeed, a lawyer who represented him personally. Regardless of Parlatore's status as a lawyer, however, the government was entitled to question Parlatore to determine whether there had been full compliance with the May 2022 subpoena. "A grand jury may compel a corporate records custodian to testify about the nature of his search and the adequacy of the disclosure," indeed, "[s]uch an inquiry may be essential to determine whether the grand jury has received the documents to which it is entitled." *Feldberg*, 862 F.2d at 627. And "[i]f the inquiry itself is legitimate, the addressee of the subpoena cannot put the subject off limits by having counsel turn over the documents." *Id.* "Since questions about the adequacy of the search do not entail legal advice, the topic is not off limits just because an attorney plays a role." *Id.* To be sure, an attorney-custodian's advisory communications with a client may be privileged, but the Office could not "throw the veil of privilege over details of how files were searched, and by whom, through the expedient of involving a lawyer in the process." *Id.* at 628; *see id.* ("questions about the mechanics (who, how, when, where) of the search" are not privileged).

Ignoring this larger context, the former President focuses (Mot. 5, 9) on a single exchange between Parlatore and the government prosecutor. In response to questions concerning whether the former President would permit the government to "look inside" boxes in a storage area at Mar-a-Lago, Parlatore testified that the former President had told government investigators during a meeting on June 2, 2022 (for which Parlatore was not present), that "if there's anything else you need, come let me—you let us know." GJ Tr. 40. When asked in a follow-up question whether

the former President had told Parlatore about the former President's seemingly cooperative statement, Parlatore refused to answer on the basis that any communications between him and his client, the former President, were privileged. GJ Tr. 40. The prosecutor then inquired whether the attorney-client privilege was limited to communications for the purpose of obtaining legal advice. GJ Tr. 41. Parlatore suggested instead that "[a]ny information obtained from a client is part of . . . legal advice or representation." GJ Tr. 41. After Parlatore confirmed, in response to a question, that a client can waive the attorney-client privilege, the prosecutor asked, "if the former President's so cooperative, why hasn't he allowed you to share his conversations with the Grand Jury today." GJ Tr. 41.

To be clear, no grand jury witness or subject is required to waive privilege to be deemed cooperative, and the government regrets this particular exchange with Parlatore to the extent it may be construed to support such a suggestion. But whatever implication could be drawn from the prosecutor's question taken in a vacuum, the prosecutor quickly and emphatically corrected any potential misunderstanding, and the questioning proceeded thereafter as reflected in more than 200 additional pages of the transcript. When Parlatore suggested that the prosecutor's question implied that to be cooperative required waiving the attorney-client privilege, the prosecutor immediately made clear that she was "absolutely not saying that," GJ Tr. 42, and that the government was not seeking "to induce any waivers . . . of attorney/client privilege," GJ Tr. 43. That statement, moreover, reflected the similar caution the government prosecutor had made at the outset of Parlatore's testimony. *See* GJ Tr. 13 (government prosecutor explaining to Parlatore that "we are not seeking today to elicit from you privileged information"). This context cured any potential for grand juror confusion and refutes the former President's claim of misconduct.

**Conclusion**

The Court should deny the Disclosure Motion.

Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:      /s/ *Jack Smith*

James I. Pearce (N.C. Bar No. 44691)
Cecil VanDevender (Tenn. Bar No. 029700)
John M. Pellettieri (N.Y. Bar No. 4145371)
Assistant Special Counsel

June 16, 2023

(originally filed June 8, 2023)

- 22 -

# Exhibit A

# Woodward Letter

## BRAND | WOODWARD
### Attorneys at Law

Stan M. Brand
+1.202.258.6597 (m) +1.866.904.4117 (f)
stanleymbrand@gmail.com

Stanley E. Woodward Jr.
+1.202.996.7447 (p) +1.202.996.0113 (f)
stanley@BrandWoodwardLaw.com

June 7, 2023

VIA ELECTRONIC MAIL

The Honorable Chief Judge James E. Boasberg
United States District Court for the District of Columbia
333 Constitution Avenue, Northwest
District of Columbia 20001

Re:     Sealed Disclosure Motion

Chief Judge Boasberg:

We represent Waltine "Walt" Nauta in connection with the investigation of the Special Counsel's Office. The SCO has advised that counsel to former President Donald J. Trump made representations concerning our interactions with prosecutors at the Department of Justice whom have since joined the SCO's staff. At the request of the SCO, we write to confirm the representations that were made by counsel to former President Trump as disclosed to us in a redacted copy of a motion filed with the Court by counsel to former President Donald J. Trump.

By way of background, with prior counsel, our client had submitted to a voluntary interview with agents of the Federal Bureau of Investigation and separately had testified before a Grand Jury here in this District. At the time of our retention, there was an outstanding request for Mr. Nauta to speak with prosecutors because they expressed concern that Mr. Nauta had not been truthful and/or forthcoming in his prior statements and/or testimony. It was in this posture that Mr. Woodward agreed to meet with approximately six prosecutors (including one on a videoconference) in an ornate conference room at Main Justice on August 24, 2022. Many, if not all, of the prosecutors who participated in the meeting – a meeting they insisted occur in person – have now been assigned to the SCO.

Despite the purported purpose of the meeting, it began with Department attorney Jay Bratt referencing a folder of materials in highlighting Mr. Woodward's professional background. Specifically, Mr. Bratt remarked that he was aware of the fact that Mr. Woodward had been recommended for a Presidential nomination to the Superior Court of

June 7, 2023
Page 2

the District of Columbia.[1]  Mr. Bratt also advised that the government's case as against Mr. Nauta was strong – referencing his belief that one way or the other Mr. Nauta would be giving up a lifestyle of private planes and private golf courses – and that it would behoove Mr. Nauta to cooperate in the government's investigation.

It was inappropriate for Mr. Bratt to mention the fact that Mr. Woodward had been recommended for a Presidential nomination to the Superior Court of the District of Columbia.  The only rational inference to be drawn from this reference, combined with the assertion that the government's case as against Mr. Nauta was strong and that Mr. Woodward was not a so-called, "Trump attorney," who would do the right thing, is that somehow Mr. Woodward's potential nomination to the Superior Court would be implicated by Mr. Nauta's decision not to "cooperate"[2] in the government's investigation.  Indeed, to the best of Mr. Woodward's recollection, Mr. Bratt concluded his observations with words to the effect of, "I wouldn't want you to do anything to mess that up" – referring to Mr. Woodward's potential nomination.  It is, of course, noteworthy that the statements giving rise to this inference were coming from a senior official with the Department of Justice.

To be clear, our representation of Mr. Nauta was not adversely impacted by this discussion.  At all times, we have strived conscientiously to meet our ethical obligations to our client.  In that, we hope the government will agree.  We also acknowledge that prior to now we have neither complained about the statements in the August 24 meeting nor referred the conduct of that meeting for further review by an appropriate oversight body.

Recently, however, we have learned recently that the conduct exhibited in the August 24 meeting may not have been isolated and that counsel for former President Trump have asked this Court to unseal Grand Jury transcripts from the SCO's investigation so as to ascertain whether there is additional evidence of potential abuse of the grand jury process.  This information comes on the heels of the receipt of a Target Letter from the OSC directed to our client Mr. Nauta, the realistic possibility that he is to be indicted for violations of 18

---

[1] Mr. Woodward was recommended for nomination to the Superior Court by the D.C. Judicial Nominations Commission on November 23, 2020.  Mr. Woodward's recommendation, and eligibility for a Superior Court nomination, remains pending with the White House today insofar as no nomination to replace the Honorable Robert E. Morin, CJ Retired, has been presented to the U.S. Senate.

[2] Much has been made in the media of the possibility of Mr. Nauta's "cooperation" with the government's investigation.  We have deliberately not commented in the press concerning the same, but do feel two observations to be necessary.  First, on behalf of all our clients, we endeavor to be cooperative with government attorneys in their investigations and are ethically obligated to facilitate our clients' provision of information whenever they have a legal obligation to do so (e.g., in response to a lawful subpoena or order of the court).  In that sense, all our clients are "cooperating" with the government's investigations.  Second, there has never been a formal offer of "cooperation" to Mr. Nauta by the government.  Thus, any suggestion that Mr. Nauta was no longer "cooperating" with the government misstates the current legal posture of the investigation as to Mr. Nauta.  Mr. Nauta has complied with every legal obligation he has to provide information to the government, which has, in turn, exhausted its legal avenues to compel Mr. Nauta to provide such information.

June 7, 2023
Page 3

U.S.C. §§ 1001, 1512, and 1519, as indicated in that letter, and the disclosure that such an indictment would come from a Grand Jury sitting in the United States District Court for the Southern District of Florida, *and not* a Grand Jury in *this District*.  Given the necessary secrecy of Grand Jury proceedings, it is impossible for us to know whether these facts are related or merely coincidental.  However, if the allegations of impropriety suggested by counsel for former President Trump are true, we have concerns that the investigation of Mr. Nauta has been adversely impacted and that any indictment of Mr. Nauta would consequently be improperly tainted.

To that end, we expect government counsel will refute any suggestion that there was an intended – explicit or implicit – attempt to threaten or otherwise improperly pressure Mr. Woodward to advise Mr. Nauta to cooperate in the government's investigation.  Insofar as the appropriateness of the conduct in the August 24 meeting may bear on this Court's determination of whether to grant the motion of counsel for former President Trump, we feel it prudent for the most appropriate oversight body to make that assessment.  Accordingly, we respectfully suggest that this matter be referred to the Department of Justice's Office of Professional Responsibility for a thorough investigation and that any indictment arising from this investigation not lie until such assessment is reached.  Put simply, an indictment of Mr. Nauta in this action will have irreparable harm on his reputation and livelihood regardless of the ultimate outcome in the case.  We feel the Department has an obligation to definitively rule out the possibility of any improper taint on the Grand Jury before it pursues a prosecution in this matter.

We remain available to the Court at its convenience to provide any possible assistance in this matter.

Sincerely,

Stan M. Brand

Stanley E. Woodward Jr.

Cc:  J.P. Cooney, Esq., Special Counsel's Office
     Raymond Husler, Esq., Special Counsel's Office
     John P. Rowley, III, Esq., Counsel to former President Trump
     James M. Trusty, Esq., Counsel to former President Trump

# Exhibit B

## Judicial Nomination Commission Webpage

311 Online    Agency Directory    Online Services
Accessibility

**DC.gov** ★ ★ ★

Search    Menu

Contact

Mayor Muriel Bowser

# Judicial Nomination Commission

## Judicial Nomination Commission



**Office Hours**
Monday to Friday, 9 am to 5 pm

**Connect With Us**
515 5th Street, NW, Suite 235, Washington, DC 20001
Phone: (202) 879-0477
Fax: (202) 879-0455
TTY: 711
Email: dc.jnc@dc.gov



Ask the Director
Agency Performance

 ◀)) **Listen** ▶

⚙ SHARE ☐ 🐦 ✉ ...

## Stanley Woodward, Jr

**Stanley E. Woodward, Jr., Esq.** has more than a decade of legal experience. As co-founder of Brand Woodward, Attorneys at Law, Mr. Woodward counsels companies and individuals alike responding to government and internal investigations as well as civil litigation. Mr. Woodward's experience includes domestic and international clients' representation of global compliance issues, including matters arising under the Foreign Corrupt Practices Act. Mr. Woodward's representations span a wide range of federal executive branch departments, commissions, and agencies. Mr. Woodward also has extensive experience representing companies in sensitive high-stakes employment litigation. In 2018, Mr. Woodward was awarded the D.C. Bar's Pro Bono Attorney of the Year Award for his representation of tenants in the District facing eviction.

Mr. Woodward earned his Bachelor of Arts degree, cum laude, from the American University and his Juris Doctor, cum laude, from the Catholic University of America Columbus School of Law, where he now serves as an Adjunct Professor as well as the President of their Alumni Council. Mr. Woodward served as a law clerk to the Honorable Vanessa Ruiz on the D.C. Court of Appeals and the Honorable Joan Zeldon on the D.C. Superior Court.

Resources

District News                                                                                    +

District Initiatives                                                                             +

About DC                                                                                         +

Contact Us                                                                                       +

Accessibility

Privacy and Security

Terms and Conditions

About DC.Gov

 

| From: | Boasberg CJ |
|---|---|
| To: | JIP (JSPT); Boasberg CJ; DCD CMECF_CRSpecial |
| Cc: | Nicole Bell-Norwood; JIB (JSPT); JAE (JSPT); BCR (JSPT); toddblanche@blanchelaw.com; Stephen Weiss |
| Subject: | RE: Sealed Opposition - 23-gj-38 |
| Date: | Friday, June 16, 2023 3:40:02 PM |

Thank you for this filing. Please note that the Clerk's office cannot move forward with docketing this Opposition until the former President has refiled their Amended Motion for Disclosure. At that point, the Clerk's office will file both in order on 23-gj-38.

Please also note that the parties are requested to file a Joint Status Report by June 20, 2023, indicating whether the recent indictment of former President Trump changes either side's position on this Motion.

Best,

Alexander Nabavi-Noori
Law Clerk to the Honorable James E. Boasberg
U.S. District Court for the District of Columbia
(202) 354-3300

**From:** JIP (JSPT) <JIP@usdoj.gov>
**Sent:** Friday, June 16, 2023 3:09 PM
**To:** Boasberg CJ <Boasberg_CJ@dcd.uscourts.gov>; DCD CMECF_CRSpecial <dcd_cmecf_crspecial@dcd.uscourts.gov>
**Cc:** Nicole Bell-Norwood <Nicole_Bell-Norwood@dcd.uscourts.gov>; JIB (JSPT) <JIB@usdoj.gov>; JAE (JSPT) <JAE@usdoj.gov>; BCR (JSPT) <BCR@usdoj.gov>; toddblanche@blanchelaw.com; Stephen Weiss <stephen.weiss@blanchelaw.com>
**Subject:** Sealed Opposition - 23-gj-38

**CAUTION - EXTERNAL:**

Dear Chambers and Clerk's Office—

Please find attached a sealed opposition to the amended motion for disclosure of grand jury materials filed by the former President in case no. 23-gj-38 (originally filed in case no. 23-gj-10). I would be grateful for your assistance in filing the opposition on the docket. Please note that I have copied attorneys for the former President on this email to provide them notice of this pleading.

Best,
James

James I. Pearce
Special Counsel's Office

202-705-9879

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

IN RE GRAND JURY SUBPOENAS     )    **CASE NO. 23-gj-38**
     )
     )    **UNDER SEAL**
     )
     )

## JOINT STATUS REPORT

The Court has directed the parties to file a joint status report to address whether, in light of the recent indictment of former President Donald J. Trump, either party's position on the former President's Amended Motion for Disclosure of Grand Jury Materials, 23-gj-38[1] (D.D.C.) (filed June 5, 2023) ("Disclosure Motion") has changed. Having conferred, the parties represent that the former President is withdrawing the Disclosure Motion without prejudice to refile at some later date to the extent any claim is not mooted by discovery, and that the Court should therefore deny the Disclosure Motion as moot. That representation is based on the following understanding:

- Following the indictment in the Southern District of Florida, the government will produce in discovery the grand jury transcripts that the former President requested in the Disclosure Motion, if such transcripts exist. That discovery production will moot the Disclosure Motion's claim for the transcripts.

- The former President hereby withdraws his separate claim seeking grand jury minutes without prejudice to refile it at some later date.

- The government maintains its position in its sealed and *ex parte* oppositions that the Disclosure Motion lacks merit for legal and factual reasons but agrees that the

---

[1] The former President originally filed the Disclosure Motion in Case No. 23-gj-10. The Court directed the parties to refile the pleadings under the current caption, Case No. 23-gj-38.

Court should deny it as moot given that former President is withdrawing the Disclosure Motion.

Because the former President is withdrawing the Disclosure Motion, the Court should deny it as moot.

Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:   */s/ James I. Pearce*

James I. Pearce (N.C. Bar No. 44691)
Cecil VanDevender (Tenn. Bar No. 029700)
John M. Pellettieri (N.Y. Bar No. 4145371)
Assistant Special Counsel

*/s/ Todd Blanche*

Todd Blanche
Blanche Law
Attorney for former President Donald J. Trump

June 20, 2023

- 2 -

| | |
|---|---|
| **From:** | Nicole Bell-Norwood |
| **To:** | CWV (JSPT); JIP (JSPT); JMP (JSPT); Stanley Woodward |
| **Cc:** | Boasberg CJ |
| **Subject:** | FW: Activity in Case 1:23-gj-00038-JEB *SEALED* GRAND JURY SUBPOENA GJ42-17 and GJ42-69 Order |
| **Date:** | Tuesday, June 27, 2023 10:13:05 AM |

Good Morning Counsel,

Please see the below Minute Order. Thanks

*Nicole Bell-Norwood*

Courtroom Deputy to the *Honorable Chief Judge James E. Boasberg*
United States District Court for the District of Columbia
333 Constitution Ave. NW, Washington, DC 20001
(202-)354-3144
Nicole_Bell-Norwood@dcd.uscourts.gov

**From:** DCD_ECFNotice@dcd.uscourts.gov <DCD_ECFNotice@dcd.uscourts.gov>
**Sent:** Tuesday, June 27, 2023 10:09 AM
**To:** ECFMail DCD <DCD_ECFNotice@dcd.uscourts.gov>
**Subject:** Activity in Case 1:23-gj-00038-JEB *SEALED* GRAND JURY SUBPOENA GJ42-17 and GJ42-69 Order

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**NOTE: This docket entry (or case) is SEALED. Do not allow it to be seen by unauthorized persons.**

**U.S. District Court**

**District of Columbia**

**Notice of Electronic Filing**

The following transaction was entered on 6/27/2023 at 10:09 AM and filed on 6/27/2023
**Case Name:**     GRAND JURY SUBPOENA GJ42-17 and GJ42-69
**Case Number:**   1:23-gj-00038-JEB *SEALED*

**Filer:**

**Document Number:** No document attached

**Docket Text:**
**MINUTE ORDER: In response to the parties' [4] Joint Status Report, the Court ORDERS that the Amended [1] Motion for Disclosure is DENIED WITHOUT PREJUDICE as moot. So ORDERED, by Chief Judge James E. Boasberg on 6/27/2023. Counsel has been notified electronically.(znbn)**

**1:23-gj-00038-JEB *SEALED* Notice has been electronically mailed to:**

**1:23-gj-00038-JEB *SEALED* Notice will be delivered by other means to::**

---

## REDACTED NOTICE FOLLOWS

---

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**NOTE: This docket entry (or case) is SEALED. Do not allow it to be seen by unauthorized persons.**

**U.S. District Court**

**District of Columbia**

### Notice of Electronic Filing

The following transaction was entered on 6/27/2023 at 10:09 AM and filed on 6/27/2023

**Case Name:**       Sealed v. Sealed

**Case Number:**     23-38 (Requires CM/ECF login)

**Filer:**           Redacted

**Document Number:** No document attached

**Docket Text:**
**Redacted due to sealed restriction. Docket text can be viewed via the**

**unredacted NEF receipt available <u>here</u>.** (Requires CM/ECF login)

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE GRAND JURY SUBPOENAS | ) | CASE NO. 23-gj-38 |
|  | ) |  |
|  | ) | UNDER SEAL AND *EX PARTE* |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## MOTION FOR ORDER AUTHORIZING DISCLOSURE

The government moves for authorization to disclose all filings pertaining to a motion filed by former President Donald J. Trump, and later denied by this Court without prejudice, which sought access to grand jury materials and made allegations about purported prosecutorial misconduct. As set forth below, disclosure of these filings is necessary for the government to comply with an order issued by the court in *United States v. Donald J. Trump, et al.*, No. 23-cr-80101 (S.D. Fla.), a copy of which is attached hereto.

## BACKGROUND

On June 5, 2023, former President Donald J. Trump filed an amended motion seeking the "transcripts of Grand Jury testimony of Waltine Nauta, Carlos de Oliveira, Margo Martin, and Chamberlain Harris, as well as the 'minutes' component of the Grand Jury proceedings, for review and possible inclusion in motions for additional relief." *See* Amended Motion for Disclosure of Grand Jury Materials, 23-gj-10, 23-gj-38 (D.D.C.) (filed June 5, 2023; refiled June 21, 2023) ("Disclosure

Motion").[1] Other than Chamberlain Harris, each of the witnesses named in the Disclosure Motion had testified in this district as part of the grand jury's investigation into the former President's retention of classified materials after his term in office ended, and the government's efforts to retrieve those materials. The Disclosure Motion grounded its request for transcripts on several allegations of purported prosecutorial misconduct, including the claim (*id.* at 4) that Jay Bratt (one of the prosecutors leading the investigation) had engaged in a conversation with Stanley Woodward, Jr. (who represented Nauta) on August 24, 2022, that, in the former President's words, "suggested a *quid pro quo* or even a threat intended to cause Mr. Woodward to persuade his client to cooperate with Mr. Bratt."

On June 8, 2023, the government responded in opposition, including by addressing the facts surrounding the August 24, 2022 conversation between Bratt and Woodward. *See* Opposition to Amended Grand Jury Materials, 23-gj-10, 23-gj-38 (D.D.C.) (filed June 8, 2023; refiled June 15, 2023).[2]

One June 9, 2023, a magistrate judge in the Southern District of Florida unsealed an indictment, returned by the grand jury the previous day, charging Trump with the willful retention of documents containing national defense information, and charging Trump and Nauta with various offenses related to

---

[1] The former President originally filed the Disclosure Motion in Case No. 23-gj-10. The Disclosure Motion was later refiled, at the Court's direction, in Case No. 23-gj-38. The government's response was likewise originally filed in Case No. 23-gj-10 and later refiled in Case No. 23-gj-38.

[2] To comply with the Rule 6(e), the government filed two versions of its response in opposition, one of which contained *ex parte* material.

obstruction of justice. *United States v. Donald J. Trump, et al.*, No. 23-cr-80101 (S.D. Fla.) ("Florida case").

Following the indictment, this Court directed the parties to file a joint status report to address whether their respective positions on the Disclosure Motion had changed. On June 20, 2023, the parties filed a joint status report, which noted: (1) that the government would "produce in discovery the grand jury transcripts that the former President requested in the Disclosure Motion, if such transcripts exist," thus "moot[ing] the Disclosure Motion's claim for the transcripts"; (2) that the former President was "withdraw[ing] his separate claim seeking grand jury minutes without prejudice to refile it at some later date"; and (3) that the government "maintain[ed] its position . . . that the Disclosure Motion lacks merit for legal and factual reasons but agree[d] that the Court should deny it as moot given that the former President is withdrawing the Disclosure Motion." *See* Joint Status Report, 23-gj-38 (D.D.C.) (filed June 20, 2023). On June 27, 2023, the Court issued a minute order denying the Disclosure Motion without prejudice on mootness grounds. *See* Minute Order, 23-gj-38 (D.D.C.) (filed June 27, 2023).

On August 7, 2023, the district court in the Florida Case issued a sealed order stating:

> THIS MATTER comes before the Court upon news reports of allegations of potential misconduct related to the investigation of this case and related reports of a review by the United States District Court for the District of Columbia. The Court refers herein to reported allegations raised by Stanley E. Woodward, counsel for Waltine Nauta, against Jay I. Bratt, Counselor to the Special Prosecutor, concerning statements made by Mr. Bratt to Mr. Woodward regarding a judicial application submitted by Mr. Woodward.

*United States v. Donald J. Trump, et al.*, 23-cr-80101, ECF No. 101 at 1 (S.D. Fla.) (filed Aug. 7, 2023) (Att. A). The court therefore ordered the government to "file under seal with the Court a complete and current report on the status of the referenced allegations, attaching any written materials on the subject in the possession or custody of the Special Counsel or the United States Department of Justice," further noting that "[t]his Order may be shared with a judicial officer if necessary to comply with this Order." *Id.* at 2.

## DISCUSSION

By Local Rule of this Court, because the proceeding on the Disclosure Motion was "in connection with a grand jury subpoena or other matter occurring before a grand jury, all other papers filed in support of or in opposition to [the] motion" were "filed under seal." D.D.C. LCrR 6.1. Accordingly, the proceeding on the Disclosure Motion must not be made public except by order of the Court. *See id.* ("Papers, orders and transcripts of hearings subject to this Rule, or portions thereof, may be made public by the Court on its own motion or on motion of any person upon a finding that continued secrecy is not necessary to prevent disclosure of matters occurring before the grand jury."). These requirements advance the important public and private interests served by the grand jury secrecy requirement contained in Federal Rule of Criminal Procedure 6(e). *See, e.g., United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 424 (1983). At the same time, Rule 6(e) permits the Court to authorize the disclosure of a grand-jury matter "preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E). The government must secure permission from a court

- 4 -

overseeing a grand jury investigation before disclosing materials protected under Rule 6(e) to another district court. *See In re Sealed Case*, 250 F.3d 764, 768-70 (D.C. Cir. 2001).

To comply with the sealed order in the Florida case, the government now seeks authorization to disclose all filings related to the Disclosure Motion. Although most filings were ultimately docketed in Case No. 23-gj-38, the government also seeks authorization to disclose any relevant filings in Case No. 23-gj-10, to ensure the completeness of the record before the court in Florida.

## CONCLUSION

The government respectfully requests that the Court grant its motion to disclose. A proposed order granting the government's motion is attached.

Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:   */s/ Cecil VanDevender*
Cecil VanDevender (Tenn. Bar No. 029700)
James I. Pearce (N.C. Bar No. 44691)
Assistant Special Counsels

August 7, 2023

# Attachment A

Sealed Order in
*United States v. Donald J. Trump, et al.*,
23-cr-80101, ECF No. 101 (S.D. Fla.)
(filed Aug. 7, 2023)

Case 9:23-cr-80101-AMC   Document 115-1   Entered on FLSD Docket 08/11/2023   Page 183 of
196
Case 9:23-cr-80101-AMC   Document 101 *SEALED*   Entered on FLSD Docket 08/07/2023
Page 1 of 2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

### CASE NO. 23-80101-CR-CANNON

UNITED STATES,

        Plaintiff,

vs.

**DONALD J. TRUMP,**
**WALTINE NAUTA, and**
**CARLOS DE OLIVEIRA,**

        Defendants.

_____/

### SEALED ORDER REQUIRING SEALED WRITTEN SUBMISSIONS

**THIS MATTER** comes before the Court upon news reports of allegations of potential

misconduct related to the investigation of this case and related reports of a review by the United

States District Court for the District of Columbia.  The Court refers herein to reported allegations

raised by Stanley E. Woodward, counsel for Waltine Nauta, against Jay I. Bratt, Counselor to the

Special Prosecutor, concerning statements made by Mr. Bratt to Mr. Woodward regarding a

judicial application submitted by Mr. Woodward.  In service of the Court's independent obligation

to protect the integrity of this judicial proceeding, and to promote transparency in the Court's

oversight of this case, it is **ORDERED AND ADJUDGED** as follows:

1. On or before **August 11, 2023**, Counsel for Waltine Nauta shall file under seal with the

    Court a complete and current account of the accuracy, substance, and status of the

    reported allegations, and shall attach to the submission any pertinent written materials

Case 9:23-cr-80101-AMC   Document 115-1   Entered on FLSD Docket 08/11/2023   Page 184 of 196
Case 9:23-cr-80101-AMC   Document 101 *SEALED*   Entered on FLSD Docket 08/07/2023
Page 2 of 2

CASE NO. 23-80101-CR-CANNON

on the subject, including any materials submitted to the United States District Court for the District of Columbia.

2. Similarly, on or before the same date of **August 11, 2023**, the Special Counsel shall file under seal with the Court a complete and current report on the status of the referenced allegations, attaching any written materials on the subject in the possession or custody of the Special Counsel or the United States Department of Justice.

3. This Order shall be filed under seal and shall remain sealed until further Court order.[1]

**DONE AND ORDERED** in Chambers in Fort Pierce, Florida, this 7th day of August 2023.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

---

[1] This Order may be shared with a judicial officer if necessary to comply with this Order.

2

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE GRAND JURY SUBPOENA | ) | CASE NO. 23-gj-38 |
| | ) | |
| | ) | UNDER SEAL AND *EX PARTE* |
| | ) | |
| | ) | |
| | ) | |

## PROPOSED ORDER AUTHORIZING DISCLOSURE

The government has filed a motion seeking authorization to disclose all filings pertaining to a motion filed by former President Donald J. Trump, and later denied by this Court without prejudice, which sought access to grand jury materials, *see* Amended Motion for Disclosure of Grand Jury Materials, 23-gj-10, 23-gj-38 (D.D.C.) (filed June 5, 2023; refiled June 21, 2023) ("Disclosure Motion").[1] The government seeks authorization from this Court in order to comply with a sealed order issued on August 7, 2023 by the court in *United States v. Donald J. Trump, et al.*, No. 23-cr-80101 (S.D. Fla.) ("Florida case").

By Local Rule of this Court, because the Disclosure Motion was "in connection with a grand jury subpoena or other matter occurring before a grand jury," all "papers filed in support of or in opposition to [the] motion" were "filed under seal." D.D.C. LCrR 6.1. Accordingly, the requested information must not be made public except by order of the Court. *See id.* These requirements advance the important public and private interests served by the grand jury secrecy requirement contained in Federal

---

[1] Most of the documents in this case were originally filed in Case No. 23-gj-10 and later refiled, at the Court's direction, in Case No. 23-gj-38.

Rule of Criminal Procedure 6(e). *See, e.g., United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 424 (1983); *McKeever v. Barr*, 920 F.3d 842, 844-45 (D.C. Cir. 2019).

Rule 6(e) also permits the Court to authorize the disclosure of a grand-jury matter "preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E). The government must secure permission from a court overseeing a grand jury investigation before disclosing materials protected under Rule 6(e) to another district court. *See In re Sealed Case*, 250 F.3d 764, 768-70 (D.C. Cir. 2001). Here, the Court finds that disclosure of all filings related to the Disclosure Motion will allow the government to comply with the sealed order issued August 7, 2023 in the Florida case and will assist the court there in resolving any issues related thereto.

To ensure adherence to Local Criminal Rule 6.1, Federal Rule of Criminal Procedure 6(e), and the interests underlying those rules, it is:

**ORDERED** that the government is authorized to disclose to the court and the parties[2] in the Florida case all filings related to the Disclosure Motion, whether filed in Case No. 23-cr-10 or in Case No. 23-gr-38.


**IT IS SO ORDERED.**

DATE: AUGUST ___, 2023.


_____
JAMES E. BOASBERG
CHIEF JUDGE

---

[2] The government is permitted to redact any filings related to the Disclosure Motion before serving them on the opposing parties, to the extent that the law and facts permit redaction.

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE GRAND JURY SUBPOENA | ) | CASE NO. 23-gj-38 |
|  | ) |  |
|  | ) | UNDER SEAL AND *EX PARTE* |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## ~~PROPOSED~~ ORDER AUTHORIZING DISCLOSURE

The government has filed a motion seeking authorization to disclose all filings pertaining to a motion filed by former President Donald J. Trump, and later denied by this Court without prejudice, which sought access to grand jury materials, *see* Amended Motion for Disclosure of Grand Jury Materials, 23-gj-10, 23-gj-38 (D.D.C.) (filed June 5, 2023; refiled June 21, 2023) ("Disclosure Motion").[1] The government seeks authorization from this Court in order to comply with a sealed order issued on August 7, 2023 by the court in *United States v. Donald J. Trump, et al.*, No. 23-cr-80101 (S.D. Fla.) ("Florida case").

By Local Rule of this Court, because the Disclosure Motion was "in connection with a grand jury subpoena or other matter occurring before a grand jury," all "papers filed in support of or in opposition to [the] motion" were "filed under seal." D.D.C. LCrR 6.1. Accordingly, the requested information must not be made public except by order of the Court. *See id.* These requirements advance the important public and private interests served by the grand jury secrecy requirement contained in Federal

---

[1] Most of the documents in this case were originally filed in Case No. 23-gj-10 and later refiled, at the Court's direction, in Case No. 23-gj-38.

Rule of Criminal Procedure 6(e). *See, e.g., United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 424 (1983); *McKeever v. Barr*, 920 F.3d 842, 844-45 (D.C. Cir. 2019).

Rule 6(e) also permits the Court to authorize the disclosure of a grand-jury matter "preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E). The government must secure permission from a court overseeing a grand jury investigation before disclosing materials protected under Rule 6(e) to another district court. *See In re Sealed Case*, 250 F.3d 764, 768-70 (D.C. Cir. 2001). Here, the Court finds that disclosure of all filings related to the Disclosure Motion will allow the government to comply with the sealed order issued August 7, 2023 in the Florida case and will assist the court there in resolving any issues related thereto.

To ensure adherence to Local Criminal Rule 6.1, Federal Rule of Criminal Procedure 6(e), and the interests underlying those rules, it is:

**ORDERED** that the government is authorized to disclose to the court and the parties[2] in the Florida case all filings related to the Disclosure Motion, whether filed in Case No. 23-cr-10 or in Case No. 23-gr-38.

**IT IS SO ORDERED.**

DATE: AUGUST _8_, 2023.

_____
JAMES E. BOASBERG
CHIEF JUDGE

---

[2] The government is permitted to redact any filings related to the Disclosure Motion before serving them on the opposing parties, to the extent that the law and facts permit redaction.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  | ) |  |
|---|---|---|
| **IN RE GRAND JURY SUBPOENAS** | ) | **Case Nos. 23 -gj 10 / 23-gj-38** |
|  | ) |  |
|  | ) | **UNDER SEAL** |
|  | ) |  |

## MOTION FOR DISCLOSURE

On August 8, 2023, this Court issued an Order authorizing the government to disclose "*all filings* related to the Disclosure Motion, whether filed in Case No. 23-cr-10 or in Case No. 23-gr-38." Order at 2. Defense counsel hereby requests this Court provide a copy of all such filings, including the government's *ex parte* motion seeking the disclosure of the same, as well as a docket sheet associated with each of the above-referenced grand jury case actions.

In April of 2022, the government initiated a grand jury investigation *in this District* into the unlawful retention of classified documents at former President Trump's Palm Beach, Florida resident, The Mar-a-Lago Club. Indictment, *United States v. Trump*, No. 23-80101-CR (S.D. Fl. June. 8, 20230). Fourteen months later, *in the Southern District of Florida*, a separate grand jury returned an indictment alleging, *inter alia*, that former President Trump unlawfully retained classified documents at Mar-a-Lago. *Id.* Relevant here, the indictment also alleges that the undersigned's client, Waltine Nauta, engaged in a conspiracy with former President Trump to obstruct justice. *Id.*

Prior to the return of the indictment, on June 5, 2023, counsel for former President Trump moved this Court for an Order permitting the disclosure of certain grand jury materials which, counsel argued, would likely reveal the government's abuse of grand jury proceedings in this District. Among other things, counsel for former President Trump argued that the undersigned counsel was threatened by government prosecutors in the course of his dealing with them on

behalf of his client Waltine Nauta.  In response to this motion, on June 7, 2023, undersigned counsel submitted, through government counsel, correspondence to the Court concerning this interaction.

On August 7, 2023, United States Federal District Court Judge Eileen Cannon issued an Order Under Seal directing the undersigned counsel to submit, "a complete and current account of the accuracy, substance, and status of the . . . allegations," detailed in, "news reports of allegations of potential misconduct related to the investigation of this case and related reports of a review by the United States District Court for the District of Columbia" by August 11, 2023. Sealed Order, *United States v. Trump*, No. 23-80101-CR (S.D. Fl. Aug. 7, 2023).[1]  Thereafter, on Tuesday, August 8, 2023, at 10:57am counsel for former President Trump wrote the government seeking its position on an anticipated request of this Court to authorize the disclosure of the above-referenced pleadings as to the undersigned counsel as well as Judge Cannon.  In response, nineteen (19) minutes later, government counsel advised, "We will get back to you very soon." Thereafter, at 7:23pm on August 8, government counsel wrote that, "the Government *has* already sought similar relief to that described [by counsel for former President Trump].

Neither counsel for former President Trump nor the undersigned counsel were copied on the government's request of this Court to authorize the disclosure of the above-referenced pleadings.  Rather, this Court's August 7, 2023, Order acknowledges the government's request was *ex parte* (the caption indicates the "Proposed Order" was filed "Ex Parte and Under Seal.")

The government's *ex parte* application for the pleadings sought by Judge Cannon is both curious and concerning. Without access to the government's filing, defense counsel cannot know whether the deliberate exclusion of defense counsel was nefarious or incidental. Why, for

---

[1] Footnote 1 of the Order advises that, "This Order may be shared with a judicial officer if necessary to comply with this Order."

example did government counsel itself seek disclosure of these materials after counsel for former President Trump had advised that it would seek same. Or if government counsel had already sought disclosure, why did they simply not so say? Government counsel's conduct is particularly concerning given the representations made to the Court concerning the undersigned's interaction with government counsel as detailed both in the motion by former President Trump and in the undersigned's correspondence to this Court – representations defense counsel is only now being made aware of.

For example, it defies credulity – albeit flatteringly so – to suggest that Mr. Bratt, a (a 30-year veteran federal prosecutor) believed that defense counsel was himself a member of the judicial nominations commission and that Mr. Bratt was simply raising this detail concerning defense counsel's professional background – and no other fact – as a mere nicety. Indeed, the government's assertion that defense counsel is "not credible" is offensive.[2]

Accordingly, so as to provide Judge Cannon with a complete picture of the government's handling of this issue, defense counsel respectfully requests the Court order the disclosure of the government's August 7, 2024 *ex parte* motion as well as a copy of the docket sheet in these matters to both defense counsel, counsel for former President Trump, and Judge Cannon.

Rule 6(e) of the Federal Rules of Criminal Procedure permit this Court to authorize the disclosure of a grand jury matter, "preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E).  In addition, authorization is required to disclose grand jury proceedings in one district to a court in another district.  *See In re Sealed Case*, 250 F.3d 764, 768-70 (D.C. Cir. 2001).

---

[2] Equally offensive is the government's suggestion that by merely "expressing sympathy," for the fact that despite having undergone shoulder reconstruction surgery, it was of no moment that government counsel's "use of a phrase" – callously asking defense counsel, "what will you come up with next week," is to be excused.

Dated: August 11, 2023

Respectfully submitted,

_/s/ Stanley E. Woodward, Jr._

Stanley E. Woodward, Jr. (*pro hac vice*)
BRAND WOODWARD LAW, LP
400 Fifth Street Northwest, Suite 350
Washington, District of Columbia  20001
202-996-7447 (telephone)
202-996-0113 (facsimile)
stanley@brandwoodwardlaw.com

*Counsel for Defendant Waltine Nauta*

4

<u>**Certificate of Electronic Service**</u>

I hereby certify that on August 11, 2023, I electronically submitted the foregoing, via electronic mail, to counsel of record.

Respectfully submitted,

_/s/ Stanley E. Woodward, Jr._

Stanley E. Woodward, Jr. (*pro hac vice*)
BRAND WOODWARD LAW, LP
400 Fifth Street Northwest, Suite 350
Washington, District of Columbia  20001
202-996-7447 (telephone)
202-996-0113 (facsimile)
stanley@brandwoodwardlaw.com

*Counsel for Defendant Waltine Nauta*

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

IN RE GRAND JURY SUBPOENAS    )    CASE NO. 23-gj-38
)
)    UNDER SEAL
)
)
)

## GOVERNMENT'S RESPONSE TO MOTION FOR DISCLOSURE

Shortly after midnight today, counsel for Waltine Nauta, a defendant in *United States v. Trump*, No. 23-cr-80101 (S.D. Fla.) ("Florida case"), filed a motion seeking disclosure of the government's *ex parte* motion—which itself sought permission to obtain and disclose all filings in this grand jury matter relevant to misconduct allegations concerning attorney Stanley Woodward. The government does not oppose Nauta's motion.

As reflected in the government's *ex parte* motion, the government sought and obtained this Court's permission to disclose all relevant filings in this grand jury matter (and related filings in Grand Jury Case No. 23-gj-10) in order to provide them to the district court and counsel for defendants in the Florida case. After the government had filed its *ex parte* motion and shortly after the Court had ruled, counsel for former President Donald J. Trump communicated to the government and to counsel of record for the other defendants in the Florida case that he intended to file a similar motion in this Court seeking permission to obtain and disclose materials in this case. In response, the government indicated that it had already obtained such permission and then shared with all counsel of record the following materials: (1) this

Court's Order on August 8 permitting disclosure of relevant filings; (2) the Amended

Motion for Disclosure of Grand Jury Materials, No. 23-gj-10 (D.D.C.) (filed June 5,

2023); (3) Government's Opposition to Amended Motion for Disclosure of Grand Jury

Materials, 23-gj-10, 23-gj-38 (D.D.C.) (filed June 8, 2023; refiled June 15, 2023), in

both a sealed version and a sealed and *ex parte* version; (4) two exhibits attached to

the Government's *ex parte* Opposition; (5) the parties' joint status report filed on June

20, 2023; and (6) this Court's order on June 27 denying Trump's Disclosure Motion

without prejudice as moot.

<div style="margin-left:40%;">

Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:     /s/ *James I. Pearce*
        James I. Pearce (N.C. Bar No. 44691)
        Cecil VanDevender (Tenn. Bar No. 029700)
        Assistant Special Counsels

</div>

August 11, 2023

| From: | JPC (JSPT) |
|---|---|
| To: | JIB (JSPT) |
| Subject: | FW: Referral |
| Date: | Friday, June 9, 2023 5:35:31 AM |
| Attachments: | 23-gj-10 - sealed response to Motion for Disclosure_6-8-2023_FINAL.pdf |
| | 2023.06.04 Motion for Disclosure of Grand Jury Materials.pdf |
| | 2023-06-07 - Correspondence to CJ Boasberg re Trump Grand Jury Motion.pdf |

J.P. Cooney
202-674-0661

**From:** JPC (JSPT)
**Sent:** Friday, June 9, 2023 5:35 AM
**To:** Ragsdale, Jeffrey (OPR) <Jeffrey.Ragsdale@usdoj.gov>
**Cc:** RNH (JSPT) <RNH@usdoj.gov>
**Subject:** Referral

Jeff:

Per our conversation yesterday, attached please find sealed pleadings in grand jury litigation in the District of Columbia, in which lawyers for Donald J. Trump allege that Jay Bratt "suggested a quid pro quo or even a threat intended to cause [Stanley Woodward, an attorney for Waltine Nauta] to persuade [Nauta] to cooperate with Mr. Bratt" (Trump Mot. at 4). The allegation is false. Nonetheless, in an abundance of caution, the Special Counsel's Office and Mr. Bratt are referring the allegation to the Office of Professional Responsibility.

In addition to that allegation, Trump's motion contains a handful of other allegations against Special Counsel attorneys, which we answer in our opposition. The Special Counsel's Office welcomes your office's review of any allegation you deem necessary or appropriate. I am available to provide any information you need.

J.P. Cooney
Deputy Special Counsel
202-674-0661