# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 22-mj-8332-BER

**IN RE SEALED SEARCH WARRANT**

_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?   No

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

BY:   /s/ Michael Thakur
        MICHAEL THAKUR
        Assistant United States Attorney
        Court ID No. A5501474/
        Florida Bar No.: 1011456
        99 Northeast 4th Street
        Miami, Florida 33132-2111
        Telephone: ███████████
        E-mail: ██████████████████

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-mj-8332-BER**



FILED BY _____ _TM_ ___D.C.

**Aug 5, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

**IN RE: SEARCH WARRANT**                    **HIGHLY SENSITIVE DOCUMENT**
_____/

### MOTION TO SEAL

The United States of America, by and through the undersigned Assistant United States Attorney, hereby moves to seal this Motion, the Search Warrant, and all its accompanying documents, until further order of this Court. The United States submits that there is good cause because the integrity of the ongoing investigation might be compromised, and evidence might be destroyed.

The United States further requests that, pursuant to this Court's procedures for Highly Sensitive documents, all documents associated with this investigation not be filed on the Court's electronic docket because filing these materials on the electronic docket poses a risk to safety given the sensitive nature of the material contained therein.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

BY:    _s/Michael Thakur_____
       MICHAEL THAKUR
       Assistant United States Attorney
       Court Number A5501474/
       Florida Bar No. 1011456
       99 Northeast 4th Street
       Miami, Florida 33132-2111

Subject to Protective Order

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-mj-8332-BER**



FILED BY _____ TM _____ D.C.

**Aug 5, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

**IN RE: SEARCH WARRANT**                **HIGHLY SENSITIVE DOCUMENT**

_____/

### SEALING ORDER

The United States of America, having applied to this Court for an Order sealing the Motion

to Seal, the Search Warrant and all its accompanying documents, and this order and the Court

finding good cause:

**IT IS HEREBY ORDERED** that the Motion to Seal, the Search Warrant and its

accompanying documents, and this Order shall be filed under seal until further order of this Court.

However, the United States Attorney's Office and the Federal Bureau of Investigation may obtain

copies of any sealed document for purposes of executing the search warrant.

**DONE AND ORDERED** in chambers at West Palm Beach, Florida, this 5TH day of

August 2022.

HON. BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

FILED BY _____ *TM* _____ D.C.

**Aug 5, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

the Premises Located at 1100 S. Ocean Blvd., Palm
Beach, FL 33480, as further described in Attachment A

)
)
)
)
)

Case No. 22-mj-8332-BER

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the     Southern     District of     Florida     , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 793 | Willful retention of national defense information |
| 18 U.S.C. § 2071 | Concealment or removal of government records |
| 18 U.S.C. § 1519 | Obstruction of federal investigation |

The application is based on these facts:

See attached Affidavit of FBI Special Agent FBI 21A

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

FBI 21A

*Applicant's signature*

FBI 21A , Special Agent, FBI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Phone (WhatsApp)     *(specify reliable electronic means)*.

Date:     08/05/2022

*Judge's signature*

City and state:   West Palm Beach, Florida

Hon. Bruce E. Reinhart, U.S. Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE SEARCH OF:          )
                                         )      Case No.
LOCATIONS WITHIN THE PREMISES            )
TO BE SEARCHED IN ATTACHMENT A           )      **Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF AN
### APPLICATION UNDER RULE 41 FOR A
### WARRANT TO SEARCH AND SEIZE

I, ██████ FBI 21A ██████, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      The government is conducting a criminal investigation concerning the improper

removal and storage of classified information in unauthorized spaces, as well as the unlawful

concealment or removal of government records.  The investigation began as a result of a referral

the United States National Archives and Records Administration (NARA) sent to the United

States Department of Justice (DOJ) on February 9, 2022, hereinafter, "NARA Referral."  The

NARA Referral stated that on January 18, 2022, in accordance with the Presidential Records Act

(PRA), NARA received from the office of former President DONALD J. TRUMP, hereinafter

"FPOTUS," via representatives, fifteen (15) boxes of records, hereinafter, the "FIFTEEN

BOXES."  The FIFTEEN BOXES, which had been transported from the FPOTUS property at

1100 S Ocean Blvd, Palm Beach, FL 33480, hereinafter, the "PREMISES," a residence and club

known as "Mar-a-Lago," further described in Attachment A, were reported by NARA to contain,

among other things, highly classified documents intermingled with other records.

2.      After an initial review of the NARA Referral, the Federal Bureau of Investigation

(FBI) opened a criminal investigation to, among other things, determine how the documents with

1

classification markings and records were removed from the White House (or any other authorized location(s) for the storage of classified materials) and came to be stored at the PREMISES; determine whether the storage location(s) at the PREMISES were authorized locations for the storage of classified information; determine whether any additional classified documents or records may have been stored in an unauthorized location at the PREMISES or another unknown location, and whether they remain at any such location; and identify any person(s) who may have removed or retained classified information without authorization and/or in an unauthorized space.

3. The FBI's investigation has established that documents bearing classification markings, which appear to contain National Defense Information (NDI), were among the materials contained in the FIFTEEN BOXES and were stored at the PREMISES in an unauthorized location. Since the FIFTEEN BOXES were provided to NARA, additional documents bearing classification markings, which appear to contain NDI and were stored at the PREMISES in an unauthorized location, have been produced to the government in response to a grand jury subpoena directed to FPOTUS's post-presidential office and seeking documents containing classification markings stored at the PREMISES and otherwise under FPOTUS's control. Further, there is probable cause to believe that additional documents that contain classified NDI or that are Presidential records subject to record retention requirements currently remain at the PREMISES. There is also probable cause to believe that evidence of obstruction will be found at the PREMISES.

4. I am a Special Agent with the FBI assigned to the Washington Field Office counterintelligence division and have been since 2016. During this time, I have received training at the FBI Academy located at Quantico, Virginia, specific to counterintelligence and espionage investigations. I currently am assigned to investigate counterintelligence and espionage matters.

2

 USA-00043153

Based on my experience and training, I am familiar with efforts used to unlawfully collect, retain, and disseminate sensitive government information, including classified NDI.

5.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 1100 S Ocean Blvd, Palm Beach, FL 33480, the "PREMISES," as further described in Attachment A, for the things described in Attachment B.

6.      Based upon the following facts, there is probable cause to believe that the locations to be searched at the PREMISES contain evidence, contraband, fruits of crime, or other items illegally possessed in violation of 18 U.S.C. §§ 793(e), 1519, or 2071.

## SOURCE OF EVIDENCE

7.      The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained during my participation in this investigation, and information obtained from other FBI and U.S. Government personnel.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I, or others, have learned during the course of this investigation.

## STATUTORY AUTHORITY AND DEFINITIONS

8.      Under 18 U.S.C. § 793(e), "[w]hoever having unauthorized possession of, access to, or control over any document . . . or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted" or attempts to do or causes the same "to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee

3

of the United States entitled to receive it" shall be fined or imprisoned not more than ten years, or both.

9.     Under Executive Order 13526, information in any form may be classified if it: (1) is owned by, produced by or for, or is under the control of the United States Government; (2) falls within one or more of the categories set forth in the Executive Order [Top Secret, Secret, and Confidential]; and (3) is classified by an original classification authority who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security.

10.     Where such unauthorized disclosure could reasonably result in damage to the national security, the information may be classified as "Confidential" and must be properly safeguarded.  Where such unauthorized disclosure could reasonably result in serious damage to the national security, the information may be classified as "Secret" and must be properly safeguarded.  Where such unauthorized disclosure could reasonably result in exceptionally grave damage to the national security, the information may be classified as "Top Secret" and must be properly safeguarded.

11.     Sensitive Compartmented Information (SCI) means classified information concerning or derived from intelligence sources, methods, or analytical processes, which is required to be handled within formal access control systems.

12.     Special Intelligence, or "SI," is an SCI control system designed to protect technical and intelligence information derived from the monitoring of foreign communications signals by other than the intended recipients.  The SI control system protects SI-derived information and information relating to SI activities, capabilities, techniques, processes, and procedures.

13.     HUMINT Control System, or "HCS," is an SCI control system designed to protect intelligence information derived from clandestine human sources, commonly referred to as

4

"human intelligence." The HCS control system protects human intelligence-derived information and information relating to human intelligence activities, capabilities, techniques, processes, and procedures.

14.     Foreign Intelligence Surveillance Act, or "FISA," is a dissemination control designed to protect intelligence information derived from the collection of information authorized under the Foreign Intelligence Surveillance Act by the Foreign Intelligence Surveillance Court, or "FISC."

15.     Classified information may be marked as "Not Releasable to Foreign Nationals/Governments/US Citizens," abbreviated "NOFORN," to indicate information that may not be released in any form to foreign governments, foreign nationals, foreign organizations, or non-U.S. citizens without permission of the originator.

16.     Classified information may be marked as "Originator Controlled," abbreviated "ORCON." This marking indicates that dissemination beyond pre-approved U.S. entities requires originator approval.

17.     Classified information of any designation may be shared only with persons determined by an appropriate United States Government official to be eligible for access, and who possess a "need to know." Among other requirements, in order for a person to obtain a security clearance allowing that person access to classified United States Government information, that person is required to and must agree to properly protect classified information by not disclosing such information to persons not entitled to receive it, by not unlawfully removing classified information from authorized storage facilities, and by not storing classified information in unauthorized locations. If a person is not eligible to receive classified information, classified information may not be disclosed to that person. In order for a foreign government to receive

5

access to classified information, the originating United States agency must determine that such release is appropriate.

18.     Pursuant to Executive Order 13526, classified information contained on automated information systems, including networks and telecommunications systems, that collect, create, communicate, compute, disseminate, process, or store classified information must be maintained in a manner that: (1) prevents access by unauthorized persons; and (2) ensures the integrity of the information.

19.     32 C.F.R. Parts 2001 and 2003 regulate the handling of classified information. Specifically, 32 C.F.R. § 2001.43, titled "Storage," regulates the physical protection of classified information.  This section prescribes that Secret and Top Secret information "shall be stored in a [General Services Administration]-approved security container, a vault built to Federal Standard (FHD STD) 832, or an open storage area constructed in accordance with § 2001.53."  It also requires periodic inspection of the container and the use of an Intrusion Detection System, among other things.

20.     Under 18 U.S.C. § 1519:

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

21.     Under 18 U.S.C. § 2071:

(a) Whoever willfully and unlawfully conceals, removes, mutilates, obliterates, or destroys, or attempts to do so, or, with intent to do so takes and carries away any record, proceeding, map, book, paper, document, or other thing, filed or deposited with any clerk or officer of any court of the United States, or in any public office, or with any judicial or public officer of the United States, shall be fined under this title or imprisoned not more than three years, or both.

6

Subject to Protective Order

(b) Whoever, having the custody of any such record, proceeding, map, book, document, paper, or other thing, willfully and unlawfully conceals, removes, mutilates, obliterates, falsifies, or destroys the same, shall be fined under this title or imprisoned not more than three years, or both; and shall forfeit his office and be disqualified from holding any office under the United States. As used in this subsection, the term "office" does not include the office held by any person as a retired officer of the Armed Forces of the United States.

22.    Under the PRA, 44 U.S.C. § 2201:

(2) The term "Presidential records" means documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President. Such term—

> (A) includes any documentary materials relating to the political activities of the President or members of the President's staff, but only if such activities relate to or have a direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President; but

> (B) does not include any documentary materials that are (i) official records of an agency (as defined in section 552(e) of title 5, United States Code; (ii) personal records; (iii) stocks of publications and stationery; or (iv) extra copies of documents produced only for convenience of reference, when such copies are clearly so identified.

23.    Under 44 U.S.C. § 3301(a), government "records" are defined as:

all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them.

## PROBABLE CAUSE

### *NARA Referral*

24.    On February 9, 2022, the Special Agent in Charge of NARA's Office of the

7

Subject to Protective Order

USA-00043158

Inspector General sent the NARA Referral via email to DOJ.  The NARA Referral stated that according to NARA's White House Liaison Division Director, a preliminary review of the FIFTEEN BOXES indicated that they contained "newspapers, magazines, printed news articles, photos, miscellaneous print-outs, notes, presidential correspondence, personal and post-presidential records, and 'a lot of classified records.'  Of most significant concern was that highly classified records were unfoldered, intermixed with other records, and otherwise unproperly [*sic*] identified."

25.     On February 18, 2022, the Archivist of the United States, chief administrator for NARA, stated in a letter to Congress's Committee on Oversight and Reform Chairwoman The Honorable Carolyn B. Maloney, "NARA had ongoing communications with the representatives of former President Trump throughout 2021, which resulted in the transfer of 15 boxes to NARA in January 2022 . . . .  NARA has identified items marked as classified national security information within the boxes."  The letter also stated that, "[b]ecause NARA identified classified information in the boxes, NARA staff has been in communication with the Department of Justice."  The letter was made publicly available at the following uniform resource locator (URL): https://www.archives.gov/files/foia/ferriero-response-to-02.09.2022-maloney-letter.02.18.2022.pdf.  On February 18, 2022, the same day, the Save America Political Action Committee (PAC) posted the following statement on behalf of FPOTUS: "The National Archives did not 'find' anything, they were given, upon request, Presidential Records in an ordinary and routine process to ensure the preservation of my legacy and in accordance with the Presidential Records Act . . . ."  An image of this statement is below.

8



**FPOTUS Stores Documents in Boxes**

26.     On April 12, 2022, FBI agents interviewed an FPOTUS representative,
"WITNESS ▇." WITNESS ▇ learned from another White House employee, hereinafter referred to
as "▇▇▇▇▇▇▇▇▇▇," that FPOTUS kept boxes in his bedroom in the White
House Residence. Both WITNESS ▇ and ▇▇▇▇▇▇▇▇▇ heard that FPOTUS
brought documents that he wanted to read to the White House Residence at the end of the day.
WITNESS ▇ reported these documents were placed in boxes that would be stacked in a corner
after FPOTUS was done reading them.

27.     On May 12, 2022, FBI agents interviewed a former employee of FPOTUS,
"WITNESS ▇," who was specifically responsible for handling presidential papers in the White
House. WITNESS ▇ also described a "regular flow of documents" between the White House

Subject to Protective Order

Residence and Oval Office, carried by the valets, at the direction of FPOTUS.

28.



It was FPOTUS's practice to store accumulated documents in boxes, and that continues to be his practice.

29.     In mid-December 2020, WITNESS ▮ was aware from the valets that there were still "several boxes" of records in the White House Residence. WITNESS ▮ brought this to the attention of the FPOTUS Chief of Staff in December 2020. WITNESS ▮ did not know specifically what documents were in those boxes but stated they "could have had anything in them," to include newspaper articles, briefing books, draft press statements, and draft letters. WITNESS ▮ knew that FPOTUS received a daily briefing book, with documents such as schedules, "dos of the day," economic reports, and other matters that were mostly unclassified. Sometimes, the daily briefing book contained classified reports. WITNESS ▮ also regularly handled, on behalf of FPOTUS, decision memo packages that had classified material attached, or

Subject to Protective Order                    USA-00043161

talking points for State Department calls, that were classified at the CONFIDENTIAL level at a minimum.  WITNESS ▮ did not always receive those documents back and assumed they were handled by other staff.  WITNESS ▮ was aware that some of these documents ended up in boxes as that was FPOTUS's "filing system."  Sometimes documents that FPOTUS did not return or discard in a burn bag (a common method of disposing of classified documents for appropriate destruction) would be "thrown in a box on the theory that he [FPOTUS] might want to do something with [them] later."

### Boxes Containing Documents Were Transported from the White House to Mar-a-Lago

30.     According to a CBS Miami article titled "Moving Trucks Spotted At Mar-a-Lago," published Monday, January 18, 2021, at least two moving trucks were observed at the PREMISES on January 18, 2021.  On June 9, 2022, FBI agents interviewed a current Mar-a-Lago employee, "WITNESS ▮."  WITNESS ▮ recalled that the move had occurred on a Monday morning, when a large moving truck and a box truck were present.  Although WITNESS ▮ did not observe Bankers boxes being offloaded from the moving trucks, at a later date, WITNESS ▮ recalled observing Bankers boxes in the White and Gold Ballroom within Mar-a-Lago.

31.     On May 26, 2022, the FBI interviewed "WITNESS 5."  WITNESS 5 was employed by FPOTUS both during the Administration and after the end of the Administration on January 20, 2021.  On June 21, 2022, WITNESS 5 testified under oath before a federal grand jury sitting in the District of Columbia.  Before the grand jury, WITNESS 5 stated that during the move from the White House to Mar-a-Lago, Bankers boxes were placed within larger brown boxes labeled "▮▮▮."

32.     According to WITNESS ▮, WITNESS ▮ subsequently learned that approximately

Subject to Protective Order                    USA-00043162

eighty-five to ninety-five of FPOTUS's boxes, hereinafter referred to as "FPOTUS BOXES," were transported from the White House to the PREMISES but WITNESS ▮ did not know when this occurred. WITNESS ▮ described the FPOTUS BOXES as white and blue Bankers boxes and cardboard printer paper boxes with lids. WITNESS ▮ confirmed that these boxes are similar to the ones pictured below, in a photograph taken by the media, of FPOTUS aides loading boxes onto Marine One on January 20, 2021, as FPOTUS departed the White House.



33.    On or about the afternoon of January 20, 2021, WITNESS ▮ observed several items, which may have contained some of the FPOTUS BOXES, being offloaded from Air Force One and transported to the PREMISES.

34.    Between January 21, 2021, and late August 2021, the FPOTUS BOXES were stored in at least two different rooms within the PREMISES. WITNESS ▮ was aware that in approximately May 2021, FPOTUS directed Mar-a-Lago staff to locate a permanent storage

12

location on the PREMISES for his boxes.  In late August or early September 2021, WITNESS ▮ observed the FPOTUS BOXES in a ground floor storage room, hereinafter the "STORAGE ROOM," with no lock on the door.  Sometime thereafter, WITNESS ▮ observed locks installed on the STORAGE ROOM door.

35.    WITNESS ▮ described the STORAGE ROOM as being located on the ground floor pool level in a hallway with other offices and storage spaces.  The door to the STORAGE ROOM was painted gold and had no other markings on it.  The door to the STORAGE ROOM is located approximately mid-way up the wall and is reachable by several wooden stairs.

36.    In addition to the approximately eighty-five to ninety-five FPOTUS BOXES located in the STORAGE ROOM, there were also other boxes in the STORAGE ROOM with merchandise such as challenge coins, garment bags, memorabilia from Mar-a-Lago such as photograph frames, and other décor items.

37.    On May 27, 2022, FBI agents interviewed "WITNESS ▮."  WITNESS ▮ was employed by FPOTUS both during the Administration and after the end of the Administration on January 20, 2021.  WITNESS ▮ described the STORAGE ROOM as located in the basement of the PREMISES.  According to WITNESS ▮, the STORAGE ROOM held file boxes and gifts from the White House deemed too valuable to store off-site.  WITNESS ▮ stated that the entrance to the STORAGE ROOM had a wooden door, which was spray-painted gold.

### *Provision of the Fifteen Boxes to NARA*

38.    On March 31, 2022, the FBI interviewed a White House government employee, "WITNESS ▮."  WITNESS ▮ reported that sometime in 2017, he/she became aware of multiple documents not being delivered to the White House Office of Records Management pursuant to

13

Subject to Protective Order

USA-00043164

PRA requirements for processing. In 2018, WITNESS ▮ learned from WITNESS ▮ that approximately two dozen boxes of materials were being kept by FPOTUS. Another White House employee confirmed to WITNESS ▮ that there was "a separate holding area." After January 20, 2021, WITNESS ▮ was aware that multiple records had not been provided by FPOTUS to NARA, including the approximately two dozen boxes.

39.     On or about May 6, 2021, NARA made a request for the missing PRA records and continued to make requests until approximately late December 2021 when NARA was informed twelve boxes were found and ready for retrieval at the PREMISES. According to WITNESS ▮, after receiving the request from NARA, FPOTUS wanted to review the boxes before providing them to NARA. WITNESS ▮, WITNESS 5, and ████████████████ collected the FIFTEEN BOXES closest to the door of the STORAGE ROOM and delivered them to FPOTUS. They carried the boxes from the STORAGE ROOM to the entryway of FPOTUS's personal residential suite on the PREMISES. Between approximately January 1-17, 2022, WITNESS ▮, WITNESS 5, and ████████████████ placed two to four boxes at a time outside FPOTUS's personal suite.[1] WITNESS ▮ believes that FPOTUS took the boxes into the residential suite and reviewed their contents. On January 17, 2022, the day of the scheduled NARA pick up, WITNESS ▮ saw all FIFTEEN BOXES in the hallway outside FPOTUS's residential suite. WITNESS 5 also testified that the FIFTEEN BOXES were in Pine Hall. Pine Hall is the

---

[1] When the FBI interviewed WITNESS 5 on May 26, 2022, WITNESS 5 claimed that the first time WITNESS 5 saw the boxes was when WITNESS 5 moved them from Pine Hall, the anteroom to FPOTUS's personal residential suite, to the moving truck to provide the boxes to NARA. WITNESS 5 testified before the grand jury, however, that he/she had actually weeks prior moved them up from the STORAGE ROOM to Pine Hall for FPOTUS's review of them. Further, in WITNESS 5's interview with the FBI on May 26, 2022, he/she had stated that he/she did not know where the boxes had come from prior to being located in Pine Hall. Testifying under oath before the grand jury, WITNESS 5 claimed he/she had said this because he/she was not sure whether the boxes in Pine Hall were the same boxes that he/she had moved from the STORAGE ROOM. WITNESS 5 thereafter admitted, however, that he/she was not aware of anyone moving any other such boxes to Pine Hall.

14

USA-00043165

anteroom to FPOTUS's personal residential suite.

40.     WITNESS ▮ believed that FPOTUS personally reviewed the items requested by NARA.

41.     WITNESS 5 testified that he/she and WITNESS ▮ transferred the boxes from Pine Hall to WITNESS 5's car. From there, on January 17, 2022, WITNESS ▮ and WITNESS 5 met the NARA contract driver and provided the driver with the FIFTEEN BOXES.

42.     Even though there were far more FPOTUS BOXES than the FIFTEEN BOXES, FPOTUS did not review the remainder of the FPOTUS BOXES before the NARA pickup. According to WITNESS 5, the FIFTEEN BOXES were not selected from the FPOTUS BOXES for review in a systematic way. WITNESS 5 testified before the grand jury that WITNESS 5 would "just open the door, turn to my left, grab a box, and take it up." WITNESS 5 confirmed that he/she was not instructed to take any particular boxes, and WITNESS 5 answered affirmatively when asked if WITNESS 5 would "just pick some off the top." When WITNESS 5 was questioned why he/she did not bring for review more than what WITNESS 5 approximated was 15 to 17 boxes, WITNESS 5 testified that "once I started putting them in there – [FPOTUS] was like, okay, that's it." According to WITNESS 5, FPOTUS did not state why he did not want to review more boxes before the NARA pickup, but whenever WITNESS 5 asked whether FPOTUS wanted WITNESS 5 to get any more boxes, FPOTUS would say, "Nope, that's it."

43.     According to WITNESS ▮, after providing the FIFTEEN BOXES to NARA, FPOTUS indicated to his staff those were the boxes going to NARA and "there are no more."

44.     According to WITNESS ▮, around the time the FIFTEEN BOXES were provided to NARA, FPOTUS directed WITNESS ▮ to convey to one of FPOTUS's lawyers, hereinafter

15

                                                    USA-00043166

"INDIVIDUAL 1," that there were no more boxes at the PREMISES.

45.     According to WITNESS ▇, however, approximately seventy to eighty of the aforementioned eighty-five to ninety-five FPOTUS BOXES remained in the STORAGE ROOM as of approximately January 2022. WITNESS ▇ did not know the contents of the remaining seventy to eighty FPOTUS BOXES, but believed they contain the same types of documents and records as the FIFTEEN BOXES that were provided to NARA.

46.     On May 18, 2022, the FBI obtained an undated photograph, hereinafter referred to as the "STORAGE-PHOTO," from WITNESS ▇, who had access to the STORAGE ROOM. WITNESS ▇ took the photograph and provided it to FPOTUS sometime between January 1-17, 2022. The purpose of the photograph was to show FPOTUS the volume of boxes that remained in the STORAGE ROOM. The STORAGE-PHOTO, which appears below, captures approximately sixty-one of the FPOTUS BOXES located in the STORAGE ROOM:



Subject to Protective Order

### *The FIFTEEN BOXES Provided to NARA Contain Classified Information*

47.     From May 16-18, 2022, FBI agents conducted a preliminary review of the FIFTEEN BOXES provided to NARA and identified documents with classification markings in fourteen of the FIFTEEN BOXES.  A preliminary triage of the documents with classification markings revealed the following approximate numbers:  184 unique documents bearing classification markings, including 67 documents marked as CONFIDENTIAL, 92 documents marked as SECRET, and 25 documents marked as TOP SECRET.  Further, the FBI agents observed markings reflecting the following compartments/dissemination controls: HCS, FISA, ORCON, NOFORN, and SI.  Based on my training and experience, I know that documents classified at these levels typically contain NDI.  Several of the documents also contained what appears to be FPOTUS's handwritten notes.

48.     Given WITNESS ▮'s statements that the FIFTEEN BOXES were a sampling taken from the larger amount of approximately eighty-five to ninety-five FPOTUS BOXES being stored in the STORAGE ROOM at the PREMISES, I believe the contents of the remainder of the FPOTUS BOXES are similar to the contents of the FIFTEEN BOXES.  Further, based upon the presence and number of documents and records bearing classification markings discovered within the FIFTEEN BOXES provided to NARA, there is reason to believe the remaining FPOTUS BOXES, from which the FIFTEEN BOXES were taken, contain classified NDI.

### *Following the Provision of the FIFTEEN BOXES to NARA, Remaining FPOTUS BOXES Were Moved from the STORAGE ROOM to Other Locations at the Premises*

49.     On June 21, 2022, while testifying under oath before the grand jury, WITNESS 5 stated that sometime after January 2022 (i.e., after the provision of the FIFTEEN BOXES to NARA), FPOTUS requested that additional boxes be moved from the STORAGE ROOM to Pine

17

USA-00043168

Hall.  FPOTUS would say, "bring me a couple boxes," and WITNESS 5 would "grab them and just put them in Pine Hall."

50.     According to WITNESS 5, WITNESS 5 was not asked to nor did he/she return boxes to the STORAGE ROOM.  WITNESS 5 confirmed he/she had been in the STORAGE ROOM recently.  WITNESS 5 acknowledged that when he/she was in there recently, there were fewer boxes in the STORAGE ROOM than represented in the STORAGE-PHOTO.  When asked how WITNESS 5 would account for the deficit in the number of boxes in the STORAGE ROOM compared to the number of boxes in the STORAGE-PHOTO, WITNESS 5 stated that the remaining boxes were "in his room in the residence," referring to FPOTUS's residential suite at the PREMISES.

### *Grand Jury Subpoena, Related Correspondence, and Production of Additional Classified Documents*

51.     DOJ has advised me that, on May 11, 2022, an attorney representing FPOTUS, "FPOTUS COUNSEL 1," agreed to accept service of a grand jury subpoena from a grand jury sitting in the District of Columbia sent to him via email by one of the prosecutors handling this matter for DOJ, "DOJ COUNSEL."  The subpoena was directed to the custodian of records for the Office of Donald J. Trump, and it requested the following materials:

> Any and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump bearing classification markings, including but not limited to the following: Top Secret, Secret, Confidential, Top Secret/SI-G/NOFORN/ORCON, Top Secret/SI-G/NOFORN, Top Secret/HCS-O/NOFORN/ORCON, Top Secret/HCS-O/NOFORN, Top Secret/HCS-P/NOFORN/ORCON, Top Secret/HCS-P/NOFORN, Top Secret/TK/NOFORN/ORCON, Top Secret/TK/NOFORN, Secret/NOFORN, Confidential/NOFORN, TS, TS/SAP, TS/SI-G/NF/OC, TS/SI-G/NF, TS/HCS-O/NF/OC, TS/HCS-O/NF, TS/HCS-P/NF/OC, TS/HCS-P/NF, TS/HCS-P/SI-G, TS/HCS-P/SI/TK, TS/TK/NF/OC, TS/TK/NF, S/NF, S/FRD, S/NATO, S/SI, C, and C/NF.

18

USA-00043169

The return date of the subpoena was May 24, 2022. DOJ COUNSEL also sent FPOTUS COUNSEL 1 a letter that permitted alternative compliance with the subpoena by "providing any responsive documents to the FBI at the place of their location" and by providing from the custodian a "sworn certification that the documents represent all responsive records." The letter further stated that if no responsive documents existed, the custodian should provide a sworn certification to that effect.

52.     On May 25, 2022, while negotiating for an extension of the subpoena, FPOTUS COUNSEL 1 sent two letters to DOJ COUNSEL. In the second such letter, which is attached as Exhibit 1, FPOTUS COUNSEL 1 asked DOJ to consider a few "principles," which include FPOTUS COUNSEL 1's claim that a President has absolute authority to declassify documents. In this letter, FPOTUS COUNSEL 1 requested, among other things, that "DOJ provide this letter to any judicial officer who is asked to rule on any motion pertaining to this investigation, or on any application made in connection with any investigative request concerning this investigation."

53.     I am aware of an article published in *Breitbart* on May 5, 2022, available at https://www.breitbart.com/politics/2022/05/05/documents-mar-a-lago-marked-classified-were-already-declassified-kash-patel-says/, which states that Kash Patel, who is described as a former top FPOTUS administration official, characterized as "misleading" reports in other news organizations that NARA had found classified materials among records that FPOTUS provided to NARA from Mar-a-Lago. Patel alleged that such reports were misleading because FPOTUS had declassified the materials at issue. WITNESS ▮ was aware Patel visited FPOTUS at the PREMISES around the time the *Breitbart* article was published, though WITNESS ▮ was not present at any meetings between Patel and FPOTUS.

54.     On May 26, 2022, and on June 7, 2022, FBI agents interviewed "WITNESS ▮."

19

WITNESS ▮ was employed by FPOTUS during the Administration.  WITNESS ▮ believed
FPOTUS had declassified records related to the FBI's investigation of what WITNESS ▮ referred
to as "Russiagate."  WITNESS ▮ was not aware of additional records being declassified in the
manner Patel claimed in the aforementioned *Breibart* article.  WITNESS ▮ opined that the
President of the United States could declassify classified information without concurrence from,
or coordination with, the owner of the information.  In some instances, WITNESS ▮ related, like
those involving the Atomic Energy Act, there may be statutes that purport to establish a
framework for declassifying classified information.

55.     After an extension was granted for compliance with the subpoena, on the evening
of June 2, 2022, FPOTUS COUNSEL 1 contacted DOJ COUNSEL and requested that FBI agents
meet him the following day to pick up responsive documents.  On June 3, 2022, three FBI agents
and DOJ COUNSEL arrived at the PREMISES to accept receipt of the materials.  In addition to
FPOTUS COUNSEL 1, another individual, hereinafter "INDIVIDUAL 2," was also present as the
custodian of records for FPOTUS's post-presidential office.  The production included a single
Redweld envelope, wrapped in tape, containing documents.  FPOTUS COUNSEL 1 relayed that
the documents in the Redweld envelope were found during a review of the boxes located in the
STORAGE ROOM.  INDIVIDUAL 2 provided a Certification Letter, signed by INDIVIDUAL 2,
which stated the following:

> Based upon the information that has been provided to me, I am authorized to certify, on
> behalf of the Office of Donald J. Trump, the following: a. A diligent search was
> conducted of the boxes that were moved from the White House to Florida; b. This search
> was conducted after receipt of the subpoena, in order to locate any and all documents that
> are responsive to the subpoena; c. Any and all responsive documents accompany this
> certification; and d. No copy, written notation, or reproduction of any kind was retained as
> to any responsive document.

56.     During receipt of the production, FPOTUS COUNSEL 1 stated he was advised all

20

                                                                    USA-00043171

the records that came from the White House were stored in one location within Mar-a-Lago, the STORAGE ROOM, and the boxes of records in the STORAGE ROOM were "the remaining repository" of records from the White House. FPOTUS COUNSEL 1 further stated he was not advised there were any records in any private office space or other location in Mar-a-Lago. The agents and DOJ COUNSEL were permitted to see the STORAGE ROOM and observed that approximately fifty to fifty-five boxes remained in the STORAGE ROOM. Considering that only FIFTEEN BOXES had been provided to NARA of the approximately eighty-five to ninety-five FPOTUS BOXES that had been located in the STORAGE ROOM, it appears that approximately fifteen to thirty of the FPOTUS BOXES had previously been relocated elsewhere. The FBI agents also observed that the composition of boxes differed such that fewer Bankers boxes were visible, while more plain cardboard boxes and storage bins were present. Other items were also present in the STORAGE ROOM, including a coat rack with suit jackets, as well as interior décor items such as wall art and frames.

57.     While testifying before the grand jury, WITNESS 5 stated that he did not know whether FPOTUS COUNSEL 1 reviewed any of the boxes that were in FPOTUS's residential suite, but he did not see FPOTUS COUNSEL1 go in there.

58.     A preliminary review of the documents contained in the Redweld envelope produced pursuant to the grand jury subpoena revealed the following approximate numbers: 38 unique documents bearing classification markings, including 5 documents marked as CONFIDENTIAL, 16 documents marked as SECRET, and 17 documents marked as TOP SECRET. Further, the FBI agents observed markings reflecting the following caveats/compartments, among others: HCS, SI, and FISA. Based on my training and experience, I know that documents classified at these levels typically contain NDI. Multiple documents also

21

                                                                                 USA-00043172

contained what appears to be FPOTUS's handwritten notes.

59.    Notably, although the FIFTEEN BOXES provided to NARA contained approximately 184 unique documents with classification markings, only approximately 38 unique documents with classification markings were produced from the remaining FPOTUS BOXES.

60.    When producing the documents, neither FPOTUS COUNSEL 1 nor INDIVIDUAL 2 asserted that FPOTUS had declassified the documents.[2]  The documents being in a Redweld envelope wrapped in tape appears to be consistent with an effort to handle the documents as if they were still classified.

61.    On June 8, 2022, DOJ COUNSEL sent FPOTUS COUNSEL 1 a letter, which reiterated that the PREMISES are not authorized to store classified information and requested the preservation of the STORAGE ROOM and boxes that had been moved from the White House to the PREMISES.  Specifically, the letter stated in relevant part:

> As I previously indicated to you, Mar-a-Lago does not include a secure location authorized for the storage of classified information.  As such, it appears that since the time classified documents (the ones recently provided and any and all others) were removed from the secure facilities at the White House and moved to Mar-a-Lago on or around January 20, 2021, they have not been handled in an appropriate manner or stored in an appropriate location.  Accordingly, we ask that the room at Mar-a-Lago where the documents had been stored be secured and that all of the boxes that were moved from the White House to Mar-a-Lago (along with any other items in that room) be preserved in that room in their current condition until further notice.

---

[2] 18 U.S.C. § 793(e) does not use the term "classified information," but rather criminalizes the unlawful retention of "information relating to the national defense." The statute does not define "information related to the national defense," but courts have construed it broadly. *See Gorin v. United States*, 312 U.S. 19, 28 (1941) (holding that the phrase "information relating to the national defense" as used in the Espionage Act is a "generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness"). In addition, the information must be "closely held" by the U.S. government. *See United States v. Squillacote*, 221 F.3d 542, 579 (4th Cir. 2000) ("[I]nformation made public by the government as well as information never protected by the government is not national defense information."); *United States v. Morison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988).  Certain courts have also held that the disclosure of the documents must be potentially damaging to the United States. *See Morison*, 844 F.2d at 1071-72.

22

On June 9, 2022, FPOTUS COUNSEL 1 sent an email to DOJ COUNSEL, stating, "I write to acknowledge receipt of this letter."

***Surveillance Camera Footage Shows Boxes Being Removed from the Storage Room Area Prior to FPOTUS Counsel 1's Review in Connection With the Subpoena***

62.     DOJ COUNSEL has advised me that on or about June 22, 2022, counsel for the Trump Organization, a group of business entities associated with FPOTUS, confirmed that the Trump Organization maintains security cameras in the vicinity of the STORAGE ROOM and that on June 24, 2022, counsel for the Trump Organization agreed to accept service of a grand jury subpoena for footage from those cameras.

63.     The subpoena was served on counsel on June 24, 2022, directed to the Custodian of Records for the Trump Organization, and sought:

> Any and all surveillance records, videos, images, photographs, and/or CCTV from internal cameras located on ground floor (basement) and outside the room known as "Pine Hall" on the Mar-a-Lago property located at 1100 S Ocean Blvd., Palm Beach, FL 33480 from the time period of January 10, 2022 to present.

64.     On July 6, 2022, in response to this subpoena, representatives of the Trump Organization provided a hard drive to FBI agents. ███████████████

███████████████████████████████████████████████

███████████████████████████████████████  Upon review of the hard drive, the FBI determined that the drive contained video footage from four cameras in the basement hallway of the PREMISES in which the door to the STORAGE ROOM is located. The footage on the drive begins on April 23, 2022, and ends on June 24, 2022. The recording feature of the cameras appears to be motion activated, so that footage is only captured when motion is detected within each camera's field of view.

23

65.     One camera in particular, identified on the hard drive as "South Tunnel Liquor," provides a view of entry and exit into a room (hereafter ANTEROOM) that leads to the STORAGE ROOM. The doorway to the ANTEROOM itself is not visible in the camera view, as a refrigerator is directly between the camera and doorway, but the footage from this camera nonetheless establishes entry and exit to the ANTEROOM because it is apparent when persons within the camera's field of view turn directly behind the refrigerator and then disappear from view. The ANTEROOM, in addition to its entrance from the South Tunnel, has approximately four doors leading off it, one of which is the gold-painted door that leads to the STORAGE ROOM. The ANTEROOM provides the only entrance to the STORAGE ROOM; however, other offices can also be entered from the ANTEROOM, so it might be possible for persons to enter the STORAGE ROOM from those other offices without being visible in the surveillance camera footage.

66.     By reviewing the camera footage provided by the Trump Organization in response to the subpoena, the FBI has determined the following:

On May 24, 2022, WITNESS 5 is observed exiting the ANTEROOM doorway with three boxes.

On May 30, 2022, four days after WITNESS 5's interview with the FBI during which the location of boxes was a significant subject of questioning, WITNESS 5 is observed exiting the ANTEROOM doorway with approximately fifty Bankers boxes, consistent with the description of the FPOTUS BOXES. FBI did not observe this quantity of boxes being returned to the STORAGE ROOM through the ANTEROOM entrance in its review of the footage.

The next day, on June 1, 2022, WITNESS 5 is observed carrying eleven brown cardboard boxes out the ANTEROOM entrance. One box did not have a lid on it and appeared to contain papers.

The day after that, on June 2, 2022, WITNESS 5 is observed moving twenty-five to thirty boxes, some of which were brown cardboard boxes and others of which were Bankers boxes consistent with the description of the FPOTUS BOXES, into the entrance of the

24

ANTEROOM.  Approximately three and a half hours later, WITNESS 5 is observed escorting FPOTUS COUNSEL 1 in through the entrance of the ANTEROOM, and FPOTUS COUNSEL 1 is not observed leaving until approximately two and a half hours later.

On June 3, 2022, FPOTUS COUNSEL 1 is escorted through the ANTEROOM entrance by an unidentified individual wearing a jacket with "USSS POLICE" printed on the back. The unidentified individual and FPOTUS COUNSEL 1 exit the ANTEROOM entrance moments later.  FPOTUS COUNSEL 1 appeared to be carrying a Redweld envelope after exiting the ANTEROOM.

67.     As described above, FPOTUS COUNSEL 1 contacted DOJ COUNSEL on June 2, 2022, asking FBI agents to meet FPOTUS COUNSEL 1 the following day.  As also described above, on June 3, 2022, FPOTUS COUNSEL 1 in response to a grand jury subpoena provided to FBI agents and DOJ COUNSEL a Redweld envelope containing documents bearing classification markings.

68.     As described above in paragraphs 31 and 49, on June 21, 2022, WITNESS 5 testified before a federal grand jury in the District of Columbia.  According to FBI's review of video footage, and as detailed in paragraph 66, WITNESS 5 can be observed removing approximately 64 boxes from the STORAGE ROOM area between May 24 and June 1, 2022, but only returning 25-30 boxes to the STORAGE ROOM area on June 2, 2022.  Notably, and as described above in paragraph 51, these boxes were removed following service of a grand jury subpoena but before FPOTUS COUNSEL 1's review of boxes in the STORAGE ROOM area to locate documents responsive to the subpoena.

69.     During his grand jury testimony on June 21, 2022, WITNESS 5 was asked to identify the occasions on which he had entered the STORAGE ROOM after October 2021, and he testified that "a lot of times" he would store "shirts, and hats, [and] stickers" in the STORAGE ROOM at FPOTUS's behest.  When asked if he had removed anything from the STORAGE

25

USA-00043176

ROOM at any time, WITNESS 5 testified that "recently," meaning "within the last month" prior to his June 21, 2022 testimony, he removed a box of challenge coins from the STORAGE ROOM and took them to FPOTUS's office.  He did not identify any other occasion on which he had removed anything from the STORAGE ROOM and did not inform the grand jury that, within the month prior to his grand jury appearance, WITNESS 5 had removed approximately sixty boxes from the STORAGE ROOM.

### *There is Probable Cause to Believe That Documents Containing Classified NDI and Presidential Records Remain at the Premises*

70.     As explained above, the FPOTUS BOXES contained numerous documents with classification markings, both in the FIFTEEN BOXES and in the remaining FPOTUS BOXES. As also explained above, the classified documents provided to the government in a Redweld envelope pursuant to the subpoena were represented to have been stored in boxes located in the STORAGE ROOM, and based on FPOTUS COUNSEL 1's statements relayed in paragraph 55-56 above, I believe it is very likely that FPOTUS COUNSEL 1 did not search for classified information in other locations at the PREMISES.  The investigation has established, however, that classified information was possessed in other areas of the PREMISES and that other FPOTUS BOXES, which are likely to contain similar contents to the FIFTEEN BOXES, were moved from the STORAGE ROOM to other locations in the PREMISES, including FPOTUS's residential suite and Pine Hall, between the time that the FIFTEEN BOXES were provided to NARA and when FPOTUS COUNSEL 1 conducted his review for classified information of the remaining FPOTUS BOXES in the STORAGE ROOM.

71.     Since FPOTUS left the White House in January 2021, WITNESS ▮ has observed, on several occasions, FPOTUS with documents containing classification markings on his desk at

26

the "45 Office," an office space used by FPOTUS and certain staffers that is located within the PREMISES. Since June 3, 2022, however, WITNESS █ has not observed documents at the PREMISES with classification markings.

72.     When WITNESS 5 was questioned under oath as to whether there were Bankers boxes remaining in the residential suite as of the time of his testimony – June 21, 2022 – WITNESS 5 said that to his knowledge, there were remaining boxes. WITNESS 5 at first claimed that there were "maybe two, three boxes in there," but when pressed on whether there were "[j]ust two or three," caveated his answer with "everything happens fast." WITNESS 5 then confirmed that he had taken multiple boxes since January 2022 to FPOTUS's private residence, and that FPOTUS had not asked him to take them back (i.e., return them to the STORAGE ROOM).

73.     On or about June 10, 2022, approximately one week after FPOTUS departed Mar-a-Lago for Bedminster, New Jersey, where FPOTUS typically spends time over the summer, WITNESS █ entered the STORAGE ROOM and observed noticeable differences in the types of boxes and organization since the prior time WITNESS █ was in the STORAGE ROOM. WITNESS █ expressed the last time he/she previously observed the STORAGE ROOM was "around the time the truck driver came," which I interpreted was a reference to the January 17, 2022 retrieval by NARA of the FIFTEEN BOXES. WITNESS █ explained that when FPOTUS COUNSEL 1 accessed the STORAGE ROOM to conduct his review, it appeared that he was alone, and "his hands were empty" when he entered. Although WITNESS █ was unable to comment on whether sufficient time existed for FPOTUS COUNSEL 1 to conduct a thorough review of the records located in the STORAGE ROOM, WITNESS █ expressed the time required to change the room to its current state "would have taken a full day I would estimate" and "that would have been very surprising to me for [FPOTUS COUNSEL 1] to have done that

27

organization." As indicated above, the video footage reveals that FPOTUS COUNSEL 1 was in the STORAGE ROOM area for only about two and a half hours on June 2, 2022.

74.     On June 29, 2022, FBI agents interviewed a current employee of the PREMISES, "WITNESS ▇." Sometime after June 10, 2022, WITNESS ▇ was contacted by FPOTUS COUNSEL 1 and asked whether there was a "better way to secure [the STORAGE ROOM]." WITNESS ▇ understood FPOTUS COUNSEL 1's request was per a DOJ requirement. As of June 29, 2022, a padlock was installed on the STORAGE ROOM door.

75.     WITNESS ▇ described FPOTUS's residential suite, referred to as the Owners' Quarters, as accessible via steel sliding doors. The first room is known as Pine Hall, which serves as a sitting room. Pine Hall then accesses a hallway known as French Hall. From within French Hall, there are two available doors. The door to the left leads to FPOTUS's personal suite, and the door to the right leads to FPOTUS's spouse's personal suite. Those two suites are additionally connected by a door between them. As of approximately June 26, 2022, WITNESS ▇ was present in FPOTUS's suite for maintenance purposes, but did not recall observing boxes in that location. On June 30, 2022, WITNESS ▇ informed the FBI, via legal counsel representing WITNESS ▇, that the dimensions of FPOTUS's personal suite are approximately 16 feet by 28 feet, and the dimensions of FPOTUS's spouse's personal suite are approximately 20 feet by 28 feet. WITNESS ▇'s legal counsel confirmed that WITNESS ▇ may not have been able to fully observe the entirety of the FPOTUS's personal suite on June 26, 2022.

76.     On July 29, 2022, FBI agents interviewed an individual who has worked at the PREMISES since ▇▇▇▇ hereinafter "WITNESS ▇." WITNESS ▇ informed the FBI that he/she is regularly in the residential suite at the PREMISES, and that as recently as July 28, 2022, WITNESS ▇ did not observe any Bankers boxes or boxes of documents currently in the

28

residential suite or the Pine Hall anteroom to the residential suite. WITNESS ▮ did indicate that there have been occasions in the past in which he/she has observed a few Bankers boxes at a time in either the residential suite or Pine Hall. WITNESS ▮ stated he/she has never seen more than three boxes at a time, even though WITNESS 5 and others have informed the FBI that the FIFTEEN BOXES were in Pine Hall prior to being delivered to NARA.

77.     Based upon this investigation, I believe that the STORAGE ROOM, FPOTUS's residential suite, Pine Hall, the "45 Office," and other spaces within the PREMISES are not currently authorized locations for the storage of classified information or NDI. Similarly, based upon this investigation, I do not believe that any spaces within the PREMISES have been authorized for the storage of classified information at least since the end of FPOTUS's Presidential Administration on January 20, 2021.

78.     As described above, evidence of the SUBJECT OFFENSES has been stored in multiple locations at the PREMISES. In addition, as described in paragraph 66 among other paragraphs, the video footage reflects that evidence has been moved recently: WITNESS 5 removed approximately 64 boxes from the STORAGE ROOM area between May 24 and June 1, 2022, but only returned 25-30 boxes to the STORAGE ROOM area on June 2, 2022. It cannot be seen on the video footage where the boxes were moved when they were taken from the STORAGE ROOM area, and accordingly, the current location of the boxes that were removed from the STORAGE ROOM area but not returned to it is unknown. WITNESS 5 did not reveal during his FBI interview or his grand jury testimony that he had moved the boxes recently or give an indication as to their current location. Additionally, no witness has indicated that boxes have left the PREMISES since the provision of the FIFTEEN BOXES to NARA on January 17, 2022. Accordingly, this affidavit seeks authorization to search the "45 Office" and all storage rooms and

29

any other rooms or locations where boxes or records may be stored within the PREMISES, as further described in Attachment A.  The PREMISES is currently closed to club members for the summer; however, as specified in Attachment A, if at the time of the search, there are areas of the PREMISES being occupied, rented, or used by third parties, and not otherwise used or available to be used by FPOTUS and his staff, the search would not include such areas.

## CONCLUSION

79.     Based on the foregoing facts and circumstances, I submit that probable cause exists to believe that evidence, contraband, fruits of crime, or other items illegally possessed in violation 18 U.S.C. §§ 793(e), 2071, or 1519 will be found at the PREMISES.  Further, I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

## REQUEST FOR SEALING

80.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation and the FBI has not yet identified all potential criminal confederates nor located all evidence related to its investigation.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness by allowing criminal parties an opportunity to flee, destroy evidence (stored electronically and otherwise), change patterns of behavior, and notify criminal confederates.

Subject to Protective Order

USA-00043181

## SEARCH PROCEDURES FOR HANDLING POTENTIAL ATTORNEY-CLIENT PRIVILEGED INFORMATION

The following procedures will be followed at the time of the search in order to protect against disclosures of attorney-client privileged material:

81.     These procedures will be executed by: (a) law enforcement personnel conducting this investigation (the "Case Team"); and (b) law enforcement personnel not participating in the investigation of the matter, who will search the "45 Office" and be available to assist in the event that a procedure involving potentially attorney-client privileged information is required (the "Privilege Review Team").

82.     The Case Team will be responsible for searching the **TARGET PREMISES**. However, the Privilege Review Team will search the "45 Office" and conduct a review of the seized materials from the "45 Office" to identify and segregate documents or data containing potentially attorney-client privileged information.

83.     If the Privilege Review Team determines the documents or data are not potentially attorney-client privileged, they will be provided to the law-enforcement personnel assigned to the investigation.   If at any point the law-enforcement personnel assigned to the investigation subsequently identify any data or documents that they consider may be potentially attorney-client privileged, they will cease the review of such identified data or documents and refer the materials to the Privilege Review Team for further review by the Privilege Review Team.

84.     If the Privilege Review Team determines that documents are potentially attorney-client privileged or merit further consideration in that regard, a Privilege Review Team attorney may do any of the following: (a) apply *ex parte* to the court for a determination whether or not the documents contain attorney-client privileged material; (b) defer seeking court intervention and

31

continue to keep the documents inaccessible to law-enforcement personnel assigned to the investigation; or (c) disclose the documents to the potential privilege holder, request the privilege holder to state whether the potential privilege holder asserts attorney-client privilege as to any documents, including requesting a particularized privilege log, and seek a ruling from the court regarding any attorney-client privilege claims as to which the Privilege Review Team and the privilege-holder cannot reach agreement.

Respectfully submitted,

FBI 21A

Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me by
telephone (WhatsApp) or other reliable electronic
means this __5__ day of August, 2022:

HON. BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE

32

Subject to Protective Order

USA-00043183

# EXHIBIT 1

Subject to Protective Order



**SILVERMAN THOMPSON**

Silverman Thompson Slutkin White

**ATTORNEYS AT LAW**

*A Limited Liability Company*
400 East Pratt Street – Suite 900
Baltimore, Maryland 21202
Telephone 410.385.2225
Facsimile 410.547.2432
**silvermanthompson.com**

*Baltimore | Towson | New York | Washington, DC*

Writer's Direct Contact:
Evan Corcoran
410-385-2225
ecorcoran@silvermanthompson.com

May 25, 2022

*Via Electronic Mail*

Jay I. Bratt, Esquire
Chief
Counterintelligence & Export Control Section
National Security Division
U.S. Department of Justice
950 Pennsylvania, Avenue, N.W.
Washington, D.C. 20530

Re:   Presidential Records Investigation

Dear Jay:

I write on behalf of President Donald J. Trump regarding the above-referenced matter.

Public trust in the government is low. At such times, adherence to the rules and long-standing policies is essential. President Donald J. Trump is a leader of the Republican Party. The Department of Justice (DOJ), as part of the Executive Branch, is under the control of a President from the opposite party. It is critical, given that dynamic, that every effort is made to ensure that actions by DOJ that may touch upon the former President, or his close associates, do not involve politics.

There have been public reports about an investigation by DOJ into Presidential Records purportedly marked as classified among materials that were once in the White House and unknowingly included among the boxes brought to Mar-a-Lago by the movers. It is important to emphasize that when a request was made for the documents by the National Archives and Records Administration (NARA), President Trump readily and voluntarily agreed to their transfer to NARA. The communications regarding the transfer of boxes to NARA were friendly, open, and straightforward. President Trump voluntarily ordered that the boxes be provided to NARA. No legal objection was asserted about the transfer. No concerns were raised about the contents of the boxes. It was a voluntary and open process.

Unfortunately, the good faith demonstrated by President Trump was not matched once the boxes arrived at NARA. Leaks followed. And, once DOJ got involved, the leaks continued. Leaks about any investigation are concerning. Leaks about an investigation that involve the residence of a former President who is still active on the national political scene are particularly troubling.

   USA-00043185

Jay I. Bratt
May 25, 2022
Page **2** of **3**

It is important to note a few bedrock principles:

### (1) A President Has Absolute Authority To Declassify Documents.

Under the U.S. Constitution, the President is vested with the highest level of authority when it comes to the classification and declassification of documents. *See* U.S. Const., Art. II, § 2 ("The President [is] Commander in Chief of the Army and Navy of the United States[.]"). His constitutionally-based authority regarding the classification and declassification of documents is unfettered. *See Navy v. Egan*, 484 U.S. 518, 527 (1988) ("[The President's] authority to classify and control access to information bearing on national security . . . flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant.").

### (2) Presidential Actions Involving Classified Documents Are Not Subject To Criminal Sanction.

Any attempt to impose criminal liability on a President or former President that involves his actions with respect to documents marked classified would implicate grave constitutional separation-of-powers issues. Beyond that, the primary criminal statute that governs the unauthorized removal and retention of classified documents or material *does not apply* to the President. That statute provides, in pertinent part, as follows:

> Whoever, being an officer, employee, contractor, or consultant of the United States, and, by virtue of his office, employment, position, or contract, becomes possessed of documents or materials containing classified information of the United States, knowingly removes such documents or materials without authority and with the intent to retain such documents or materials at an unauthorized location shall be fined under this title or imprisoned for not more than five years, or both.

18 U.S.C. § 1924(a). An element of this offense, which the government must prove beyond a reasonable doubt, is that the accused is "an officer, employee, contractor, or consultant of the United States." The President is none of these. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 497–98 (2010) (citing U.S. Const., Art. II, § 2, cl. 2) ("The people do not vote for the 'Officers of the United States.'"); *see also Melcher v. Fed. Open Mkt. Comm.*, 644 F. Supp. 510, 518–19 (D.D.C. 1986), *aff'd*, 836 F.2d 561 (D.C. Cir. 1987) ("[a]n officer of the United States can only be appointed by the President, by and with the advice and consent of the Senate, or by a court of law, or the head of a department. A person who does not derive his position from one of these sources is not an officer of the United States in the sense of the Constitution."). Thus, the statute does not apply to acts by a President.

2

USA-00043186

Jay I. Bratt
May 25, 2022
Page **3** of **3**

### (3) DOJ Must Be Insulated From Political Influence.

According to the Inspector General of DOJ, one of the top challenges facing the Department is the public perception that DOJ is influenced by politics. The report found that "[o]ne important strategy that can build public trust in the Department is to ensure adherence to policies and procedures designed to protect DOJ from accusations of political influence or partial application of the law." *See* https://oig.justice.gov/reports/top-management-and-performance-challenges-facing-department-justice-2021 (last visited May 25, 2022). We request that DOJ adhere to long-standing policies and procedures regarding communications between DOJ and the White House regarding pending investigative matters which are designed to prevent political influence in DOJ decision-making.

### (4) DOJ Must Be Candid With Judges And Present Exculpatory Evidence.

Long-standing DOJ policy requires that DOJ attorneys be candid in representations made to judges. Pursuant to those policies, we request that DOJ provide this letter to any judicial officer who is asked to rule on any motion pertaining to this investigation, or on any application made in connection with any investigative request concerning this investigation.

The official policy of DOJ further requires that prosecutors present exculpatory evidence to a grand jury. Pursuant to that policy, we request that DOJ provide this letter to any grand jury considering evidence in connection with this matter, or any grand jury asked to issue a subpoena for testimony or documents in connection with this matter.

Thank you for your attention to this request.

With best regards,

M. Evan Corcoran

cc:   Matthew G. Olsen
      Assistant Attorney General
      National Security Division
      *Via Electronic Mail*

Subject to Protective Order

USA-00043187

**ATTACHMENT A**

*Property to be searched*

The premises to be searched, 1100 S Ocean Blvd, Palm Beach, FL 33480, is further described as a resort, club, and residence located near the intersection of Southern Blvd and S Ocean Blvd. It is described as a mansion with approximately 58 bedrooms, 33 bathrooms, on a 17-acre estate. The locations to be searched include the "45 Office," all storage rooms, and all other rooms or areas within the premises used or available to be used by FPOTUS and his staff and in which boxes or documents could be stored, including all structures or buildings on the estate. It does not include areas currently (i.e., at the time of the search) being occupied, rented, or used by third parties (such as Mar-a-Largo Members) and not otherwise used or available to be used by FPOTUS and his staff, such as private guest suites.

Subject to Protective Order

**ATTACHMENT B**

*Property to be seized*

All physical documents and records constituting evidence, contraband, fruits of crime, or other items illegally possessed in violation of 18 U.S.C. §§ 793, 2071, or 1519, including the following:

a. Any physical documents with classification markings, along with any containers/boxes (including any other contents) in which such documents are located, as well as any other containers/boxes that are collectively stored or found together with the aforementioned documents and containers/boxes;

b. Information, including communications in any form, regarding the retrieval, storage, or transmission of national defense information or classified material;

c. Any government and/or Presidential Records created between January 20, 2017, and January 20, 2021; or

d. Any evidence of the knowing alteration, destruction, or concealment of any government and/or Presidential Records, or of any documents with classification markings.

2

Subject to Protective Order

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.   22-mj-8332-BER |
| the Premises Located at 1100 S. Ocean Blvd., Palm | ) |
| Beach, FL 33480, as further described in Attachment A | ) |
| | ) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the     Southern     District of     Florida
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before     August 19, 2022     *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Duty Magistrate     .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for     days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of     .

Date and time issued:     8/5/22   12:12 PM          *Bruce Reinhart*

*Judge's signature*

City and state:     West Palm Beach, FL          Hon. Bruce Reinhart, U.S. Magistrate Judge

*Printed name and title*

Subject to Protective Order

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>22-mj-8332-BER | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

Subject to Protective Order

## ATTACHMENT A

*Property to be searched*

The premises to be searched, 1100 S Ocean Blvd, Palm Beach, FL 33480, is further described as a resort, club, and residence located near the intersection of Southern Blvd and S Ocean Blvd. It is described as a mansion with approximately 58 bedrooms, 33 bathrooms, on a 17-acre estate. The locations to be searched include the "45 Office," all storage rooms, and all other rooms or areas within the premises used or available to be used by FPOTUS and his staff and in which boxes or documents could be stored, including all structures or buildings on the estate. It does not include areas currently (i.e., at the time of the search) being occupied, rented, or used by third parties (such as Mar-a-Largo Members) and not otherwise used or available to be used by FPOTUS and his staff, such as private guest suites.

Subject to Protective Order

1

## ATTACHMENT B

*Property to be seized*

All physical documents and records constituting evidence, contraband, fruits of crime, or other items illegally possessed in violation of 18 U.S.C. §§ 793, 2071, or 1519, including the following:

a. Any physical documents with classification markings, along with any containers/boxes (including any other contents) in which such documents are located, as well as any other containers/boxes that are collectively stored or found together with the aforementioned documents and containers/boxes;

b. Information, including communications in any form, regarding the retrieval, storage, or transmission of national defense information or classified material;

c. Any government and/or Presidential Records created between January 20, 2017, and January 20, 2021; or

d. Any evidence of the knowing alteration, destruction, or concealment of any government and/or Presidential Records, or of any documents with classification markings.

2

Subject to Protective Order

USA-00043193