**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-801010-CR-CANNON/REINHART**

**UNITED STATES OF AMERICA,**

v.

**DONALD J. TRUMP,**
**WALTINE NAUTA, and**
**CARLOS DE OLIVIERA,**

                         **Defendants.**

_____ /

**MOTION TO SUPPRESS EVIDENCE AND FOR RETURN OF PROPERTY**
**AND REQUEST FOR EVIDENTIARY HEARING AND _FRANKS_ HEARING**

      Defendant, Waltine Nauta, through counsel and pursuant to Fed. R. Crim. P. 12 and 41, respectfully moves to suppress all evidence unlawfully seized pursuant to invalid search warrants for property, papers, and stored data of the defendant and the fruits of the searches, where the warrants were facially defective in lacking, or otherwise exceeding the scope of, any purported probable cause; authorized an impermissible general search; were premised on speculative, incomplete, and contradictory assertions and false and misleading statements made deliberately or recklessly; and were deficient and improperly employed as further described in this motion. Defendant requests an evidentiary hearing on this motion, including under _Franks v. Delaware_, 438 U.S. 154 (1978).

**I.      INTRODUCTION AND BACKGROUND OF THE SEARCHES**

      The search of defendant's digital devices and stored electronic data and communications, including e-mail and text messages, was premised on a series of FBI warrant affidavits, of which

only some of the contents have been made available in public filings.[1]  Each affidavit was drafted to create the false impression of probable cause to believe the defendant committed federal offenses under multiple statutes, when the government had no such evidence, nor even evidence that the defendant was aware of the commission of such offenses.

As further stated in defense motions to dismiss under the Fifth Amendment's due process clause based on the selective, partisan, and vindictive use of criminal process in this case to undermine electoral participation by Donald Trump and to punish those who support or are employed by him, the misuse of process in this case, including the search warrant process, represents a grave threat to democracy, and the abuses outlined in this motion form only one part of that unconstitutional effort by the present Administration.  The unconstitutional purpose of the criminal process employed informs evaluation of the individual improprieties reflected in the warrant applications and general searches.  It is clear from review of the applications that the government sought warrants not for specific evidence proving the commission of crimes for which probable cause existed, but for the contrary purpose of a general search for any form of evidence that the government could take before a grand jury to then assert probable cause.  In other words, the government violated the core function of the Fourth Amendment: barring general searches *for* a crime where the government lacks sufficient cause to believe the subject committed *any* offense.

Illustrating the government's misuse of the warrant process, the applications claimed probable cause that the defendant violated five statutes (18 U.S.C. §§ 793, 1001, 1519, 1623, and

---

[1]  Sealed Exhibits A-E (attached) are copies of affidavits submitted in the Southern District of Florida by S/A ████████ in October and November 2022.  Sealed Exhibits F and G are copies of affidavits submitted by S/A ████████ in the District Court for the District of Columbia in February 2023.  The initial warrants sought Nauta's phones and phone-related data, while the later D.C. warrants sought additional remotely stored electronic data (from Google) and cell site locator information (CSLI) from Verizon.

2071). Notably, however, of those, two find no mention in the Indictment at all. First, as to the applications' claimed evidence of perjury, there was no such evidence and there is, of course, no such charge in this case, even though Nauta testified before a federal grand jury several months prior to the warrants, where he was examined by three prosecutors: Jay Bratt, Brett Reynolds, and Julie Edelstein. The affidavits falsely claim that Nauta tried to convince the grand jury that he had *never* moved boxes out of the storage room at Mar-a-Lago. But in the grand jury, Nauta plainly acknowledged that he had on *many occasions* moved storage room boxes to Pine Hall at Mar-a-Lago. Indeed he clearly explained that he did so "whenever [the President] wanted." USA-00809092. At all times, whenever Nauta was asked about any movement of boxes, Nauta truthfully explained that he had done so, including specifically various movements of boxes prior to the President's response to a NARA request—a matter as to which the affidavit falsely claims Nauta lied. As to movement of boxes from the storage room, Nauta testified in the grand jury that "either ███████ Per. 34 ███████ or the president would ask to get some boxes up there. I'd get the key from ██ P. 34 ██; I'd go and I'd move some boxes from that storage room up to Pine Hall or the office, whatever he requested; and then I'd give ██ P. 34 ██ the key back; and that was it. Lock it up and give ██ P. 34 ██ key back." USA-00809092. The government has never suggested that ███████ Per. 34 ███████ or anyone else contradicted this testimony. The affidavits' improper claim that Nauta should have volunteered more information than what was asked of him by three seasoned federal prosecutors, Bratt, Reynolds, and Edelstein—where they personally knew that Nauta had readily described box movements when asked about them—was an egregious misleading of the magistrate by the prosecutorial team.

The affidavits' false thesis that Nauta lied about the movement of boxes is not merely a failure of probable cause as to the affidavits' perjury claims, but also shows a calculated design to

mislead the issuing magistrates.  By falsely asserting (without evidentiary support) that there was probable cause that Nauta's grand testimony was false, the affiant skewed the remainder of the presentation against Nauta.  The exculpatory nature of Nauta's truthful grand jury testimony, including fully explaining the correctness of his prior statements in FBI interviews and his movement of boxes months before any grand jury was even impaneled, much less a subpoena issued, and reasons for doing so, was improperly used to create a false impression to prejudice Nauta and to mischaracterize other innocent actions described in the affidavits.  Revealing the truth that Nauta had not lied, and that the government's dispute with him was that they tactically avoided asking him questions that would have permitted him to fully explain anything they wanted to know, has caused great harm and warrants suppression.[2]

Nor is there any allegation in the Indictment of a violation of § 2071, which had been the centerpiece of the government's claim for use of a grand jury in the first place.  Section 2071 is entirely inapplicable to the actions of a President with regard to his papers.  (Nauta adopts President Trump's motions to dismiss explaining the law applicable to a Presidential decision to treat his papers as personal papers and the non-reviewability of such decisions.  Any now-abandoned claim of illegality of Presidential decision to designate papers for private possession—which as the referenced motions show was premised on a coordinated effort by the Biden administration to distort the NARA document review process—cannot serve as the basis for sustaining the warrant.) The notion that a President's disposition of his papers near the end of his term is a violation of §

---

[2]   There was no explanation for the SCO decision in 2023 to stop presenting warrant applications to the original issuing Magistrate Judge in the Southern District of Florida.  Nor did the D.C. affidavits contain any reference to the extensive nature of searches already conducted in 2022 and that they had *failed* to confirm prior affidavit allegations or even that Nauta had any awareness of criminal conduct, instead noting only seized text messages that, although ambiguously described, did not confirm any previous affidavit allegation.

2071 is not merely novel—in that there has never been even a suggestion made by the government prior to this case that a President's or even a Vice President's disposition, including into private hands, of papers in their exclusive possession can be the subject of any criminal charge, much less a violation of § 2071 which, on its face, does not apply to Presidential disposition of records—but represents extreme bias and lack of credibility.  There is no charge of a § 2071 violation in this case because that statute (regarding documents deposited in a public office) does not apply to records that the President assumes control of while still in office, and instead applies only to federal record custodians at the officer level; and it would be unconstitutional as well as raise significant immunity questions if § 2071 had actually been used here for any purpose other than to mislead and cast aspersions in the warrant applications.  In any event, even as to records the government claims to be Presidential records, the Presidential Records Act is the law that addresses their handling, and the supposed § 2071 violation on which the warrants were premised was illusory. The government's knowledge and concealment of this is confirmed by their never asking a grand jury to return such a charge. This form of deception used in the applications, however, exemplifies the fundamental problem with the investigation, in that the government has maintained an unfounded claim of § 2071 crimes since the beginning of its improper invocation of the D.C. grand jury in this matter, despite clear knowledge that it has no place with regard to Presidential disposition of papers and records.

As to the third of the five criminal statutes referred to in the warrant applications, § 793, the government never asserted that Nauta had any knowledge of national defense information or even any matter that had not been declassified, much less of any unlawful retention of the same. Nor does the affidavit actually say that national defense information was found at Mar-a-Lago. And most importantly, the affidavits were drafted in a manner that precluded the magistrates from

making an independent determination of whether any national defense information was involved, so that the magistrate could then make an independent evaluation of evidence regarding a potential § 793 violation. And, of course, it is unsurprising that the Indictment fails to charge Nauta with any § 793 violation and that the government failed to convey to the issuing magistrates that the government did not believe there was any evidence that Nauta had committed such an offense; the affidavit instead misleadingly conveyed the opposite.[3]

The Indictment does contain one charge of a violation of § 1001 and one charge of a violation of § 1519. But the pertinent accusations in the warrant applications were misleading, speculative, and materially false and failed to show any violation of § 1519 or § 1001, much less that any evidence of such offenses would be found in a search. The Indictment charges that Nauta "concealed ... from the FBI [the] continued possession of documents with classification markings at" a club in Palm Beach. But the warrant applications do not set forth facts showing Nauta's knowledge of any classified-marking document withheld from the FBI or, more specifically, that any classified-marking document covered by a subpoena to the Office of Donald J. Trump was ever at Mar-a-Lago, much less remained there after counsel's response to the subpoena. The applications use speculation, layered upon false assertions and mischaracterizations, to imply Nauta's knowledge that documents covered by a subpoena he never saw, directed to an organization whose operations he did not manage, seeking documents he did not know were present (much less in large numbers or unaccounted-for previously), were concealed from the FBI or the agents who came to Mar-a-Lago in June 2022 and whose access while there was not

---

[3] S/A FBI 21A, notably, falsely swore in a D.C. District Court affidavit filed in 2021 (for arrest on a January 6-related charge of an individual FBI 21A identified as having attended a "Trump rally") that "at least one federal police officer died as a result of the injuries he sustained" in the Capitol building riot. *See United States v. Allan*, D.D.C. No. 21-mj-00137-RMM (Dckt. Ent. 1-1). This false statement also was not disclosed to any issuing magistrate.

restricted.  Nor was Nauta alleged to know of any restriction on the movements or actions of counsel for the subpoena respondent or of any communications between counsel and the subpoena target.  The warrant applications distorted the facts to create an illusion of knowledge by Nauta.  Most importantly, the affidavits' single (false) claim of a misstatement made to the FBI *not* regarding any compliance with a grand jury subpoena, but rather regarding helping President Trump's staff *provide* documents to NARA before any grand jury was impaneled (and four months before the commencement date of any conspiracy charge in the indictment), bore no nexus to the supposed object of the later-in-time subpoena compliance issue that was the sole topic of the affidavits' obstruction thesis.  The affidavits epitomize the improper effort to press Nauta for anything the SCO could use to influence the national election.

The absence of probable cause for a § 1001 charge is equally important.  The affidavits omit information necessary to understand what the FBI had sought in interviewing Nauta, and the truthful nature of Nauta's responses, in what was described to him (falsely) by the FBI questioners (including S/A █FBI 21A█) as an informal conversation, conducted in May 2022.  The focus of the interview was whether the Intelligence Community could be assuaged about concerns, including specifically "about that day," January 17, 2022, when Nauta helped send boxes to NARA.  USA-00823809.  When asked to give more information about boxes stored in the residential suite at Mar-a-Lago, Nauta advised that he was "not sure" and that "I just know that they were in Pine Hall, when █P. 34█ asked me to come." USA-00823814. And when asked what █Per. 34█ said about box contents, Nauta indicated he had moved boxes on multiple occasions: "[J]ust *most of the times* █P. 34█ would say] just we got to move the boxes" (emphasis added).  USA-00823815. The agents then changed the topic from Pine Hall to the President's "home" or "suite," into which Nauta did not bring boxes.  USA-00823816.  Nauta explained the difference, stating that from Pine

Hall, "there's that door that you go through, that he comes out of, they come out of, it's to another small room and then that room from there there's two doors that go into their suites."   USA-00823818.   Agent FBI 21A acknowledged this difference, confirming that after leaving Pine Hall, "you've got the suite ... which you know, big mansion."  USA-00823819–20. Nauta, who did not work for President Trump in the post-presidential period until autumn 2021, stated that he did not know of anything about classified documents that would give the Intelligence Community the assurance they sought.  He also stated in that regard that he could not verify the derivation of the specific boxes that were turned over to NARA in January 2022.  The affidavits wrongly claim that Nauta falsely denied knowing that he had seen *those specific cardboard boxes* previously—and failed to infer that the boxes that went to NARA were the very same ones he had brought to Pine Hall *weeks earlier* (indeed, as early as November 2021, when from time to time over the next month or so, he and other persons brought a couple of boxes at a time to Pine Hall, *see* Ex. F, ¶ 21, *not* a delivery of 15 boxes as implied in the claim of a false statement), even though he was not aware of what was done with any such boxes from 2021 thereafter and did not, and could not, know whether they were the same boxes (and even though the government does not know if they were the same boxes received by NARA as much as two months later in 2022), but knew of video surveillance, as FBI 21A told Nauta.  Yet the SCO never sought video evidence to establish the movement or identifying features of boxes at those relevant times.

The affidavits fail to show literal, material, or intentional falsity; instead, they mislead as to the context of the questions asked, the nature of the interview, and its focus, which was to derive from Nauta something to reassure the IC about the boxes received by NARA, which he truthfully explained he lacked sufficient knowledge to provide.  The affidavit allegations regarding the later-asked question of whether Nauta moved boxes to Pine Hall at the direction of others in November

or December 2021—which he readily admitted in grand jury testimony—fail Fourth Amendment requirements.  The affidavits (falsely) claimed Nauta's *truthful* grand jury testimony—that although he had brought boxes to Pine Hall weeks earlier, he did not know they were the same ones he picked up weeks later to send to NARA—was a contradiction, when it was instead an uncontradicted explanation in answer to questions not asked in the FBI interview.  Thus, there was nothing more to search for on this matter, and the affidavits failed to show any basis for belief that there would be evidence of this non-offense in the items to be searched.[4]

Finally, in affidavits filed in D.C. District Court for stored communications and CSLI, the affiant added a claim that Nauta spoke with the Secret Service and others about video cameras at Mar-a-Lago in relation to a subpoena for video recordings that was fully complied with by President Trump.  The affidavits omitted that before Nauta did so, President Trump's representative had already instructed the head of security at Mar-a-Lago, some two days earlier, to preserve all video recordings in light of the subpoena.

## II.   GROUNDS FOR SUPPRESSION AND FOR AN EVIDENTIARY HEARING

Probable cause specific to the items to be searched is required, and the government may not claim probable cause to search through millions of bytes of digital data merely in the hope that doing so might show falsity in a prior statement.  *See United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991) (explaining the nexus between probable cause and the particularity requirement for a warrant). In evaluating whether such a fair probability exists, a magistrate must

---

[4]  The affidavits do not assert any investigative finding by the FBI that the boxes in Pine Hall in January 2022 were the same boxes (much less the same contents) as those handled by Nauta weeks earlier.  Thus, it remains speculation that they were the same and that Nauta should have known that.  The cardboard boxes lacked any distinctive identifiers; they were fungible, like paper cups.  The affiant did not know then, and does not know now, whether the boxes sent to NARA were the same boxes Nauta readily admitted moving to Pine Hall weeks before the NARA shipment.

evaluate "all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Illinois v. Gates* 426 U.S. 213, 238 (1983); *see also United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir. 1986). In the present case, there was no information contained in the affidavits to dispute Nauta's veracity, but there were abundant omissions and mischaracterizations clouding the record as to the veracity of unnamed persons casting vague aspersions Nauta's way. Here, there was no corroboration that the boxes moved by Nauta were the same boxes sent to NARA and no corroboration of any inference that would show that Nauta knew or could have known that—largely because the paucity of the investigation left no possibility of establishing one way or the other the same-boxes premise of the warrant affidavits. The courts have required a detailed description of firsthand observations to overcome weaknesses of an informant's speculation. *United States v. Brundidge*, 170 F.3d 1350, 1353 (11th Cir. 1999).

In *Brundidge*, the affidavit stated eight different times in which the source's information proved to be valid. *Id.* at 1353. The affidavits in the present case make no mention whatsoever of the source's reliability in predicting box identity at any time, and the source did not state that P. 34 knew for a fact that the same boxes sent to NARA were those previously handled by Nauta, nor did P. 34 suggest that Nauta had any way to know that.

These are not evidence-weight matters; these are immutable facts that the SCO and the agents knew when the affidavits were filed, and the affiants knew that no investigation was being conducted to track the boxes to add any definiteness to the possibility of the same-boxes theory proving to be true. The statement made by the source was simply consistent with the statement made by Nauta when he was finally asked about the matter in the grand jury. *See United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996) (observing that "[a]n affidavit that states suspicious

beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge, is a 'bare bones' affidavit" and as such may be lacking in any indicia of probable cause). As Justice Scalia explained in writing for the Supreme Court in *Virginia v. Moore*, 128 S.Ct. 1598, 1603 (2008): "The immediate object of the Fourth Amendment was to prohibit the general warrants and writs of assistance that English judges had employed against the colonists, *Boyd v. United States*, 116 U.S. 616, 624-627, 6 S.Ct. 524, ... (1886); *Payton v. New York*, 445 U.S. 573, 583-584, 100 S.Ct. 1371 ... (1980)." *See id. (*"That suggests, if anything, that founding-era citizens were skeptical of using the rules for search and seizure set by government actors as the index of reasonableness."); *Stanford v. Texas*, 379 U.S. 476, 481 (1965) (general exploratory warrants were "[v]ivid in the memory of the newly independent Americans"); *cf. Connor v. Picard*, 434 F.2d 673 (1st Cir. 1970) (failure to name individual subjects was "comparable to the detested pre-Revolutionary general warrant").

The D.C. search warrant affidavits, Exs. F & G, omitted that multiple prior warrant executions as to Nauta yielded no inculpatory evidence as to any purported crimes.  The evidence that prior searches failed to confirm prior allegations was material and exculpatory, and its omission from the search affidavits violated Nauta's Fourth Amendment rights, warranting suppression.  *See United States v. Martin*, 615 F.2d 318, 328 & cases cited therein, 329 (5th Cir. 1980) (pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), an omission made intentionally or with reckless disregard for the affidavit's accuracy vitiates the affidavit); *see also Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985); *Stewart v. Donges*, 915 F.2d 572 (10th Cir. 1990); *United States v. Ippolito,* 774 F.2d 1482, 1486–87 n.1 (9th Cir. 1985) ("*Franks* rationale applies with equal force where police officers secure a warrant through the intentional or reckless omission of material facts.").

Moreover, bad faith is inherently implicated when an affiant recklessly omits exculpatory information and presents an inaccurate and skewed portrayal of facts relevant to probable cause in the affidavit presented to the magistrate, as was the case here. As the Court stated in *Franks*, "[I]t would be an unthinkable imposition" on a magistrate's authority if a warrant affidavit containing deliberate or reckless falsehoods stood beyond impeachment. 438 U.S. at 165. For that reason, the exclusion of relevant and exculpatory evidence from a warrant affidavit falls squarely within the type of conduct that *Franks* sought to deter. Importantly, the deterrent component of the *Franks* doctrine would be rendered meaningless if a warrant still stands after probable cause is destroyed by a material omission. As to the D.C. warrants, the failure to reveal that multiple, recent searches had uncovered no confirmation of the prior affidavit speculation was a material omission that gives rise to the inference that law enforcement acted with reckless disregard for the accuracy of the information presented to the magistrate judge in the warrant affidavit.

A.    Probable Cause

The affidavits, despite the inclusion of abundant false and misleading conclusory claims, fail to set forth probable cause of the commission of a crime by Nauta. Nor, even with the attorney-client privileged communications improperly included in the warrant affidavits as to President Trump, did the affidavits show the commission of a crime by anyone.

With regard to the accusation of a § 793 violation, the affidavits failed to show that national defense information was involved, failing even to offer an opinion by any intelligence officer that *non-public* information was at issue or that items with classification markings remained classified. The affidavits failed to afford the requisite information to permit the issuing magistrates to independently determine if such material was involved. The Supreme Court has held that when searching for personal papers of a target, the assertions must be based on the presentation of

underlying facts showing the elements of the offense, not merely by a conclusory claim of an affiant that the elements might have been met, leaving the magistrate to engage in an investigation or guesswork.  A reviewing court must be satisfied that the magistrate was apprised of sufficient facts and circumstances to make a "neutral and detached" judgment. *Johnson v. United States*, 333 U.S. 10, 14 (1948). There must be some basis, apart from the mere conclusory speculation of the complaining officer, for a determination that probable cause exists. *Giordenello v. United States*, 357 U.S. 480, 486–87 (1958). In this District, one court explained this rationale in suppressing films seized from a Mafia-run adult film organization, concluding that mere conclusory claims of pornography were not evidence absent setting forth information that established the violative character of the material at issue.  *United States v. Defalco*, 509 F.Supp. 127, 137–38 (S.D. Fla. 1981).  In this case, none of the essential attributes of national defense information were set forth in the affidavits, nor was it even alleged that speculation about concealment of additional classified markings documents related to material that remained classified, much less national defense information.

Equally important, for reasons stated in President Trump's motion to suppress the August 2022 search warrant executed at Mar-a-Lago, there was no valid basis to allege a criminal violation of § 793 by President Trump, much less any precedent for it, where Presidents going back at least as far as Franklin Roosevelt had privately maintained information of such a character which even today has still not been turned over to the Archivist.

Regarding the affidavits' claim of an obstruction violation under 18 U.S.C. § 1519, the allegation against Nauta was untenable.  The sole (false) assertion of wrongdoing concerns Nauta's recollection regarding moving boxes at the direction of the former President of the United States or ███ Per. 34 ███ in November or December 2021—before there was any suggestion of

13

any criminal investigation of anything, much less FBI involvement or a grand jury.  There is no allegation in the affidavits that Nauta was aware of—or that there was—any impropriety regarding his movement of such boxes.  Nor was any connection between the movement of those boxes and the subject matter of the obstruction of justice allegation (identified in the affidavits as pertaining to conduct five months later in June 2022) set forth in the affidavits.  *See also* Indictment at Count 36 (claiming that the § 1519 obstruction conduct, commencing May 11, 2022, concerned "continued possession" of documents, not documents previously given to NARA). Nor was there any allegation in the affidavits that Nauta was present for or knew of any private attorney-client consultation by President Trump concerning a subpoena response or otherwise knew of any intention to fail to comply with any subpoena.  The claim of obstruction was pure speculation lacking factual support.

And as explained above, the perjury and false statement allegations were insufficient, mischaracterized, and self-contradictory.  The literal truth that Nauta did not know whether fungible cardboard boxes he moved from time to time in November or December 2021 were the same as a cluster of boxes provided to NARA weeks later bars a finding of probable cause.  And the affidavits' wholly unsupported reference to 18 U.S.C. § 2071, which the affiants erroneously suggested had some reference to either Presidential records or personal records of the President possessed solely by him and disposed of prior to the end of the term (as were all of the documents at issue), is legally unfounded.  There was no probable cause to search as to Nauta.

The novel, speculative theory of obstruction used in the warrant applications is inconsistent with relevant probable cause standards and is marred by the government's failure to include essential relevant information.  The affidavits were premised on speculation of Nauta's knowledge of the existence of subpoena-covered documents; his belief in the absence of good faith by the

President; a complete disregard for Presidential immunity and authority as to official acts; distortion and avoidance of the law applicable to PRA matters; concocting strained theories of a false statement; and ignoring undisputed explanations by Nauta for his literally true responses in an informal interview.

Ultimately, the premise of a valid grand jury proceeding and some form of criminal intent to interfere with valid investigation of a crime was lacking in this case, making the obstruction counts unfounded. The absence of probable cause and the impropriety of the government's misuse of a false, inapplicable theory of violations of §§ 793(e) and 2071, neither of which apply to Presidential possession of documents or disposition of them *by the President* that places them in private hands, did not provide jurisdiction for the criminal proceedings improperly initiated in this case. (Defendant Nauta adopts arguments presented by President Trump concerning the impermissibility of the employment of grand jury process in this matter.)

The FBI based the obstruction component of the affidavits on these shaky *mere-assumption* premises: (a) that some small subset of boxes that belonged to the Office of President Donald J. Trump ("the Office") was not examined by or on behalf of Trump's counsel ▌Per. 18▐ in any way, even though the FBI had not sought to determine what boxes the Office controlled or possessed; that this occurred due to some false statement made by somebody to ▌Per. 18▐, although such false statement does not actually appear in the search affidavits; that this small subset of boxes was never examined by President Trump, or anyone else on his behalf, to determine if there were documents *(or even paperwork of any kind)* in them, and this assumption was made even though the agents never sought to meaningfully investigate the matter, such as by asking President Trump or anyone else about that subset of boxes; that this small subset of boxes might (or might not) have contained documents with classified markings because some of the other boxes did, although no

one claimed to have seen any such documents (*or any paperwork at all*) in the small subset at issue; that President Trump knew that this small subset belonged to the Office, and thus was within the scope of the subpoena, and that the President had examined them and intentionally made a false determination that they did not belong to the Office or did not have documents subject to the subpoena, even though there was no basis to make such adverse assumptions as to a President of the United States.

These speculative inferences as applied to defendant Nauta never rose above a mere possibility—inference piled upon inference, all without conducting essential investigation to test the thesis.  As to Nauta, these were wishing-and-hoping affidavits issued based on the political urgency that AG Garland noted in appointing Jack Smith.[5]  And as to Nauta, the entire premise of criminality was unfounded and an affront to Fourth Amendment requirements, because there was nothing wrong with the possession of the documents by either the Office of the President or the President himself personally, even though the government falsely claimed the contrary.

The absence of probable cause vitiated the warrant, and the misconduct in relation to the affidavits' composition and related investigation factors show use of them to obtain the warrants was improper and reflects bad faith overzealousness and bias.

B.    General Warrant

Even assuming some form of probable cause as to any offense, the warrants were wildly overbroad and failed to link any such allegations to specific items to be searched.  The warrant

---

[5]  Attorney General Merrick Garland ordered Jack Smith to handle the Trump prosecutions in an "urgent manner." *See* https://www.justice.gov/opa/pr/appointment-special-counsel-0. (Garland did not do so in appointing Robert Hur in President Biden's classified documents case, https://www.justice.gov/d9/2023-01/Order.Appointment%20of%20Robert%20Hur.11223%20%28002%29.pdf.)   Within ten days of the urgency directive, the initial Nauta phone warrant affidavits, riddled with falsity, exaggerations, and mischaracterizations, were filed by the SCO.

was general, rather than particularized, and the use of this general warrant exceeded the permissible bounds of the Fourth Amendment. *See* Ex. A, Attachment B (warrant authorized search for anything to do with: "any boxes or records," "any monetary transactions" at any time, any reflection of Nauta's "state of mind," and any "information" or "records" concerning the *entire Presidential term of Donald Trump*, as well as any "matters" that somehow "relat[e]" to the investigation).[6] The warrants—and this applies to all but the CSLI warrant to Verizon (Ex. G, which was itself absurdly overbroad and unnecessary in that Nauta's location at all *relevant* times was unquestioned and documented), were as broad as if to say 'search for whatever suits you.'

A general warrant—authorizing police officers to rummage through private effects, papers, and personal information—is prohibited by the Fourth Amendment's command that "no Warrants shall issue [unless] particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *see Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (plurality). In order to prevent a "wide-ranging exploratory search," *Maryland v. Garrison*, 480 U.S. 79, 84 (1987), the warrant must enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized for seizure on the basis of probable cause. *See Steele v. United States*, 267 U.S. 498, 503 (1925).

Illustrative of the reckless and unbounded nature of the warrants in this case is the haphazard claim in the key FBI 21A affidavits, Exs. A-E, that "when an individual uses an electronic device to illegally solicit another to commit a *crime of violence*, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime." *See* Ex. A at ¶ 55(f). The warrant executed in this case was a general warrant for which the probable cause connection between the items to be seized under

---

[6] The same "Attachment B" overbreadth is made part of each of the affidavits.

the warrant applications and the standards for determination of what records would be determined to meet the test for seizure were left wholly undefined, such that the resulting search was unbounded and general, invading not only the records, thoughts, and papers of the defendant himself, but also the protected privacy interests of those who had entrusted the defendant with their communications.

Because the warrants called for a search having no limiting link to the vague allegations on which the affiant relied, and because there was no specificity despite the apparent capacity of sources to give specific information, the warrant was general in nature and the fruits of the search should be suppressed. *See United States v. Pratt*, 438 F.3d 1264 (11th Cir. 2006) ("[A] supporting affidavit, no matter how perfect, cannot save a 'facially defective' warrant"); *United States v. Squillacote*, 221 F.3d 542, 556 (4th Cir. 2000) (recognizing that "blanket suppression of all evidence seized" is appropriate where the Fourth Amendment violation is an impermissible general search).

C.   Execution of Each Searches Was Overbroad, and the Searches Were Roving and Exploratory

Without any specification of data to be searched or any meaningful limitation on the authority of the searching agents, the warrant delegated to the searching agents the function to be fulfilled by a neutral magistrate.  *See Lo-Indictment Sales, Inc. v. New York*, 442 U.S. 319, 325–26 (1979) (unbounded search conducted upon the unparticularized warrant violated Fourth Amendment). Without any probable cause to look for anything specific, the searches that were largely off-site and indefinite, with extended review of digital records, lacked any meaningful limitation.  "The Supreme Court has never abrogated the requirement of a specific warrant." *Buonocore v. Harris*, 65 F.3d 347 356 (4th Cir. 1995). To prevent a general rummaging through a person's personal belongings, a search warrant should remove "from the officer executing the

warrant all discretion as to what is to be seized." *United States v. Torch*, 609 F.2d 1088, 1089 (4th Cir. 1979); *see United States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989, 1006 (9th Cir. 2009) (en banc) (recognizing that "over-seizing is an inherent part of the electronic search process;" "This calls for greater vigilance on the part of judicial officers in striking the right balance between the government's interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures. The process of segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect.").

Whatever potential limitation language was available to the SCO, that might have restricted the execution of the warrants, was not employed as to Nauta's search warrants. And the resulting unbounded searches were overbroad and merit suppression. An evidentiary hearing is needed to show the unbounded nature of the warrant executions and that there were no limits on the scope of, or time restrictions regarding, the searches undertaken.

D.     *Franks* Violation and Governmental Bad Faith

The affidavits were facially deficient as to the probable cause requirement. Additionally, suppression should be ordered because the affiants communicated to the issuing magistrates false and misleading claims that gave the impression that the defendant had been in a violation of federal laws, had been aware of any such violations, or had knowledge of any illegality at all.

Based on a series of false and misleading representations in the affidavits, the defendant requests an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Under *Franks*, "the rule of exclusion [extends] beyond instances of deliberate misstatements [to] those of reckless disregard." *Id.* at 170.

The agents first hid the partisan political influence brought to bear on NARA as part of the

19

get-Trump-and-lie-about-him modus operandi of the Biden administration.  *See United States v. Flowers*, 531 F. App'x 975, 982 (11th Cir. 2013) (relative weights of all the various indicia of reliability and unreliability are needed in magistrate review of a warrant).  In this regard, defendant Nauta adopts the motion of President Trump to dismiss based on selective and vindictive prosecution, showing a clear course of bias and abuse of process. Similarly, the false allegation of illegal removal of papers that the President had every right to remove, the misstated claims regarding perjury and false statement, the failure to admit that there was no evidence that Nauta knew anything about the grand jury subpoena's mode or scope of compliance (much less the compliance certification), the mischaracterization and decontextualization of Nauta's actions and statements, giving a false impression that any witness believed Nauta had criminal knowledge, and the other falsifications addressed above and in the suppression motion filed today by President Trump, all combine to create a false presentation designed to wrongly cast Nauta in an incriminating light, when the facts did not warrant it.

Regarding subpoena compliance, the affidavits omit material information regarding the limitations placed by the government as to who the subpoena respondent would be: the government (i.e., prosecutor Jay Bratt) specifically advised Donald Trump, through his counsel (███ Per. 18 ), that the government had decided *not* to issue, and was *not issuing,* a subpoena compelling Donald Trump individually to do anything.  Thus, Mr. Trump personally *had no legal obligation* with regard to the subpoena, other than to help determine what was within the possession and control of the Office as opposed to himself as an individual.  The government's tactical reasons for failing to subpoena Mr. Trump individually are not known, but logic suggests that it was to avoid affording Mr. Trump a Fifth Amendment production privilege as to compelled production of what the government claimed was contraband regarding which he would have a

valid Fifth Amendment privilege that would have precluded effective use of the subpoena.  The government thus chose to subpoena only the Office, not the individual.

The affiants also hid from the magistrates the government's apparent refusal to interview President Trump, despite invitation from him to provide whatever they needed.  (By comparison, Special Counsel Robert Hur readily granted interview consideration to, and based his decision not to pursue charges against, Joe Biden based on interview opportunities that revealed aspects of Biden's mental condition.)

Importantly, in the D.C. affidavits, the government *failed* to acknowledge that the individual who would later accuse another defendant of asking about storage of video recordings at Mar-a-Lago had unequivocally denied any impropriety in Nauta's June 2022 trip to Mar-a-Lago, and that two days prior, President Trump's attorney and corporate representatives had already already arranged for preservation of any videos, pictures, etc. that might be responsive to a subpoena.  As to the D.C. warrant, the affiant used a manufactured jurisdictional premise that amounted merely to forum shopping, while hiding also knowledge that Nauta knew that the security personnel (and not the technical team) controlled video of movements at Mar-a-Lago and that the security team was immediately instructed to preserve all video footage.

The affiants concealed from the issuing magistrates the manner in which they made Nauta believe in the informality and non-finality of the crucial FBI interview and that its focus was on giving assurance that no national security interest was compromised, which Nauta truthfully said he could not do.  The affiants hid information about ████████████████████████ ████████████████████ who were acting as political enemies of President Trump, including one attorney who had an attorney-client privilege relationship with President Trump and then proposed to act in an undercover role parallel to ████████████████████.

And defendant Nauta adopts arguments presented in President Trump's motion for suppression of the search warrant issued in August 2022, and with particular relevance to the *Franks* issue here, the series of false statements made by S/A FBI 21A in that affidavit (including regarding the derivation and purpose of the investigation, the absence of necessity for warrants given cooperation by President Trump, and his authorization to possess classified documents), none of which were corrected in the Nauta affidavits.

The overwhelming focus of the affidavits in this case is on false and misleading allegations of criminality on the part of Nauta.  Suppression of the warrants is compelled under *Franks*.

     E.    <u>Due Process and Other Constitutional Violations—Fruit of the Poisonous Tree Doctrine</u>

Defendant Nauta adopts the arguments presented in President Trump's motion to dismiss based on due process violations.  The grand jury was improperly invoked and exceeded its jurisdiction.  The grand jury subpoena was jurisdictionally defective, as the premise for asserting Justice Department control was unfounded and violated due process, and the separation of powers, as well as the PRA.  And the use of a D.C. grand jury to search for evidence to sustain a prosecution in the Southern District of Florida was unwarranted and served to diminish the defendants' procedural rights.

The use of attorney-client privileged communications to obtain the affidavits also presents a due process violation.  Defendant Nauta adopts the arguments presented by President Trump in his motion challenging the violation of the attorney-client privilege.  Use of such violations, and failure to disclose them, violates due process.  The affiants used attorney-client violations as the basis for evidentiary allegations, but the SCO cannot use information it gathers improperly to justify a search warrant, or as evidence against a third party.  Information the government obtains from privileged attorney-client conversations does not constitute evidence supporting probable

cause.

From start to finish, the process leading to the searches at issue was vitiated by constitutional violations that warrant suppression.

## III.   <u>REQUEST FOR EVIDENTIARY HEARING</u>

Defendant Nauta requests, in accordance with the procedure established by the Supreme Court in *Franks*, 438 U.S. at 169–70, 171, an evidentiary hearing to enable him to establish law enforcement's reckless disregard with respect to the material omission of exculpatory evidence in the search warrant affidavit.  *See also Martin*, 615 F.2d at 327–28. An evidentiary hearing is requested both as to the *Franks* violations and to further establish the impermissible scope of search executions, including the delay in completing the searches and in failing to return items seized.

At an evidentiary hearing, the defendant will establish the factors that led the SCO and affiants to misrepresent and mischaracterize factual allegations and to omit essential factual information necessary to evaluate any untainted allegations in the affidavits.  The defendant will also show the coordination and planning that went into the making of the false assertions, the bias and animus that motivated the improprieties, and the manner in which the SCO and relevant agents proceeded intentionally or with reckless disregard for the truth and with a design to omit material facts necessary to a fair evaluation of the affidavits.

At the evidentiary hearing, the defendant will further show that there were no meaningful restrictions placed on the review of the seized items, that the scope of materials designated for filter team review was unduly constricted, and that the filter process employed provided no protection to the defendant from disclosure of work product and attorney-client privileged material. Further, the use in this case of the same U.S. Attorney office as the filter team

inadequately served the filtering function, where the defendant was precluded from participating in designation of protected material and where the prosecuting office filter team was not made fully aware of the SCO's relevant actions and prior use of attorney-client privileged material.

## CONCLUSION

For all of these reasons, including the facial invalidity of the warrants, both as to violations that were at the core of the warrant's scope and the remaining allegations of the affidavits, Defendant Waltine Nauta requests that the Court grant the defendant's motion to suppress the evidentiary fruits of the searches, order that an evidentiary hearing on the motion be conducted, and order the return of seized property to the defendant.

Dated: February 22, 2024

Respectfully submitted,

*s/ Stanley E. Woodward, Jr.*
Stanley E. Woodward, Jr. (*pro hac vice*)
Brand Woodward Law, LP
400 Fifth Street NW, Suite 350
Washington, DC 20010
202.996.7447 (telephone)
202.996.0113 (facsimile)
stanley@brandwoodwardlaw.com

*s/ Sasha Dadan*
Sasha Dadan, Esq. (Fla. Bar No. 109069)
Dadan Law Firm, PLLC
201 S. 2nd Street, Suite 202
Fort Pierce, Florida 34950
772.579.2771 (telephone)
772.264.5766 (facsimile)
sasha@dadanlawfirm.com

*Counsel for Defendant Waltine Nauta*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 22, 2024, I electronically submitted the foregoing, via electronic mail, to counsel of record.

Respectfully submitted,

*s/ Sasha Dadan*
Sasha Dadan, Esq. (Fla. Bar No. 109069)
Dadan Law Firm, PLLC
201 S. 2nd Street, Suite 202
Fort Pierce, Florida 34950
772.579.2771 (telephone)
772.264.5766 (facsimile)
sasha@dadanlawfirm.com

*Counsel for Defendant Waltine Nauta*