# EXHIBIT G

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

## for the

### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. 23-SW- 34 |
| CELL SITE LOCATION DATA FOR TWO | ) |
| VERIZON CELL PHONES | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 793(e) - Willful Retention of National Defense Information; 18 U.S.C. § 2071 - Concealment or Removal of Government Records; 18 U.S.C § 1519 - Obstruction of Federal Investigation; 18 U.S.C. § 1001 - Material False Statement; 18 U.S.C. § 1623 - Perjury. | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

███████████████████████
*Applicant's signature*

█████████ Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date: 2/3/2023   2/6/2023

*Judge's signature*

City and state: Washington, D.C.

Chief Judge Beryl A. Howell
United States Chief Judge

Subject to Protective Order

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF **CELL SITE LOCATION DATA FOR TWO VERIZON CELL PHONES** | **Case No. 23-SW-** <br><br> **UNDER SEAL** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, █████████ being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure, 18 U.S.C. §§ 2703(a), and 2703(c)(1)(A), for information about the historical location of the cellular devices assigned to call number █████████ ("**TARGET PHONE 1**") and █████████ ("**TARGET PHONE 2**") (collectively, "**TARGET PHONES**") that were utilized by **Waltine Nauta** ("**Nauta**"), as described in the following paragraphs and in Attachment A, for the items described in Attachment B.  The service provider is Verizon ("PROVIDER"), a company headquartered at 1095 Avenue of the Americas, New York, NY 10036.  Verizon is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Washington Field Office counterintelligence division and have been since 2021. During this time, I have received training at the FBI Academy located in at Quantico, Virginia, specific to counterintelligence and espionage investigations. I am currently assigned to investigate counterintelligence and espionage matters. Based on my experience and training, I am familiar with efforts used to unlawfully collect, retain, and disseminate sensitive government information, including classified National Defense Information ("NDI"), and with efforts to obstruct justice.

USA-00395459

3.       The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.       Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the historical location of the TARGET PHONES, as described in Attachment A, will provide evidence of violations of 18 U.S.C. § 793(e) (willful retention of national defense information); 18 U.S.C. § 2071 (concealment or removal of government records); 18 U.S.C § 1519 (obstruction of federal investigation), 18 U.S.C. § 1001 (material false statement); or 18 U.S.C. § 1623 (perjury), as further described in Attachment B.

5.       For the purpose of this affidavit, the devices to be searched are capitalized and bolded (e.g., the **TARGET PHONES**), and the name of the apparent user of the **TARGET PHONES** is lowercase and bolded (i.e., **Walt Nauta**).

6.       The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred in part within the District of Columbia. *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### Background on Investigation

7.       The FBI is investigating potential violations of 18 U.S.C. §§ 793(e), 2071, 1519, 1001, and 1623 related to the improper removal and storage of classified national defense information in unauthorized spaces, as well as the unlawful concealment or removal of government records and obstruction of its investigation.

2

8.　　This investigation began as a result of a referral that the United States National Archives and Records Administration ("NARA") sent to the United States Department of Justice ("DOJ") on or about February 9, 2022 (hereinafter, the "NARA Referral"). The NARA Referral stated that on January 18, 2022, in accordance with the Presidential Records Act ("PRA"), NARA received from the office of former President Donald J. Trump (hereinafter "FPOTUS"), via representatives, 15 boxes of records (hereinafter, the "15 boxes"). The 15 boxes, which had been transported from a property owned by FPOTUS at 1100 S. Ocean Blvd., Palm Beach, Florida, a residence and club known as "Mar-a-Lago," were reported in the NARA Referral to contain, among other things, highly classified documents intermingled with other records.

9.　　After an initial review of the NARA Referral, the FBI opened a criminal investigation to, among other things, identify any person(s) who may have removed or retained classified information without authorization and/or in an unauthorized space. The FBI's investigation established that documents bearing classification markings, which appear to contain NDI, were among the materials contained in the 15 boxes and were stored at Mar-a-Lago in an unauthorized location.

10.　　As further described below, on May 11, 2022, the Department of Justice ("DOJ") served a grand jury subpoena on counsel for the Office of the Former President (the "Office") seeking "any and all documents . . . bearing classification markings" in FPOTUS's and/or the Office's possession. On June 3, 2022, FPOTUS's counsel provided DOJ with a package of 38 documents bearing classification markings at the Confidential, Secret, and Top Secret levels. Counsel for FPOTUS provided DOJ with a written certification, signed by another person who was acting as the custodian of records on behalf of the Office for purposes of the subpoena, indicating that "a diligent search was conducted," that the "search was conducted after receipt of the subpoena, in order to locate any and all documents that are responsive to the subpoena" seeking

3

　　　　　　　　USA-00395461

all documents with classification markings in the custody or control of FPOTUS and/or the Office, and that "any and all responsive documents" were being provided. Counsel for FPOTUS indicated that all responsive documents had been located in one storage room located on the ground floor at Mar-a-Lago (hereinafter, "the storage room.").

11.     After developing additional evidence that the June 3 production did not contain all of the documents with classification markings located at Mar-a-Lago, on August 8, 2022, the FBI executed a search and seizure warrant issued by a Magistrate Judge of the U.S. District Court for the Southern District of Florida. During the search, the FBI recovered from the storage room as well as FPOTUS's office at Mar-a-Lago over 100 documents bearing classification markings, which had not been produced on June 3. The documents appeared to contain NDI. The search also yielded apparent government and/or Presidential records subject to the Presidential Records Act, 44 U.S.C. § 2201.

### Background on Nauta

12.     **Nauta** began his career in the U.S. Navy in approximately 2001 and worked as a White House chef beginning in or around 2012. In 2017, **Nauta** transitioned to work as a valet, or personal aide, for FPOTUS during FPOTUS's Presidential Administration (hereinafter "Administration"). During his time in the White House, **Nauta** held a high security clearance and received training in the handling of classified information. In or around the summer of 2021, **Nauta** retired from the military and went to work as a civilian for FPOTUS as his "body man" or assistant. According to publicly available information filed with the Federal Election Commission, the Save America PAC, a political action committee created by FPOTUS, paid **Nauta** $149,167 between August 26, 2021, and August 30, 2022, which included $6,375 in "advance consulting" fees.

13.     **Nauta** was involved in at least two key movements of FPOTUS's boxes at Mar-a-Lago: (1) in the weeks leading up to the provision of the 15 boxes to NARA in January 2022,

4

USA-00395462

**Nauta** and at least one other FPOTUS employee brought, at FPOTUS's request, the 15 boxes from their location in a storage room at Mar-a-Lago to FPOTUS's residential entryway at Mar-a-Lago for FPOTUS's review; and (2) in the week before FPOTUS's representatives claimed on June 3 that they had conducted a diligent search for classified documents, **Nauta** moved approximately 64 boxes out of the storage room at Mar-a-Lago and returned only about 25-30 prior to the review of the storage room for records responsive to the May 11 subpoena. In June 2022, as described further below, **Nauta** testified before a grand jury and provided inconsistent statements about the movement of a large number of boxes prior to the June 3 production of classified documents. Furthermore, on June 24, 2022, DOJ served a grand jury subpoena on the Trump Organization for certain surveillance video from Mar-a-Lago. That evening, **Nauta** made flight arrangements to travel from New Jersey to Palm Beach the next day. Text messages obtained by search warrant show that **Nauta** went to Mar-a-Lago the next day, June 25, 2022, and met with the Mar-a-Lago property manager. Surveillance video later obtained by a subsequent subpoena shows **Nauta** and the Mar-a-Lago property manager in the storage room area the evening of June 25, 2022, where it appears that the property manager is gesturing in the direction of the surveillance cameras.

<strong>FPOTUS Stores Documents in Boxes</strong>

14.



It was FPOTUS's practice to store accumulated documents in boxes, and that continues to be his practice.

5

Subject to Protective Order

15. On June 21, 2022, **Nauta** testified under oath before a federal grand jury sitting in the District of Columbia. Before the grand jury, **Nauta** stated that during the move from the White House to Mar-a-Lago, Bankers boxes were placed within larger brown boxes. **Nauta** was part of the team that packed items from FPOTUS residence at the White House for the move.

16. According to ▮▮▮ subsequently learned that approximately eighty-five to ninety-five of FPOTUS's boxes, hereinafter referred to as "FPOTUS boxes," were transported from the White House to the Mar-a-Lago but ▮▮▮ did not know when this occurred. ▮▮▮ described the FPOTUS boxes as white and blue Bankers boxes and cardboard printer paper boxes with lids. ▮▮▮ confirmed that these boxes are similar to the ones pictured below, in a photograph taken by the media, of FPOTUS aides loading boxes onto Marine One on January 20, 2021, as FPOTUS departed the White House.



6

USA-00395464

17. On or about the afternoon of January 20, 2021, ████ observed several items, which may have contained some of the FPOTUS boxes, being offloaded from Air Force One and transported to Mar-a-Lago.

18. In late August or early September 2021, ████ observed the FPOTUS boxes in the storage room at Mar-a-Lago, with no lock on the door. Sometime thereafter, ████ observed that locks were installed on the storage room door. ████ described the storage room as being located on the ground floor, pool level, in a hallway with other offices and storage spaces. The door to the storage room was painted gold and had no other markings on it.

19. In addition to the approximately eighty-five to ninety-five FPOTUS boxes located in the storage room, there were also other boxes in the storage room with merchandise such as challenge coins, garment bags, memorabilia from Mar-a-Lago such as photograph frames, and other décor items.

### Provision of the 15 Boxes to NARA

20. Over the course of 2021, NARA endeavored to obtain what appeared to be missing records subject to the Presidential Records Act (PRA), 44 U.S.C. § 2201. On or about May 6, 2021, NARA made a request for the missing PRA records and continued to make requests until approximately late December 2021, when NARA was informed twelve boxes were found and ready for retrieval at Mar-a-Lago. According to ████ after receiving the request from NARA, FPOTUS wanted to review the boxes before providing them to NARA. ████ **Nauta**, and on occasion possibly another FPOTUS employee collected the 15 boxes closest to the door of the storage room and delivered them to FPOTUS.

21. They carried the boxes from the storage room to the entryway of FPOTUS's personal residential suite at Mar-a-Lago. Between approximately November 2021 and January 2022, ████ **Nauta**, and the other FPOTUS employee placed two to four boxes at a time outside

7

Subject to Protective Order

FPOTUS's personal suite. [redacted] believes that FPOTUS took the boxes into the residential suite and personally reviewed their contents.

22. [redacted] took a photograph of the storage room and provided it to FPOTUS in or around November 2021, to show FPOTUS the number of boxes that were in the storage room. The storage photo, which appears below and was later provided to the FBI by [redacted] captures approximately sixty-one of the FPOTUS boxes located in the storage room:



23. On January 17, 2022, the day of the scheduled NARA pick up, [redacted] saw all 15 boxes in the hallway outside FPOTUS's residential suite, known as Pine Hall. **Nauta** confirmed that the 15 boxes were in the location described by [redacted]

24. **Nauta** testified that he and [redacted] transferred the boxes from Pine Hall to **Nauta**'s car. From there, on January 17, 2022, [redacted] and **Nauta** met the NARA contract driver and

8

provided the driver with the 15 boxes. **Nauta** further testified that he had brought, at FPOTUS's request, additional boxes to Pine Hall after the January 2022 provision to NARA of the 15 boxes.

25.     Even though there were far more FPOTUS boxes than the 15 boxes, FPOTUS did not review the remainder of the FPOTUS boxes before the NARA pickup. According to **Nauta**, the 15 boxes were not selected from the FPOTUS boxes for review in a systematic way. **Nauta** testified before the grand jury that **Nauta** would "just open the door, turn to my left, grab a box, and take it up." **Nauta** confirmed that he was not instructed to take any particular boxes, and **Nauta** answered affirmatively when asked if **Nauta** would "just pick some off the top." When **Nauta** was questioned why he did not bring for review more than what **Nauta** approximated was 15 to 17 boxes, **Nauta** testified that "once I started putting them in there – [FPOTUS] was like, okay, that's it." According to **Nauta**, FPOTUS did not state why he did not want to review more boxes before the NARA pickup.

26.     According to ▓▓▓▓ after providing the 15 boxes to NARA, FPOTUS indicated to his staff those were the boxes going to NARA and "there are no more."

27.     According to ▓▓▓▓ around the time the 15 boxes were provided to NARA, FPOTUS directed ▓▓▓▓ to convey to one of FPOTUS's lawyers, hereinafter "Individual 1," that there were no more boxes at Mar-a-Lago, which was an attempt to conceal from NARA that additional boxes remained at Mar-a-Lago.

28.     According to ▓▓▓▓ however, approximately seventy to eighty of the aforementioned eighty-five to ninety-five FPOTUS boxes remained in the storage room as of approximately January 2022. ▓▓▓▓ did not know the contents of the remaining seventy to eighty FPOTUS boxes, but believed they contained the same types of documents and records as the 15 boxes that were provided to NARA.

9

Subject to Protective Order                    USA-00395467

29. From May 16-18, 2022, FBI agents conducted a preliminary review of the 15 boxes provided to NARA and identified over 190 documents with classification markings in fourteen of the 15 boxes. Several of the documents also contained what appears to be FPOTUS's handwritten notes.

### Grand Jury Subpoena, Related Correspondence, and Production of Additional Classified Documents

30. On May 11, 2022, an attorney representing FPOTUS, "FPOTUS Counsel 1," agreed to accept service of a grand jury subpoena requesting "[a]ny and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump bearing classification markings." The return date of the subpoena was May 24, 2022.

31. After an extension was granted for compliance with the subpoena, on the evening of June 2, 2022, FPOTUS Counsel 1 contacted DOJ Counsel and requested that FBI agents meet him the following day to pick up responsive documents. On June 3, 2022, three FBI agents and DOJ Counsel arrived at Mar-a-Lago to accept receipt of the materials. In addition to FPOTUS Counsel 1, another individual, hereinafter "Individual 2," was also present as the custodian of records for FPOTUS's post-presidential office. The production included a single Redweld envelope, wrapped in tape, containing documents. FPOTUS Counsel 1 relayed that the documents in the Redweld envelope were found during a review of the boxes located in the storage room. Individual 2 provided a Certification Letter, signed by Individual 2, which stated the following:

> Based upon the information that has been provided to me, I am authorized to certify, on behalf of the Office of Donald J. Trump, the following: a. A diligent search was conducted of the boxes that were moved from the White House to Florida; b. This search was conducted after receipt of the subpoena, in order to locate any and all documents that are responsive to the subpoena; c. Any and all responsive documents accompany this certification; and d. No copy, written notation, or reproduction of any kind was retained as to any responsive document.

10

USA-00395468

32.     During receipt of the production, FPOTUS Counsel 1 stated he was advised all the records that came from the White House were stored in the storage room at Mar-a-Lago and the boxes of records in the storage room were "the remaining repository" of records from the White House. FPOTUS Counsel 1 further stated he was not advised there were any records in any private office space or other location in Mar-a-Lago. The agents and DOJ Counsel were permitted to see the storage room (although they were not permitted to look inside the boxes) and observed that approximately fifty to fifty-five boxes remained in the storage room. Considering that only 15 boxes had been provided to NARA of the approximately eighty-five to ninety-five FPOTUS boxes that had been located in the storage room, it appeared that approximately fifteen to thirty of the FPOTUS boxes had previously been relocated elsewhere. The FBI agents also observed that the composition of boxes differed such that fewer Bankers boxes were visible, while more plain cardboard boxes and storage bins were present. Other items were also present in the storage room, including a coat rack with suit jackets, as well as interior décor items such as wall art and frames.

33.     While testifying before the grand jury, **Nauta** stated that he did not know whether FPOTUS Counsel 1 reviewed any of the boxes that were in FPOTUS's residential suite, but he did not see FPOTUS Counsel 1 go in there.

34.     A review of the documents contained in the Redweld envelope produced pursuant to the grand jury subpoena revealed 38 unique documents bearing classification markings, some of which bore classification markings at the highest levels. Based on my training and experience, I know that documents classified at these levels typically contain NDI. Multiple documents also contained what appears to be FPOTUS's handwritten notes.

11

35.     When producing the documents, neither FPOTUS Counsel 1 nor Individual 2

asserted that FPOTUS had declassified the documents.[1] The documents being in a Redweld

envelope wrapped in tape appears to be consistent with an effort to handle the documents as if they

were still classified.[2]

### Surveillance Camera Footage Shows Nauta removing boxes from the Storage Room Area Prior to FPOTUS Counsel 1's Review in Connection with the Subpoena

36.     On July 6, 2022, in response to a June 24 grand jury subpoena for surveillance video

from internal cameras located on the ground floor (basement) and outside Pine Hall at Mar-a-Lago,

representatives of the Trump Organization provided a hard drive to FBI agents. Upon review of

the hard drive, the FBI determined that the drive contained video footage from four cameras in the

basement hallway of Mar-a-Lago in which the door to the storage room is located. The footage on

the drive begins on April 23, 2022, and ends on June 24, 2022. The recording feature of the cameras

appears to be motion activated, so that footage is only captured when motion is detected within

each camera's field of view.

37.     One camera in particular, identified on the hard drive as "South Tunnel Liquor,"

provides a view of entry and exit into a room (hereafter anteroom) that leads to the storage room.

---

[1] 18 U.S.C. § 793(e) does not use the term "classified information," but rather criminalizes the unlawful retention of "information relating to the national defense." The statute does not define "information related to the national defense," but courts have construed it broadly. *See Gorin v. United States*, 312 U.S. 19, 28 (1941) (holding that the phrase "information relating to the national defense" as used in the Espionage Act is a "generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness"). In addition, the information must be "closely held" by the U.S. government. *See United States v. Squillacote*, 221 F.3d 542, 579 (4th Cir. 2000) ("[I]nformation made public by the government as well as information never protected by the government is not national defense information."); *United States v. Morison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988). Certain courts have also held that the disclosure of the documents must be potentially damaging to the United States. *See Morison*, 844 F.2d at 1071-72.

[2] On May 25, 2022, while negotiating for an extension of the subpoena, FPOTUS Counsel 1 sent two letters to DOJ Counsel. In the second such letter, available at 22-mj-8332-BER (D.E. 125), FPOTUS Counsel 1 asked DOJ to consider a few "principles," which include FPOTUS Counsel 1's claim that a President has absolute authority to declassify documents. In this letter, FPOTUS Counsel 1 requested, among other things, that "DOJ provide this letter to any judicial officer who is asked to rule on any motion pertaining to this investigation, or on any application made in connection with any investigative request concerning this investigation."

Subject to Protective Order

USA-00395470

The doorway to the anteroom itself is not visible in the camera view, as a refrigerator is directly between the camera and doorway, but the footage from this camera nonetheless establishes entry and exit to the anteroom because it is apparent when persons within the camera's field of view turn directly behind the refrigerator and then disappear from view. The anteroom, in addition to its entrance from the South Tunnel, has approximately four doors leading off it, one of which is the gold-painted door that leads to the storage room. The anteroom provides the only entrance to the storage room; however, other offices can also be entered from the anteroom, so it might be possible for persons to enter the storage room from those other offices without being visible in the surveillance camera footage.

38. By reviewing the camera footage provided by the Trump Organization in response to the subpoena, the FBI has determined the following:

On May 24, 2022, **Nauta** is observed exiting the anteroom doorway with three boxes.

On May 30, 2022, four days after **Nauta**'s interview with the FBI during which the location of boxes was a significant subject of questioning, **Nauta** is observed exiting the anteroom doorway with approximately fifty Bankers boxes, consistent with the description of the FPOTUS boxes. FBI did not observe this quantity of boxes being returned to the storage room through the anteroom entrance in its review of the footage.

On June 1, 2022, **Nauta** is observed carrying eleven brown cardboard boxes out the anteroom entrance. One box did not have a lid on it and appeared to contain papers.

The day after that, on June 2, 2022, **Nauta** is observed moving twenty-five to thirty boxes, some of which were brown cardboard boxes and others of which were Bankers boxes consistent with the description of the FPOTUS boxes, into the entrance of the anteroom. Approximately three and a half hours later, **Nauta** is observed escorting FPOTUS Counsel 1 in through the entrance of the anteroom, and FPOTUS Counsel 1 is not observed leaving until approximately two and a half hours later.

On June 3, 2022, FPOTUS Counsel 1 is escorted through the anteroom entrance by an unidentified individual wearing a jacket with "USSS POLICE" printed on the back. The unidentified individual and FPOTUS Counsel 1 exit the anteroom entrance moments later. FPOTUS Counsel 1 appeared to be carrying a Redweld envelope after exiting the anteroom.

13

USA-00395471

39. According to FBI's review of video footage, and as detailed in the paragraph above, **Nauta** can be observed removing approximately 64 boxes from the storage room area between May 24 and June 1, 2022, but only returning 25-30 boxes to the storage room area on June 2, 2022. Notably, and as described above, these boxes were removed following service of a grand jury subpoena but before FPOTUS Counsel 1's review of boxes in the storage room area to locate documents responsive to the subpoena.

40. **Nauta** testified to the grand jury that he was aware that FPOTUS Counsel 1 reviewed the boxes in the storage room on June 2. When asked about his role in assisting FPOTUS Counsel 1 with the review, **Nauta** testified that he showed FPOTUS Counsel 1 where the storage room was, let him in, and then FPOTUS Counsel 1 told **Nauta** to leave. **Nauta** stated, "and that was it" for his role in assisting with the review.

**Nauta provided inconsistent statements during his FBI interview and Grand Jury testimony**

41. On May 26, 2022, the FBI interviewed **Nauta** and explained that the FBI was conducting an investigation as to whether classified documents were stored at Mar-a-Lago and that the FBI was particularly interested in where the boxes with classified documents were located and whether they had been moved outside the storage room.

42. **Nauta**'s answers about his knowledge of the boxes were inconsistent. During the interview, **Nauta** claimed that the first time **Nauta** saw the boxes was when **Nauta** moved them from Pine Hall, the anteroom to FPOTUS's personal residential suite, to the moving truck to provide the boxes to NARA. Less than a month later, when **Nauta** testified before the grand jury, however, he stated he had actually moved them weeks prior from the storage room at Mar-a-Lago to Pine Hall for FPOTUS's review of them. Further, in **Nauta**'s interview with the FBI on May 26, he had stated that he did not know where the boxes had come from prior to being located in Pine

14

USA-00395472

Hall. Testifying under oath before the grand jury, **Nauta** claimed he had said this because he was not sure whether the boxes in Pine Hall were the same boxes that he had moved from the storage room. **Nauta** thereafter admitted, however, that he was not aware of anyone moving any other such boxes to Pine Hall.

43.     When **Nauta** was questioned under oath as to whether there were Bankers boxes remaining in the residential suite as of the time of his testimony on June 21, **Nauta** said that to his knowledge, there were remaining boxes. **Nauta** at first claimed that there were "maybe two, three boxes in there," but when pressed on whether there were "[j]ust two or three," caveated his answer with "everything happens fast." **Nauta** then confirmed that he had taken multiple boxes since January 2022 to FPOTUS's private residence, and that FPOTUS had not asked him to take them back (i.e., return them to the storage room).

44.     Furthermore, during his grand jury testimony, **Nauta** was asked to identify the occasions on which he had entered the storage room after October 2021, and he testified that "a lot of times" he would store "shirts, and hats, [and] stickers" in the storage room at FPOTUS's behest. When asked if he had removed anything from the storage room at any time, Nauta testified that "recently," meaning "within the last month" prior to his June 21 testimony, he removed a box of challenge coins from the storage room and took them to FPOTUS's office. He did not inform the grand jury that, within the month prior to his grand jury appearance, **Nauta** had removed approximately 64 boxes from the storage room area between May 24 and June 1, 2022, but only returned 25-30 boxes to the storage room area on June 2, 2022.

### Nauta Trip to Mar-a-Lago on June 25

45.     As noted above, on June 24, 2022, DOJ served a grand jury subpoena on the Trump Organization for certain surveillance video from Mar-a-Lago. That evening, **Nauta** made flight arrangements to travel from New Jersey to Palm Beach the next day, falsely informing multiple

15

                    USA-00395473

individuals that he was traveling to Florida for family reasons. Text messages sent from **TARGET PHONE 1**, obtained by search warrant, show that **Nauta** contacted the Mar-a-Lago property manager to meet with him on June 25, 2022. Surveillance video later obtained by a subsequent subpoena shows **Nauta** and the Mar-a-Lago property manager in the Mar-a-Lago storage room area the evening of June 25, 2022, where it appears that the property manager is gesturing in the direction of the surveillance cameras. On the surveillance video, **Nauta** appears to be holding his cell phone in his hand. Within minutes of **Nauta** exiting the storage room area, **Nauta** uses **TARGET PHONE 1** to contact a Secret Service agent and that Secret Service agent sent **Nauta** a text message, "Walking over."

### Execution of Search Warrant at Mar-a-Lago and Movement of Boxes After June 3

46.     On August 8, 2022, the FBI executed a search warrant at Mar-a-Lago authorized by the Honorable Bruce E. Reinhart, U.S. Magistrate Judge in the Southern District of Florida. *See* 22-mj-83332-BER.   The  search  yielded  over  100  unique  documents  bearing  classification markings,  with  some  indicating  the  highest  levels  of  classification  and  extremely  limited distribution, found in both the storage room and FPOTUS's office at Mar-a-Lago. Based on my training and experience, I know that documents classified at these levels typically contain NDI.

47.     During the search, FBI agents found approximately 70 to 80 boxes in the storage room. Accordingly, at some point between June 3, when the FBI observed approximately 50 to 55 boxes in the storage room, and August 8, someone had moved approximately 15 to 30 boxes into the storage room.

48.          has indicated that after the June 3 production, FPOTUS traveled back to Mar-a-Lago twice during the summer before the search warrant was executed on August 8. According to          , it was unusual for FPOTUS to return to Mar-a-Lago during the summer, when he usually stayed at his properties at Bedminster, New Jersey or Trump Tower in New York

16

City. To ████'s knowledge, FPOTUS had not returned to Mar-a-Lago the previous summer. During one of the return trips, ████ asked **Nauta** why FPOTUS was back at Mar-a-Lago and, based on **Nauta**'s response, ████ understood **Nauta** and FPOTUS were there to "check on things." Based on the cryptic nature of the response and the unusual nature of the trips, ████ believed that **Nauta** was referring to the movement of FPOTUS boxes.

49.     When asked about **Nauta**'s motivation regarding his actions in this investigation, ████ assessed that **Nauta** was motivated by "loyalty" to FPOTUS.

████████████████     ████████████

50.     ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████     ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

51.     ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

17

Subject to Protective Order                    USA-00395475

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████       ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

52.    On or about January 6, 2023, FPOTUS Counsel 2 informed DOJ Counsel that in

██████████████████████████████████████████████,

he discovered that ████████████████████ possessed a laptop that contains

PDF scans of the contents of that FPOTUS box, including the documents with classified markings.

He stated that ██████ had scanned the documents in 2021. FPOTUS Counsel 2 indicated at first

that this was ██████ personal laptop but then clarified that the laptop was issued by the Save

America PAC to ██████. FPOTUS Counsel 2 further stated that he had on his own, without

consulting DOJ first, made a thumb drive of the PDF scans on ██████ laptop and that he would

turn that over to the FBI. On or about January 6, the FBI retrieved the thumb drive from FPOTUS

Counsel 2. DOJ then obtained a search warrant to search both the thumb drive and ██████ s laptop.

### The TARGET PHONES

53.    **TARGET PHONE 1**, associated with phone number ██████████, is **Nauta's**

work cellular phone and **TARGET PHONE 2**, associated with phone number ██████████, is

**Nauta's** personal cellular phone. Verizon records confirm that the phone number associated with

**TARGET PHONE 1** has been effective since at least May 21, 2021. Verizon records also show

that **TARGET PHONE 1** is an iPhone 12 Pro Max. The subscriber of **TARGET PHONE 1** is

listed as ██████████████ and the business name is listed as ██████████ at ██████████

18



Apple records list [REDACTED], the phone number associated with **TARGET PHONE 2**, as the telephone number associated with **Nauta**'s Apple iCloud account, with [REDACTED]@gmail.com as the email address associated with that iCloud account. Apple records also show that **TARGET PHONE 2**, an iPhone 13 Pro Max, is the device associated with **Nauta**'s iCloud account as of May 29, 2022.

54.     [REDACTED] indicated to the FBI that [REDACTED] the phone number associated with **TARGET PHONE 2**, is **Nauta**'s personal number and when **Nauta** was hired to work for FPOTUS in the summer of 2021, he used his personal phone number to communicate regularly regarding work with FPOTUS and others until he was given a work phone with phone number [REDACTED], the same number associated with **TARGET PHONE 1**, in late summer/early fall, approximately a month after he began working for FPOTUS. Toll records show that since January 2022, phone number [REDACTED] contacted FPOTUS's known cell phone number at least once (on July 13, 2022). Additionally, between February 2022 and August 2022, there were at least 17 calls between [REDACTED] and [REDACTED] possibly because of forwarded calls. From February 2022 through August 2022, there were approximately 12 text messages between [REDACTED] and [REDACTED]

### Location Information

55.     There is probable cause to believe that the location information will constitute evidence of the Target Offenses. Since individuals typically use and carry their cell phones, or otherwise have their cell phones in close proximity, location information for the phones likely

19

means location information for the individuals whose phones they are. The location of **Nauta** is material to the investigation, for many reasons. Location information could be pivotal in determining where and with whom **Nauta** met during the relevant time periods.

56. For example, cell site location information may further corroborate that **Nauta** entered the storage room area in November 2021 through January 2022 to bring FPOTUS boxes to the FPOTUS residence. Cell site location information may also show other instances in which **Nauta** went to the storage area and where he went immediately after, which would tend to indicate where he moved the FPOTUS boxes. **Nauta** had testified in the grand jury on June 21, 2022, that FPOTUS boxes remained in FPOTUS's residence at that time. No FPOTUS boxes were found in FPOTUS's residence on the day the search was executed on August 8, 2022. Accordingly, cell site location data might help establish whether and when **Nauta** accessed FPOTUS's residence after June 21, 2022, including providing information about **Nauta**'s whereabouts during the weekend of June 25, 2022; the two trips that FPOTUS and **Nauta** made to Mar-a-Lago in July 2022; and

█████████████████████████████████████████████████████████.

Such cell site data could further lead to evidence regarding whom **Nauta** met with during those periods.

### Background on Cell-Site Data and Location Information

57. In my training and experience, I have learned that PROVIDER is a company that provide cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or "cell tower/sector records." E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology

20

                                                                                    USA-00395478

built into the phone or by triangulating on the device's signal using data from several of the providers' cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

58. Based on my training and experience, I know that certain PROVIDERS can collect E-911 Phase II data about the location of the Target Phones, including by initiating a signal to determine the location of the Target Phones on a PROVIDER's network or with such other reference points as may be reasonably available.

59. Based on my training and experience, I know that PROVIDERS can collect cell-site data about the Target Phones. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as PROVIDER typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

60. Based on my training and experience, I know that Verizon also can collect per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the

21

Subject to Protective Order

USA-00395479

speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

61.     Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

62.     Based on my training and experience, I know that wireless providers such as PROVIDER typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as PROVIDER typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Phones' user or users.

22

                                                          USA-00395480

## REQUEST FOR SEALING

63.     The United States request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss aspects of an ongoing criminal investigation that are neither public nor known to the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

## CONCLUSION

64.     Based on the forgoing, I request that the Court issue the proposed search warrant.

Respectfully submitted,

Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on __Feb. 6, 2023 at 10:11 AM.__

HONORABLE BERYL A. HOWELL
CHIEF UNITED STATES DISTRICT JUDGE

23

Subject to Protective Order

USA-00395481

## ATTACHMENT A

### Property to Be Searched

1.      This warrant applies to records and information associated with the cellular devices assigned to call number ▆▆▆▆▆▆ and ▆▆▆▆▆▆ (each individually identified as **"Target Phone"**), whose service provider is Verizon ("PROVIDER"), a company headquartered at 1095 Avenue of the Americas, New York, NY 10036.

2.      Information about the location of the **Target Phone** that is within the possession, custody, or control of PROVIDER.

                                                                   USA-00395482

## ATTACHMENT B

### Particular Things to be Seized

**I.     Government procedures for warrant execution**

To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose to the government the following information pertaining to the Account/**Target Phones** listed in Attachment A:

    a.   The following information about the customers or subscribers associated with the Account/**Target Phones** for the time period November 1, 2021, through the present.

        i.   Names (including subscriber names, user names, and screen names);

        ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.   Local and long distance telephone connection records;

        iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.   Length of service (including start date) and types of service utilized;

        vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

1

Subject to Protective Order

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account/**Target Phones**, including:

    A. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    B. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

    C. **If available:** (Verizon) all available per-call measurement data and RTT reports, to include 1X, EVDO, LTE, IP session, and Data.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 793 (willful retention of national defense information); 18 U.S.C. § 2071 (concealment or removal of government records); 18 U.S.C. § 1519 (obstruction of federal investigation); 18 U.S.C. § 1001 (material false statement); or 18 U.S.C. § 1623 (perjury), during the period November 2021, through the present.

## III. Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order

2

USA-00395484

of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

3

Subject to Protective Order

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means     ☑ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>CELL SITE LOCATION DATA FOR TWO<br>VERIZON CELL PHONES | )<br>)<br>)    Case No. 23-SW-<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before     February 17, 2023     *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Chief Judge Beryl A. Howell     .
                                                                   *(United States Chief Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
   ☐ for     days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of                 .

Date and time issued:     2/6/2023 at 10:11 AM          *Beryl A. Howell*
                                                                        *Chief Judge's signature*

City and state:       Washington, D.C.          Chief Judge Beryl A. Howell
                                                                   United States Chief Judge

Subject to Protective Order                                              USA-00395486

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>23-SW- | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| Certification |
|---|
|     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge. |

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

Subject to Protective Order

## ATTACHMENT A

### Property to Be Searched

1.     This warrant applies to records and information associated with the cellular devices assigned to call number ▮▮▮▮ and ▮▮▮▮ (each individually identified as "**Target Phone**"), whose service provider is Verizon ("PROVIDER"), a company headquartered at 1095 Avenue of the Americas, New York, NY 10036.

2.     Information about the location of the **Target Phone** that is within the possession, custody, or control of PROVIDER.

Subject to Protective Order

## ATTACHMENT B

### Particular Things to be Seized

I.    **Government procedures for warrant execution**

To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose to the government the following information pertaining to the Account/**Target Phones** listed in Attachment A:

a.  The following information about the customers or subscribers associated with the Account/**Target Phones** for the time period November 1, 2021, through the present.

    i.  Names (including subscriber names, user names, and screen names);

    ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.  Local and long distance telephone connection records;

    iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v.  Length of service (including start date) and types of service utilized;

    vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

1

USA-00395489

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account/**Target Phones**, including:

    A. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    B. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

    C. **If available:** (Verizon) all available per-call measurement data and RTT reports, to include 1X, EVDO, LTE, IP session, and Data.

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 793 (willful retention of national defense information); 18 U.S.C. § 2071 (concealment or removal of government records); 18 U.S.C. § 1519 (obstruction of federal investigation); 18 U.S.C. § 1001 (material false statement); or 18 U.S.C. § 1623 (perjury), during the period November 2021, through the present.

## III.     Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order

2

USA-00395490

of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

3

Subject to Protective Order

USA-00395491