UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
CASE NO. 23-801010-CR-CANNON

UNITED STATES OF AMERICA,

        v.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

        **Defendants.**

_____/

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO SUPPRESS EVIDENCE AND FOR RETURN OF PROPERTY AND REQUEST FOR EVIDENTIARY HEARING**

The fundamental flaw in the SCO's understanding of the Fourth Amendment is that guilty-knowledge assumptions borne of investigative animus do not amount to probable cause. Yet that is all the government had to upend Nauta's life with multiple intrusive searches.

The SCO remarkably does not dispute the suppression motion's most important allegations of affidavit falsity and material omissions. Despite having the cooperation (and text and email records) of a key insider "staff" witness who refuted key allegations, the government sought to implicate Nauta in the obstruction of grand jury subpoenas. The affidavits omitted: (1) that President Trump's subpoena attorney had already secured preservation of all video recordings before Nauta traveled to Palm Beach on June 24, 2022; (2) that there was no evidence of Nauta's knowledge of the specific demands of the grand jury subpoenas or of any communications between Trump and his counsel; (3) that the subpoenas imposed no obligations on Trump individually; (4) as to the 2023 affidavits, the 2022 searches of Nauta devices and accounts failed to show any criminal intent or knowledge by Nauta or confirm any affidavit assertions of a false statement; (5) that no one actually knew whether "the boxes" sent to NARA (from Pine Hall *and* French Hall at Mar-a-Lago) included any of the lesser number of boxes Nauta had brought to Pine Hall weeks and months earlier;[1] (6) that no witness supported any accusation that Nauta knew or could have known the specifics of any of the boxes provided in 2022; (7) that the investigative inadequacy (including no forensic effort to relate boxes or contents to box movements in 2021 to boxes sent in 2022) left no possibility of establishing the affidavits' same-boxes premise; (8) that in the crucial FBI interview, Nauta truthfully explained he had moved boxes to Pine Hall many times: "[J]ust *most of the times* ▆▆ Per. 34 ▆▆ would say] just we got to move the boxes" (emphasis added). USA-00823815; (9) that the ground rules for the crucial FBI interview were set as informal and "relaxed" with no requirement to speculate in the absence of certainty about the information sought, and that its focus was on giving assurance that no national security interest was affected, as to which Nauta importantly *did not* claim documents sent to NARA were securely handled; and (10) that the government never sought to ask President Trump about anything, and that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ who were Trump enemies, including an attorney who, despite an attorney-client relationship with Trump, asked to act in an undercover role parallel

---

[1] Nauta *did* acknowledge in the interview that it would be "reasonable" to believe that "one of these [Mar-a-Lago] storage rooms is where" those boxes came from. Int. at 59.

to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[2]

The affidavits falsely claimed Nauta's grand jury testimony was perjurious and that he falsely denied he moved boxes out of the Mar-a-Lago storage room, when he stated he did so whenever Trump wanted, including multiple times prior to shipping material to NARA. The affidavits falsely claimed ▇Per. 34▇ quoted Trump as saying he wanted to tell NARA he had no more boxes at all at Mar-a-Lago, when instead ▇p.34▇ stated that ▇p.34▇ understood Trump to have meant that the January 17, 2022 transfer would be the end of any provision of boxes to NARA. The affidavits falsely implied that Nauta knew of any restriction on the movements or actions of counsel handling the documents subpoena response or of any communications involving counsel and falsely implied his knowledge that any boxes went unexamined by President Trump, or others on his behalf, to determine if there were documents (*or even paperwork of any kind*) relating to a subpoena response. The affiants zealously pursued searches lacking a valid, non-speculative basis.

Given the motion's showing of no probable cause that Nauta committed any crime, the SCO suggests it does not matter if the affidavits were drafted to create the false impression of probable cause as to Nauta. SCO-Resp:10 (arguing there need not be probable cause that the victim of the search committed crimes; failing to acknowledge Nauta's contention that "false and misleading claims ... gave the impression that the defendant had been in a violation of federal laws, had been aware of any such violations, *or* had knowledge of any illegality," Motion at 19). But the expansive warrants to search Nauta's private data—everything he said or did for 6 years (since January 2017) without limit, including any evidence of his "state of mind"—rested on allegations that *Nauta* was an obstructionist-perjurer. The false allegations about Nauta, including concealing that an insider witness who provided text and other communications with him did not allege he even knew of any crime, were the foundation for the warrants.

The SCO argues for a good faith finding as to the absence of probable cause, the overbreadth of the warrant, and the general search conducted. But the use of false and misleading allegations in the warrant precludes such a finding. And the remaining good faith arguments can only be resolved in an evidentiary hearing. "Whether the officers acted in subjective good faith in obtaining and executing the warrant is a mixed question of law and fact." *See United States v.*

---

[2] A marked departure from prior practice, the prosecutors here failed to avail themselves of the opportunity offered (in fact, invited) by Trump to address whatever they wanted. The affiants failed to reveal the government's refusal to interview President Trump.

*Travers*, 233 F.3d 1327, 1331 (11th Cir. 2000) (concluding based on adversarial testing of an evidentiary hearing at which agents testified that the district court's "factual findings" were not erroneous). Unlike cases of vast, pervasive criminal operations for which warrant limitations are impractical, *see United States v. Wuagneux*, 683 F.2d 1343, 1348–50 (11th Cir.1982) (applying good faith exception to a warrant which authorized seizure of "all corporate records"), everyone in the investigation knew that the subpoena evasion case was narrowly focused, speculatively premised, and required a narrowly drawn warrant in order to comply with Fourth Amendment requirements. Purported good faith, in the face of the tenuous, misleading and false assertions in the affidavits, is a subject for a hearing.[3]

      To try to make Nauta's denial of moving boxes into the residence appear false, the SCO's response twists into knots any definitive understanding that Pine Hall is outside the residence—indeed outside the vestibule to the residence—even though the FBI agents agreed to a map and description of Pine Hall, and otherwise stipulated in the Nauta interview, that Pine Hall was *outside* the residential suite at Mar-a-Lago and thus to be distinguished from the private residence living quarters. The SCO engages in wordplay, referring (twice) to that same hall as "the anteroom *to* Trump's personal residential suite at Mar-a-Lago," SCO-Resp:5, 11, before repeatedly labeling Pine Hall "the *vestibule of* the former President's residence." SCO-Resp:16, 17 n. 6 (all emphasis added). The shift to the *vestibule* label is notably misleading. As the map and detailed discussion at the interview and the SCO's own discovery productions show, the residence did have a vestibule, but it was **not** Pine Hall, but a different room, named French (or Louis XV) Hall—a room adjacent to a residence doorway entrance. On these shifting sands that drift away from the testimony, FBI interview, and reality itself, the SCO seeks to justify materially erroneous affidavits repeatedly filed for unjustified, overbroad searches of Nauta's data and other information.

      Apart from its use of incorrect new jargon for the Pine Hall located *outside* the Mar-a-Lago residential suite, the SCO's response employs several other contortions of the affidavits' contents. On the question of whether the affidavits reveal that the subpoena for classified documents was **not** directed to President Trump and that it imposed no obligations on him, and instead imposed

---

[3] The SCO continues to maintain the debunked conspiracy theory that police officers suffered fatal injuries in the Capitol Building riot. S/A [FBI 21A] falsely swore in an affidavit filed in 2021 that a "Trump rally" participant engaged in a riot that fatally injured an officer. The SCO now says it was merely an exaggeration, and that the stress of the riot might have affected an officer who had a fatal heart disease. But [FBI 21A] was trying to falsely link murder to a Trump rallygoer in a manner that reflected both bias and recklessness regarding Trump matters.

3

obligations only on the "records custodian" of the quasi-corporate entity "Office of former President Trump," the SCO says the affidavits made that distinction clear. SCO-Resp:18. But the affidavits did the opposite. They referred merely to delivery of the subpoena to an attorney for the corporate entity, *id.*, but did not even hint that the subpoena imposed no obligations on President Trump individually. Most importantly, Trump had no obligation to waive any of his rights so as to amplify the corporate subpoena response. *See* Subpoena, stating: "To: Custodian of Records, The Office of Donald J. Trump." Had the subpoena been directed to former President Trump, he could have moved to quash it, including on grounds such as immunity or constitutional privilege. *See* Fed. R. Crim. P. 17(c)(2). But then lead DOJ counsel Jay Bratt told President Trump's attorney at the time that the government *chose* not to subpoena President Trump. The government's subpoena gambit of telling the recipient to produce items in President Trump's possession was, in part, ultra vires and unenforceable—just as a subpoena to anyone else without legal authority over President Trump would be. A subpoena recipient can be compelled to produce what it possesses or controls, including what it can compel of others. Fed. R. Civ. P. 45(a)(1)(A)(iii)(subpoena requires production of the designated documents that are "in that person's possession, custody or control"); *Outside Box Innovations, LLC v. Travel Caddy, Inc.*, 455 F.Supp.2d 1374, 1378 (N.D. Ga. 2006) (applying Rule 45). The recipient cannot be compelled to obtain what it neither possesses, controls, nor can itself compel. *United States v. Llanez-Garcia*, 735 F.3d 483, 494 (6th Cir. 2013) (Rule 17(c) subpoena recipient, in that case, the government, "not obligated to acquire material possessed or controlled by others"). The portion of the subpoena asking for more than the entity could compel of President Trump was a nullity. *See Outside Box*, 455 F.Supp.2d at 1378 (subpoena served on law firm associate "cannot produce" documents under the control of the law firm itself, nor can the subpoena produce documents under the control of a different law firm now representing the associate's and her law firm's former client in the same matter). President Trump could volunteer to the entity items in his possession, but could not be compelled by it to do so. Thus, the affidavit misled the magistrate judge in stating that there was subpoena non-compliance simply because "the June 3 production did not contain all of the documents with classification markings located at Mar-a-Lago." Ex. A, ¶ 9. Also false was the affidavit's claim that "FPOTUS's representatives" claimed they "conducted a diligent search for classified documents." ¶ 11. Not true. The "designated" custodian of records of the *corporate entity* made that assertion "on behalf of the Office of Donald J. Trump" regarding "documents that are responsive to the subpoena."

The absence of reasonable, unbiased investigative efforts undermines probable cause. *Kingsland v. City of Miami*, 382 F.3d 1220, 1228 (11th Cir. 2004); *id.* at 1229 (agents may not "investigate selectively" to create probable cause; "officer may not choose to ignore information that has been offered"; "Nor may the officer conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts.") (citing *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir.1996)); *id.* at 1231 (evidence that agents "chose to either ignore or misrepresent those facts ... makes the information on which they based their arrest less than 'reasonably trustworthy'").[4]

To justify the claim of false statement (where only dissatisfaction with the conducting of the interview by [FBI 21A] is warranted), the SCO disputes that Nauta was given informal parameters for his answers about the relevant events.[5] But the directions given to him were that he did not need to speculate in any way in his answers. Upon giving Nauta an interview-opening "spiel" about not lying, [FBI 21A] told Nauta not to worry about choosing not to speculate about events he was not sure of. Int. at 6–7 ("SA [FBI 21A]: Okay. If you're not sure about something, cause if we're going back a ways, you can just say, hey, I'm not sure. I'm not going – it – *we're not strict like that*. [7] SA [FBI 21A]: ... *You can, you can say, I'm not sure*, but I think it's this. That's, that's fine and *I won't hold you to that*. ... SA [FBI 21A]: But sometimes *even what you think you remember* kind of gives us a little bit of color, and so *if you're comfortable with doing that*, we're, we're welcome to, *to hear it* as well."). This set the guidelines for Nauta to truthfully say he would not speculate at all about the boxes he saw in 2022 in Pine Hall and in French Hall that went to NARA. Importantly, the agents failed to ask if Nauta ever brought *anything* to Pine Hall (or French Hall, for that matter). Instead, having distinguished Pine Hall from the residential suite, they asked Nauta about the residence, to which he ordinarily brought only personal items.

The SCO's response founders on whether Nauta, in an FBI interview, had a right to decline to guess about the "the boxes" (with, unbeknownst to Nauta, 37 classified-marking documents) that [Per. 34] ask him to help send to NARA. SCO-Resp:17 (claiming Nauta "dissembled"); *id.* at 17 n. 6 (citing: "Gov't Ex. 9 ... at 47 (Question: "We were talking about a year, so can—***can***

---

[4] *See Olson v. Tyler*, 771 F.2d 277, 281 n.5 (7th Cir. 1985) ("*Franks* rationale applies with equal force where police officers secure a warrant through the intentional or reckless omission of material facts."); *United States v. Martin*, 615 F.2d 318, 328–29 (5th Cir. 1980) (intentional or reckless omission affecting accuracy vitiates affidavit).

[5] At the inception of the interview, [FBI 11] joked about [FBI 21A] being "the [21A] you [Nauta] need to be scared of" and then told Nauta that the interview was a "relaxed" one—"as relaxed as we can make it." Int. at 2, 4. [FBI 21A] then told Nauta he did not need to even answer questions he was "uncomfortable with [and] that's all fine." Int. at 5.

*you guess* where they [the 15 boxes] could have been or where they could have come from?" Answer: "*I don't want to guess*. I just, I just, *my answer is I don't know*.")) (emphasis added). From that interaction—declining to "guess" if boxes Nauta handled in 2021, shortly after beginning work with Trump at Mar-a-Lago, were part of those that contained classified-marking material sent to NARA in mid-January 2022—the SCO seeks to justify seven search warrants.[6]

The remainder of the affidavit deals with purely innocent conduct that did not support claims of perjury, espionage, or any other crime. Nauta moved boxes in connection with a review by President Trump prior to the Office's subpoena compliance, with no allegation that Nauta knew who or what was subpoenaed. Nauta came back to Mar-a-Lago after Trump's appropriate representatives had secured for production the videos sought by government subpoena. That's it. No witness claims Nauta knew anything improper about this. The SCO highlights Nauta's circumspection in not widely revealing that he may have wanted to examine aspects of Mar-a-Lago's hallway video surveillance. But the SCO well knows that every fact about President Trump that becomes public is immediately used to harm him in the legacy media, no matter the spin necessary to do so. The SCO offers no reason why, if the goal were to inspect the basement area as the affidavits allege, Nauta should have made that widely known. Usually, a subpoena recipient is not supposed to broadcast it to the public (and S/A [FBI 21A] specifically warned Nauta—though [21A] did not mention it in the affidavits—that confidentiality about the investigation matters is requested because we "don't want peoples['] reputations to be tarnished – on speculation and unfounded things because they get leaked out before they're – before we actually get a chance to actually just get all the facts." Int. at 5–6).

Other deficiencies in the affidavits are relevant to the probable cause analysis, the *Franks* issues, the good faith questions, and the overbroad warrants and searches. The affidavits provided insufficient information to enable the magistrate to make an independent determination of whether any national defense information was involved, so that the magistrate could then independently

---

[6] In the grand jury, the SCO presented documentation showing [Per. 34] moved bankers boxes into Pine Hall no later November 25, 2021—nearly two months before the NARA shipment. [p.34] told Nauta [p.34] did so only after the fact, and he told [p.34] he had heard nothing about boxes. Later that day, Nauta told [Per. 34] that Trump "knocked out" two boxes in Pine Hall, but it was not known if they were returned to storage. Late in November 2021, [Per. 34] again asked Nauta to help [p.34] move some boxes, but gave no explanation why. [p.34] provided him with photographs indicating that some boxes were filled with newspapers—not records. [p.34] grand jury exhibits confirmed that Nauta had been recovering from Covid (not at Mar-a-Lago) in the crucial week prior to the NARA pickup when [Per. 34] was communicating with others about how many boxes would be turned over. Nauta's first day back, while still recovering, was January 12.

evaluate evidence regarding potential 18 U.S.C. § 793 or other violations.[7] None of the essential attributes of national defense information were set forth, such as non-public information, whether material remained classified, and what the information related to. Nor did the affidavits even offer an opinion by any intelligence officer that non-public information was at issue or that items with classification markings remained classified. The SCO relies on the affidavit's assertion of an improper legal opinion by S/A [FBI 21A] that "some" unknown number of documents were nominally of the type of documents that "typically" are national defense information. This "typically" opinion was insufficient, just as it would be to claim "typically" a group of young men acting suspiciously on a street corner are committing crimes. Hunches are not probable cause. *See, e.g., United States v. Valenzuela*, 365 F.3d 892, 897, 902 (10th Cir. 2004); *see also Maryland v. Garrison*, 480 U.S. 79, 85 (1987) ("The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate."); *United States v. Short*, 570 F.2d 1051, 1053–54 & n. 4 (D.C. Cir. 1978) (no probable cause to arrest on basis of generalized description that fit innocent people in the same area).

The SCO disputes that its claims of an 18 U.S.C. § 2071 violation were unexplained and unfounded. SCO-Resp:12–14. But the SCO's view of the scope of § 2071 is unrealistic. Whether or not the statute applies only to a record custodian, or instead reaches other lesser public officers regarding material filed or deposited in a public office, it certainly does not apply to a President's records, personal or otherwise. The SCO's own admissions regarding the process for disputes between NARA and a former President show that it is impossible to read the language of the statute as treating a President's retention or privatization of his own records—whether the dispute regarding their personal versus Presidential status has been resolved or not—as a § 2071 violation. Even if the statute could otherwise be applied to Presidential retention of documents taken from some government office, the documents at issue in this case simply were not "filed or deposited in a public office" within the meaning of the statute. The SCO's failure to acknowledge the understanding of the statute set forth in the Hur Report is only a further indication that the notion that the statute applies in this context is farfetched and vindictive.

---

[7] *See Johnson v. United States*, 333 U.S. 10, 14 (1948) (magistrate must be apprised of sufficient facts and circumstances to make a "neutral and detached" judgment); *Giordenello v. United States*, 357 U.S. 480, 486–87 (1958) (more than conclusory speculation of the complaining officer is required to show probable cause exists); *United States v. Defalco*, 509 F.Supp. 127, 137–38 (S.D. Fla. 1981) (affidavit must provide enough facts to allow independent judgment regarding alleged violative character of material at issue).

The report of Special Counsel Robert Hur (the "Hur Report") confirms the inapplicability of § 2071 to President Trump, where it does not apply even to a lesser official such as the Vice President's retention of records properly provided to him. As explained in the Hur Report (the relevant portion of which is attached as Appendix A), § 2071 requires proof that the defendant "deprived or attempted to deprive the government of its ability to use a given record." Hur Report at 190 & n. 773. The Hur Report found "no evidence that the government was deprived of the use of any of the materials recovered during the investigation," where "no one in the government seemed to notice that any classified materials were missing at any point from the time President Biden left office on January 20, 2017, until marked classified documents were found at the Penn Biden Center on November 2, 2022." *Id.* at 190-91. Thus, there was no evidence of the essential offense element of deprivation. *Id.* at 191. The very same elemental defect, among others, exists with respect to Trump. Further, the government's reliance on *United States v. Poindexter*, 725 F.Supp. 13 (D.D.C. 1989)—a non-binding district court decision from a different Circuit—is misplaced, where the decision neither involved nor purported to resolve the singular circumstance of a former President in relation to the provisions of § 2071. *Poindexter* asserts that § 2071 applies not only to records custodians "in a technical sense," but also to "others working in a government agency." *Id.* But neither that, nor the decision's further statement that the statute pertains to those "officials," amounts to a conclusion that the statute applies to a former President, who is neither a government agency employee nor a government official within the meaning of the statute. If anything, *Poindexter* supports Nauta's position that no § 2071 culpability lies here, where the affidavit was directed to a private citizen as to documents that were his to privatize or not, and were not filed in a public office.[8]

That the SCO again tries to blur reality to achieve prosecutorial ends of an unprecedented nature against Nauta only confirms that misstatements in the Nauta search warrants and the excessive scope of the searches were not accidental, much less undertaken in good faith. And the SCO fails to see that claiming that wholly legal conduct by Nauta in going to Mar-a-Lago during the June 2022 incessant effort by the Biden Administration to interfere with the former President's

---

[8] Contrary to the SCO, where a law enforcement agent knows of facts and circumstances establishing a defense— even if all other elements of the offense are otherwise met—probable cause is absent. *See Williams v. Sirmons*, 307 Fed.Appx. 354, 358–59 (11th Cir. 2009) (no probable cause where circumstances demonstrated defenses of necessity or duress; citing *Marx v. Gumbinner*, 905 F.2d 1503, 1506 (11th Cir. 1990), which explained that probable cause is "judged not with clinical detachment but with a common sense view to the realities of normal life").

8

home and privacy should be treated as criminal, when the production sought by the then-latest subpoena had already been assured. The SCO oddly claims that Trump's agents' preservation of the recordings for production before Nauta even traveled means nothing. But suspicions—or really wishful thinking that something would occur to satisfy the Biden Administration's thirst for criminal action against Trump and his allies—do not provide probable cause of anything.

The context of the smoke-and-mirrors allegations against Nauta is ignored by the SCO. The President brought his personal items and records to Mar-a-Lago for private post-presidential use. He had every right to do that and, prior to this investigation, no governmental authority had ever questioned the validity of such a presidential right. Thus, this is not suspicious activity by an associate of someone engaged in conduct that is clearly illegal; there was no well-established core of criminal conduct that could convert the otherwise entirely innocent conduct of Nauta—moving boxes at the President's direction for review purposes; truthfully advising agents that he cannot vouch for the derivation of boxes sent to NARA;[9] and examining Mar-a-Lago video setup after video recordings were subpoenaed and production assured—into something that was not innocent.

The warrant applications do not set forth facts showing Nauta's knowledge of any classified-marking document withheld from the FBI or, more specifically, that any classified-marking document covered by a subpoena *to the Office of Donald J. Trump* was ever at Mar-a-Lago, much less remained there after counsel's response to the subpoena. No informant said he did. And, in any event, courts have required a detailed description of firsthand observations to overcome weaknesses of an informant's speculation. *United States v. Brundidge*, 170 F.3d 1350, 1353 (11th Cir. 1999) (affidavit stated eight different times in which the source's information proved to be valid). The affidavits in the present case make no mention whatsoever of the source's reliability in predicting box identity at any time, and the source did not state that ▓ knew for a fact that the same boxes sent to NARA were those previously handled by Nauta, nor did ▓ suggest that Nauta had any way to know that. *See United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996) ("affidavit that states suspicious beliefs, or conclusions, without providing some

---

[9] The SCO's *ipse dixit* claim that it is "implausible" that Nauta did not know whether boxes picked in Pine Hall and French Hall were the same boxes brought to Pine Hall up to two months earlier. The SCO simply ignores that the cardboard boxes were fungible items, that only some were in Pine Hall when shipped to NARA, that activity relating to the boxes was ongoing for months, that Nauta had only been at Mar-a-Lago a short time when box movement occurred, that Nauta was out sick with Covid in the week before the NARA box movement, and that ▓Per. 34▓ was coordinating everything and not Nauta, who acted merely as a box moving helper in this matter. The implausibility is in the SCO's blind refusal to see that speculation is not enough.

9

underlying factual circumstances regarding veracity, reliability, and basis of knowledge, is a 'bare bones' affidavit" and as such may be lacking in any indicia of probable cause").

Nauta's request for an evidentiary hearing is supported on several grounds, not solely under *Franks v. Delaware*, 438 U.S. 154, 169–70, 171 (1978), to enable him to establish the requisite reckless disregard with respect to mistaken information and material omissions of essential facts in the affidavits. An evidentiary hearing is also warranted to address good faith claims raised by the SCO and to further establish the impermissible scope of search executions,[10] including the delay in completing the searches and in failing to return items seized (a delay longer than the period of time the SCO originally claimed would be needed to prepare to for trial of the entire case). The factors that led the SCO and affiants to misrepresent and mischaracterize factual allegations and to omit essential factual information necessary to evaluate any untainted allegations in the affidavits should be addressed at an evidentiary hearing in the context of this significant and unprecedented case. At the hearing, the evidence will show the deliberation, coordination, and planning that show no accident in the relevant material misstatements and the bias and animus that motivated the omission of material facts necessary to a fair evaluation of the affidavits.

## CONCLUSION

For the reasons stated in his motion, Defendant requests that the Court grant relief following an evidentiary hearing. Nauta adopts the relevant arguments made by President Trump in his replies on issues of suppression, due process, and selective prosecution, all of which are directly relevant.

[SIGNATURE NEXT PAGE]

---

[10] Contrary to the SCO, these were not "limited purpose" searches, but included anything that might show state of mind or attitudes over a period of 6 years, including while working in the White House (as to which privileged matters might well be at issue). *See* SCO-Resp:1. The government may not claim probable cause to search through millions of bytes of digital data merely in the hope that doing so might show falsity in a prior statement. *See United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991) (explaining nexus between Fourth Amendment's probable cause and particularity requirements). The SCO's response confirms the recklessness and inadequacy of the affidavits and the unlimited search parameters that led to a general search.

Date: March 24, 2024                            Respectfully submitted,

                                                     *s/ Stanley E. Woodward, Jr.*
Stanley E. Woodward, Jr. (*pro hac vice*)
Brand Woodward Law, LP
400 Fifth Street NW, Suite 350
Washington, D.C. 20010
202.996.7447 (telephone)
202.996.0113 (facsimile)
stanley@brandwoodwardlaw.com

                                                     *s/ Sasha Dadan*
Sasha Dadan, Esq. (Fla. Bar No. 109069)
Dadan Law Firm, PLLC
201 S. 2nd Street, Suite 202
Fort Pierce, Florida 34950
772.579.2771 (telephone)
772.264.5766 (facsimile)
sasha@dadanlawfirm.com

*Counsel for Defendant Waltine Nauta*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2024, I electronically submitted the foregoing via electronic mail, to counsel of record.

*s/ Sasha Dadan*