UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-80101-CR-CANNON(s)

**UNITED STATES OF AMERICA**,

    Plaintiff,

v.

**DONALD J. TRUMP**,
**WALTINE NAUTA**, and
**CARLOS DE OLIVEIRA**,

    Defendants.

_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT WALTINE NAUTA'S MOTION TO EXTEND TIME

On April 10, 2024, the Court set a May 9 deadline for defendants' expert disclosures and notice pursuant to Section 5(a) of the Classified Information Procedures Act ("CIPA"), *see* 18 U.S.C. App. 3 § 5(a). ECF No. 439. Three weeks later, on May 1, defendant Waltine Nauta moved for an extension of the deadline. ECF No. 507. Originally, Nauta had counted on leveraging his counsel's vacation and trial schedule to delay the proceedings. But when his counsel's trial schedule excuse evaporated, Nauta was forced to devise a new basis—that the Government's discovery is insufficient for him to identify the classified evidence he wants to disclose at trial and to notice any expert testimony. Nauta's latest basis for delay is both factually wrong—the Government has afforded Nauta technical support, indexing, and material not required by the Federal Rules or provided in most criminal cases—and legally baseless: the shortfalls Nauta alleges do not impact preparing a CIPA Section 5 notice or a Rule 16 expert notice. The Court should deny his motion.

**INTRODUCTION**

In his motion, Nauta resorts to a familiar tactic by trying to paint a confusing and misleading picture of the state of discovery, but at bottom, his arguments are uncomplicated. First, as to CIPA Section 5, Nauta claims that he cannot make the required disclosures without knowing "for certain" (a) which documents produced in classified discovery were recovered from boxes in the Storage Room; and (b) where those documents were found in the boxes. ECF No. 507 at 10. Both claims are flawed. The premise of the first—that Nauta has not been informed which documents came from storage room boxes—is inaccurate. Nauta was provided that information many months ago. The conclusion of the second—that Nauta needs to know where the documents were within each box in order to make a CIPA Section 5 disclosure—is recently manufactured and not credible.

With respect to expert notice, Nauta claims not only that he is unable to meet the Court's May 9 deadline, but also that it is premature for this Court even "to set any deadline." ECF No. 507 at 13. The prospect of experts being at issue in this case has been apparent since indictment, and a scheduling order the Court propounded as early as July 2023 included expert notice deadlines for the Government and the defendants. *See* ECF No. 83. And the Government timely filed its expert notices in January 2024, nearly four months ago. *See* ECF Nos. 215, 256, and 257. Against this backdrop, Nauta's lobbing an argument eight days before his notice is due that the Court should not *have even set* a defense expert disclosure deadline readily reveals his true purpose: injecting needless delay. But as discussed below, his alleged basis is also meritless. Nauta claims that he cannot be expected to identify or disclose experts because "the Special Counsel's Office has yet to provide forensic images of the devices for which it has proffered expert testimony." ECF No. 507 at 13. The claim is inaccurate and misleading, as the Government has explained

elsewhere. *See* ECF No. 470, n. 6; ECF No. 257, Attachment A at 3-4 and Attachment B at 4-5. In August 2023, the Government provided Nauta with the unfiltered and unscoped forensic extractions of his two phones, complete with Cellebrite reports. *See* Exhibit A, attached hereto. And as detailed nearly four months ago in the Government's Notice of Expert Disclosure, *see* ECF No. 257, Attachment A at 3-4 and Attachment B at 4-5, since one of the phones contained two unique images with classification markings, the Government provided those images separately to defense counsel via classified discovery in October 2023, along with the related forensic report containing metadata relating to those two images. Nauta has everything he needs to identify an expert, and has had it for several months.

## ARGUMENT

I.     **Nauta is Adequately Equipped to Provide a CIPA Section 5 Notice**

The purpose of CIPA Section 5 is simple: to require notice to the Government and the Court of any classified information a defendant expects to disclose at trial or a pretrial proceeding. Nauta has known for months that he would be required to provide such notice, and, as discussed below, he has for months had access to the information to equip him to do so on the Court's schedule. A review of the procedural history underscores his gamesmanship.

A.     **Procedural Background**

At the time of its first production of unclassified discovery to each defendant (July 6, 2023 to Nauta), the Government informed the defense that it could contact the Government to arrange for inspection of unclassified items seized during the August 8, 2022 search of Mar-a-Lago. *See* ECF Nos. 30 at 3, 59. At no time before the first CIPA Section 5 notice deadline of November 17, 2023 (ECF No. 83 at 6), nor for months afterward, did Nauta contact the Government to schedule

an inspection.[1]  Instead, Nauta waited nearly eight months—until March 4, 2024—to do so.  The Government arranged for Nauta's counsel, Stanley Woodward, as well as defendant Carlos De Oliveira's counsel, to review the boxes the following week, on March 12.  Although the Government made available all 27 boxes seized from Mar-a-Lago, counsel elected to review only eight of them.  To facilitate the review, the Government provided as a courtesy a chart listing, for all documents with classification markings seized at Mar-a-Lago: (1) the room in which the document was found, including box number, if applicable; (2) the beginning Bates number in classified discovery; (3) the index code assigned by the FBI (described below); (3) the number of copies of the document found; (4) the classification markings on the document; and (5) if applicable, the corresponding indictment count.  This is but the most recent in a long line of accommodations and assistance the Government has provided—which to date includes curated lists of important evidence, hard drive arrays, even provision of government laptops—all above and beyond its obligations under the rules.

On April 10, the day the Court set the May 9 deadline, Nauta's counsel informed the Government that he would be seeking an extension.  Woodward claimed that he needed more time because of a vacation, and after that, a trial beginning on April 29.  Three days later, on April 13, defendant Donald J. Trump filed a motion to postpone the deadline.  ECF No. 452.  Trump indicated that his co-defendants joined his motion and intended to file an additional submission.  Eleven more days passed, during which the co-defendants neither filed any submission nor indicated to the Government that there were any other obstacles to meeting the Court's May 9

---

[1] The Court's having already set one CIPA Section 5 deadline underscores that as with expert notices, the prospect that such notices would be involved was apparent from very early in the proceedings.  The Court's setting a deadline for them in ECF No. 439 could not have come as a surprise to Nauta or the other defendants.

deadline.  Then, on April 24—two weeks after the Court set the May 9 deadline and with only fifteen days remaining until then—Woodward informed the Government that his trial had been continued,[2] but that Nauta nonetheless would seek an extension on an entirely new basis. Woodward claimed difficulty in cross-referencing materials in classified and unclassified discovery—in particular, that certain items in the seized boxes he reviewed were in a different order from where they appear in the scans of the boxes' contents produced in discovery.  But neither at the time of counsel's box review on March 12, nor at any time in the month-and-a-half between then and April 24, did Woodward (or De Oliveira's counsel, for that matter) raise any concerns about not understanding the order of documents within a particular box.

The Government conferred with Woodward on April 24 and informed him the next day, April 25, that it opposed his motion because the exact location of a classified document within a box could not inform Nauta's CIPA Section 5 disclosure.  Nauta waited another six days before filing his extension motion on May 1—three weeks after this Court set the deadline at issue, *see* ECF No. 507—and included two additional points never mentioned during conferral: his claimed need to consult with Trump's counsel (ECF No. 507 at 1 n.1) and Nauta's intention to seek an extension of the expert witness deadline.

In its April 14 opposition to Trump's extension motion, the Government detailed the procedural history leading up to the setting of the May 9 deadline and explained why the defendants have already had adequate time to prepare their submissions, such that no extension should be granted.  *See* ECF No. 453 at 2-5.  Those arguments apply equally to Nauta—including

---

[2] The trial had been continued six days earlier, on April 18.  *See United States v. Jeremy Wyeth Schulman*, Case No. 8:20-cr-434, Seventh Amended Pretrial Scheduling Order, ECF No. 443 (D. Md. Apr. 18, 2024).

to Nauta's argument that he needs time to consult with Trump's counsel, *see* ECF No. 507 at 1 n.1—and the Government incorporates its response here. Below, the Government addresses the new arguments raised in Nauta's motion.

### B. Relevant Factual Background

#### 1. The August 8 Search

During the August 8 search at Mar-a-Lago, the Government deployed a filter team to search the boxes before the investigative team performed their search. The filter team took care to ensure that no documents were moved from one box to another, but it was not focused on maintaining the sequence of documents within each box. If a box contained potentially privileged material and fell within the scope of the search warrant, the filter team seized the box for later closer review. If a box did not contain potentially privileged documents, the filter team provided the box to the investigative team for on-site review, and if the investigative team found a document with classification markings, it removed the document, segregated it, and replaced it with a placeholder sheet. The investigative team used classified cover sheets for that purpose, until the FBI ran out because there were so many classified documents, at which point the team began using blank sheets with handwritten notes indicating the classification level of the document(s) seized. The investigative team seized any box that was found to contain documents with classification markings or presidential records.

#### 2. Processing the Boxes After Seizure

All seized boxes were stored overnight at the FBI field office in Miami and flown back to Washington, D.C., the next day. A D.C.-based filter team reviewed any boxes potentially containing privileged materials and provided contents to the investigative team on a rolling basis, as the filter team resolved any privilege issues. The documents with classification markings were

6

secured in areas approved for their storage, and since then the boxes have been stored at two Washington Field Office ("WFO") locations that could only be accessed by individuals assigned to this case.

After the boxes were brought to WFO, the FBI created an index to correlate the documents with classification markings to codes (e.g., document "bb") and labeled the classified cover sheets in the boxes with the codes for the seized documents. The FBI also generally replaced the handwritten sheets with classified cover sheets annotated with the index code, but regardless, any handwritten sheets that currently remain in the boxes do not represent additional classified documents—they were just not removed when the classified cover sheets with the index code were added. In many but not all instances, the FBI was able to determine which document with classification markings corresponded to a particular placeholder sheet.

### 3. Preservation of Which Boxes Contained Documents With Classification Markings

The Government has taken steps to ensure that documents and placeholders remained within the same box as when they were seized, i.e., to prevent any movement of documents from one box to another. The FBI was present when an outside vendor scanned the documents in connection with the now-closed civil case (*see, e.g.*, *Trump v. United States*, Case No. 22-81294-CIV-CANNON, ECF No. 91 at 2 (requiring the Government to inventory the property seized from Mar-a-Lago); *id.* at ECF No. 125 at 3 (requiring the Government to "make available to Plaintiff and the Special Master copies of all Seized Materials" in electronic format by October 13, 2022)), and the boxes were kept separate during that process. When the FBI created the inventories, each inventory team worked on a single box at a time, separated from other teams. And during defense counsel's review, any boxes open at the same time (and any personnel reviewing those boxes) were kept separate from one another. In other words, there is a clear record of which boxes

contained classified documents when seized, and this information has long been in the defense's possession, as discussed *infra* at 9.

### 4.     Location of Classified Documents Within Each Box

Since the boxes were seized and stored, appropriate personnel have had access to the boxes for several reasons, including to comply with orders issued by this Court in the civil proceedings noted above, for investigative purposes, and to facilitate the defendants' review of the boxes. The inventories and scans created during the civil proceedings were later produced in discovery in this criminal case. Because these inventories and scans were created close in time to the seizure of the documents, they are the best evidence available of the order the documents were in when seized. That said, there are some boxes where the order of items within that box is not the same as in the associated scans.[3]  There are several possible explanations, including the above-described instances in which the boxes were accessed, as well as the size and shape of certain items in the boxes possibly leading to movement of items. For example, the boxes contain items smaller than standard paper such as index cards, books, and stationary, which shift easily when the boxes are carried, especially because many of the boxes are not full. Regardless of the explanation, as discussed below, where precisely within a box a classified document was stored at Mar-a-Lago does not bear in any way on Nauta's ability to file a CIPA Section 5 notice.

---

[3] The Government acknowledges that this is inconsistent with what Government counsel previously understood and represented to the Court. *See, e.g.*, 4/12/24 Hearing Tr. at 65 (Government responding to the Court's question of whether the boxes were "in their original, intact form as seized" by stating "[t]hey are, with one exception; and that is that the classified documents have been removed and placeholders have been put in the documents").

**C.     Discussion**

    **1.     Nauta Already Has An Accurate Record of the Boxes In Which Documents With Classified Markings Were Found**

Nauta acknowledges that he and/or his counsel have access to the boxes in three formats: the physical boxes, the scans of the documents, and the documents with classification markings. ECF No. 507 at 5-6. In its first production of discovery, the Government produced the scans of the boxes from Mar-a-Lago, which indicate from which box an item was retrieved, and include cover sheets indicating, by FBI index code, which classified documents were in the box. Nauta, therefore, has had access to this information, as well as the physical boxes, for nearly ten months. Nauta's counsel was also provided access last year to all classified documents stored at Mar-a-Lago, as well as a classified index correlating each seized document with classification markings to its FBI index code. And in addition to all of this information, the Government also included in its second production of unclassified discovery (July 17, 2023 to Nauta) about 200 pages of notes and other inventory-related information generated by the FBI related to the boxes. In sum, Nauta has long had access to the information to prepare his notice, and he has simply failed to take the steps necessary to meet the Court's deadlines.

Nauta's claims regarding the accuracy of the unclassified index recently provided to him as a courtesy to facilitate his March 12 review of the boxes are false. *See* ECF No. 507 at 7-10. The index did not purport to identify the location of documents *within* boxes. Rather, it indicated, as noted above, the room in which the document was found, including box number, if applicable. That information is entirely accurate.[4]

---

[4] There are no "disputes" that require a "non-evidentiary hearing" for resolution. *See* ECF No. 507 at 17. The request is simply for delay.

### 2. Nauta Does Not Need to Know the Internal Document Sequencing of Each Box In Order to Make a CIPA Section 5 Disclosure

Nauta offers no explanation for how intra-box document sequencing would impact his Section 5 notice. Even if Nauta wanted to elicit testimony about where a classified document was stored within a box, that would not require him to disclose the contents of the classified document—obviating the need for a Section 5 notice altogether. There are no Section 793 charges against Nauta, and it is unclear why he "reasonably expects to disclose or to cause the disclosure of" classified information, *see* 18 U.S.C. App. 3 § 5(a), at all, much less why he needs additional time to parse the exact location of items within the boxes in order to identify what classified information he wishes to disclose at trial. *See* ECF No. 340 at 5 (the Court stating in denying Nauta's personal access to classified information that "[u]nlike the charges brought against Defendant Trump under 18 U.S.C. § 793(e), the document-related charges against Defendants Nauta and De Oliveira do not require proof that they willfully retained documents 'relating to the national defense' [*See* ECF No. 85 p. 32]"); *id.* at 7 ("[T]he Court still is left without any reasonably concrete example of a classified document, or documents, the substance of which appear helpful to either Defendant Nauta or De Oliveira in defending against the non-§ 793(e) charges against them.").

Nauta's difficulty meeting the Court's deadline is entirely of his own making. He has had information about which classified documents are located in which boxes for months, and failed to raise with the Government his current "issue" about intra-box sequencing until over nine months after the boxes were made available to him—and then only after his primary excuse for delay (trial in another district) disappeared. Nauta's disregard for the Court's deadlines should not be rewarded with an extension.

## II. The Court's Expert Notice Deadline Is Not Premature

Nauta asserts (ECF No. 507 at 13) that the Court's deadline for his expert disclosures is premature. But Nauta has had the forensic images of his phones for months, as the Government indicated in its Response to the defendants' Motion to Compel. ECF No. 277 at 15 n.6. In August 2023, the Government, through a filter attorney, provided Nauta with the forensic extraction of Nauta's two cell phones, including a Cellebrite reader. *See* Exhibit A. As explained in the Government's expert notices almost four months ago (ECF No. 257, Attachment A at 3-4 and Attachment B at 4-5), since one of the phones contained images with classification markings, those two unique images were provided separately to defense counsel in classified discovery. Importantly, the classified discovery contained a forensic report that included the metadata for the images with classification markings, including information about which cell phone sent the images, at what time, and to what number. *Id*. Finally, the raw latitude/longitude data obtained pursuant to the search warrant for Nauta's cell-site location was also provided in discovery. ECF No. 257, Attachment E at 3 n.1. In short, Nauta has had all discovery related to his cell phones for months, including the forensic data that forms the basis for the testimony of the Government's expert witnesses. The Government has timely met and exceeded its obligations, and there is no further information that Nauta needs to make any expert disclosure regarding the forensic examination of his devices.[5]

---

[5] Nauta's motion is ambiguous about the range of devices that form the putative basis of his request for an extension. *Compare* ECF No. 507 at 14 ("the cell phones seized from Mr. Nauta") with *id*. ("the devices [the Government] seized during the course of its investigation"). As set forth above, Nauta was provided with the forensic images of his own devices months ago. For any devices seized from other individuals, he has been provided with the filtered materials that the Government seized within the scope of the pertinent warrants, in full compliance with the Government's obligations under Rule 16.

## **CONCLUSION**

For these reasons, Nauta's motion should be denied.

                                          Respectfully submitted,

                                          JACK SMITH
                                          Special Counsel

By:    */s/ Jay I. Bratt*
           Jay I. Bratt
           Counselor to the Special Counsel
           Special Bar ID #A5502946
           950 Pennsylvania Avenue, N.W.
           Washington, D.C.  20530

           Julie A. Edelstein
           Senior Assistant Special Counsel
           Special Bar ID #A5502949

           David V. Harbach, II
           Assistant Special Counsel
           Special Bar ID #A5503068

## **CERTIFICATE OF SERVICE**

I, Julie A. Edelstein, certify that on May 3, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

/s/ *Julie A. Edelstein*
Julie A. Edelstein