**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Case No. 23-cr-80101- CANNON** |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| WALTINE NAUTA, and | ) | |
| CARLOS DE OLIVEIRA, | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANTS' EMERGENCY MOTION TO PRECLUDE THE GOVERNMENT**
**FROM ISSUING A PURPORTED SPECIAL COUNSEL REPORT CONTRAVENING**
**THIS COURT'S DISMISSAL ORDER AND PREJUDICING DEFENDANTS' PRETRIAL**
**RIGHTS; AND DEFENDANTS' REQUEST FOR A HEARING ON THE MOTION**

John S. Irving, IV
E&W LAW, LLC

Larry Donald Murrell, Jr.
L.D. MURRELL, P.A.

*Counsel for Defendant*
*Carlos De Oliveira*

Stanley E. Woodward, Jr.
BRAND WOODWARD LAW, LP

Richard C. Klugh
KLUGH WILSON, LLC

*Counsel for Defendant*
*Waltine Nauta*

## I.      INTRODUCTION

Despite this Court's concluding that Smith is unconstitutionally appointed and funded, and despite ongoing proceedings against Defendants Waltine Nauta and Carlos De Olivera, Special Counsel Smith, in defiance of this Court's rulings, is determined to have the final word by pushing forward with issuing and transmitting a final report under 28 C.F.R. § 608(c) (the "Final Report") which Attorney General Garland is certain to make immediately public.  These Defendants will irreparably suffer harm as civilian casualties of the Government's impermissible and contumacious utilization of political lawfare to include release of the unauthorized Report.  The Final Report relies on materials to which Smith, as disqualified special counsel, is no longer entitled access—making his attempt to share such materials with the public highly improper.

This Court's authority to regulate the participants and attorneys in this matter and to preserve the authority of its orders and the Court's control of the proceedings compels the granting of this emergency motion to preclude this imminent act of defiance of the Court's authority by the Government.  The Defendants request an immediate hearing on this motion, at which they will establish the impropriety of unchecked release; the scope of the resulting prejudice; and the specific materials contained in the Report for which release is impermissible.  Even if *any* version of a Final Report were to be transmitted and released—and the Defendants maintain no such release would be warranted—the Defendants are at the very least entitled to a hearing to demonstrate why certain materials should remain protected.  The Defendants request that this Court enter an Order to preclude Smith from transmitting the Final Report or taking any other action related to it—including sharing it with other persons; editing it; or accessing materials on which it relies—until this Court resolves this emergency motion.

The Final Report promises to be a one-sided, slanted report, relying nearly exclusively on evidence presented to a grand jury and subject to all requisite protections—and which is known to

Smith only as a result of his unconstitutional appointment—in order to serve a singular purpose: convincing the public that everyone Smith charged is guilty of the crimes charged.  But Nauta's and De Oliveira's criminal cases are not over; the appeal of this Court's dismissal order *by Smith* is still pending.  The Government notably continued briefing the appeal even following the dismissal of the appeal as to President Trump.  There remains the threat of future criminal proceedings as to Nauta and De Oliveira, and those proceedings will be irreversibly and irredeemably prejudiced by dissemination of the Final Report.  As the Government knows, the continued operation of the protective order in this case will make the one-sided impermissible Final Report even more unfairly prejudicial; Defendants are strictly precluded form refuting the Report.  The Final Report is meant to serve as a Government verdict against the Defendants contrary to all criminal justice norms and constitutional guideposts.

Critically, the Government never sought a stay of this Court's rulings as to the impermissibility of the Special Counsel appointment and his actions in regard to this prosecution. The Government never sought clarification of Fed. R. Crim. P. 6(e)(2)(B)'s prohibition of disclosure of grand jury materials by persons not authorized to act as government counsel in the matter, with limited exceptions that clearly do not apply to government attorneys found to have no authority to act in the case.  Given the invalidity of his purported status under the Appointments and Apportionment Clauses, the invalidly appointed Special Counsel lacks authority to write a grand jury report, to file a report, to share information about the report, or to issue a report.

The filing of such a report, by an unauthorized person, is clearly improper in this context and will cause grave harm given the pendency of criminal proceedings, now on appeal, at counsel Smith's own insistence.  Issues of disclosure and use of materials by the Government are matters that this Court assumed jurisdiction over when the parties briefed constitutional and privilege issues that remain, by virtue of the dismissal that is now on appeal, unresolved (if not effectively

decided against the Government). The filing of the Final Report, by an unauthorized Special Counsel, would necessarily implicate the very same unresolved Fourth, Fifth, and Sixth Amendment issues and extensive issues of attorney-client and other privileges, that counsel Smith lost any authority to even take a position on for the Government. The Final Report would constitute an abuse of such constitutional and privilege violations, all of which remain pending in the event of a reversal of the dismissal order. Such sidestepping by the Government of pending constitutional and related issues by revelation and misuse of such matters—including any content of the Final Report that may, as is anticipated, unreasonably and prejudicially disparage defense counsel in their handling of the case—would not only adversely affect any further criminal proceedings, tainting the jury pool, but would render defense of the case unreasonably difficult and cast a pall on the fairness of the criminal process. *See* S.D. Fla. L.R. 77.2(a) (proscribing a lawyer's release of information or opinion for anticipated public dissemination in connection with pending litigation where such dissemination is reasonably likely to interfere with a fair trial or otherwise prejudice the due administration of justice).

This Court need not tolerate this prejudice, which is unconstitutional and which violates the Local Rules. And it *certainly* does not need to tolerate such prejudice when it stems directly from the unconstitutionally funded acts of an unconstitutionally appointed individual whose purported authority stems directly from unlawful regulations. The Final Report itself is also inconsistent with other constitutional, statutory, and regulatory provisions, further illustrating why it must not be released. Indeed, its release would directly infringe on Nauta's and De Oliveira's Fifth Amendment due process rights, taking on the status of a public form of an invalid new indictment, replete with unfairly prejudicial assertions of alleged offenses going well beyond any assertions in the indictment and other public filings. This Court should prevent that constitutional infringement by immediately enjoining the United States, Attorney General Garland, the

3

Department of Justice ("DOJ"), Smith, and all their officers, agents, and employees (together, the "Government") from issuing the Final Report.

Immediate relief is necessary because there is every reason to believe that the Government will issue the Final Report within the next few days. Thus, Defendants respectfully request that this Court treat this motion as an Emergency Motion under Local Rule 7.1(d)(1) and request a ruling by January 10, 2025.

## II.   FACTUAL BACKGROUND

### A.   Smith's unconstitutional appointment and funding.

On November 18, 2022, Attorney General Garland issued Order No. 5559-2022 appointing Smith, "an attorney from outside the United States Government, to serve as Special Counsel . . . ." Doc. 672, at 6–7. The Special Counsel Regulations, codified at 28 C.F.R. §§ 600.1–600.10, provide for his appointment, authority, and oversight. *See* Office of Special Counsel, 64 Fed. Reg. 37,038 (July 9, 1999). "Smith was not nominated by the President or confirmed by the President." Doc. 672, at 7. Instead, the Appointment Order pointed to 28 U.S.C. §§ 509, 510, 515, 533. *Id.*

In due course, Defendants filed a motion to dismiss based on "the unlawful appointment of Special Counsel Jack Smith, in violation of the Appointments Clause and the Appropriations Clause." Doc. 326, at 1; *see* Doc. 672, at 5 n.1. On July 15, 2024, the Court ruled in Defendants' favor. *See* Doc. 672 (the "Dismissal Order"). As this Court correctly determined: (1) the statutes cited in the Appointment Order "as purported authorization for his appointment" do not vest "the Attorney General with authority to appoint a Special Counsel like Smith," *id.* at 22; *see also id.* at 19–53; (2) Smith is at least an inferior officer within the meaning of the Appointments Clause, *id.* at 67–81 & n. 60; and (3) because there was no law authorizing Smith's appointment, he could not be funded by the Indefinite Appropriation. *Id.* at 85–89.

On July 17, 2024, Smith filed his notice of appeal. Doc. 673. On November 25, 2024,

Smith asked the Eleventh Circuit to dismiss the appeal in this case as to defendant Trump.  The Eleventh Circuit granted Smith's request.  Order, *United States v. Trump*, No. 24-12311 (11th Cir. Nov. 26, 2024), Doc. 81-2.  The appeal as to Nauta and De Oliveira is still pending, albeit with Smith attempting to relinquish control.  On December 30, 2024, the Special Counsel moved to withdraw from the appeal, asserting it had "referred" the case to the U.S. Attorney for the Southern District of Florida.  *See* Docket, *United States v. Trump*, No. 24-12311 (11th Cir.), Docs. 83, 84.

**B.    The imminent Final Report.**

**1.    Smith's preparation of the Final Report.**

Despite losing in court and having no valid appointment, Smith is determined to continue litigating this case in the court of public opinion.  In early December, news reports indicated that Smith intends "to submit to the Justice Department a report summarizing the results of his dual investigations into President-elect Trump."  Breanne Deppisch, *Special Counsel Jack Smith Required to Submit Trump Findings to DOJ Before Leaving.  What Happens Next?*, Fox News (Dec. 7, 2024), https://www.foxnews.com/politics/jack-smith-submit-trump-findings-doj-before-leaving-what-happens-next.  In response, counsel for Defendants and President Trump reached out to a member of the Special Counsel's Office, J.P. Cooney.  Counsel were told the Special Counsel's Office would afford the meager courtesy of allowing hard-copy review of the Report at the Special Counsel's office with provision of comments due before 2:00 p.m. on January 6. (President Trump, a former party to this case, has submitted a letter to the Justice Department further explaining the impropriety of the Special Counsel's actions.  *See* Exhibit A, attached.)  Counsel were not permitted to bring electronic devices into the reviewing room, and the Office declined to make the Report available to out-of-town Florida counsel anywhere other than in the Special Counsel's D.C. office (either shortly before or during a significant snowstorm). D.C. counsel for De Oliveira was able to review the Report on Saturday, January 4, and D.C. counsel for Nauta did so yesterday,

Sunday, January 5.   Counsel's limited-access review of the draft Report revealed a one-sided narrative arguing that the Defendants committed the crimes charged in this case.

### 2.    Garland will inevitably release the Final Report to the public.

The Final Report will go to Attorney General Garland, who then can authorize public release of the Final Report.   *See* 28 C.F.R. § 600.9(e).   There is every reason to believe he will do so as fast as possible.   First, he "has opted to release the reports from two other special counsels whose investigations concluded during his tenure."   Deppisch, *Special Counsel Jack Smith Required to Submit Trump Findings to DOJ Before Leaving.   What Happens Next?*, Fox News (Dec. 7, 2024), https://www.foxnews.com/politics/jack-smith-submit-trump-findings-doj-before-leaving-what-happens-next.   Moreover, Garland released those reports quickly.[1]

The review deadline Smith's team gave Defendants' attorneys—providing for review only between January 3 and January 6—reflects that public release is imminent.   Underscoring that is the close cooperation that has existed between Smith and his team and Garland and the DOJ—a cooperation mandated by the Special Counsel Regulations, *see* 28 C.F.R. § 600.7(a), and proven by the Special Counsel's saying in open court that the positions he takes are taken "on behalf of the Justice Department, representing the United States," Transcript of Oral Argument at 110:13–15, *Trump v. United States*, 603 U.S. 593 (2024) (No. 23-939).

### 3.    The need for emergency relief.

As the time frame above shows, relief is warranted immediately.   Smith gave Defendants and President Trump a very brief window in which to review the Final Report.   That window

---

[1] In releasing the report of Special Counsel Robert Hur, Garland said that as to "each Special Counsel who has served since I have taken office, I am committed to making as much of the Special Counsel's report public as possible."   Letter from Merrick B. Garland, Att'y Gen., to Sen. Richard Durbin et al. (Feb. 7, 2024),   https://www.justice.gov/sco-hur/media/1337886/dl?inline   "Hur provided Garland his report on February 5, 2024, and Garland made it public as soon as the White House finished its privilege review" three days later.   Letter from Merrick B. Garland, Att'y Gen. (Feb. 8, 2024), https://www.justice.gov/storage/20240208aggarlandletter.pdf.

expires this week.  It is thus fair to assume that once that window expires, the Report soon thereafter will be transmitted to Garland and publicly released days afterward.  That is within seven days of this motion.  Thus, for Defendants to receive meaningful relief, they need a ruling by January 10, 2025, and their request qualifies as an emergency motion.  *See* S.D. Fla. L.R. 7.1(d)(1).

## III.   ARGUMENT

The requested injunction is necessary to prevent Special Counsel Smith from releasing the Report in direct and flagrant violation of:  this Court's order disqualifying the Special Counsel; Fed. R. Crim. P. Rule 6(e) (governing grand jury secrecy); and Local Rule 77.2 (governing release of information in criminal and civil proceedings).  Imbued in these rules are principles of fundamental fairness, designed to ensure a defendant's Fifth Amendment right to a fair trial.  The criminal proceeding against the Defendants is very much still pending, and to allow former Special Counsel Smith to effectively try this case to the media—*after* his involvement therein has been deemed unlawful and unconstitutional by this Court—would be highly prejudicial and highly improper.  Enjoining the release of the Final Report is necessary to protect these Defendants' due process rights.  At the very least, the Defendants are entitled to injunctive relief pending the conclusion of any and all proceedings in this matter.

Releasing the Final Report is also improper because this is not Smith's case anymore; he has been disqualified by a court of law and is now proceeding as a rogue actor with a personal and political vendetta against the Defendants.  Allowing him to release privileged materials and information to the public at large does great harm to these Defendants, who remain at risk of prosecution and against whom the United States is actively pursuing prosecution.  In any other case, this Court would have the authority to issue an order to stop him, and the same is true in this case.  Our system simply does not allow a disqualified prosecutor to withdraw from an unlawful appeal only then to embark on a media mudslinging tour through the issuance of a highly detailed

and one-sided press release describing the events charged in the superseding indictment and the Government's theory of prosecution as it relates to those events.

Smith's latest tactic, to release a Final Report after being removed from the case, reflects his ongoing and continuous effort to violate this Court's rulings and to disregard the Court's authority.  In this instance, that effort has severe implications for Nauta and De Oliveira, civilian criminal defendants entitled to a fair trial like anyone else in our system.  This Court has previously recognized the Special Counsel's efforts to evade court rules and to selectively communicate privileged material to the public.  *See* Transcript of May 8, 2024, Hearing (DE:533) at 67 (court commenting on government's selective release of grand jury material and noting that it would like a coherent thought process that is objective).  The former Special Counsel's approach is anything but objective.  And the integrity of future proceedings[2] are threatened by release of the Report.

Finally, release should be enjoined because, as this Court has already determined—and as is binding on the Government—Smith is unconstitutionally appointed and unconstitutionally funded.  Issuing the Final Report compounds the constitutional error of his appointment, while also independently violating statutory and regulatory authority and effecting an impermissible evasion of this Court's authority.  Any of these reasons would be enough to justify an injunction; considered cumulatively, they overwhelmingly demonstrate the need for relief or at the very least a hearing where Nauta can establish protection of specific materials.

**A. The Final Report threatens the integrity of future potential proceedings, Local Rule 77.2, and Fed. R. Crim. P. Rule 6(e), and thus must be enjoined.**

An order precluding the transmission of the Final Report to the Attorney General Garland is necessary to preserve the integrity of potential future proceedings and is required by this Court's

---

[2] Defendants firmly believe this Court's Dismissal Order reached the correct legal conclusion and will be affirmed.  Until that happens, or until the Government drops the appeal that was unfounded in the first instance, this Court must act to protect against the risk of prejudice in future proceedings.

local rules.  Release of material that was before the grand jury also reflects disregard of Fed. R. Crim. P. 6(e).  Violation of these rules in the manner contemplated here will interfere with the Defendants' due process rights.  A hearing before this Court to address these matters while maintaining the status quo is essential to preservation of the Defendants' fundamental due process rights.

S.D. Fla. Local Rule 77.2(a) provides that attorneys may not "release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which the lawyer or the firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice."  Smith, his team, Garland, and the DOJ all fall squarely within the ambit of this rule. Ethical and related rules also bar the Report. Justice Manual § 1-7.100; *see also* 32 C.F.R. § 776.47 (Unless "necessary to inform the public of the nature and extent of the trial counsel's actions and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused."); Florida Bar Rule 4-3.6 (Trial Publicity) and 4-3.8 (Special Responsibilities of a Prosecutor). Justice Department attorneys are required to follow local ethical rules. *See* 28 U.S.C. 530B.

Any "reasonable person" plainly "would expect" the Final Report "to be disseminated by means of public communication." And that is an understatement.  The Final Report would not just be disseminated by means of publication but shared *widely*.  Media outlets would be quick to send push notifications to millions of phones across the country; news station talk shows would book pundits and talking heads to give reactions and purported "legal analysis" on events about which they in fact know only Smith's position; and the details of the Government's case *as portrayed only by the disqualified Special Counsel* would blaze across headlines and social media.  The mass

media would become a mass microphone for Smith and his political allies, left to report only the narrative advanced by Smith based on materials as to which the Defendants are not permitted to address, and as to which Smith is no longer permitted access based on this Court's prior Order. The resulting prejudice would be immediate and uncontainable.  Indeed, the news media is already rife with reports about the release of the Final Report.  *See*, *e.g*., Katherine Faulders & Peter Charalambous, Special Counsel Jack Smith Withdraws From Appeal of Classified Docs Case Against Trump's Co-Defendants, ABC NEWS (Dec. 30, 2024), abcnews.go.com/US/special-counsel-jack-smith-withdraws-appeal-classified-docs/story?id=117209773;  Jesus Mesa,  Jack Smith Plans to Release Report Before Donald Trump Is Sworn In: CNN, NEWSWEEK (Nov. 26, 2024),  https://www.newsweek.com/jack-smith-deadline-final-donald-trump-report-1991904. Media reporting on this case has been so ubiquitous that the Court could take judicial notice of it.

All of this prejudice would occur in the face of additional litigation that is "pending or imminent," Local Rule 77.2(a), "in the sense that if" the Eleventh Circuit reversed on appeal, "the case would go back as a viable one from the very date of its filing," *Pettway*, 411 F.2d at 1003. The adversarial nature of our court system is fundamental to due process.  In this instance, that adversarial system *could not* be captured in public discussion where the protective order still binds Nauta and De Oliveira and their counsel, thereby preventing them from fully responding or attempting to prevent further unwarranted prejudice.  Trials must take place in courtrooms, not in newsrooms.  Having lost his place in the courtroom, Smith's attempt to release the report reflects an intent to try this case in public, thus destroying the fundamental right to a fair trial.

"The very wo[r]d 'trial' connotes decisions on the evidence and arguments properly advanced in open court"—not in the court of public opinion, where rules to protect constitutional rights do not apply.  *Bridges v. State of Cal*., 314 U.S. 252, 270 (1941).  "Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper."  *Id*.  Having

come face-to-face with the unconstitutional nature of his appointment, that is precisely what Smith seeks to do here: Try his case in the press, taint the jury pool, and worse yet, taint the legal soundness of this Court's decisions. The Supreme Court has ruled that "no one [is] be punished for a crime without 'a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power.'" *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966). Smith's planned Final Report—now that he is unshackled from due process requirements that restrained him as a government actor—would engender the very prejudice, passion, and excitement and be an exercise of the tyrannical power that our court system is designed to insulate against.

In 1966—that is, around the time that "hot type" of the press began to give way to "cold type"[3]—the Supreme Court wrote that "[g]iven the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused." *Id*. at 362. If that was true in 1966, the principle carries even more weight today; indeed, most printing presses have shuttered as the industrial model of news delivery has been replaced by the instantaneous delivery system enabled by the internet, computers, and smartphones. These modern developments of course affect the constitutional balancing test, and the Supreme Court has made clear that public dissemination must yield to the due process rights of the accused.

Release of the Final Report would plainly and obviously "interfere with a fair trial or otherwise prejudice the due administration of justice." S.D. Fla. L.R. 77.2(a). The Report involves extensive, one-sided discussions about the conduct alleged in the indictment. The issue is compounded by the inflammatory manner in which the report discusses Nauta's and De Oliveira's

---

[3] "Hot type" was the form of printing technology used for the first half of the 20th century, which involved molten lead being poured into brass molds to create a line of type. "Cold type" refers to phototypesetting.

former co-defendant, President Trump—further betraying the political motivation behind Smith's planned disclosure.  Throughout this litigation, the Government has tied Nauta and De Oliveira to President Trump, referring to them as "Co-Conspirators" in the indictment.  Doc. 85, at 4.  There is no way at this point to separate Nauta and De Oliveira from President Trump, so that even if the Final Report focuses on the President-elect (again betraying its political motivations), the effect will be to stir up prejudice against the Defendants before the public.  The political motivations here cannot be overlooked: Smith is rushing to release the Final Report prior to a change in control of the Executive Branch.  Smith and his political allies are of course disappointed that his appointment was deemed unlawful, and that President Trump won the 2024 election.  That, however, is not a basis to deny the Defendants due process of law—and indeed, the timing of Smith's actions reveals the impropriety of them.  The court system functions independently of political aims.

Political considerations certainly do not justify the pretrial public release of evidence that has not been made public and is not or may not be admissible at trial.  The Final Report contains such evidence.  This includes grand jury materials, the disclosure of which is prohibited under Rule 6(e)—and aside from certain material that falls squarely under Rule 6(e), the Final Report is flush with material that violates the spirit of the Rule.  Grand jury materials are entitled to the utmost secrecy; indeed, the Supreme Court "consistently ha[s] recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979).  "Since the 17th century, grand jury proceedings have been closed to the public, and records of such proceedings have been kept from the public eye." *Id*. at 218 n. 9 (citation omitted).  "The rule of grand jury secrecy was imported into our federal common law and is an integral part of our criminal justice system." *Id*. (citing *Costello v. United States*, 350 U.S. 359, 362 (1956); *United States v. Johnson*, 319 U.S. 503, 513 (1943)).  "Federal Rule Crim. P. 6(e) codifies the requirement

that grand jury activities generally be kept secret."  *Id*.  Smith, through his planned release of the Final Report, seeks to evade this grand jury secrecy requirement by relaying to the public sensitive and privileged grand jury materials, by not specifying that they were, in fact, presented to the grand jury.  Protecting these grand jury materials in this instance is not only important to protect the integrity of the jury, but also essential to protect the Defendants' due process rights.  The impropriety of Smith's actions in this respect is heightened by the fact that Smith only has knowledge of such privileged information via his unconstitutional and unlawful appointment. Even if Smith once properly had access to grand jury materials,[4] he is no longer permitted to access them, much less disclose them at large.

Smith has proposed recommending redactions of direct quotes from the grand jury but has notably not proposed redacting information provided to the grand jury in direct response to a grand jury subpoena—for example, communications subpoenaed and taken out of context.  This further illustrates the need for a hearing before this Court to determine what material contained in the Final Report cannot be released, at least during the pendency of the criminal case.  A hearing is particularly warranted because, though Smith has recommended certain redactions, his team has not invited *any* further redactions by the defense and has, apparently, ignored the record history of this Court's repeated efforts to carefully identify matters that should remain sealed to protect constitutional rights, privileges, and the interest of the public in a fair adjudicative process.  Smith has not initiated a process by which the defense can properly or effectively assert objections to release of specific material, and then, to the extent there is disagreement, seek resolution in court. Indeed, the defense has not even been provided any more than a limited scope of *access* to the Report prior to its anticipated release; counsel was permitted review in person over a two-business-

---

[4] See Fed. R. Crim. P. 6(e)(2)-(3) (identifying those who typically have access to grand jury materials).

day period without the aid of electronic devices to compare data to its privileged or grand jury source. This further illustrates the need for a hearing at which this Court can address relevant disclosure considerations. A hearing is also warranted because Smith and his team are not ultimately in charge of what is redacted before the Final Report is released to the public; that responsibility lies with the Attorney General's Office. This Court should hold a hearing to determine what content in the Report must be blocked from release and to determine whether Smith has the authority to release any kind of Final Report, given this Court's prior ruling on his appointment and appropriations for his activities.

There are several identifiable and concrete ways in which release of the Final Report will prejudice the defense and the right to a fair trial. In addition to the general prejudice and poisoning of the jury pool that will result from release, due to the inevitable and widespread public dissemination discussed above, release is improper because Smith's Report relies on materials that are or have been the subject of active litigation relating to privilege, the Fourth Amendment, and other constitutional rights over which this Court has exercised, and may continue to exercise, jurisdiction. Smith of course no longer has the authority to litigate such issues. His attempt to release the Final Report is consistent with his pattern of manipulating his purported authority to remain in the case after disqualification—reflected in his recent (and apparently tactical) "referral" of the case to the local United States Attorney's Office. All of these actions demonstrate evasion of this Court's authority and disregard for the rule of law and the rules governing criminal proceedings. Release of the Final Report is yet another example of this evasion—and perhaps the worst yet, as the resulting harm will be irreversible.

"[T]he primary constitutional duty of the Judicial Branch [is] to do justice in criminal prosecutions . . . ." *United States v. Nixon*, 418 U.S. 683, 707 (1974). "Accordingly, courts must take steps to protect the integrity of the criminal justice process." *United States v. Trump*, 88 F.4th

990, 1003 (D.C. Cir. 2023). "Due process demands that 'the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.'" *Id.* at 1004 (quoting *Sheppard*, 384 U.S. at 351 (quoting another source)). Courts have a duty to "'prevent the prejudice' to the trial process 'at its inception,'" *id.* at 1004 (quoting *Sheppard*, 384 U.S. at 363))—a duty this Court can fulfill by issuing the requested injunction here.

The imminent release of the Final Report is also an imminent violation of both the court rules and the constitutional rights of Nauta and De Oliveira to a fair criminal proceeding. That justifies an order prohibiting publication of the Final Report until the appellate process and any subsequent proceedings in the case are over.

**B.  The Government cannot lawfully issue the Final Report.**

Smith's attempt to prejudice potential future proceedings in this case is particularly improper as it compounds the unconstitutional and unlawful underpinnings of the Final Report, which cannot be released even upon conclusion of the case due to the unconstitutional nature of the appointment. "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *see also Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902).

**1.    The Final Report cannot be produced by an unconstitutionally appointed and funded Special Counsel.**

**a.    This Court's findings in the Dismissal Order are binding.**

This Court held in the Dismissal Order that: no statute authorizes Smith's appointment; Smith is thus an inferior officer whose appointment violates the Appointments Clause, U.S. CONST. art. II, § 2, cl. 2; and, accordingly, the continued funding of Smith's activities and office violates

the Appropriations Clause, U.S. CONST. art. I, § 9, cl. 7.  Those holdings are binding here under

principles of law of the case and of estoppel.

> **b.     The unconstitutional nature of Smith's appointment and funding bar issuance of the Final Report.**

The constitutional defects this Court identified relating to Smith's appointment and funding

bar him from producing the Final Report, and thus bar Attorney General Garland from producing

it, for three reasons:

> **i.     *Smith cannot provide the Final Report because of his unconstitutional appointment***

A precondition to publication of the Final Report is for Smith to "provide" it to the Attorney

General.  28 C.F.R. § 600.8(c).  Smith, however, cannot do that because he was not constitutionally

appointed, as this Court has already determined. *See* Doc. 672, at 19–52.[5]

Because Smith is unconstitutionally appointed, an injunction barring release of the Final

Report is justified for two reasons.  First, and most obviously, the Appointment Order is unlawful.

It purports to appoint an officer of the United States without statutory authority.  The Appointment

Order is thus void.  "An agency … literally has no power to act—including under its regulations—

unless and until Congress authorizes it to do so by statute."  *FEC v. Cruz*, 596 U.S. 289, 302 (2022)

(quotations omitted).  And because the Appointment Order is void, Smith is not the Special

Counsel and cannot use the information he has unlawfully acquired to write the Final Report or

claim the ability, under 28 C.F.R. § 600.8(c), to write the Report.

Second, the injunction flows from what this Court has already noted: the proper remedy

for "a 'Government actor's exercise of power'" "is invalidation of the *ultra vires* action."  Doc.

---

[5] The Government did not contest that Smith was at least an inferior officer.  *See id.* at 2.  Any attempt to claim otherwise here would fail; indeed, this Court has already said as much.  *See id.* at 81 n. 60 (addressing such an argument from *amici* Landmark Legal).

672, at 82 (quoting *Collins v. Yellen*, 594 U.S. 220, 258 (2021)).  Smith's creation of the Final Report, just as much as this prosecution, will flow "from his defective appointment" and is thus an "unlawful exercise[ ] of executive power."  *Id.* at 83–84.  Indeed, the Final Report must explain "the prosecution or declination decisions reached by the Special Counsel."  § 600.8(c).  Such decisions are "the special province of the Executive Branch," *Trump v. United States*, 603 U.S. 593, 620 (2024) (quotations omitted), of which Smith, as an unconstitutionally appointed prosecutor, is not a part.  Moreover, to gather the information, Smith used authority granted to him under the Appointment Order.  *See* Ex. A, at 1–2 (granting investigatory and prosecutorial authority to Smith); *see also* §§ 600.4(a), 600.6.  Because he had no right to do so, his actions in gathering that information are *ultra vires* and thus void; accordingly, there is nothing for Smith to Report.

By issuing the Final Report, Smith would be unlawfully acting as a prosecutorial authority. A disqualified prosecutor cannot, especially while a case is still pending, issue a memorandum discussing prosecutorial decisions he was unauthorized to make in the first instance.  The Final Report's attempted transmission to Attorney General Garland and presumed release is again just another instance of Smith's unlawfully acting as a super prosecutor.  There are significant separation of powers issues at stake as well: An unlawfully appointed prosecutor cannot respond to a disqualification order by disclosing at large privileged material, the release of which will infect the ongoing criminal proceeding with bias, prejudice, and sensationalism.

### ii. *The Final Report cannot be released because it is the product of unlawful Special Counsel regulations*

The Special Counsel Regulations are unlawful.  The regulations supplied Garland the purported authority to appoint Smith as "an outside Special Counsel . . . ."  28 C.F.R. § 600.1(b). The Special Counsel regulations claim, as authority, 5 U.S.C. § 301 and 28 U.S.C. §§ 509, 510, and 515–19.  *See* 64 Fed. Reg. 37,042.  For the reasons this Court has explained, 28 U.S.C. §§ 509,

510, and 515 do not authorize the Special Counsel Regulations.  *See* Doc. 672, at 23–41.  The other statutory provisions do not fill the gap.  Section 516 reserves "the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, . . . to officers of the Department of Justice, under the direction of the Attorney General."  Section 517 authorizes the Attorney General to send "[t]he Solicitor General, or any officer of the Department of Justice" to any court "to attend to the interests of the United States in a suit . . . ."  Neither gives the Attorney General appointment authority.  Far from an authorization, § 518 is a limitation on who may represent the United States in court—"the Attorney General and the Solicitor General" "[e]xcept when the Attorney General in a particular case directs otherwise."  Section 519, as the Court has noted, *see* Doc. 672, at 30–32, is also about the Attorney General's supervisory power.  Even further afield is 5 U.S.C. § 301, which permits heads of departments to "prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property."

Not one of those statutes authorizes the Attorney General to appoint officers of the United States, and so none of them can be considered congressional authorization for the Special Counsel Regulations.  The regulations are thus void.  *See*, *e.g.*, *Cruz*, 596 U.S. at 302.  And thus everything Smith does—including creating the Final Report—is void and should be enjoined.

### iii.     *The preparation of the Final Report reflects a misuse of appropriated funds*

[F]or many of the same reasons" that Congress has not authorized Smith's appointment, it "has not authorized the appropriation of money to be drawn for the expenses of his office."  Doc. 672, at 4.  "The Appropriations Clause dictates that '[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.'"  *Id.* at 86 (quoting U.S. CONST. Art. I, § 9, cl. 7).  "This 'straightforward and explicit command ... means simply that no money can be paid

out of the Treasury unless it has been appropriated by an act of Congress.'"  *Id.* (quoting *OPM v. Richmond*, 496 U.S. 414, 424 (1990)).

"Since its inception, … Smith's office has been funded by" the Indefinite Appropriation. *Id.* at 85–86.  By its terms, the Indefinite Appropriation authorizes the expenditure of public funds by Smith only if Smith is an "independent counsel appointed pursuant to … *other law*."  101 Stat. 1329.  As with the phrase "by Law" in the Appointments Clause, the phrase "other law" means *statutory* law.  *See* Doc. 672, at 87 ("Both sides agree that 'other law' … is the collection of statutes cited in the Appointment Order.").  Because no statute authorizes Smith's appointment, he is not an "independent counsel appointed pursuant to … other law."  *Id.*  Thus, he cannot be funded by the Indefinite Appropriation.  "When Congress has enacted a legislative restriction" like that, federal courts should "enjoin DOJ from *spending funds*" in violation of those restrictions. *McIntosh*, 833 F.3d at 1172 (discussing a limit on the use of funds for criminal prosecutions); *see Gen. Land Office v. Biden*, 722 F. Supp. 3d 710, 743, 745 (S.D. Tex. 2024) (enjoining the government from spending funds for items besides what they were appropriated for); *see also In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objectives.").

  **2.**  **Issuing the Final Report would violate the Presidential Transition Act, the Executive Vesting Clause, and the Special Counsel regulations.**

    **a.**  **The Presidential Records Act & Executive Vesting Clause bar release of the Final Report**

There is every indication the Government will issue the Final Report during the Presidential transition.  That violates the Presidential Transition Act, *see* 3 U.S.C. § 102 note, and the imminent vesting of the Executive power in President Trump on January 20, 2025, *see* U.S. CONST. art. II, § 1, cl. 1.

The Presidential Transition Act's purpose is "to promote the orderly transfer of the

executive power in connection with the expiration of the term of office of a President and the inauguration of a new President."  3 U.S.C. § 102 note (§ 2 of the Act).  "Any disruption" of the transition "could produce results detrimental to the safety and well-being of the United States and its people."  *Id.*  And thus "all officers of the Government" are "to avoid or minimize disruptions that might be occasioned by the transfer of the executive power, and otherwise to promote orderly transitions in the office of President."  *Id.*

Disruption is a constitutional issue because "[t]he transition period insures that the candidate will be able to perform effectively the important functions of his or her new office as expeditiously as possible."  Definition of Candidate Under 18 U.S.C. § 207(j), 24 Op. O.L.C. 288, 292 (2000).  Release of the Final Report will disrupt the President-Elect's ability to govern once he takes office.  Like an indictment, the Final Report threatens "public stigma and opprobrium" and so could "compromise the President's ability to fulfill his constitutionally contemplated leadership role with respect to foreign and domestic affairs."  *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 246 (2000).  That is a burden on the President's constitutional responsibilities, and "a proper balancing of constitutional interests in the criminal context dictates" instructs that the Final Report should not now issue.  *Id.* at 249; *see id.* at 249–51 (discussing reasons).  Such a burden must not be imposed, especially as a result of a prosecution deemed unlawful by an Article III court.  The Final Report threatens the proper balancing of constitutional interests, and is *a fortiori* inconsistent with the Presidential Transition Act.

### b. Issuing the Final Report is inconsistent with the Special Counsel Regulations

Under § 600.8—which is "applicable to" Smith, Ex. A, at 2—the Final Report is provided only "[a]t the *conclusion* of the Special Counsel's work."  § 600.8(c) (emphasis added).  But

Smith's work has *not* concluded; the appeal as to Nauta and De Oliveira continues.  To be sure, Smith and his team have moved to withdraw from that *appeal*.  They have not withdrawn from their representation of the Government in *this* Court—nor have they sought a stay in this Court or clarification of Rule 6 constraints.

The motion to withdraw from the appeal is a transparent attempt to manufacture a "conclusion" to Smith's work without actually concluding it.  The ordinary meaning of "conclusion" is "[t]he close or last part; the end or finish."  *Conclusion*, AM. HERITAGE DICTIONARY (5th ed. 2022), https://ahdictionary.com/word/search.html?q=conclusion.  Until the prosecution of Nauta and De Oliveira ends, Smith's work has not concluded.

### C.  This Court has the power to provide the requested relief.

This Court acts well within its authority in providing the requested relief.  This is not an issue of discretionary authority; rather, the court rules cited above—as well as the Supreme Court cases addressing the due process right to a fair trial—explicitly contemplate courts' taking such actions to prevent prejudice.  The All Writs Act, and  the Court's ancillary jurisdiction and supervisory power, provide ample authority for the Court to prevent these injustices.  *See, e.g.*, *United States v. DiBernardo*, 775 F.2d 1470, 1475-76 (11th Cir. 1985) ("Federal courts may exercise their supervisory powers to remedy violations of recognized rights, to protect the integrity of the federal courts, and to deter illegal conduct by government officials.").

The All Writs Act authorizes the issuance of "all writs necessary or appropriate in aid of [its] respective jurisdiction[ ] and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  The Act applies "not only [to] ongoing proceedings, but potential future proceedings, as well as already-issued orders and judgments."  *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099 (11th Cir. 2004) (footnotes omitted).  "A court may grant a writ under this act whenever it is 'calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it.' "  *Id.*

(quoting *Adams v. United States*, 317 U.S. 269, 273 (1942)).  Thus, it "empowers a federal court to employ procedures necessary to promote the resolution of issues in a case properly before it," *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978)[6].

This Court also has "ancillary jurisdiction … 'to adjudicate and determine matters incidental to the exercise of its primary jurisdiction over a cause under review.' " *United States v. McIntosh*, 833 F.3d 1163, 1172 n.2 (9th Cir. 2016) (citing and quoting *United States v. Sumner*, 226 F.3d 1005, 1013–15 (9th Cir. 2000)).  That includes enforcement of its local rules as part of its power "to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380 (1994).  It also includes prohibiting the federal government from violating constitutional and statutory limits on its authority, such as limits on the spending of funds.  *See McIntosh*, 833 F.3d at 1172–72.

District courts can issue injunctions, like the one requested here, that "preserve the status quo and protect [their] proceedings in all germane matters," including by addressing "events transpiring subsequent to the" order on appeal.  *EEOC v. Locals 14 & 15, Int'l Union of Operating Eng'rs*, 438 F. Supp. 876, 880 (S.D.N.Y. 1977).  That is because the case is " 'pending' … in the sense that if" the Eleventh Circuit reverses, "the case would go back as a viable one from the very date of its filing," *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1003 (5th Cir. 1969).  This preservation of the status quo allows this Court to provide relief notwithstanding the Government's improper and unlawful appeal of the Dismissal Order.  The Court maintains jurisdiction to "act in aid of the appeal," *Shewchun v. United States*, 797 F.2d 941, 942 (11th Cir. 1986), or over "collateral matters not affecting the questions presented on appeal," *Weaver v. Florida Power and Light Co.*, 172 F.3d 771, 773 (11th Cir. 1999).  "[A]ctions that a district court

---

[6] Fifth Circuit precedent issued prior to October 1, 1981, is binding in this Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

may take in aid of the appellate court's jurisdiction include preserving the status quo pending appeal." 16A Charles A. Wright et al., *Federal Practice and Procedure* § 3949.1 (Sept. 2024 update); *see Newton v. Consol. Gas Co. of N.Y.*, 258 U.S. 165, 177 (1922) ("Undoubtedly, after appeal the trial court may, if the purposes of Justice require, preserve the status quo until decision by the appellate court."); *Pugach v. Dollinger*, 280 F.2d 521, 522–23 (2d Cir. 1960) (Friendly, J., in chambers) (same). Indeed, the federal appellate rules expressly contemplate that district courts consider such *status quo* injunctions in the first instance. FED. R. APP. P. 8(a)(1)(C). (Although the Defendants have also sought relief in the court of appeals by separate filing today, this Court maintains its authority over matters of enforcement of its orders, including the contempt power.)

Moreover, this relief is collateral to the merits of Smith's appointment and funding issues on appeal. Like any other order "restraining parties' speech during the pendency of a criminal case," this request is "separate from the merits," *United States v. Trump*, 88 F.4th 990, 1000 (D.C. Cir. 2023), and will not require the Court to exercise "control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).

## CONCLUSION

The impending issuance by the Special Counsel of the Final Report is in direct violation of this Court's Dismissal Order, which effectively disqualified the Special Counsel as unconstitutionally appointed and funded. Disclosure of the Final Report would constitute an affront to this Court and a contumacious action, and is an improper attempt to circumvent the Court's authority and prosecute in the court of public opinion on the basis of the same purported authority that this Court ruled the Special Counsel lacks. The Special Counsel's use of materials is still being litigated with respect to core issues of privilege, Fourth Amendment, and other constitutional rights over which this Court has exercised jurisdiction. Moreover, the protective order which still applies to Nauta and De Oliveira prevents them from fully responding or

attempting to protect themselves from further prejudice. The protective order also relates to Rule 6(e) of the Federal Rules of Criminal Procedure, over which this Court retains control in a criminal prosecution. By placing itself above the Court and the Court's rulings, the Special Counsel seeks to override orderly procedures pursuant to Rule 6, including to determine if the Special Counsel is authorized to release any materials from the grand jury proceedings eventually presided over by this Court, the parameters of which the government has never sought clarification, and Local Rule 77.2, proscribing the dissemination of information or opinion in connection with pending litigation that could interfere with a fair trial or otherwise prejudice the due administration of justice.

For those reasons, Defendants Nauta and De Oliveira respectfully request that the Court issue an Order barring the United States and its officers and agents, including but not limited to Smith and members of the Special Counsel's team, Garland, and the DOJ from issuing the Final Report until this case has reached a final judgment and appellate proceedings are concluded. The Defendants further respectfully request that this Court grant the Defendants' request for a hearing on this emergency matter. Finally, the Defendants request that this Court enter an Order to preclude Smith from taking any action related to the Final Report pending resolution of this emergency motion—including but not limited to transmitting it; sharing it with other members of the team; editing it; or accessing the protected materials and evidence upon which it is based.

## REQUEST FOR HEARING AND GOVERNMENT POSITION

The Defendants request a hearing. A hearing is particularly warranted because this motion identifies highly sensitive and protected matters that Smith seeks to share widely with the public. The need for sealing, and for continued protection of the relevant rights and interests of the parties, is best addressed with a more fully developed record. The release of the Final Report implicates the Defendants' due process rights, which should not be infringed without the Defendants having the opportunity to be heard on the matter. The Final Report also includes several specific

categories of information subject to protection, and these issues are best addressed live at a hearing. The Defendants estimate that the time required for the hearing is three to four hours.

Undersigned counsel conferred telephonically and via electronic correspondence with opposing counsel prior to the filing of this motion. To date, the Government has not consented to the relief requested by the motion. The Government advises that it considers the meet and confer process to be ongoing. However, Defense Counsel requested a reasonable opportunity for the Court to consider the relief requested in the instant motion before the Final Report was transmitted to Attorney General Garland and the Government was unwilling to commit to the same. Specifically, the Government advised that it would connect with Defense Counsel tomorrow, that it was skeptical of any authority of the Court to bar the transmission of the Final Report to Attorney General Garland, and that it could make no representation about the amount of time between the next conferral between Defense Counsel and the Government and when the Final Report would be transmitted to Attorney General Garland. Accordingly, because of the emergency nature and substantial importance of the matter, the issues are ripe for resolution. To the extent that the Government amends its position upon further review and consideration, Defendants will immediately advise the Court.

## CERTIFICATION OF EMERGENCY

After reviewing the facts and researching applicable legal principles, we certify that this motion in fact presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days. I understand that an unwarranted certification may lead to sanctions.

Dated: January 6, 2025          Respectfully submitted:

/s/ Stanley E. Woodward, Jr.                    /s/ John S. Irving, IV
Stanley E. Woodward, Jr. (pro hac vice)         John S. Irving, IV (pro hac vice)
BRAND WOODWARD LAW, LP                          E&W LAW, LLC
400 Fifth Street NW, Ste 350                    1455 Pennsylvania Ave NW, Ste 400
Washington, DC 20001                            Washington, DC 20004
(202) 996-7447 (telephone)                      (301) 807-5670 (telephone)
stanley@brandwoodwardlaw.com                    john.irving@earthandwatergroup.com

/s/ Richard C. Klugh                            /s/ Larry Donald Murrell, Jr.
Richard C. Klugh                                Larry Donald Murrell, Jr.
Fla. Bar No. 305294                             Fla. Bar No. 326641
KLUGH WILSON, LLC                               L.D. MURRELL, P.A.
40 N.W. 3rd Street, PH1                          400 Executive Center Drive, Ste 201
Miami, FL 33128                                 West Palm Beach, FL 33401
(305) 536-1191 (telephone)                      (561) 686-2700 (telephone)
klughlaw@gmail.com                              ldmpa@bellsouth.net

*Counsel for Defendant Waltine Nauta*          *Counsel for Defendant Carlos De Oliveira*

# Exhibit A



**TODD BLANCHE**
ToddBlanche@blanchelaw.com
(212) 716-1250

January 6, 2025

<u>Via Email</u>
The Honorable Merrick Garland
Attorney General of the United States
c/o Brad Weinsheimer
Associate Deputy Attorney General

**Re:     Draft "Final Report" By Jack Smith**

Dear Attorney General Garland:

We write on behalf of President Trump to demand that Smith terminate all efforts toward the preparation and release of this report (the "Draft Report").[1]

As you know, Courts in Florida and the District of Columbia have now dismissed both of Jack Smith's failed cases against President Trump. Rather than acknowledging, as he must, President Trump's complete exoneration, Smith now seeks to disseminate an extrajudicial "Final Report" to perpetuate his false and discredited accusations. Consistent with the bad-faith crusade that Smith executed on behalf of the Biden-Harris Administration from the moment he was appointed, we were only permitted to review the Draft Report in person in the District of Columbia, including prohibitions on the use of any outside electronic devices in the room where the Draft Report was made available. Smith's team likewise demanded, in advance of any review, that we delete prior discovery productions, preventing us from reviewing any of those underlying documents cited in the Draft Report. Nevertheless, it is clear, as has been the case with so many of the other actions of Smith and his staff, that the Draft Report merely continues Smith's politically-motivated attack, and that his continued preparation of the Report and efforts to release it would be both imprudent and unlawful.

First, Smith lacks authority under our Constitution to issue a report because he was not validly appointed, and the plain terms of the permanent indefinite appropriation that he has pillaged for more than $20 million clearly do not apply to his politically-motivated work. The preparation and release of a report, therefore, would extend and perpetuate Smith's violations of the Appointments Clause and the Appropriations Clause.

Second, the Draft Report violates fundamental norms regarding the presumption of innocence, including with respect to third parties unnecessarily impugned by Smith's false claims. Releasing the report to the public without significant redactions (that would render its release meaningless) would violate prohibitions on extrajudicial statements by prosecutors and Rule 6(e). This is particularly problematic with respect to ongoing proceedings relating to Waltine Nauta and Carlos De Oliveira, as well as others who Smith and his staff falsely characterize as co-conspirators in the Draft Report.

---

[1] Should these demands be improperly rejected, contrary to law, we respectfully request that this letter be appended to and addressed in any report by Smith that is issued to the public.

Exhibit A

January 6, 2025
Page 2

Third, preparing a report and releasing it to the public would violate the Presidential Transition Act and the Presidential immunity doctrine. The Act prohibits *all* officers and those acting as such, including the Attorney General and Smith, at least in his own view of himself, from interfering with the ongoing transition process. Presidential immunity, which Smith conceded required pre-inauguration dismissal of his prosecutions, likewise prohibits criminal processes, including disclosures of any prosecutorial reports or statements, that would exacerbate stigma and public opprobrium surrounding the Chief Executive and otherwise divert from the time and attention that is necessary to complete the transition and run the County. Accordingly, releasing a report regarding Smith's failed and abandoned election-interference efforts would violate the Act and Presidential immunity.

Finally, the release of any confidential report prepared by this out-of-control private citizen unconstitutionally posing as a prosecutor would be nothing more than a lawless political stunt, designed to politically harm President Trump and justify the huge sums of taxpayer money Smith unconstitutionally spent on his failed and dismissed cases. Under such circumstances, releasing Smith's report is obviously not in the public interest—particularly in light of President Trump's commanding victory in the election and the sensitive nature of the ongoing transition process.

Accordingly, because Smith has proposed an unlawful course of action, you must countermand his plan and remove him promptly. If Smith is not removed, then the handling of his report should be deferred to President Trump's incoming attorney general, consistent with the expressed will of the People. Finally, should you disagree with the positions set forth below, we respectfully request notice of that decision prior to the unlawful release of any report so that we can pursue injunctive and other relief to protect the rights of President Trump, others unfairly implicated by Smith's work, and the people of this great Nation who elected President Trump to run the government and put an end to the weaponization of the justice system.

## I.    Background

You are no doubt familiar with the history of the unethical election-interference and lawfare by the Special Counsel's Office, as you have publicly commented on some of those efforts while they were ongoing. This letter concerns Smith's most recent improper activities.

During the week of December 9, 2024, we learned from members of the media that Smith was preparing a report, which would include a purported analysis relating to classified information at issue in the dismissed Florida prosecution. We were surprised to learn of such a plan because, among other reasons, Smith had insisted up to that point that his work was not concluded, Smith and his Office refused to disclose details regarding this alleged analysis prior to the dismissal of his Florida prosecution against President Trump, and the Biden-Harris Administration has suggested that they wish to facilitate an orderly and collegial transition process.

On December 11, 2024, we contacted a supervisor with the Special Counsel's Office to express concerns about reports we were hearing from the press. We asked whether the Office was preparing a report and, if so, whether we would be allowed to review it prior to completion. Initially, Smith's position was that: (1) we would only be permitted to access a draft of the report in Washington, D.C. between December 23 and December 29, 2024, the week of Christmas; (2) we would only be permitted to take handwritten notes during our review; and (3) any comments or objections to the draft would have to be

January 6, 2025
Page 3

submitted in writing by the close of business on December 29, 2024. Aside from all counsel living outside D.C. and planning on spending time with family that week, as Smith and his team knew, Smith's proposal afforded zero opportunity for President Trump to assist counsel in reviewing and preparing any response to the report, given the irrational conditions imposed. Apparently working under a self-imposed deadline, Smith's team informed us, implausibly, that permitting defense review of Smith's unlawful Draft Report during the first week of January 2025 would be "too late to allow us to complete our work." Subsequently Smith walked back those now clearly false claims and permitted defense counsel to review the two-volume Draft Report in a conference room at Smith's office between January 3 and January 6, 2025, without allowing counsel to access the Internet or use their own electronic devices while in the room with supposedly sensitive documents that the press has known about for weeks by virtue of Smith's leaks.

## II.     Preparation And Release Of A Report Would Violate Existing Law

Preparation and public release of a report by Smith would violate the Constitution and existing law, including the Appropriations and Appointments Clauses, the Special Counsel Regulations, the Presidential Transition Act, and the Presidential immunity doctrine. Collectively, these considerations distinguish the circumstances surrounding the release of reports by prior Special Counsels. Here, release of an unlawful report would *not* "comply with applicable legal restrictions" or "be in the public interest." 28 C.F.R. § 600.9(c); *see also id.* § 600.7(a) ("A Special Counsel shall comply with the rules, regulations, procedures, practices and policies of the Department of Justice."). Therefore, you must countermand Smith's proposed course of action, *id.* § 600.7(b), and he should be removed for "dereliction of duty" and "good cause," § 600.7(d).

Smith was not validly appointed, and Congress did not provide funding for his improper mission. No statute authorized you to deploy a private attorney against President Trump and others, and Smith functioned as a principal officer acting without the necessary Senate confirmation. In addition, the DOJ permanent indefinite appropriation Smith relied upon was—and still is—inapplicable. The only judge to have examined the particulars of Smith's appointment reached these conclusions in an extremely thorough and well-reasoned opinion. *See generally United States v. Trump*, 2024 WL 3404555, at *46 (S.D. Fla. July 15, 2024). On appeal, Smith's prosecutors failed to identify any meritorious reason for questioning Judge Cannon's treatment of these issues, and then abandoned the appeal as to President Trump. Therefore, Smith lacks authority to issue a report regarding his activities while masquerading as a prosecutor, and his Office lacks authority to expend any public funds in furtherance of preparing or issuing such a report. Indeed, because Smith abandoned the 11th Circuit appeal as to President Trump, Judge Cannon's decision is a final judgment with issue-preclusive effect on these issues. *See, e.g.*, *Bravo-Fernandez v. United States*, 580 U.S. 5, 7-8 (2016) (cleaned up) ("In criminal prosecutions, as in civil litigation, the issue-preclusion principle means that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."); *Bobby v. Bies*, 556 U.S. 825, 834 (2009) (same).

Preparation and release of a report would also be improper under the Special Counsel Regulations. Those Regulations only call for "Closing documentation," in the form of a "confidential report," to be prepared "[a]t the *conclusion* of the Special Counsel's work." 28 C.F.R. § 600.8(c) (emphasis added). In light of the violations of the Appointments Clause and the Appropriations Clause, Smith has no lawful "work" to conclude. Moreover, by Smith's own repeated admission, Smith has not concluded his mission.

January 6, 2025
Page 4

Rather, Presidential immunity based on the national mandate arising from President Trump's overwhelming victory in the election has made it impossible for Smith to proceed, and rightly so.

Smith's representations in the District of Columbia regarding his dismissed prosecution of President Trump reinforce these points and make clear that no "Closing documentation" is warranted. 28 C.F.R. § 600.8(c). Smith wrongly relied on the claim that Presidential immunity is "temporary," which is not the case, to ask that the charges against President Trump only be dismissed "without prejudice."[2] The plain implication of Smith's position, which Judge Chutkan adopted, is that he does not believe his work targeting President Trump has reached its "conclusion." 28 C.F.R. § 600.8(c). Thus, taking a contrary position in order to justify preparation of one last long-winded, inaccurate, and unlawful smear of the President-elect and others would violate the Special Counsel Regulations.

Public release of a report by Smith would also disrupt the ongoing transition process and violate the Presidential Transition Act. "[T]he orderly transfer of the executive power is one of the most important public objectives in a democratic society. The transition period insures that the candidate will be able to perform effectively the important functions of his or her new office as expeditiously as possible." Memorandum from Randolph D. Moss, Assistant Attorney General, OLC, *Definition of "Candidate" Under 18 U.S.C. §207(j)*, 2000 WL 33716979, at *4 (Nov. 6, 2000) (cleaned up). "One of the top priorities of any presidential administration is to protect the country from foreign and domestic threats. While a challenge at all times, the country is especially vulnerable during the time of presidential transitions . . . ."[3] Thus, the transition process is "an integral part of the presidential administration," in the "national interest," and part of President Trump's "public function," as he prepares to govern. Memorandum from Randolph D. Moss, Assistant Attorney General, OLC, *Reimbursing Transition-Related Expenses Incurred Before The Administrator Of General Services Ascertained Who Were The Apparent Successful Candidates For The Office Of President And Vice President*, 2001 WL 34058234, at *3 (Jan. 17, 2001).

Congress passed the Presidential Transition Act to protect these critical functions. The purpose of the Act is "to promote the orderly transfer of the executive power in connection with the expiration of the term of office of a President and the inauguration of a new President." 3 U.S.C. § 102 note, § 2. "Any disruption" of the transition "could produce results detrimental to the safety and well-being of the United States and its people." *Id.* Consequently, under the Act, "all officers of the Government"—including the Attorney General and, according to his claims, Smith—are required to "conduct the affairs of the Government for which they exercise responsibility and authority" in a manner that "promote[s] orderly transitions in the office of President." *Id.* This includes, *inter alia*, "tak[ing] appropriate lawful steps to avoid or minimize disruptions that might be occasioned by the transfer of the executive power." *Id.*

Creating and releasing a prejudicial report to the public would violate these commands by giving rise to a media storm of false and unfair criticism that President Trump would be required to address while preparing to assume his Article II responsibilities. Equally problematic and inappropriate are the draft's

---

[2] ECF No. 281 at 6, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Nov. 25, 2024).

[3] Center for Presidential Transition, *Presidential Transitions are a Perilous Moment for National Security* (Aug. 16, 2023), https://presidentialtransition.org/reports-publications/presidential-transitions-are-a-perilous-moment-for-national-security.

January 6, 2025
Page 5

baseless attacks on other anticipated members of President Trump's incoming administration, which are an obvious effort to interfere with upcoming confirmation hearings, and Smith's pathetically transparent tirade about good-faith efforts by X to protect civil liberties, which in a myriad other contexts you have claimed are paramount.

A one-sided, improper report by Smith, particularly if publicly released, would also violate the Presidential immunity principles that Smith has conceded foreclose him from proceeding against President Trump. Indeed, footnote 1 of "Volume 1" of the Draft Report concedes that Smith has brazenly included "conduct for which the Supreme Court later held [President] Trump to be immune from prosecution," and subsequently further highlights the incredible hubris that has clouded the judgment of Smith and his staff from the outset by falsely claiming that the Supreme Court's decision is ambiguous with respect to holdings and reasoning that Smith simply does not like. Based on guidance from OLC—which Smith's staff subsequently informed us that the Office improperly failed to document in any way, in violation of, *inter alia*, DOJ policy regarding the handling of exculpatory information—Smith has acknowledged that Presidential immunity is "categorical," and that it applies while President Trump is the President-elect prior to his inauguration.[4] A public report by Smith would unnecessarily and unjustly add to the inappropriate "peculiar public opprobrium" that has resulted from Smith's unlawful activities thus far. *Trump v. United States*, 603 U.S. 593, 613 (2024). OLC explained previously that such "public stigma and opprobrium" could "compromise the President's ability to fulfill his constitutionally contemplated leadership role with respect to foreign and domestic affairs." Memorandum from Randolph D. Moss, Assistant Attorney General, OLC, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 2000 WL 33711291, at *19 (Oct. 16, 2000). "[T]he stigma arising . . . from the need to respond to such charges through the judicial process would seriously interfere with [the President's] ability to carry out his constitutionally assigned functions." *Id.* at *22. The release of a report would also pose an unconstitutional risk of diverting President Trump's "*personal* time and energy, and [would] inevitably entail a considerable if not overwhelming degree of mental preoccupation." *Id.* at *25 (emphasis in original). A "single prosecutor" such as Smith should not, and must not, be afforded "the practical power to interfere with the ability of a popularly elected President to carry out his constitutional functions." *Id.* at *19. "The Framers' design of the Presidency did not envision such counterproductive burdens on the vigor and energy of the Executive." *Trump*, 603 U.S. at 614 (cleaned up).

In sum, the same legal principles and logic that required Smith to dismiss his prosecutions of President Trump require that his activities be terminated without further action. Preparation and release of "Closing documentation" would violate the Constitution and existing law, harm the activities of the transition, and weaken the federal government that you have sworn an oath to support. The collective application of these circumstances make this situation entirely unlike any prior Special Counsel report. Preparation and release of a report is therefore not "in the public interest." 28 C.F.R. § 600.9(c). To the contrary, the course of action Smith proposes would further solidify the well-founded perception of partisanship created by Smith's violation of DOJ policies in connection with decisions based on his ultimately failed attempt to influence the outcome of the 2024 Presidential election. For all of these reasons, you must countermand Smith's proposed course of action, remove him, and stop the preparation and/or dissemination of the Draft Report.

---

[4] ECF No. 281 at 6, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Nov. 25, 2024) ("[T]he Department's position is that the Constitution requires that this case be dismissed before the defendant is inaugurated.").

January 6, 2025
Page 6

### III.    Smith's Report Violates The Presumption of Innocence

The presumption of innocence is "the undoubted law, axiomatic and elementary." *Coffin v. United States*, 156 U.S. 432, 453 (1895). It is "vital and fundamental" to our Constitutional system, *id.* at 460, and "its enforcement lies at the foundation of the administration of our criminal law," *id.* at 453; *see also Cool v. United States*, 409 U.S. 100, 104 (1972) (holding violation of defendant's "constitutionally rooted presumption of innocence" required reversal).

"The presumption serves as a reminder to the jury that the prosecution has the burden of proving every element of the offense beyond a reasonable doubt," *United States v. Starks*, 34 F.4th 1142, 1158 (10th Cir. 2022), and thus, may be "extinguished only upon the *jury's* determination that guilt has been established beyond a reasonable doubt," *Mahorney v. Wallman*, 917 F.2d 469, 471 n.2 (10th Cir. 1990) (emphasis in original) (collecting cases).

Consistent with *these* bedrock principles, the Justice Manual prohibits prosecutors from publicly declaring a defendant's guilt prior to a jury verdict, or otherwise disseminating statements inconsistent with the presumption of innocence. Justice Manual §§ 1.7.500; 1-7.600; 28 C.F.R. § 600.7(a) ("A Special Counsel shall comply with the rules, regulations, procedures, practices and policies of the Department of Justice."). Rather, prosecutors must limit their statements to "[t]he substance of the charge, as contained in the complaint, indictment, information, or other public documents" and any "release issued before a finding of guilt should state that the charge is merely an accusation, and the defendant is presumed innocent until proven guilty." Justice Manual § 1.7.500. Moreover, "DOJ personnel should refrain from disclosing" *inter alia,* "[a]ny opinion as to [a] defendant's guilt" or any other "[o]bservations about a defendant's or party's character" "except as appropriate *in the proceeding or in an announcement after a finding of guilt*." Justice Manual § 1-7.610 (emphasis added).

These restrictions ensure that the Department's statements do not "prejudice the rights of a defendant; or unfairly damage the reputation of a person." Justice Manual § 1-7.100; *see also* 32 C.F.R. § 776.47 ("Except for statements that are necessary to inform the public of the nature and extent of the trial counsel's actions and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused."); D.C. Bar Rule 3.8 (same).

The Draft Report violates every one of these core requirements. Despite Smith's decision to dismiss his cases against President Trump, and his complete failure to obtain a "*jury's* determination that guilt has been established beyond a reasonable doubt," *Mahorney*, 917 F.2d at 471 n.2 (emphasis in original), his Draft Report repeatedly, and falsely, claims that President Trump, Carlos De Oliveria, Waltine Nauta, and others have committed crimes and otherwise engaged in purported "criminal conduct." For example, Volume I of the Draft Report falsely asserts, without any jury determination, that President Trump and others "engaged in an unprecedented criminal effort," was "the head of the criminal conspiracies," and harbored a "criminal design." Draft Report, Vol. I at 2, 68, 69. These false accusations of criminality, which Smith again utterly failed to prove in Court, repeat throughout Volume I. *See, e.g.*, *id*. at 3, 52, 60, 64, 67, 88, 108. Likewise, Volume II asserts, without any supporting verdict, "that Mr. Trump violated multiple federal criminal laws," and that he and others engaged in "criminal conduct." Vol. II at 60, 88; *see also, e.g.*, *id*. at 89, 121. Moreover, the Draft Report makes these allegations despite

January 6, 2025
Page 7

the ongoing prosecutions of DeOliveira and Nauta, which would cause gravely unconstitutional prejudice if released.

Neither the Constitution nor applicable regulations or ethical rules allow Smith to make public, extrajudicial claims that purport to reflect conclusive determinations of guilt backed by the imprimatur of DOJ. It is the role of the jury, not the Special Counsel, to weigh the facts and determine guilt. Other Special Counsels have recognized this foundational fact. For example, Special Counsel Hur carefully cabined his observations to what some "jurors could," "might," "may well," or, at most, "would likely" conclude. *See, e.g., Hur Report* at 4, 5, 9, 10, 204, 206-211, 214, 216, 218, 220, 233, 235, 240-42, 246-47. At all points, Hur's focus was on whether "jurors assessing Mr. Biden's guilt and intent w[ould] be persuaded," *id*. at 241, and not on the Special Counsel's unilateral views or opinions regarding Biden's obvious guilt.

Likewise, Special Counsel Mueller expressly declined to "apply an approach" to his report "that could potentially result in a judgment that the President committed crimes," where, as here, "no charges c[ould] be brought." *Mueller Report*, Vol. II at 2. In Special Counsel Mueller's view, "[f]airness concerns counseled against" any kind of public accusation because:

> [t]he ordinary means for an individual to respond to an accusation is through a speedy and public trial, with all the procedural protections that surround a criminal case. An individual who believes he was wrongly accused can use that process to seek to clear his name. In contrast, a prosecutor's judgment that crimes were committed, but that no charges will be brought, affords no such adversarial opportunity for public name-clearing before an impartial adjudicator.

*Id*. Moreover, Special Counsel Mueller warned that a public disclosure of a prosecutor's unilateral judgment would only heighten these dangers. *Id*. ("[T]he possibility of the report's public disclosure and the absence of a neutral adjudicatory forum to review its findings counseled against potentially determining 'that the person's conduct constitutes a federal offense.' Justice Manual § 9-27.220."). For these reasons, Special Counsel Mueller's report "did not draw ultimate conclusions about the President's conduct," *id*. at 182, but "[i]nstead for each of the relevant actions investigated, . . . set[] out evidence on both sides of the question. . . ." Ltr. from Attorney General William Barr at 3 (Mar. 24, 2019).

To the extent Special Counsel Smith possesses any authority to draft a report (and he does not) he should have applied the same principles as Special Counsels Hur and Mueller, which the Constitution, the Justice Manual, and applicable regulations and ethical rules all require. That is—providing a dispassionate description of the relevant facts, free of any gratuitous commentary regarding President Trump's conduct, let alone direct accusations of guilt. Smith failed to do so. Instead, he chose to construct the Draft Report as a partisan weapon, designed to "unfairly damage the reputation" of President Trump, Justice Manual § 1-7.100, in a manner calculated to "heighten[] public condemnation," 32 C.F.R. § 776.47, while providing "no . . . adversarial opportunity for public name-clearing before an impartial adjudicator," *Mueller Report*, Vol. II at 2. Accordingly, the Department should not, under any circumstances, permit Smith to complete or submit the Draft Report in this form or otherwise disseminate it to the public.

January 6, 2025
Page 8

### IV.    Preparation And Release Of A Report Would Serve No Valid Purpose

There are many practical and prudential reasons to obey the law here.  Preparation and release of a report by Smith would not "be in the public interest."  28 C.F.R. § 600.9(c).

In 2023, Smith and his Office levied extremely serious, and entirely false, allegations against President Trump in two separate cases.  Smith has now been forced by the rule of law to dismiss both of those cases.  It would be highly improper and contrary to the public interest—as well as inconsistent with the reconciliation and public healing process that is necessary following divisive and unconstitutional actions by Smith—to allow him to create and disseminate yet another document recycling politically motived and inaccurate claims that the law has forced him to abandon.   Indeed, "no legitimate governmental interest is served by an official public smear of an individual when that individual has not been provided a forum in which to vindicate his rights."  *In re Smith*, 656 F.2d 1101, 1106 (5th Cir. 1981).  Smith lacks the credibility that is necessary for such a report to be reliable or valuable to anyone, as his biased and unlawful approach to these cases has been widely-criticized and discredited from the outset.[5]  Quite appropriately, he is the subject of an ongoing investigation by the Office of Professional Responsibility, further diminishing any value from a report.[6]  Smith's unlawful plan would reinforce the "likely prospect of an Executive Branch that cannibalizes itself, with each successive President free to prosecute his predecessors, yet unable to boldly and fearlessly carry out his duties for fear that he may be next."  *Trump*, 603 U.S. at 640.  "The enfeebling of the Presidency and our Government that would result from such a cycle of factional strife is exactly what the Framers intended to avoid."  *Id.*

At 1999 hearings relating to the Independent Counsel Act, Ted Olson argued that "the final report . . . has turned into an excuse to file long exhaustive expositions which rationalize the investigation," as well as "offer opinions regarding and/or pronounce judgments on the individuals investigated, and generally make the Independent Counsel look good."[7]  Attorney General Janet Reno pointed out, more succinctly, that "the price of the final report is often too high."[8]  Deputy Attorney General Eric Holder

---

[5] WSJ Editorial Board, *Jack Smith Loses in the People's Court*, WSJ (Nov. 7, 2024, 5:52 PM), https://www.wsj.com/opinion/donald-trump-prosecutions-jack-smith-fani-willis-alvin-bragg-juan-merchan-1c68f640; Jonathan Turley, *Opinion: Donald Trump just won the greatest jury verdict in American history*, The Hill (Nov. 6, 2024, 10:56 AM), https://thehill.com/opinion/campaign/4976533-trump-prosecutions-lawfare-end; Elie Honig, *So What Happens With All the Cases Against Trump Now?*, N.Y. Mag. (Nov. 8, 2024), https://nymag.com/intelligencer/article/what-will-happen-with-the-charges-against-trump.html.

[6] Letter from Chairman Jim Jordan to Jeffrey Ragsdale, DOJ OPR (Dec. 4, 2024) https://www.scribd.com/document/800789357/Judiciary-to-DOJ?secret_password=vphCtDdh3lHj7mTM5Ib8.

[7] *The Future of the Independent Counsel Act: Hearings before the S. Comm. on Governmental Affairs*, 106th Cong. 231 (1999) (prepared statement of Theodore B. Olson).

[8] *The Future of the Independent Counsel Act: Hearings before the S. Comm. on Governmental Affairs*, 106th Cong. 252 (1999) (prepared statement of Attorney General Janet Reno).

Exhibit A

January 6, 2025
Page 9

added: "the reporting requirement goes directly against most traditions and practices of law enforcement and American ideals."[9]   Based on this feedback, Congress permitted the Independent Counsel Act to expire, and DOJ promulgated a reporting regulation that was much more restrictive than its statutory predecessor.[10]

For the quarter century that DOJ has operated under these Regulations, DOJ has not released a single Special Counsel report concerning any individual who has mounted a successful defense in court, as President Trump has done with respect to Presidential immunity.  For good reason: the Special Counsel Regulations state that the purpose of a report is to "explain[] the prosecution or declination decisions."  28 C.F.R. § 600.8(c).  When filing and resolving a case in Court, that information, together with the defense's responses, becomes part of the public record.  An additional, one-sided report, would only sow confusion and undermine the judicial process.

Here, Smith has explained himself, and sought unsuccessfully to justify his actions, *ad nauseum*. This has included routinely leaking sensitive details regarding the actions of Smith's Office to the media in violation of DOJ policy.  In October 2024, it was leaked that Smith planned to "pursue his two cases against Mr. Trump for as long as he has the legal authority to do so—including during the period between Election Day and the inauguration, when Mr. Trump, if he prevails, would be president-elect."[11]  A similar July 2024 report cited "a person familiar with Mr. Smith's thinking."[12]  As another example, we first learned from the media, rather than Smith's Office, that they were considering dismissing the prosecutions of President Trump.[13]  And we learned for the first time via private outreach from media sources, rather than Smith's Office, that Smith is working on a report.

---

[9] *Reauthorization of the Independent Counsel Statute, Part I: Hearings Before the H. Comm. on the Judiciary*, 106th Cong. 86 (1999) (prepared statement of Deputy Attorney General Eric Holder )

[10] *Compare* 28 U.S.C. § 594(h)(1)(B) (calling for a "final report . . . setting forth fully and completely a description of the work of the independent counsel, including the disposition of all cases brought"), *with* 28 C.F.R. § 600.8(c) (calling for "a confidential report explaining the prosecution or declination decisions reached by the Special Counsel").

[11] Maggie Haberman et al., *Trump Says He'll Fire Jack Smith, Special Counsel Who Indicted Him, if He Wins Again*, N.Y. Times (Oct. 24, 2024), https://www.nytimes.com/2024/10/24/us/politics/trump-jack-smith.html.

[12] Alan Feuer, *Special Counsel Is Said to Be Planning to Pursue Trump Cases Past the Election*, N.Y. Times (July 2, 2024), https://www.nytimes.com/2024/07/02/us/politics/jack-smith-trump-charges.html.

[13] Pierre Thomas et al., *Special counsel Jack Smith expected to wind down Trump prosecutions: Sources*, ABC News (Nov. 6, 2024, 3:26 PM), https://abcnews.go.com/Politics/special-counsel-jack-smith-expected-to-wind-trump-prosecutions/story?id=115571646; Devlin Barrett, *Jack Smith Assesses How to Wind Down Trump's Federal Cases, Official Says*, N.Y. Times (Nov. 6, 2024), https://www.nytimes.com/2024/11/06/us/politics/doj-trump-federal-cases.html.

January 6, 2025
Page 10

   In addition to the leaks, Smith filed four gratuitous speaking indictments, held a lawless press conference before the national media, and filed hundreds of pages of briefing in two district courts, two Courts of Appeals, and the Supreme Court.  Smith's inappropriate 165-page "Motion For Immunity Determinations," accompanied by a 1,885-page "Appendix," is an especially egregious example of Smith's proclivity to seize all available opportunities to issue lengthy diatribes attacking President Trump based on Smith's biased view of the law and evidence.[14]  Smith insisted on the filing, which even Judge Chutkan characterized as "atypical,"[15] to further publicize his narrative in the lead-up to the Presidential election.  Smith's tome was not responsive to a defense motion, had no basis in the Federal Rules of Criminal Procedure, and violated DOJ's election-interference policies and practices.  *See, e.g.*, Justice Manual § 9-85.500.[16]  Having previously insisted on highly restrictive protective orders that prevented dissemination of discovery, based in part on histrionic, unsupported claims about witness identities, Smith abandoned those arguments and released the contents of protected reports, grand jury material, and accounts from thinly-veiled witnesses whom the media immediately identified.

   Under these circumstances, there is no legitimate need for an additional "report" to "explain [Smith's] prosecution or declination decisions." 28 C.F.R. § 600.8(c).  His baseless rationales for prosecution are already fully public. So too is the selective description that his Office prepared of the legal basis for the motions to dismiss, which Smith's Office caused OLC not to further memorialize in violation of the *Brady* doctrine and DOJ policy.  Moreover, the Draft Report goes far beyond merely explaining Smith's "prosecution or declination decisions," deviating instead into extensive and irrelevant discussions on purported "litigation issues," including post-indictment immunity litigation and Smith's violation of the Department's political non-interference policies.  *See* Draft Report Vol. I at 107-37.  Although Smith may wish to air his baseless and politically motivated grievances regarding the Constitutional importance of immunity, and otherwise provide feeble and transparent excuses for his plainly political motivations, that is not the purpose of a Special Counsel report under 28 C.F.R. § 600.8(c). A report must simply "explain[]" a Special Counsel's "prosecution or declination decisions" and nothing more.  The Draft Report violates this core principle.

   The issuance of such a report, in violation of the Constitution, the Transition Act, Presidential immunity, and DOJ's own regulations, would exacerbate the irreparable damage that Smith has already inflicted on DOJ's reputation for non-partisanship through his repeated violations of DOJ policies about election interference.  As we noted one year ago in opposing Smith's failed attempt to obtain certiorari before judgment on Presidential immunity, which the Supreme Court rejected, Smith's actions "create[] the compelling appearance of a partisan motivation: To ensure that President Trump . . . will face a months-long criminal trial at the height of his presidential campaign."  Br. in Opp. to Pet'n for Writ of

---

[14] ECF No. 252, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Oct. 2, 2024).

[15] ECF No. 243 at 2, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Sept. 24, 2024).

[16] *See also* A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election, U.S. Dep't of Justice Office of Inspector General (June 2018) at 18 ("[I]n general, the practice has been not to take actions that might have an impact on an election, even if it's not an election case or something like that."), *available at* https://s3.documentcloud.org/documents/4515884/DOJ-OIG-2016-Election-Final-Report.pdf.

January 6, 2025
Page 11

Certiorari Before Judgment in *United States v. Trump*, No. 23-624, at 21 (filed Dec. 20, 2024).  Smith's nakedly partisan, election-interference motivation was obvious to commentators across the political spectrum.  *See id.* (citing many sources).  "[T]he best traditions of the U.S. Department of Justice … call for prosecutors to *avoid* the appearance of election interference in the prosecution of political candidates." *Id.* at 23 (emphasis in original).  "[F]ederal prosecutors . . . may never make a decision regarding an investigation or prosecution, or select the timing of investigative steps or criminal charges, for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party." *Id.* (citing Justice Manual § 9-27.260).  Smith's latest illegal plan to launch yet another partisan attack against President Trump, De Oliveira, and Nauta will have the same injurious effect on DOJ's reputation if not stopped in its tracks.

Further, preparing and releasing a report would be improper for the additional reason that Smith has relied on numerous legal theories that are unprecedented and incorrect as a matter of law.  Many of those issues were the subject of ongoing litigation at the time Smith dismissed the cases.  To name a few, these issues include the lack of statutory authority for Smith's appointment; Smith's reliance on official-acts allegations in both cases in violation of the Presidential immunity doctrine[17]; Smith's unlawful theory under 18 U.S.C. § 1512(c)(2) in violation of *Fischer v. United States*, 603 U.S. 480 (2024); equal protection violations, based on selective and vindictive prosecution theories[18]; the unprecedented and unlawful raid at Mar-a-Lago; and violations of the Presidential Records Act and NARA's longstanding practices under that Act.[19]  There were also numerous discovery disputes in both cases, including unresolved motions in the Southern District of Florida regarding *Brady* obligations, the scope of the prosecution team, and Intelligence Community holdings, which further call into question the reliability of Smith's theories.[20]  Smith's Draft Report presents a selective and inaccurate response to only some of these issues, and then proceeds as if his theories are well-founded and undisputed.  Nothing could be further from the truth.

Finally, given the status of Smith and his team as the inauguration approaches, using additional taxpayer resources to prepare, review, and disseminate a report is not a legitimate use of taxpayer funds—even if there were a valid appropriation here, which there is not.  "The Special Counsel's office has spent tens of millions of dollars since November 2022, all drawn unconstitutionally from the Indefinite Appropriation."  *United States v. Trump*, 2024 WL 3404555, at *46 (S.D. Fla. July 15, 2024).  For the period preceding March 31, 2024, Smith's Office had used $20 million from a permanent indefinite appropriation and an additional $16 million from other unspecified "DOJ components."[21]  The costs of Smith's activities since March 2024 have not yet been released.  It is clear, however, that the total figure

---

[17] ECF No. 324, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Feb. 22, 2024).

[18] ECF No. 328, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Feb. 22, 2024).

[19] ECF No. 327, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Feb. 22, 2024).

[20] ECF No. 262, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Jan. 16, 2024).

[21] Special Counsel's Office, DOJ, Statements of Expenditures, https://www.justice.gov/sco-smith.

January 6, 2025
Page 12

will greatly exceed—by an extraordinarily wide margin—what all of this lawfare was actually worth to the public, the operations of the government, and the Country as a whole.

*     *     *

Smith's proposed plan for releasing a report is unlawful, undertaken in bad faith, and contrary to the public interest.  Smith's conduct also raises grave concerns under Article II because it unlawfully encroaches on the Executive authority of the incoming Administration of President Trump to resolve the issues surrounding Smith's Office in accordance with President Trump's commanding national mandate from the voters.  The time has come to put an end to this weaponization of the justice system and move forward constructively.  No report should be prepared or released, and Smith should be removed, including for even suggesting that course of action given his obvious political motivations and desire to lawlessly undermine the transition.  If you elect to proceed with Smith's plan, we again respectfully request (1) notice of such decision prior to any publication of the Draft Report, allowing us to take appropriate legal action, and (2) that this letter and Smith's meritless responses to the legal arguments set forth herein be incorporated into the Report.

Respectfully Submitted,

/s/ Todd Blanche / Emil Bove
Todd Blanche
Emil Bove
Blanche Law PLLC

/s/ John Lauro / Gregory Singer
John Lauro
Gregory Singer
Lauro & Singer

*Attorneys for President Donald J. Trump*

Cc:   Jack Smith, Special Counsel
      JP Cooney, Deputy Special Counsel
      (Via Email)

Exhibit A